**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | Case No. 19-56885 (JEH) |
| | Judge John E. Hoffman |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ROBERT D. MOORE, PRESIDENT,
CHIEF EXECUTIVE OFFICER, AND CHIEF FINANCIAL OFFICER,
OF MURRAY ENERGY HOLDINGS CO., IN SUPPORT OF CHAPTER 11 PETITIONS**

I, Robert D. Moore, hereby declare under penalty of perjury:

1.      I am the President, Chief Executive Officer, and Chief Financial Officer of Murray Energy Holdings Co. ("Holdings," and together with its affiliated debtors, debtors in possession, and non-debtor subsidiaries, collectively, "Murray").

2.      I was named Chief Executive Officer of Holdings as of October 28, 2019, and have served as Chief Financial Officer of Holdings since 2007.  Prior to that, I held a number of financial and other senior management positions within Murray and have more than 20 years of experience in management, operations, finance, accounting, and acquisitions in the United States coal industry.  I received my Bachelor of Science degree from The Ohio State University in Accounting and Finance, Certified Public Accountant certification from the State of Ohio, and a Master of Business Administration from The Ohio State University.

---

[1]      Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

3.      As Chief Executive Officer and Chief Financial Officer, I am responsible for overseeing Murray's operations and financial activities including, but not limited to, monitoring cash flow, business relationships, workforce issues, and financial planning.  As a result of my tenure with Murray, my review of public and non-public documents, and my discussions with other members of Murray's management team, I am generally familiar with Murray's businesses, financial affairs, policies and procedures, day-to-day operations, and books and records.

4.      On the date hereof (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Ohio (the "Court").  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions filed contemporaneously herewith.

5.       Except as otherwise noted, I have personal knowledge of the matters set forth herein, or have gained knowledge of such matters from Murray's employees or retained advisers that report to me in the ordinary course of my responsibilities.  I am over the age of 18, and authorized to submit this declaration on behalf of the Debtors.  References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such in reliance on the explanations provided by, and the advice of, counsel.  If called upon to testify, I could and would testify competently as to the facts set forth herein.

**Introduction**

6.      Murray is the largest privately-owned coal company in the United States, producing about 53 million tons of high quality bituminous coal in 2018, and employing nearly 5,500 people,

including approximately 2,400 active union members.[2]  Headquartered in St. Clairsville, Ohio, Murray owns and operates 13 active mines across the Northern, Central, and Southern Appalachia Basins (located in Ohio, West Virginia, eastern Kentucky, and Alabama), the Illinois Basin (located in Illinois and western Kentucky), the Uintah Basin (located in Utah), and Colombia, South America.  Murray also manages and operates five additional mines in the Illinois Basin through its partnership with non-debtor affiliate, Foresight Energy LP.  Excluding Foresight-related operations, Murray's operations generated approximately $2.5 billion in revenue related to coal sales and $542.3 million of EBITDA in 2018.

7.      The thermal coal markets that Murray traditionally serves have been meaningfully challenged over the past three to four years, and deteriorated significantly in the last several months.  This sector-wide decline has been driven largely by (a) the closure of approximately 93,000 megawatts of coal-fired electric generating capacity in the United States, (b) a record production of inexpensive natural gas, and (c) the growth of wind and solar energy, with gas and renewables, displacing coal used by U.S. power plants.  During its peak in 2007, coal was the power source for half of electricity generation in the United States and by early 2019, coal-fired electricity generation fell to approximately 27 percent.[3]  These challenges have intensified recently as (i) certain electric utility companies have filed for bankruptcy protection and others have sought, and received, subsidies for their nuclear generation capacity to avoid bankruptcy, at the expense of coal-fired facilities, (ii) domestic natural gas prices hit 20-year lows this past summer, and (iii) overall demand for electricity in the United States has declined two percent in 2019, further

---

[2]    These amounts exclude individuals employed through the Debtors' partnership with non-debtor affiliate Foresight Energy LP, but include employees at the operating companies of non-debtor subsidiary, Murray Metallurgical Coal Holdings, LLC.

[3]    "Generation" refers to the amount of electricity that is produced over a period of time.  This is usually measured in kilowatt-hours, megawatt-hours, or terawatt-hours (1 terawatt equals 1 million megawatts).

depleting demand for coal at domestic utilities.  At the same time, demand for U.S. coal from international utilities has been subject to its own perfect storm of negative forces,[4] and the European benchmark price for thermal coal has halved in the last year.  The impact of depressed demand and pricing in both domestic and international markets has hit Murray hard in recent months: customers with pre-existing commitments have simply refused to accept delivery, and with export markets closed there is simply no alternative market to place product, resulting in the temporary idling of mining operations.  At the same time, Murray has had to rebate cash to certain customers under price sharing arrangements as a result of low pricing in the PJM Interconnection,[5] negatively impacting Murray's realization per ton.

8.      Moreover, while Murray has historically been able to navigate the challenges of the coal marketplace, these rapidly deteriorating industry conditions have caused more than 40 coal companies to file for bankruptcy since 2008, with more than half a dozen major operators filing in the last year alone.  These bankruptcies have affected thousands of workers across the United States, and they have left their mark on Murray.  Competitors have used bankruptcy to reduce debt and lower their cost structures by eliminating cash interest obligations and pension and benefit obligations, leaving them better positioned to compete for volume and pricing in the current market, while Murray continued to satisfy its significant financial obligations required by the

---

[4]    Overall weakness in the global demand for coal has been driven by a number of factors, including: low liquefied natural gas prices; a recent trade war driving Russia to increase exports; mild weather across the Northern Hemisphere led to a reduction in demand for heating in both Europe and Asia; higher freight costs; and a prolonged monsoon season in India which kept demand depressed while conditions cleared for a record eight months.

[5]    The PJM Interconnection is a regional transmission organization that coordinates the movement of wholesale electricity in 13 states and the District of Columbia.  The PJM Interconnection pricing scheme is designed to favor natural gas as it has historically folded state-level subsidies for renewable resources into its auctions and market participation decisions.  Over the last several years, 29 gigawatts of retiring coal plants in the PJM Interconnection have been replaced with 23 gigawatts of natural gas.  Further, the Henry Hub is a natural gas priceline located in Louisiana that serves as the official delivery location for futures contracts on the New York Mercantile Exchange. Henry Hub natural gas prices this past summer were the lowest in 20 years.

weight of its own capital structure and legacy liability expenses.  As a result, Murray generated

little cash after satisfying debt service obligations, paying employee health and pension benefits,

and maintaining operations.

9.      As of the Petition Date, Murray has outstanding funded debt obligations of

approximately $2.7 billion, with associated annual interest and amortization expenses of

approximately $298 million.  In addition, Murray has more than $8 billion in actual or potential

legacy liability, and in 2018, Murray's actual cash outlay for certain statutory or collective

bargaining agreement related employee and retiree obligations was  approximately $160 million.[6]

Murray's employees are its lifeblood and Murray has a longstanding history and valued partnership

with their unions, including the United Mine Workers of America ("UMWA").  Nonetheless, the

cost of servicing its funded debt, together with the myriad of obligations Murray has to current and

former employees, including to a pension fund that has been abandoned by other employers, have

substantially reduced liquidity.

