# THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 )  ) Case No. 19-56885 (JEH) |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) ) Judge John E. Hoffman |
| Debtors. | ) ) (Joint Administration Requested) |

**BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.'S (X) LIMITED OBJECTION TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF; (Y) RESERVATION OF RIGHTS; AND (Z) REQUEST OF ADEQUATE ASSURANCE**

Black Diamond Commercial Finance, L.L.C. ("BDCF"), as Administrative Agent with respect to the outstanding term loans (the "Term Loans") issued under the Credit and Guaranty Agreement dated April 16, 2015, as amended or otherwise modified from time to time (the "Credit Agreement"), by and among Murray Energy Corporation as Borrower, Murray Energy Holdings Co., certain subsidiaries of Borrower as guarantors (collectively, "Murray Energy" or the "Debtors"), the lenders party thereto from time to time and BDCF (as successor to GLAS Trust Company, LLC (as successor to Deutsche Bank AG New York Branch)), by and through its undersigned counsel, hereby files this objection (the "Objection" to) the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and*

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy. The location of Debtor Murray Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

*(B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [D.I. 28] (the "Priming DIP Motion").[2]  In support of this Objection, BDCF respectfully states as follows:

## PRELIMINARY STATEMENT

Despite assertions to the contrary, the CTA (as defined below),[3] and moreover any provisions in the CTA that purport to prioritize the liens of the "Superpriority" lenders in any way to the liens of the True Term Lenders (as defined below) under the Credit Agreement after the 2018 Refinancing Transaction (as defined below) are invalid and unenforceable.  Notwithstanding this, the Debtors have neither obtained the consent of the True Term Lenders for the Priming DIP Facility nor provided them with sufficient adequate protection.  More importantly, even assuming the CTA were valid and enforceable, the amount of borrowings under the Priming DIP Facility, the timing of those borrowings, and the extent of fees proposed to be paid under the Interim Order are materially prejudicial to the True Term Lenders and to unsecured creditors in general, and cannot be approved on the first day of these chapter 11 cases because they are not required for the Debtors to avoid immediate and irreparable harm.  In fact, limiting the amount and timing of approved borrowings and fees to those that are absolutely necessary will allow the Debtors to effectively shop for a better alternative financing prior to the Final Hearing, which will inure to the benefit of all creditors.  Consequently, the Court should only approve the Priming DIP Facility only to the extent necessary to prevent immediate and irreparable harm to the Debtors' estates, and provide the True Term Lenders with appropriate adequate protection.

---

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Priming DIP Motion.
[3]   A copy of the CTA is attached hereto as Exhibit A.

2

## BACKGROUND

1. Pursuant to that certain Waiver, Consent and Amendment No. 3 to Credit and Guaranty Agreement (the "Third Amendment"), the Second Amended and Restated Collateral Trust Agreement (the "CTA"), and the Superpriority Credit and Guaranty Agreement (the "Superpriority Credit Agreement"), on June 29, 2018, Murray Energy purportedly consummated a refinancing transaction (the "2018 Refinancing Transaction") with, among others, certain lenders under the Credit Agreement (the "New Term Lenders"), pursuant to which, among other things, the New Term Lenders relinquished 97% of their Term Loans and were issued new term loans (the "New Term Loans"). The terms of the 2018 Refinancing Transaction, specifically the CTA, provide that the New Term Loans are secured by liens that rank senior to the liens securing the term loans outstanding under the Credit Agreement (the "True Term Loans") held by lenders that did not participate in the 2018 Refinancing Transaction (the "True Term Lenders").

2. On October 29, 2019, the Debtors filed the Priming DIP Motion, which seeks, among other things, authorization to (i) obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of $440 million, consisting of a $350 million term loan and a roll-up $90 million DIP FILO Facility (the "Priming DIP Facility"), (ii) grant each of the DIP Parties priming liens on the DIP Collateral, including the Term Loan Collateral, (iii) pay principal, interest, fees, and expenses and other amounts payable under the DIP Documents, and (iv) use Cash Collateral.