10.      Despite the continued industry decline and liquidity challenges, Murray is

well-positioned to continue to serve the domestic and export coal markets.  Murray has a

diversified portfolio of valuable operating assets, a "best in class" management team and

workforce, and is the lowest-cost producer of high-quality coal in the United States.  Indeed,

Murray's success in outrunning the industry downturn to date reflects its proactive efforts to

combat market pressures across a number of segments, including as follows:

- In the face of declining demand and pricing, Murray has reduced its overall cost per ton by 18 percent year-to-date 2019 versus 2015;

---

[6]     Part III of this declaration further describes Murray's statutory and contractual obligations under various retiree and employee benefit plans, including workers compensation and the Black Lung Act  (as defined below), as well as reclamation and environmental obligations.

- Murray has enhanced operational efficiencies by building a low-cost, consolidated vendor, supplier, consultant, and shipper base;

- Throughout the downturn, Murray has capitalized on opportunities to make value-accretive asset acquisitions, such as Consolidation Coal Company, Foresight Energy LP, Mission Coal Company, LLC, Armstrong Energy, Inc., and certain Colombian assets;

- From 2015 to 2017, Murray generated in excess of $60 million from non-core asset sales to bolster liquidity and support Murray's operations and debt service obligations;

- Murray has actively engaged with its long-term lenders in a series of liability management transactions to extend maturities and enhance operating flexibility;

- Murray Founder and Chairman Robert E. Murray has long been at the forefront of legislative efforts focused on stabilizing the industry; and

- Murray has remained the single largest contributor to retiree benefits for coal miners and to the largely-orphaned 1974 multi-employer pension plan (the "1974 Pension Plan").[7]

11.     Although Murray has been able to outlast many of its competitors, mounting debt and legacy liability expenses have become too heavy of a burden to sustain under current industry conditions.  There simply are no creative management solutions, operational improvements, or strategic or financial options remaining, even for Murray; the company has exhausted all options and liquidity.  Faced with the servicing of its highly levered balance sheet in a deteriorating market, Murray has had to manage cash by stretching payables to trade partners who provide goods and services critical to maintaining the safety standards and productivity that have become synonymous with the Murray name and requires immediate access to financing to ensure continued operations and to preserve value.  Accordingly, Murray has been working closely with an ad hoc

---

[7]     In 1984, there were over 2,800 employers contributing to the 1974 Pension Plan.  The number of contributing employers declined to 82 by 2004 and further declined to 37 in 2014.  As of January 2019, there were only 11 employers contributing to the 1974 Pension Plan, with more than 80 percent of contributions derived from one controlled group of signatory companies.

lender group (the "<u>Ad Hoc Group</u>") of its superpriority term lenders to develop a fully-financed

restructuring path, which has culminated in the parties' entry into the restructuring support

agreement attached hereto as **<u>Exhibit B</u>** (together with the related term sheets, the "<u>RSA</u>").  Murray

has commenced these chapter 11 cases to access much-needed liquidity provided by the proposed

$350 million debtor-in-possession financing package included with the RSA, to stabilize

operations, and to ultimately de-lever its balance sheet to ensure going concern value for the benefit

of its employees, trade partners, and all stakeholders.

12.     To better familiarize the Court with Murray, its business and the circumstances

leading up to these chapter 11 cases, I have organized this declaration as follows:

- **Part I** provides a general overview of Murray's corporate history, business operations, and corporate structure;

- **Part II** describes Murray's prepetition capital structure and indebtedness;

- **Part III** describes additional obligations owed by Murray; and

- **Part IV** describes the circumstances leading to the commencement of these chapter 11 cases.

**<u>Background</u>**

I.     **Murray's History, Operations, and Corporate Structure.**

13.     Murray is a privately-owned coal producer founded in 1988 by Robert E. Murray

through the purchase of The Ohio Valley Coal Company's Powhatan No. 6 Mine, a single

continuous miner coal mining operation that had an annual output of approximately 1.2 million

tons per year.  Based on Mr. Murray's belief that the energy industry would come to appreciate

the potential value of high heat bituminous coal, Murray continued to purchase numerous high

heat bituminous coal reserves strategically located in optimal mining regions near electric power

plants and waterways throughout the United States over the next 30 years.

14.     Murray primarily produces thermal coal and has recently started producing metallurgical coal through the acquisition of certain mining assets formerly owned by Mission Coal Company, LLC's bankruptcy estate.  Thermal coal is principally used by the electric utility industry to produce steam to drive turbines to generate electricity.  Metallurgical coal is a globally scarce resource that is critical for the production of coke, an integral component for steel production.  Coke is mixed with iron ore and other products in a blast furnace to produce steel. Steelmakers in the United States and abroad blend a variety of metallurgical coal qualities to achieve the required, specific coke chemistry in blast furnaces.  Murray's predominant longwall operations, which are capital-intensive but highly-productive, involve an underground method using hydraulic shields to support the roof of a mine, while a shearing machine operates along the coal face to remove coal with each pass.  Murray's diverse portfolio of operations involve, among other things, mining and reserve companies, river and docking facilities, rebuild and fabrication shops, and office complexes.

### A.      Murray's Mining & Other Operations.

15.     As described in further detail below, Murray now owns and/or operates 18 active coal mines (including five non-debtor Foresight operations) under its Restricted, Specified Restricted, and Unrestricted Subsidiaries (each as defined below).  In 2018, Murray's thermal complexes produced approximately 53 million tons of thermal coal, generating $2.5 billion in revenue, and resulting in approximately $542 million of EBITDA (excluding non-debtor Foresight operations).  Since acquisition, Murray's metallurgical mining complexes have produced more than 420,000 tons of coal, generating nearly $30.7 million in revenue, and resulting in $8.6 million of EBITDA.

16.     A high level map showing Murray's mining operations is below.



17.    In addition to the coal production, processing, and sales businesses, Murray's operations include mining equipment manufacture and repair, transportation operations, and oil and gas operations.  Murray's mining equipment business consists largely of repairing equipment used in underground and surface mining by its affiliates.  Additionally, Murray holds interests in oil and gas operations in eastern Ohio and Kentucky, but the revenues and costs from these businesses are not material to Murray's financial condition.

18.     Murray's diverse transportation operations allow it to maintain a broad customer base, ensure lower costs through direct shipments to customers, and provide services to third parties outside of the coal industry.  As of December 31, 2018, Murray owns and operates 26 harbor boats and towboats, 478 barges, 15 locomotives, 748 railcars, and 25 coal hauling tractor trailers (exclusive of non-debtor Foresight operations).

19.    While Murray sells the majority of coal produced directly to customers within the United States, Murray occasionally enters into contracts with brokers who then sell the coal to overseas markets.  In 2018, over half of Murray's total coal revenue came from its three largest

customers, Javelin (as defined herein), FirstEnergy Corporation, and American Electric Power Company. Murray's ongoing strategy has been to selectively enter into or renew long-term supply agreements, which are generally appealing to customers because of their reliability and predictable pricing. Although the terms vary significantly, Murray's thermal coal sale agreements generally range in length from one to five years. At the end of 2018, Murray had sale and price commitments for approximately 94 percent of the coal its Restricted Subsidiaries (as defined below) anticipated producing in 2019 and 56 percent of the coal its Restricted Subsidiaries anticipate producing in 2020.

### B.  Murray's Corporate Structure.

20.  Murray's corporate structure includes both Debtor and non-debtor entities, which are generally operated on a consolidated basis. Certain wholly or partially-owned subsidiaries, however, are operated as standalone entities, though they are managed by Murray. These non-consolidated entities include non-debtor Foresight Energy LP and its subsidiaries. The following chart illustrates Murray's organizational structure as of October 1, 2019, in summary form, and the complete structure as of this time is set forth in **<u>Exhibit A</u>**.