3. On the first day of these chapter 11 cases, per the Interim Order, the Debtors seek to, among other things:

    a. Repay the $60 million outstanding under the Prepetition ABL Facility;

    b. Roll-up the $90 million prepetition FILO Facility into the DIP FILO Facility;

      c. Pay a 3% upfront fee ($10,500,000) on the entire $350 million cash portion of the Priming DIP Facility;

      d. Pay a 5% backstop fee ($17,500,000) on the entire $350 million cash portion of the Priming DIP Facility; and

      e. Lock in a 1% exit fee ($3,500,000) on the entire $350 million cash portion of the Priming DIP Facility.

## LEGAL STANDARD

4. This Court may authorize the extension of postpetition credit on an emergency basis with less that 14 days notice "only to the extent necessary ***to avoid immediate and irreparable harm*** to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2) (emphasis added); *see also In re BX Acquisitions, Inc.*, No. 18-8014, 2019 WL 1768144, at *7 (B.A.P. 6th Cir. Apr. 19, 2019) (noting that Bankruptcy Court authorization to use cash collateral on interim basis was proper only after determination that it was "necessary to avoid immediate and irreparable harm to the Debtor, its creditors, and its assets, businesses, goodwill, reputation, and employees.").

5. Furthermore, before a court approves the terms of a proposed debtor in possession facility, it must find that such financing "is in the best interest of creditors generally." *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citing *In re Texlon Corp.*, 596 F.2d 1092, 1098-99 (2d Cir. 1979)). In addition, a court must review the terms of a debtor in possession facility to determine whether those terms are fair, reasonable, and adequate given the circumstances of the debtor and the proposed lender. *See*, *e.g.*, *Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (holding that proposed financing should be beneficial and reasonable); *Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (courts should focus on whether the terms of proposed DIP financing are reasonable).

6. To obtain court approval for a financing secured by a priming lien under Section 364(d), the Debtor must establish an inability to obtain the necessary credit by any method other than having such financing secured by such lien. As one court explained:

> Although a debtor is not required to seek credit from every possible resource, a debtor must show that it made a 'reasonable effort' to obtain post-petition financing from other potential lenders on less onerous terms and that such financing was unavailable. A court must make its decision as to '[h]ow extensive the debtor's efforts to obtain credit must be' on a case-by-case basis.

*Suntrust Bank v. Den-Mark Constr., Inc.,* 406 B.R. 683, 691 (E.D.N.C. 2009) (internal citations omitted); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630–31 (Bankr. S.D.N.Y. 1992) ("Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien"); *In re Stacy Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987) (holding that a debtor failed to carry its burden under Section 364(d) where there was no evidence that the debtor had applied for loans from institutions other than its pre-petition senior lender and the proposed priming lender).

7. If a court authorizes the extension of postpetition financing, then a secured creditor's interest in collateral is entitled to adequate protection under Section 363(e) of the Bankruptcy Code. That section provides, in part:

> Notwithstanding any other provision of [section 363], at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, *shall* prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e) (emphasis added). This section "is not permissive or discretionary—it states that the court 'shall' grant the relief specified, at any time, on request of the secured entity."

*Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.)*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003).

8. Furthermore, Section 364(d)(1) of the Bankruptcy Code provides that the bankruptcy court may authorize post-petition financing supported by a superpriority lien only if "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 363(e); *Resolution Tr. Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994). In drafting these provisions, Congress recognized that secured creditors are entitled to protection of their property interests under the Fifth Amendment of the Constitution and "insure[d] that the secured creditor receives the value for which he bargained." S. Rep. No. 95-989, at 53 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5839; accord H.R. Rep. No. 95-595, at 339 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6295.

9. Sections 363(e) and 364(d)(1) must be read together with Section 361, which provides a non-exhaustive list of the forms of adequate protection available for lenders. Such adequate protection may include, without limitation, "periodic cash payments," "additional or replacement lien[s]" and any other relief that "will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361. This provision is "regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party. Therefore, a determination of whether there is adequate protection is made on a case by case basis." *In re Swedeland Dev. Grp., Inc.*, 16 F.3d at 564. It is a "broad and flexible definition" of adequate protection that allows courts to fashion any such "relief as will result in the realization by the protected entity [i.e., the secured creditor] of the value of its interest in the property involved." *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631; *see also Metro. Life. Ins.*

*Co. v. Monroe Park (In re Monroe Park)*, 17 B.R. 934, 940 (D. Del. 1982) (observing that "adequate protection is a flexible concept which requires a Court to make decisions on a case-by-case basis").