### i.     Restricted Subsidiaries.

21.     The vast majority of value sits at Murray's restricted subsidiaries, which are guarantors under all of Murray's funded debt obligations (the "Restricted Subsidiaries").  The Restricted Subsidiaries operate seven mines with approximately 4,000 employees, including nearly 2,000 UMWA miners and 50 members of the Seafarers Union.  Murray's Restricted Subsidiaries include assets purchased from CONSOL Energy Inc. and Murray Global Commodities, Inc., which holds Murray's joint venture interest in Javelin Global Commodities Holdings LLP.

22.     ***CONSOL Transaction.***  In December 2013, Murray purchased Consolidation Coal Company and certain of its subsidiary companies from CONSOL Energy Inc.  This transaction included the purchase of (a) five active longwall mines that operate six longwall systems in West Virginia, (b) Murray Keystone Processing, Inc.'s preparation plant, which processed trucked coal from local mines, (c) the river operations of Murray American Transportation, Inc. and Murray American River Towing, Inc., which transport coal and other commodities from Murray's mines

and others' facilities to customers along the Monongahela, Ohio, Kanawha, and Allegheny rivers, and (d) two nonproducing mines, Mine 84 in Pennsylvania and the Rend Lake Mine in Illinois.

23. ***Javelin Global Commodities Holdings.*** In June 2015, Murray Global Commodities, Inc. entered into a joint partnership agreement for a 34 percent interest in non-debtor Javelin Global Commodities Holdings LLP (together with its direct and indirect subsidiaries, "Javelin"). Javelin is a global commodities trading, logistics, operations, and investment company, focused on thermal and metallurgical coal, iron ore, steel and steel scrap, oil and gas, and related markets. Javelin maintains financial and physical trading, physical scheduling, and risk management systems on a multi-commodity platform, and formed a coal marketing and trading team enabling Murray to leverage Javelin's global network and key relationships in the freight and transportation sector.

24. Through this partnership, Javelin has (a) entered into multiple coal supply agreements with U.S. and international utilities to provide combinations of Powder River Basin, Central Appalachian Basin, Northern Appalachian Basin ("NAPP"), Colombian, Russian, MEC, and foreign coal, (b) signed multi-year agreements with four major railroads, and shipped coal with all five major railroads, and (c) formed its fuel management services division, entering into agreements to manage five power plants focused on coal procurement and trading activities. Javelin has performed well since its inception, and maintains a robust balance sheet.

25. **Restricted Subsidiaries Summary.** In 2018, Murray's Restricted Subsidiaries' operations generated approximately $2.011 billion in revenue from 45.6 million tons of coal sales and $480 million of EBITDA.[8] The following charts depict the revenue and EBITDA contributions by each respective mine under the Restricted Subsidiaries.

---

[8] Although these amounts are not included in the below mine chart, $480 million includes approximately $7.2 million in EBITDA generated by Murray American River Towing, Inc. and negative $122.7 million in

| Company | Mine | Region | State | Employee Count | Union | EBITDA (TTM 6/30/19) ($ millions) | Production (TTM 6/30/19) (million tons) | Reserves (As of 6/30/19) (million tons) | Est. Mine Life (years) |
|---|---|---|---|---|---|---|---|---|---|
| **Restricted Entities** | | | | | | | | | |
| American Energy Corporation | Century | Northern App. | Ohio | 468 | No | $35.3 | 4.4 | 34.3 | 8 |
| The Harrison County Coal Company | Harrison County | Northern App. | West Va. | 487 | Yes | $209.3 | 7.6 | 302.3 | 45 |
| KenAmerican Resources | Paradise | Illinois Basin | Kentucky | 8 | No | ($20.5) | 1.0 | 55.5 | 9 |
| The Marion County Coal Company | Marion County | Northern App. | West Va. | 535 | Yes | $83.9 | 6.4 | 69.1 | 9 |
| The Marshall County Coal Company | Marshall County | Northern App. | West Va. | 869 | Yes | $132.1 | 11.2 | 190.0 | 17 |
| The Monongalia County Coal Company | Monongalia County | Northern App. | West Va. | 433 | Yes | $77.8 | 5.0 | 70.2 | 14 |
| The Ohio County Coal Company | Ohio County | Northern App. | West Va. | 505 | Yes | $92.9 | 6.9 | 64.2 | 10 |
| UtahAmerican Energy, Inc. | Lila Canyon | Uintah Basin | Utah | 266 | No | $15.2 | 2.9 | 37.9 | 11 |



**Revenue Contribution by Mine (TTM 6/30/19)**

Marshall County 22%, Harrison County 19%, Ohio County 15%, Marion County 14%, Century 11%, Monongalia County 11%, Lila Canyon 5%, Paradise 2%

**EBITDA Contribution by Mine (TTM 6/30/19)[9]**

Harrison County 32%, Marshall County 20%, Ohio County 14%, Marion County 13%, Monongalia County 12%, Century 5%, Lila Canyon 2%

### ii.    Specified Restricted Subsidiaries.

26.    Murray's specified restricted subsidiaries include Murray South America, Inc. and

Murray Kentucky Energy, Inc. and its subsidiaries (collectively, the "Specified Restricted

---

EBITDA generated by operations relating to Transloading facilities, rebuild and repair shops, costs related to The American Coal Sales Company, reclamation, workers' compensation, pension, benefits, acquisition costs, etc.

[9]    Excludes Paradise Mine due to negative contribution.

Subsidiaries"). The Specified Restricted Subsidiaries are guarantors and have pledged equity under only certain tranches of Murray's funded debt obligations (unlike the Restricted Subsidiaries, who are guarantors on all of Murray's funded debt obligations). Murray South America, Inc. is a guarantor on the Superpriority Term Loan and 1.5L Notes. Murray Kentucky Energy, Inc. and its subsidiaries are guarantors on the Superpriority Term Loan, Prepetition ABL Facility, and 1.5L Notes (each as defined below). The Specified Restricted Subsidiaries operate four mines with about 700 employees.

27. **Murray South America, Inc.** Strengthening its global presence, in August 2015, Murray acquired National Resources Investment S.L., NRI Cayman Ltd., and all of their subsidiaries (collectively, "CNR"), whose mining operations are located in Colombia, South America. Pursuant to the CNR transaction, Murray South America, Inc. obtained the La Francia and El Hatillo active surface mines, 17 percent ownership in the Feneco rail line in Colombia (with an allocated capacity of seven million tons per annum), 11 locomotives and 528 wagons (with a capacity of 10–11 million tons per annum), and 100 percent ownership of the Rio Cardoba Transloading Facility.

28. **Murray Kentucky Energy, Inc.** On February 23, 2018, Debtor Murray Kentucky Energy, Inc. completed a series of transactions to acquire Western Kentucky Coal Resources, LLC, which holds certain assets formerly owned by Armstrong Energy, Inc. These assets include the active Genesis and Pride underground mines, the Lewis Creek Surface Mine, two idled or closed surface mines, three coal processing plants, certain river dock coal handling and rail loadout facilities, and certain coal reserves.

29. **Specified Restricted Subsidiaries Summary.** In 2018, Murray's Specified Restricted Subsidiaries' operations generated approximately $500 million in revenue related to

8.3 million tons of coal sales and $63 million of EBITDA.[10]  The following charts depict the revenue and EBITDA contributions by each respective mine under the Specified Restricted Subsidiaries.

| Company | Mine | Region | State | Employee Count | Union | EBITDA (TTM 6/30/19) ($ millions) | Production (TTM 6/30/19) (million tons) | Reserves (As of 6/30/19) (million tons) | Est. Mine Life (years) |
|---|---|---|---|---|---|---|---|---|---|
| **Specified Restricted Entities** | | | | | | | | | |
| Murray South America, Inc. | La Francia / El Hatillo | Colombia | - | 191 | No / Yes | $20.6 | 4.6 | 74.6 / 49.5 | 21 / 17 |
| The Muhlenberg County Coal Company | Pride | Illinois Basin | Kentucky | 255 | No | $3.5 | 1.6 | 52.9 | 33 |
| The Western Kentucky Coal Company, LLC | Genesis | Illinois Basin | Kentucky | 268 | No | $23.2 | 2.7 | 26.5 | 11 |

*Values in millions.