10. Additionally, adequate protection must ensure that secured parties receive the value for which they bargained prepetition. *See In re Swedeland Dev. Group, Inc.* 16 F.3d at 564 (finding that "adequate protection, no matter its form, should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights") (internal citations omitted); *see also In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985) (proposal of adequate protection "should as nearly as possible . . . provide the creditor with the value of his bargained for rights").

11. Critically, the Debtors bear "the burden of proof on the issue of adequate protection." 11 U.S.C. § 364(d)(2); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899 (Bankr. N.D. Ohio 1992) ("Section 36[4](d)(1)(B) requires the movant to prove that the lender who is subject to being primed will be adequately protected in the face of the loan transaction").

## ARGUMENT

### I. The CTA Is Unenforceable, And The Proposed Adequate Protection For The True Term Lenders Is Insufficient

12. As the True Term Lenders will demonstrate at a subsequent hearing before this Court, the CTA is unenforceable, and consequently, the True Term Lenders are the actual senior and first lien lenders in these chapter 11 cases with respect to the Term Loan Collateral.[4]

13. The New Term Loans purport to have obtained their "Superpriority" status in connection with the 2018 Refinancing Transaction. But the 2018 Refinancing Transaction was

---

[4] To the extent the Debtors' stipulations and releases in paragraph 7 of the Interim Order and the effect of such stipulations in paragraph 31 of the Interim Order purports to release or otherwise affect any claims BDCF has related to the 2018 Refinancing Transaction against the Debtors or third parties or any right BDCF has to seek to unwind the 2018 Refinancing Transaction, BDCF expressly objects to such overbroad provisions being included in the Interim Order.

not permitted by the Credit Agreement because, among other things, the auction conducted as part of the 2018 Refinancing Transaction was not conducted in accordance with the express terms of the Credit Agreement. The new obligations under the 2018 Restructuring Transaction also violated the Credit Agreement because they were secured by additional guarantors and by liens that purport to be senior to, and not *pari passu* with, the liens held by the True Term Lenders under the Credit Agreement, which violated the refinancing provisions of the Credit Agreement. Further, the subordination required a 100% vote under the Credit Agreement that was never obtained.[5]

14. Accordingly, as will be demonstrated in a subsequent proceeding, the liens granted to the New Term Lenders in connection with the Superpriority Credit Agreement are actually subordinate to the liens of the True Term Lenders, and True Term Lenders are the actual senior and first lien lenders in these chapter 11 cases with respect to the Term Loan Collateral. Consequently, they are entitled to adequate protection beyond what has been provided under the proposed Interim Order and to which they have not consented and should not be deemed to consent.

## II. Even If The CTA Were Valid, The Priming DIP Motion Can Not Be Granted

15. Even assuming, *arguendo*, that the CTA were valid and enforceable, the Priming DIP Motion should still not be approved without substantial changes. In particular, although the CTA provides for a "deemed consent" to the Priming DIP Facility, the CTA expressly provides that the True Term Lenders nonetheless have the right to (1) contest the Priming DIP Facility because, among other things, it is "materially prejudicial to their interests," CTA §2.11(a); (2) take any actions and exercise any all rights that would be available to a holder of unsecured claims,

---

[5] BDCF expressly reserves any and all rights, powers, privileges, and remedies available under the Credit Agreement, applicable law or otherwise as it relates to the 2018 Refinancing Transaction and to seek to unwind the adequate protection scheme contained in the Interim Order.

CTA §2.11(a); and (3) request certain specified adequate protection that is not provided under the Interim Order. CTA §2.11(b)(1)(C).