### iii.    Unrestricted Subsidiaries.

30.    Murray's unrestricted subsidiaries mainly include the Foresight and Murray Metallurgical operations (the "Unrestricted Subsidiaries").  The Unrestricted Subsidiaries' assets are not pledged to Murray's creditors.  Murray's relationship with the Unrestricted Subsidiaries is as a majority equity owner and manager, but there is separate governance at these entities.  The

---

[10]    This EBITDA figure includes other costs related to Murray Kentucky Energy, Inc. that are not included on the below mine chart.

Unrestricted Subsidiaries operate six mines with 1,605 employees, including 385 UMWA unionized miners.

31.    ***Foresight Energy.***    In April 2015, Murray expanded its portfolio through an agreement with Foresight Reserves, L.P. and its related entities to acquire an economic interest in Foresight Energy LP ("FELP") and FELP's general partner, Foresight Energy GP LLC ("FEGP") for $1.4 billion.[11]  I am also the Chairman, President, and Chief Executive Officer of FEGP, which Murray obtained a 34 percent voting interest in in 2015, with the option to acquire an additional 46 percent.  FELP is a publicly-traded company listed on the New York Stock Exchange that mines and markets coal from reserves of primarily high Btu thermal coal operations at four mining complexes located exclusively in the Illinois Basin, including the Williamson, the Sugar Camp Complex (comprising of two active mines), Hillsboro, and Macoupin mines.  On March 28, 2017, the Foresight entities refinanced certain indebtedness, resulting in MEC acquiring an additional 46 percent voting interest in FEGP (bringing MEC's total voting interest to 80 percent) and a combined total of 9,628,108 common units (totaling approximately 12 percent) of FELP, for an aggregate purchase price of $60.6 million.  FEGP, FELP, and FELP's subsidiaries are not debtors in these chapter 11 cases.

32.    Murray entities have entered into several ancillary agreements with Foresight Reserves, L.P. and FELP's subsidiaries, including the Third Amended Management Services Agreement, effective as of March 27, 2017 (the "MSA").  Pursuant to the MSA, the general operations of FEGP and its subsidiaries' facilities are managed and administered by Debtor Murray American Coal, Inc.[12]  The following chart illustrates Foresight's organizational structure.

---

[11]    Foresight Reserves L.P. is owned and controlled by a trust in favor of the heirs of Chris Cline.

[12]    A further discussion of the Foresight relationships can be found in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System,*



33. ***Murray Metallurgical Operations.***  In April 2019, Murray subsidiary Murray
Metallurgical Coal Properties, LLC and Javelin Investment Holdings LLC formed a new
unrestricted joint venture subsidiary (Murray Metallurgical Coal Holdings, LLC, or "Murray
Metallurgical") to acquire certain metallurgical coal mining complexes from Mission Coal
Company, LLC's bankruptcy estate.  Following the Mission transaction, Murray Metallurgical
owns five subsidiary entities, which in turn own the Oak Grove and Maple Eagle mines in Alabama
and West Virginia, respectively.  The Oak Grove and Maple Eagle mines consist of premier
metallurgical coal-producing operations and reserves that provide Murray with strategic and
valuable entry into the metallurgical coal market.  Murray Metallurgical and its subsidiaries are
not debtors in these chapter 11 cases.

34. In 2018, when the Murray Metallurgical operations were still owned and controlled
by Mission Coal Company, LLC, such operations generated approximately $261 million in
revenue related to 2.35 million tons of coal sales and $10 million of EBITDA.  The following chart
illustrates the simplified equity ownership structure of the Murray Metallurgical entities.

---

*(B) Maintain Existing Business Forms, and (C) Perform Intercompany Transactions and Pay Prepetition
Obligations Related Thereto, and (II) Granting Related Relief.*



## II.    Summary of Murray's Prepetition Debt.

35.    As a privately-held company, Holdings is not listed on any public exchange. Holdings' authorized, issued, and outstanding capital stock consists of 100 shares of voting Class A common shares and 9,900 shares of non-voting Class B common shares. As of the Petition Date, Robert E. Murray holds all of the issued and outstanding voting Class A common shares and 1,900 shares (or 19.2 percent) of the outstanding Class B common shares. Mr. Murray's sons, and a trust set up for the benefit of Mr. Murray's wife, hold the remaining 80.8 percent of Class B shares. Holders of Class B shares hold solely economic rights.

36.    As set forth on the structure chart attached hereto as **<u>Exhibit A</u>**, Holdings currently owns, directly or indirectly, each of Murray's 120 subsidiaries. Of the wholly-owned entities, 95 entities are guarantors on some or all of Murray's prepetition secured debt. As of the Petition Date, Murray has approximately $2.7 billion in total outstanding secured debt obligations (exclusive of non-debtor Foresight). Certain of Murray's subsidiaries are also obligated on $45 million in total outstanding unsecured notes. These obligations are illustrated below.

| Secured Debt | Maturity[13] | Outstanding Principal Amount (as of October 16, 2019) |
|---|---|---|
| **Secured Debt** | | |
| Prepetition ABL Facility | February 12, 2021 | $60.7 million (ABL) $90 million (FILO) |
| Superpriority Term Loan Facility | October 17, 2022 | $1,727 million |
| Term Loan Facility | April 17, 2020 | $51 million |
| 1.5L Notes | April 15, 2024 | $491 million |
| 2L Notes due 2020 | December 5, 2020 | $2 million |
| 2L Notes due 2021 | April 15, 2021 | $295 million |
| **Total Secured Debt** | | **$2.7 billion** |
| **Unsecured Debt** | | |
| Unsecured Murray South America Note | February 14, 2022 | $20 million |
| Unsecured Murray Met. Note | April 30, 2024 | $25 million |
| **Total Unsecured Debt** | | **$45 million** |

## A.    Prepetition ABL Facility.

37.    On December 5, 2013, Murray entered into the Amended and Restated Revolving Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement"), which governs an asset-based revolving ("ABL") credit facility among Murray Energy Corporation ("MEC"), as borrower, Holdings and certain subsidiaries, as guarantors, Goldman Sachs Bank USA, as agent, and the lenders from time to time party thereto (the "Prepetition ABL Facility").  The Prepetition ABL Facility provides for up to $125 million of an asset-based revolving line of credit, as well as a $90 million first in, last out ("FILO") facility.  The Prepetition ABL Facility matures on February 12, 2021, unless maturity springs forward as a result of a violation of the springing

---

[13]    Subject to certain springing maturities, as provided for in the applicable credit agreements.

maturity covenant contained in the ABL Credit Agreement, and is subject to a weekly borrowing base calculation and monthly interest at LIBOR plus 125.