### A. The Proposed Financing is Materially Prejudicial to the Interest of the True Term Lenders and Cannot Be Approved Under Applicable Law

16. Under the Priming DIP Facility, the Debtors propose (a) to borrow $350 million, of which $200 million would be drawn immediately upon entry of the Interim Order and $150 million upon entry of the Final Order and (b) roll-up the $90 million prepetition FILO Facility. The Priming DIP Facility will bear interest at LIBOR *plus* 11.00%, and the Interim Order will (i) require payment of a 5% backstop fee on the entire $350 million cash portion of the Priming DIP Facility payable upon entry of the Interim Order, (ii) require payment of a 3% upfront fee on the entire $350 million cash portion of the Priming DIP Facility payable upon entry of the Interim Order, and (iii) lock in a 1% exit fee on the entire $350 million cash portion of the Priming DIP Facility. The amount of the Priming DIP Facility and the cost thereof are materially prejudicial to the True Term Lenders.

*i. Prepetition ABL Refinancing / Prepetition FILO Roll-Up*

17. With the proceeds of the proposed Priming DIP Facility, the Debtors seek authority to repay in full the $61,020,000 outstanding under the Prepetition ABL Facility, which borrowing currently bears interest at LIBOR *plus* 2.250%. Thus, on the first day of these chapter 11 cases, the Debtors propose to borrow at LIBOR *plus* 11.00% under the Priming DIP Facility to repay over $61 million of debt that costs the Debtors only LIBOR *plus* 2.250%. This extra interest expense alone is materially prejudicial to the True Term Lenders. Even if the CTA were valid and enforceable, the True Term Lenders have a junior lien on the Prepetition ABL Collateral that is now further subordinated by the extra interest costs (and possibly the relaxation of the borrowing base requirements) associated with new money borrowings under the proposed Priming DIP

Facility. Thus, the Debtors cannot reasonably dispute that the "refinancing" of the Prepetition ABL Facility materially prejudices the True Term Lenders' likelihood of receiving a recovery by unnecessarily subordinating the True Term Lenders' secured claims to the additional interest expenses that will accrue and be paid ahead of them.

18. In addition, the Debtors propose to roll up $90 million of the Prepetition ABL FILO Claims into the Priming DIP Facility. Not only are the rolled up Prepetition DIP FILO Claims going to receive higher interest payments during the case, which payments are senior to the True Term Lenders' secured claims, but also, as of the first day of these cases, the Debtors have in effect agreed that any future plan of reorganization must pay what were the Prepetition DIP FILO Claims in cash, in full, thereby relinquishing forever their right to provide a different treatment to the Prepetition DIP FILO Claims as a prepetition secured claim under a future plan of reorganization.

19. Nor is the basis for such disparate treatment warranted on the first day of these chapter 11 cases. While the Debtors allege that repayment of Prepetition ABL Facility and roll-up of the Prepetition ABL FILO Claims was necessary to get access to cash collateral, there is no evidence that the repayment and roll-up could not occur at the Final Hearing. Based on the Debtors' own statements, the Debtors believe there is an equity cushion in the Prepetition ABL Collateral:

- "The repayment of the ABL portion of the Prepetition ABL Facility merely accelerates the satisfaction of the obligations owed under the Prepetition ABL Credit Facility without affecting the recovery of other creditors because the Debtors believe that these obligations are fully secured by perfected, first priority liens with respect to, among other things, inventory and receivables, with a value in excess of outstanding borrowings" (Priming DIP Motion ¶74);

- "Because the FILO lender, who the Debtors believe is covered by the current borrowing base…the Debtors agreed to convert prepetition FILO loans into DIP FILO loans" (Berube Declaration ¶30);

10

- "Given the nature of the Debtors' borrowing base and the over-secured status of the prepetition FILO facility…" (Priming DIP Motion ¶53); and

- "Given the prepetition ABL facilities' borrowing base protections and other liquidity blocks, the Debtors believe that the value of that collateral is well in excess of the outstanding borrowings under the prepetition ABL facility." (Berube Declaration ¶27).

Accordingly, the Debtors could have sought, at least on an interim basis, to use the cash collateral of these prepetition lenders on the basis that an equity cushion exists and by providing some other form of adequate protection that is much less expensive than the Priming DIP Financing.