38.     Obligations arising under the ABL Credit Agreement are secured by (a) senior, first priority security interests in, and liens upon, substantially all of the Debtors' accounts receivable, inventory, cash, related letter of credit rights, commercial tort claims, and related contract rights and books and records (the "ABL Collateral"), and (b) a junior lien on fixed assets, including real estate, equipment, term debt collateral, related letter of credit rights, commercial tort claims, and related contract rights and books and records (the "Term Loan Collateral").  Guarantors to the Prepetition ABL Facility include Murray Kentucky Energy, Inc. and its subsidiaries, but the Prepetition ABL Facility does not have guarantees from, or liens against, Murray South America, Inc.  Amounts outstanding under the prepetition FILO facility are only repaid after the amounts are repaid for the ABL facility.  As of the Petition Date, there is approximately $150.7 million in aggregate principal amount outstanding under the Prepetition ABL Facility.

**B.      Superpriority Term Loan Facility.**

39.     On June 29, 2018, Murray entered into the Superpriority Credit and Guaranty Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Superpriority Term Loan Agreement"), which governs a $1.57 billion B-2 and a $158 million B-3 superpriority senior secured term loan facility among MEC, as borrower, Holdings and certain subsidiaries, as guarantors, GLAS Trust Company, LLC, as agent, and the various lenders from time to time party thereto (the "Superpriority Term Loan Facility" and the loans issued thereunder, the "Superpriority Term Loans").[14]  As discussed further below, the Superpriority Term Loan Facility is the result of a transaction support agreement MEC entered

---

[14]    "B-2" and "B-3" merely refer to separate tranches that contain certain different terms.

into on June 29, 2018 (the "2018 TSA").  The Superpriority Term Loan Facility matures on

October 17, 2022, unless maturity springs forward as a result of a violation of the springing

maturity covenant contained in the Superpriority Term Loan Agreement, and obligations arising

thereunder are secured by a first lien on Term Loan Collateral, and a second lien on ABL

Collateral.  Guarantors to the Superpriority Term Loan Facility include Murray South America,

Inc. and Murray Kentucky Energy, Inc. and its subsidiaries.  As of the Petition Date, there is

approximately $1.73 billion in principal amount outstanding under the Superpriority Term Loan

Facility.

      **C.**     **Term Loan Facility.**

     40.     On April 16, 2015, Murray entered into the Term Loan Credit and Guaranty

Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified

from time to time, the "Term Loan Credit and Guaranty Agreement"), which governs a $38 million

B-2 and a $13 million B-3 secured term loan facility among MEC, as borrower, Holdings and

certain subsidiaries, as guarantors, Black Diamond Commercial Finance, L.L.C., as agent, and the

additional lenders from time to time party thereto (the "Term Loan Facility").  The Term Loan

Facility matures on April 17, 2020, and obligations arising thereunder are secured by a second lien

on Term Loan Collateral, and a third lien on ABL Collateral.  The Term Loan Facility does not

have guarantees from, or liens against, Murray South America, Inc. or Murray Kentucky Energy,

Inc. and its subsidiaries.  Holders of the Term Loan Facility were given the option to exchange

their notes for Superpriority Term Loans pursuant to the 2018 TSA, and in connection with such

option, holders of approximately 61 percent in aggregate principal amount of the Term Loans

elected to exchange for the Superpriority Term Loans.  As of the Petition Date, there is

approximately $51 million aggregate principal outstanding under the Term Loan Facility.

**D.    1.5L Notes.**

41.    On June 29, 2018, Murray entered into the Senior Secured Notes Indenture (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "1.5L Notes Indenture"), which governs 12 percent senior secured notes among MEC, as issuer, Holdings and certain subsidiaries, as guarantors, and U.S. Bank, N.A., as trustee (the "1.5L Notes").  As described further below, the 1.5L Notes are the result of the 2018 TSA.  The 1.5L Notes mature on April 15, 2024, and obligations arising thereunder are secured by a third lien on Term Loan Collateral, and a fourth lien on ABL Collateral.  Guarantors to the 1.5L Notes include Murray South America, Inc. and Murray Kentucky Energy, Inc. and its subsidiaries.  As of the Petition Date, there is approximately $491 million in principal amount outstanding under the 1.5L Notes.

**E.    2L Notes due 2020.**

42.    On May 8, 2014, Murray entered into the Senior Secured Notes Indenture (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "2020 2L Notes Indenture"), which governs 9.5 percent senior secured notes among MEC, as issuer, Holdings and certain subsidiaries, as guarantors, The Bank of New York Mellon Trust Company, N.A., as indenture trustee, and U.S. Bank, N.A., as collateral trustee (the "2L Notes due 2020").  The 2L Notes due 2020 mature on December 5, 2020, and obligations arising thereunder are secured by a fourth lien on Term Loan Collateral, and a fifth lien on ABL Collateral.  The 2L Notes due 2020 do not have guarantees from, or liens against, Murray South America, Inc. or Murray Kentucky Energy, Inc. and its subsidiaries.  As of the Petition Date, there was approximately $2 million in principal amount outstanding under the 2L Notes due 2020.

**F.**     **2L Notes due 2021.**

43.     On April 16, 2015, Murray entered into the Senior Secured Notes Indenture (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "2021 2L Notes Indenture"), which governs 11.25 percent senior secured notes among MEC, as issuer, Holdings and certain subsidiaries, as guarantors, The Bank of New York Mellon Trust Company, N.A., as indenture trustee, and U.S. Bank, N.A., as collateral trustee (the "2L Notes due 2021").  The 2L Notes due 2021 mature on October 15, 2021, and obligations arising thereunder are secured by a fifth lien on Term Loan Collateral, and a sixth lien on ABL Collateral.  The 2L Notes due 2021 do not have guarantees from, or liens against, Murray South America, Inc. or Murray Kentucky Energy, Inc. and its subsidiaries.  Holders of the 2L Notes due 2021 were given the option to exchange their notes for 1.5L Notes due 2024 pursuant to the 2018 TSA, and in connection with such option, holders of approximately 71 percent in aggregate principal amount of the 2L Notes due 2021 elected to exchange for the 1.5L Notes due 2024.  As of the Petition Date, there is approximately $295 million in principal amount outstanding under the 2L Notes due 2021.

**G.**     **Robert E. Murray Trust Notes.**

44.     ***Unsecured Murray South America Note.***  In February 2018, Debtor Murray South America, Inc. ("MSAI") entered into an unsecured promissory note with the Robert E. Murray 5/6/10 Trust for $16 million (the "Unsecured Murray South America Note").  The Unsecured Murray South America Note matures on February 14, 2022, and interest is due quarterly at a fixed rate of 11.25 percent.  During the second quarter of 2018, MSAI borrowed an additional $4 million from the Robert E. Murray 5/6/10 Trust.  As of the Petition Date, $20 million in principal amount was outstanding under the Unsecured Murray South America Note.

45. ***Unsecured Murray Met. Note.***   In April 2019, Murray's subsidiary, Murray Metallurgical Coal Properties, LLC entered into an unsecured promissory note for $25 million with the Robert E. Murray 5/6/10 Trust (the "Unsecured Murray Met. Note").  The Unsecured Murray Met. Note matures on April 30, 2024, and the unpaid principal balance thereunder bears a payment-in-kind ("PIK") interest at a fixed annual rate of 8 percent.  As of the Petition Date, $25 million in principal amount was outstanding under the Unsecured Murray Met. Note.

**H.   Non-Debtor Affiliate Debt.**

46. ***Metallurgical Take-Back Facility.***   On April 29, 2019, non-debtor Murray Metallurgical, a Murray joint-venture subsidiary, entered into a credit agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Take-Back Credit Agreement"), which governs a secured term credit facility among Murray Metallurgical, as borrower, certain of its subsidiaries, as guarantors, Wilmington Savings Fund Society, FSB, as agent, and the additional lenders from time to time party thereto.  The Metallurgical Take-Back Facility matures on April 29, 2023, and is secured by substantially all of Murray Metallurgical's assets.  The Metallurgical Take-Back Facility bears interest at 8 percent and is payable either in cash or by PIK semi-annually.  As of the Petition Date, there is approximately $158.3 million in principal amount outstanding under the Metallurgical Take-Back Facility.  As noted above, Murray Metallurgical and its subsidiaries are not debtors in these chapter 11 cases.