20. The fact that the proposed "refinancing" and "roll-up" need not be approved at the Interim Hearing is further underscored by the events leading up to the Debtors entry into the Priming DIP Facility. First, in the October 2019 Lender Presentation, attached hereto as Exhibit B, the Debtors marketed a DIP financing that would leave the Prepetition ABL Facility and Prepetition ABL FILO Claims in place during the course of these chapter 11 cases. Exhibit B at 28. It is not surprising then that in the Priming DIP Motion, the Debtors state that the Debtors' commitment to repay the Prepetition ABL Facility and roll-up of the Prepetition ABL FILO Claims was done at the request of the New Term Lenders in exchange for the purported "significant benefits" the New Term Lenders provided under the Priming DIP Facility. Priming DIP Motion ¶11. The "refinancing" is not necessary to avoid immediate and irreparable harm; it is a means to put money to work for a substantial rate of return.

21. All told, repayment of Prepetition ABL Facility and roll-up of the Prepetition ABL FILO Claims is extraordinary relief on the first day that materially prejudices the True Term Lenders (and unsecured creditors) and substantially, if not entirely, predetermines the outcome of these chapter 11 cases by dictating the terms of a bid or plan, which the Debtors have failed to show is necessary to avoid immediate and irreparable harm.

*ii. Unnecessary Expenses in the DIP Budget*

22. Per the DIP Budget, a copy of which is attached hereto as Exhibit C, the Debtors propose to pay expenses during the interim period that are not necessary and will materially prejudice the True Term Lenders by subordinating the secured claims of the True Term Lenders to fees and interest expenses that the Debtors could avoid incurring, especially during the interim period. As set forth in the DIP Budget, with the proceeds of the initial borrowing, the Debtors propose to pay not only the Prepetition ABL Facility, but also (a) fund a $7,163,000 professional fee escrow, (b) directly pay $4,360,000 of professional fees and (c) pay $28,814,000 of "DIP TL Related Fees." The DIP TL Related Fees in particular are both disproportionate and premature as they are applied to the entire final $350 million amount of the Priming DIP Facility, rather than the borrowing authorized under the Interim Order.

23. All told, including the repayment of the Prepetition ABL Facility, these "first day" expenses total $101,357,000. During that same interim period, the Debtors' liquidity never falls below $61 million, an amount well in excess of the minimum liquidity covenant required by the Priming DIP Lenders of $50 million. Each dollar that is borrowed and each fee that is paid further subordinates the True Term Lenders and materially prejudices them without a showing that these are necessary to avoid immediate and irreparable harm in the interim period. At the outset of these cases, the Debtors should only be permitted to borrow those funds and pay those fees that are necessary to avoid immediate and irreparable harm.

*iii. Excessive Cost of Capital / Failed Marketing*

24. The overall cost of the Priming DIP Facility is simply excessive, and undoubtedly reflects the failure of the Debtors to timely seek adequate alternative financing. The Debtors' prepetition cost of capital was (a) LIBOR+2.75% for the Prepetition ABL Facility, (b) LIBOR+9%

12

for the FILO Asset Based Term Loan and (c) LIBOR+7.25%-7.75% for the New Term Loans. Based on a seven month[6] Priming DIP Facility, the annualized rate of return of the Priming DIP Facility is 28%. This is true despite the fact that the Priming DIP Facility primes nearly all the prepetition collateral, including part of the Prepetition ABL Priority Collateral.

25. It appears, however, that Evercore only started marketing the Priming DIP Facility within the past 30 days and only approached 24 parties to provide the financing. Berube Declaration ¶17. Given the complexity of these cases and the diligence required to commit to a financing of this nature, a mere 30 day marketing period is too short. Given the annualized rate of return and the fact that the New Term Lenders have agreed to prime themselves and have agreed to allow subordinated lenders to participate in the Priming DIP Facility and prime them as well (Priming DIP Motion ¶48), before nearly $28 million in fees are approved and paid, the Debtors should be required to use the time between the interim and final hearings to re-market the Priming DIP Facility to see if better terms can be achieved. Indeed, if the Priming DIP Facility is approved as is, it will effectively foreclose the Debtors from being able to obtain better financing terms as it will lock the Debtors into both the payment of significant fees – $28 million – aggressive case milestones and plan treatments for certain creditors.