47. ***Foresight Debt.***   As discussed, Murray's wholly-owned non-debtor MEC holds an 80 percent interest in non-debtor FEGP, the general partner of FELP, as well as 12 percent of the common units and 100 percent of the subordinated units in FELP.  FELP and Foresight Energy LLC are borrowers under their own debt facilities, and nearly all of their subsidiaries are guarantors on approximately $1.29 billion in total secured debt obligations, consisting of approximately

(a) $113 million in principal amount outstanding under a Foresight revolving credit facility,

(b) $743.3 million in principal amount outstanding under a Foresight term loan facility,

(c) $425 million in principal amount outstanding under 11.5 percent second lien senior secured

notes, and (d) $3.1 million in principal amount outstanding under a longwall equipment financing

arrangement.

## III.    Additional Obligations Owed by the Debtors.

### A.    Legacy Liability Obligations.

48.     A number of Murray's subsidiaries and affiliates are parties to three active

collective bargaining agreements ("CBAs"), as well as a memorandum of understanding with the

UMWA.[15]   The following chart summarizes the CBAs, the number of employees covered

thereunder, and their respective expiration dates.

| CBA | Mine / Entity | Union | Employees | Expiration Date |
|---|---|---|---|---|
| National Bituminous Coal Wage Agreement of 2016 ("NBCWA" or the "2016 CBA") | The Marshall County Coal Company The Ohio County Coal Company The Harrison County Coal Company The Marion County Coal Company The Monongalia County Coal Company | UMWA | 1,946 | December 2021 |
| Seafarers International Union of North America Atlantic, Gulf, Lakes and Inland Waters District / NMU AFL-CIO (the "Seafarers CBA") | Murray American Transportation, Inc. | The Seafarers International Union | 47 | October 2019 |
| Murray Oak Grove Coal, LLC Wage Agreement ("Oak Grove CBA") | Murray Oak Grove Coal, LLC | UMWA | 385 | April 2024 |

49.     As discussed above, Murray has over $8 billion in actual or potential legacy liability

under various pension and benefit plans pursuant to statue and Murray's CBAs.   The following

---

[15]    The Ohio Valley Coal Company and The Ohio Valley Transloading Company also entered into a memorandum of understanding with the UMWA dated July 2, 2019.

illustration summarizes these liabilities and expenses at the Restricted and Specified Restricted Subsidiaries as of the Petition Date.



Source: Company presentations, Company filings, 1974 UMWA Pension Plan Form 550, UMWA 1974 Pension Plan Actuarial Valuation Report July 1, 2018
1.   Represents liabilities and expenses across all subsidiaries.  Updated to reflect liability estimate after Q1'19
2.   Includes $23.0mm related to OPEB ($22.5mm LC, $0.5mm cash), $62.5mm related to Workers' Compensation & Black Lung ($54.0mm LCs, $8.5mm cash), and $35.3mm related to Reclamation (all cash).

### B.    Retirement Plans.

50.    Murray sponsors and maintains single-employer defined contribution retirement plans in which salaried, non-union, and union employees participate.  Murray also has obligations to contribute to a multi-employer defined benefit plan and two multi-employer defined contribution retirement plans, pursuant to the CBAs.  None of Murray's obligations to contribute to the retirement plans are statutory, but all obligations stem from the CBAs or the single employer defined contribution retirement plan maintained by Murray.

51.    Murray contributes to three multi-employer retirement plans pursuant to its obligations under the CBAs:  (a) the 1974 Pension Plan, (b) the UMWA Cash Deferred Savings Plan of 1988 (the "UMWA Cash Deferred Savings Plan"), and (c) the Seafarers Money Purchase Pension Plan (the "Seafarers Money Purchase Plan").

52.     ***1974 Pension Plan.***   The 1974 Pension Plan is a defined benefit multi-employer pension plan with contribution requirements established by the 2016 CBA.  The 1974 Pension Plan provides pension benefits to approximately 87,000 retired miners and surviving spouses, who collect pensions averaging approximately $600 per month.  Murray is the last major employer funding a staggering 97 percent of total contributions to the 1974 Pension Plan, paying approximately $15 million in 2018 alone.

53.     Following the large wave of chapter 11 filings in 2015 and 2016, more than half a dozen large U.S. coal companies collapsed into bankruptcy over the last several years and withdrew from the 1974 Pension Plan.  When an employer withdraws, its vested beneficiaries remain in the 1974 Pension Plan and are referred to as "orphan" beneficiaries.  The remaining contributing employers become responsible for the benefits of these orphaned participants who were never their employees.  As a result, approximately 95 percent of beneficiaries who currently receive benefits from the 1974 Pension Plan last worked for employers that no longer contribute to the Plan.  As of January 2019, 11 employers contribute to the 1974 Pension Plan, compared to over 2,800 in 1984.  This has placed significant stress on the 1974 Pension Plan and the small number of contributing employers—Murray most of all.  If Murray withdraws from the 1974 Pension Plan, the withdrawal liability could be $6.4 billion or more, with annual estimated payments of approximately $32 to $35 million in perpetuity.

54.     ***UMWA Cash Deferred Savings Plan.***   Murray is required to make contributions to the UMWA Cash Deferred Savings Plan, a defined contribution multi-employer retirement plan, pursuant to the 2016 CBA.  Murray makes contributions equal to $1.50 per hour worked by active, covered employees, as well as a supplemental contribution of $1.50 per hour for miners with 20 or more years of credited service and a supplemental contribution of $1.50 per hour for certain miners

with less experience who do not participate in the 1974 Pension Plan.  In 2018, Murray made contributions to the UMWA Cash Deferred Savings Plan in the aggregate amount of $380,000.

55.  ***Seafarers Money Purchase Plan.***  Murray is required to make contributions to the Seafarers Money Purchase Plan, a multi-employer defined contribution retirement plan, pursuant to the Seafarers CBA.  Murray makes contributions equal to $2.00 per day worked by active, covered employees.  The Seafarers CBA will expire this month and may not be extended.

56.  ***MEC Plan.***  Pursuant to the Oak Grove CBA, Murray is required to contribute $3.50 per hour worked by active, covered employees to a single-employer Murray-sponsored defined contribution plan, the Murray Oak Grove Hourly Savings Plan (the "Murray Oak Grove Plan").  In addition to contributing to the Murray Oak Grove Plan on behalf of certain union employees, Murray contributes to the Murray Energy Savings and Security Plan (the "MEC Plan") on behalf of eligible non-union salaried and hourly employees.  For non-union employees, Murray makes a matching contribution equal to 100 percent of employee contributions up to three percent of eligible compensation.  In 2018, the total expense recognized by Murray related to the MEC Plan for both union and non-union employees was $6.4 million.

**C.  OPEB.**

57.  Murray is obligated to fund other post-employment benefits ("OPEB"), which stem from statute and the CBAs.  As of the Petition Date, Murray's total unfunded OPEB liability is approximately $1.9 billion.  Murray's statutory OPEB obligations are pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the United States Black Lung Benefits Revenue Act of 1977, and the Black Lung Benefits Reform Act of 1977 (together, the "Black Lung Act").

i.     **The Coal Act.**

58.     The Coal Act provides for the funding of health benefits for certain UMWA retirees

and their spouses or dependents.   Under the Coal Act, retirees can receive benefits under the

Combined Benefit Fund, the UMWA 1992 Benefit Plan, and the Murray American Energy, Inc.