### B. The Debtors Must Provide the True Term Lenders With Post-Petition Payment of Fees and Expenses

26. The proposed Priming DIP Facility provides the New Term Lenders with payment of all professional fees and expenses. As part of their adequate protection, the True Term Lenders should receive the same benefit. Payment of professional fees and expenses is a standard,

---

[6] The DIP Credit Agreement contains a milestone that a "confirmed Acceptable Plan shall have become effective" within 210 days of the Petition Date – or seven months. DIP Credit Agreement §5.18(n). Failure to achieve this milestone is an Event of Default. DIP Credit Agreement §8.1(c). Accordingly, the Priming DIP Facility is really a seven month long facility, not a nine month facility as the Debtors state (Priming DIP Motion ¶8).

reasonable form of adequate protection, which will ensure the True Term Lenders are adequately protected from the imposition of priming liens and claims and other challenges to the agent preserving and protecting the True Term Lenders' collateral. It will allow the True Term Lenders to monitor the chapter 11 cases to protect against any diminution in the value of their collateral and ensure the value of the collateral is maximized.

### C. The Terms of the Challenge Period Should be Changed

27. As discussed, BDCF expressly reserves any and all rights, powers, privileges, and remedies available under the Credit Agreement, applicable law or otherwise as it relates to the 2018 Refinancing Transaction and to seek to unwind the adequate protection scheme contained in the Interim Order. In connection therewith, BDCF requests the following changes be made to Paragraph 31 of the Interim Order. BDCF can provide a markup of the Interim Order to the Debtors.

- The Challenge Period should be permitted to be extended by this Court for cause;

- The filing of a motion for derivative standing shall toll the Challenge Period until the date that is five (5) business days after such motion is determined by a final and non-appealable order;

- In a motion for derivative standing, BDCF should be excused from any requirement under applicable law to establish that the Debtors unjustifiably failed to bring an action;

- Delete the lead in to 31(i)(y) – "if no Creditors Committee has been appointed"; and

- Add the following after 31(B) before the definition of Challenge - (C) otherwise contesting or challenging any of the stipulations, admissions, agreements, and releases set forth in paragraph 7 hereof.

### CONCLUSION

28. For the foregoing reasons, BDCF respectfully requests this Court (i) delay consideration of the repayment of the Prepetition ABL Facility and roll-up of the Prepetition FILO Claims until the Final Hearing, (ii) only approve interim borrowings and related fees and expenses

as is necessary for the Debtors to avoid immediate and irreparable harm, (iii) direct the Debtors to conduct further marketing for debtor in possession financing on more favorable terms, (iv) grant additional adequate protection to BDCM in the form of post-petition fees and expenses, and (v) grant such other relief as the Court deems appropriate under the circumstances.

## RESERVATION OF RIGHTS

29. This Objection is filed with a full reservation of rights, including the right to amend and/or supplement this Objection in all respects, to raise additional arguments at the First Day Hearing, and to raise additional objections at the Final Hearing.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Dated: October 30, 2019
Cincinnati, Ohio

        */s/ Robert G. Sanker*
        Robert G. Sanker (0039040)
        Joseph E. Lehnert (0089492)
        KEATING MUETHING & KLEKAMP PLL
        One East Fourth Street, Suite 1400
        Cincinnati, Ohio 45202
        Telephone: (513) 579-6400
        Facsimile: (513) 579-6457
        Email: rsanker@kmklaw.com
        jlehnert@kmklaw.com

        -and-

        Gregg M. Galardi
        Matthew M. Roose
        ROPES & GRAY LLP
        1211 Avenue of the Americas
        New York, NY 10036-8704
        Telephone: (212) 596-9000
        Facsimile: (212) 596-9090

        -and-

        Lawrence S. Robbins
        Kathryn S. Zecca
        Ariel N. Lavinbuk
        Jack A. Herman
        ROBBINS, RUSSELL, ENGLERT,
        ORSECK, UNTEREINER & SAUBER LLP
        2000 K Street, N.W., 4th Floor
        Washington, DC 20006
        Telephone: (202) 775-4500
        Facsimile: (202) 775-4510

        *Counsel to Black Diamond Commercial Finance, L.L.C.*

9560054.1