Individual Employer Health Plan.

59.     *Combined Benefit Fund.*   The Combined Benefit Fund is a multi-employer welfare

fund managed by a board of trustees established by the Coal Act that provides retiree health

benefits for UMWA retirees (and their surviving spouses and dependents) who retired from the

coal industry on or before July 20, 1992, and did not have another source of retiree health benefits

because they were orphan retirees.   Coal operators with UMWA-represented employees are

obligated to pay premiums to the Combined Benefit Fund.   In 2018, no premiums were due from

Murray to the Combined Benefit Fund.

60.     *UMWA 1992 Benefit Plan.*   The UMWA 1992 Benefit Plan is a multi-employer

welfare fund managed by a board of trustees established by the Coal Act that provides retiree

health benefits to those UMWA retirees (and their surviving spouses and dependents) who retired

from the coal industry after July 20, 1992, but before September 30, 1994, and who did not have

another source of retiree health benefits.   In 2018, Murray posted security equal to $22.5 million

for the UMWA 1992 Benefit Plan, as required by the Coal Act.

61.     *Murray American Energy, Inc. Individual Employer Health Plan.*   The Murray

American Energy, Inc. Individual Employer Health Plan is an employer-sponsored individual

retiree health plan which provides retiree health, vision, and dental benefits to those retirees who

were, as of February 1, 1993, receiving health benefits directly from the employer through a single

employer plan pursuant to a 1978 or subsequent coal wage agreement.   As of July 31, 2019, the

Murray American Energy, Inc. Individual Employer Health Plan had 2,361 beneficiaries and Murray's contributions for 2018 equaled approximately $23 million.

### ii.     Non-Statutory.

62.     ***NBCWA Individual Employer Plan and UMWA 1993 Benefit Plan.***  Murray also has contractual OPEB obligations pursuant to the 2016 CBA.  The UMWA 1993 Benefit Plan is a defined benefit plan that provides health care benefits to orphan UMWA retirees who are not eligible to participate in the Combined Benefit Fund, the UMWA 1992 Benefit Fund, or whose last employer signed the 1993 or a later NBCWA and whose employer subsequently goes out of business.  Pursuant to the 2016 CBA, Murray must contribute $0.50 per hour worked through 2021.  In 2018, Murray contributed $2.1 million to the UMWA 1993 Benefit Plan and approximately $74 million to the NBCWA individual employer plan for medical benefits.

63.     ***VEBA.***  Non-debtor Murray Oak Grove Coal, LLC is also required to contribute a total of $3 million to a Voluntary Employee's Beneficiary Association ("VEBA"), that is administered by the UMWA pursuant to the Oak Grove CBA.  Murray Oak Grove Coal, LLC's contributions to the VEBA are made in a series of installments:  $300,000 in 2019, and $600,000 in 2021 through 2023.

### iii.     Workers Compensation and Black Lung Act Obligations.

64.     As required by the Black Lung Act, the Debtors provide benefits to employees for awards related to workers' compensation and Pneumoconiosis (more commonly known as black lung disease).  Pursuant to the Black Lung Act, coal miners who suffer from Pneumoconiosis and their dependents may file disability claims with the U.S. Department of Labor (the "DOL"), which then investigates the claims and assigns liability to make benefit award payments for those claims

to a "responsible operator" (likely the miner's most recent employer or a successor of the employer) (the "Black Lung Act Claims").

65.    Black Lung Act Claims include claims for the payment of (a) disability benefit awards to workers who suffer from black lung disease and (b) excise taxes to fund the Black Lung Disability Trust Fund (the "Black Lung Fund").  If a responsible coal operator fails to pay a benefit award, the Black Lung Fund will pay the award and the DOL can (i) assert liens (with the same priority as tax claims) against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant.  In addition, the Black Lung Act requires a coal operator either to secure its payment obligations by posting collateral, or to obtain insurance for its payment obligations.  A coal operator's directors and officers may also be held personally liable for unpaid benefits.

66.    Benefits under the Black Lung Act are in addition to typical workers' compensation benefits.  The Debtors are insured for federal and state workers' compensation and black lung benefits for employees by a third-party insurance provider.  In 2018, Murray paid approximately $4.7 million on account of Black Lung Claims and $30 million for the workers' compensation plan.  Murray's liability under the Black Lung Act, as well as for general workers' compensation, totals approximately $155 million.

**D.    Asset Retirement Obligations.**

67.    Like other coal companies, the Debtors have asset retirement obligations related to mine reclamation and closure costs.  Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface Mining Control and Reclamation Act, as well as certain analogous state laws.

68.     The Debtors' asset retirement obligations primarily consist of spending estimates for surface land reclamation and support facilities at both their surface and underground mines in accordance with applicable reclamation laws in the United States, as primarily defined by each mining permit.  Asset retirement obligations are determined for each mine using various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage, and the timing of these cash flows, discounted using a credit-adjusted, risk-free rate.  As of the Petition Date, the Debtors have outstanding surety bonds (excluding FELP and Murray Metallurgical) with a total face amount of $280 million, of which approximately $218.8 million secures reclamation and other asset retirement obligations.

### E.     Environmental Obligations.

69.     In addition to asset retirement obligations, the Debtors have ongoing obligations under federal environmental laws, including the Clean Water Act and the Clean Air Act, certain analogous state environmental laws, and the Debtors' environmental permits, with respect to discharges to water bodies, air emissions, management and disposal of waste materials, subsidence, and other environmental concerns.  From time to time, the Debtors receive notices of noncompliance from regulatory agencies alleging violations of applicable environmental laws and permit requirements, which in some cases result in the assessment of fines or penalties or construction of capital projects to address alleged violations.  In addition, certain mining operations have given rise to obligations to treat impacted water resources and/or to address alleged subsidence of nearby third party properties.

IV.    **Circumstances Leading Up to These Chapter 11 Cases.**

A.    **Adverse Market Conditions.**

70.    The thermal coal markets that Murray traditionally serves have been meaningfully challenged over the last decade, both in the domestic market and abroad.  The industry's difficult market conditions have been driven by changes in legislative priorities, commercialization of shale gas, wind, solar, and nuclear electric generation subsidies, and low-cost natural gas exports.

71.    In particular, the installed generation base of the U.S. power market has changed dramatically in response to both regulatory and economic forces.  Federal regulation of emissions increased the cost of coal-fired generation and incentivized the installation of gas and renewables generation, while technological developments in gas exploration and renewables generation has decreased the cost of alternative sources of electric power.  As a result, coal-fired installed capacity as a percentage of total installed capacity has fallen from 26 percent in 2013 to 20 percent in 2019, with coal-fired generation as a percentage of total generation falling from 35 percent in 2013 to 27 percent in early 2019.  Natural gas and renewables installed electricity generation capacity in the United States as a percentage of total installed capacity has increased from 59 percent in 2013 to 67 percent in 2019, and natural gas and renewables generation as a percentage of total generation increased from 42 percent in 2013 to 48 percent in early 2019.

72.    In the PJM Interconnection power market, into which most of Murray's customers dispatch their electricity, the changes have been even more dramatic.  Approximately 19 gigawatts of installed, coal-fired generation capacity has been retired since 2013, representing a total reduction of 27 percent relative to the 2013 installed base.  Meanwhile, gas-fired generation capacity has increased by 30 percent, and renewables by over 50 percent over the same period.  In response to higher running costs, and facing lower cost-competition, the remaining coal-fired power plants are running at capacity factors of just 42 percent versus 48 percent in 2013.

73.    Demand for U.S. thermal coal from European utilities has been subject to its own set of negative forces.  The development of liquefied natural gas infrastructure has facilitated the import of cheap U.S. gas to Europe, reducing local utilities' reliance on Russian-sourced natural gas, and increasing the competitiveness of gas-fired generation.   The increased supply of low-priced Russian thermal coal has increased competition to supply the resulting lower demand from coal-fired generators.  These challenges are on top of a difficult regulatory environment in Western Europe, which, like the United States, has subjected to coal-fired power industry to increased regulations and provided support for renewable energy power sources.  For instance, Germany is reportedly considering legislation to shut down all of its coal-fired power plants by 2038 at the latest to completely shift to other power sources such as renewables.  As a result, the European benchmark price for imported thermal coal has halved in the past year.





**B.    Murray's Efforts.**

74.    Despite market challenges, Murray is well positioned to maintain its status as a leading operator in the coal industry both domestically and abroad for numerous reasons.  In

response to declining demand, Murray has proactively taken self-help measures to cut costs and streamline existing operations. Murray pulled back its coal production by 16 percent between 2014 and 2019, reducing output to 52.6 million tons from 62.8 million tons. Murray also decreased its cost per ton by approximately 18 percent from 2015 to 2018. Also, certain mining operations have been idled (including the Paradise Mine in February 2019).

75.     Murray maintains its belief that longer term demand for coal is underpinned in the United States by a practical requirement that approximately 25 percent of the power supplied to the electrical grid come from coal power generation to ensure reliable electricity during cold snaps and heat waves, when other parts of the grid will be less reliable or overly expensive. This belief has guided Murray's decisions to make value-accretive acquisitions during general market distress, such as Consolidation Coal Company, Armstrong Energy, Inc., and Foresight LP. Accordingly, Murray is well-positioned to take advantage of the industry's need for a minimum proportion of the installed power grid capacity, given its coal reserves located in strategically-optimal mining regions near coal-fired power plants, and key rail and waterway transportation routes.

76.     Murray's value-accretive acquisitions boosted earnings and gave the company additional assets to pledge to creditors in exchange for extending debt maturities. Pursuant to the 2018 TSA, Murray worked with its existing long-term lenders to refinance a large portion of its first lien and second lien debt, which established the current capital structure. The refinancing through the 2018 TSA resulted in an extension of Murray's existing Term Loan maturities by approximately two and a half years on $1.7 billion in debt and an extension of Murray's existing 2L Notes due 2021 maturities by over three years on an additional $500 million in debt. The 2018 TSA also provided for a reduction in certain outstanding debt balances and in annual cash interest. Last year, Murray was able to persuade most creditors to extend maturities on most of its debt to

2021 and beyond.  Murray has also been an active participant in the legislative process, working
to develop a favorable regulatory regime.

77.    Unfortunately, when coupled with external pricing pressure, increased regulation,
heavy debt service obligations, outsized pension and retiree healthcare obligations, and other costs
associated with Murray's business, the Debtors are simply not able to repay their liabilities and
must dramatically reduce their obligations to attract the capital necessary to fund future operations.

C.     **Negotiations Regarding Deleveraging Transactions and Forbearance.**

78.    Faced with these market conditions and the overhang of looming pension
obligations, Murray explored strategic alternatives, including by entering into discussions with
certain of its second lien noteholders regarding a cash infusion that would permit Murray to
improve its business and provide a runway for market conditions to improve.  Ultimately, by the
end of September, these discussions were terminated because the second lien noteholders'
proposals did not provide for enough cash, interest expense savings, or covenant cushion to
sufficiently extend runway.

79.    As the end of September 2019 approached, Murray was faced with approximately
$19.8 million due on September 30 and October 1 in aggregate amortization and interest payments
on the Superpriority Term Loan, Term Loan, and Prepetition ABL Facility.[16]  Murray did not have
sufficient liquidity to make the principal and interest payments under the Superpriority Term Loan
and Term Loan, while also making other payments necessary to operate their business.  Failure to
make these debt service payments would trigger defaults under both the Superpriority Term Loan
and Term Loan, as well as cross-defaults under the Prepetition ABL Facility and the 1.5L Notes

---

[16]    Specifically, on September 30, 2019, amortization payments due included $4,362,513.10 under the Superpriority
Term Loan and $137,088.65 under the Term Loan.  Interest payments due included $13,986,964.80 under the
Superpriority Term Loan, $417,423.33 under the Term Loan, and $883,090.59 under the Prepetition ABL
Facility.

Indenture.  Faced with these significant payment obligations and unreceptive capital markets, Murray and its advisors commenced discussions with an ad hoc group of Superpriority Term Loan lenders and holders of 1.5L Notes and their advisors regarding potential transactions that would enable the Debtors to deleverage their balance sheet and address significant debt service requirements.

80.     To facilitate these discussions, on October 2, 2019, Murray and the requisite majority of lenders under the Prepetition ABL Facility and Superpriority Term Loan entered into forbearance agreements, whereby the lenders agreed to forbear from exercising remedies on account of the default and cross-default until October 14, 2019.  Murray then did not make the amortization and interest payments due under the Superpriority Term Loan and the Term Loan.[17] To accommodate ongoing negotiations regarding debtor in possession financing and the path forward for these cases, the forbearance agreements with the lenders under the Prepetition ABL Facility and Superpriority Term Loan were further amended and extended through October 28, 2019, subject to earlier termination in certain circumstances.

81.     Following significant back and forth, on October 28, 2019, Murray, its equityholders, and the Ad Hoc Group of lenders holding more than 60% of claims under the Superpriority Term Loan Facility, entered into the RSA, a copy of which is attached hereto as **Exhibit B**.  The RSA provides a framework for the Debtors' proposed sale process and the commitment of the Superpriority Term Loan lenders to be the stalking horse bidder in that process, along with their commitment to fund administrative expenses and a chapter 11 process.  Most

---

[17]   On October 8, 2019, Murray received a notice of acceleration from the administrative agent to the Term Loan for failure to make the amortization and interest payments, calling all unpaid principal and accrued interest under the Term Loan immediately due and payable.  The administrative agent and lenders under the Term Loan were subject to a 180 day standstill period under the Second Amended and Restated Collateral Trust Agreement, dated as of June 29, 2018.  Pursuant to that standstill period, the collateral trustee must wait for the 180 days to elapse before exercising any rights and remedies against their collateral.

importantly, the RSA ensures that the Debtors' viable business will continue to operate uninterrupted with the Superpriority Term Loan lenders' substantial cash commitment through debtor in possession financing (the "DIP Facilities").  Pursuant to the DIP Facilities, certain of the Superpriority Term Loan lenders will commit up to $350 million, which provides significant cash to fund operations, the cost of these cases, and vendors who have been stretched thin, while also taking out the Prepetition ABL Facility to give the Debtors more flexibility on its significant working capital fluctuations.

82.     The RSA, DIP Facilities, and chapter 11 process provide the Debtors with a path forward and access to liquidity to meet operational needs.  Accordingly, and as detailed further in the Campagna Declaration, the Debtors have commenced these chapter 11 cases to access much needed liquidity, stabilize operations, and de-lever the balance sheet to ensure continuation of ongoing operations.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  October 29, 2019

*/s/  Robert D. Moore*
Name:  Robert D. Moore
Title:   President, CEO, COO, CFO
         Murray Energy Corporation