**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) | Case No. 19-56885 (JEH) |
|  | ) |  |
|  | ) | Judge John E. Hoffman, Jr. |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

---

### DEBTORS' JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

Kim Martin Lewis (0043533)
Alexandra S. Horwitz (0096799)
**DINSMORE & SHOHL LLP**
255 East Fifth Street
Suite 1900
Cincinnati, Ohio 45202
Telephone:       (513) 977-8200
Facsimile:       (513) 977-8141

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated:  December 3, 2019

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Mark McKane, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

- and -

Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions.  This Plan is not an offer with respect to any securities.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
GOVERNING LAW .................................................................................................................. 1

    A.    Defined Terms ................................................................................................ 1
    B.    Rules of Interpretation ................................................................................. 15
    C.    Computation of Time .................................................................................. 16
    D.    Governing Law ............................................................................................ 16
    E.    Reference to Monetary Figures ................................................................... 16
    F.    Non-Consolidated Plan ................................................................................ 16

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS ............................ 17

    A.    Administrative Claims ................................................................................. 17
    B.    Payment of Fees and Expenses under DIP Order ........................................ 17
    C.    Professional Fee Claims .............................................................................. 18
    D.    DIP Claims .................................................................................................. 19
    E.    Priority Tax Claims ..................................................................................... 20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..................................... 20

    A.    Classification of Claims and Interests ......................................................... 20
    B.    Treatment of Claims and Interests .............................................................. 21
    C.    Special Provision Governing Unimpaired Claims ....................................... 26
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 27
    E.    Subordinated Claims ................................................................................... 27
    F.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ............................. 27
    G.    Intercompany Interests ................................................................................ 27
    H.    Controversy Concerning Impairment .......................................................... 27

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................................... 28

    A.    General Settlement of Claims and Interests ................................................. 28
    B.    Restructuring Transactions .......................................................................... 28
    C.    Sources of Consideration for Plan Distributions ......................................... 28
    D.    Plan Administrator and the Wind-Down Trust ............................................ 30
    E.    New Organizational Documents .................................................................. 32
    F.    New Board ................................................................................................... 32
    G.    New Employment Contracts ........................................................................ 33
    H.    Cancellation of Existing Securities and Agreements ................................... 33
    I.    Corporate Action ......................................................................................... 34
    J.    Effectuating Documents; Further Transactions ........................................... 34
    K.    Exemption from Securities Act Registration ............................................... 35
    L.    Exemption from Certain Taxes and Fees ..................................................... 35
    M.    Preservation of Causes of Action ................................................................ 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................ 36

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases .................................... 36
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ..................................... 37
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................................. 37
    D.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases ............ 38
    E.    Insurance Policies ........................................................................................ 38
    F.    Director, Officer, Manager, and Employee Liability Insurance ................... 38
    G.    Indemnification Obligations ........................................................................ 38
    H.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ......................... 39
    I.    Reservation of Rights .................................................................................. 39

J.      Nonoccurrence of Effective Date..............................................................................39
K.     Contracts and Leases Entered Into After the Petition Date ......................................39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .........................................................39

A.     Timing and Calculation of Amounts to Be Distributed.............................................39
B.     Distributions on Account of Obligations of Multiple Debtors ...................................40
C.     Distributions Generally .............................................................................................40
D.     Rights and Powers of Disbursing Agent ...................................................................40
E.     Delivery of Distributions and Undeliverable or Unclaimed Distributions.....................41
F.     Distributions on Account of Claims or Interests Allowed After the Effective Date ......42
G.     Compliance with Tax Requirements..........................................................................42
H.     Allocations Between Principal and Accrued Interest .................................................43
I.      No Postpetition Interest on Claims............................................................................43
J.      Foreign Currency Exchange Rate .............................................................................43
K.     Setoffs and Recoupment ...........................................................................................43
L.     Claims Paid or Payable by Third Parties...................................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS.............................................................................................................................44

A.     Allowance of Claims .................................................................................................44
B.     Claims Administration Responsibilities....................................................................44
C.     Estimation of Claims.................................................................................................44
D.     Adjustment to Claims Without Objection .................................................................45
E.     Time to File Objections to Claims ............................................................................45
F.     Disallowance of Claims ............................................................................................45
G.     Amendments to Claims .............................................................................................45
H.     No Distributions Pending Allowance ........................................................................46
I.      Distributions After Allowance ..................................................................................46

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........46

A.     Settlement, Compromise, and Release of Claims and Interests .................................46
**B.**     **Release of Liens**......................................................................................................46
**C.**     **Debtor Release**.......................................................................................................47
**D.**     **Third-Party Release** ..............................................................................................48
**E.**     **Exculpation** ...........................................................................................................49
**F.**     **Injunction**..............................................................................................................49
G.     Protections Against Discriminatory Treatment .........................................................50
H.     Document Retention .................................................................................................50
I.      Reimbursement or Contribution ...............................................................................50
J.      Term of Injunctions or Stays.....................................................................................50
K.     Subordination Rights.................................................................................................50

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN..........................51

A.     Conditions Precedent to the Effective Date ..............................................................51
B.     Waiver of Conditions ................................................................................................52
C.     Substantial Consummation .......................................................................................52
D.     Effect of Failure of Conditions .................................................................................52

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .....................52

A.     Modification and Amendments..................................................................................52
B.     Effect of Confirmation on Modifications...................................................................52
C.     Revocation or Withdrawal of Plan ............................................................................52

ARTICLE XI. RETENTION OF JURISDICTION .................................................................................53

ARTICLE XII. MISCELLANEOUS PROVISIONS ...........................................................................54

    A.      Immediate Binding Effect ...........................................................................................54
    B.      Payment of Certain Fees .............................................................................................55
    C.      Additional Documents .................................................................................................55
    D.      Payment of Statutory Fees ..........................................................................................55
    E.      UCC and Cessation of Fee and Expense Payment .....................................................55
    F.      Reservation of Rights .................................................................................................55
    G.      Successors and Assigns ...............................................................................................55
    H.      Notices .........................................................................................................................56
    I.      Entire Agreement ........................................................................................................57
    J.      Exhibits .......................................................................................................................57
    K.      Non-Severability of Plan Provisions ..........................................................................57
    L.      Votes Solicited in Good Faith .....................................................................................58
    M.      Closing of Chapter 11 Cases .......................................................................................58
    N.      Conflicts ......................................................................................................................58

**INTRODUCTION**

Murray Energy Holdings Co. and its Debtor affiliates in the above-captioned Chapter 11 Cases propose this joint plan pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A. This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor. Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, projections, and future operations, as well as a summary and description of this Plan and certain related matters.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME AND GOVERNING LAW**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.    "*1.5L Indenture*" means that certain Indenture, dated as of June 29, 2018, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among, Murray Energy Corporation, as issuer, each of the guarantors party thereto, U.S. Bank National Association, as collateral trustee, and The Bank of New York Mellon Trust Company, N.A., as trustee, pursuant to which Murray Energy Corporation issued its 12.00% Senior Secured Notes due 2024.

2.    "*1.5L Notes Claims*" means Claims outstanding under the 1.5L Notes Documents.

3.    "*1.5L Notes Documents*" means, collectively, the 1.5L Indenture and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

4.    "*2L Indenture*" means that certain Indenture, dated as of April 16, 2015, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among, Murray Energy Corporation, as issuer, each of the guarantors party thereto, U.S. Bank National Association, as collateral trustee, and Wilmington Savings Fund Society, FSB, as successor trustee to The Bank of New York Mellon Trust Company, N.A., pursuant to which Murray Energy Corporation issued its 11.25% Senior Secured Notes due 2021.

5.    "*2L Notes Claims*" means Claims outstanding under the 2L Notes Documents.

6.    "*2L Notes Documents*" means, collectively, the 2L Indenture and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

7.    "*ABL Credit Agreement*" means that certain Amended and Restated Revolving Credit Agreement, dated as of June 29, 2018, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among Murray Energy Corporation, as borrower, each of the guarantors from time to time party thereto, Goldman Sachs Bank USA, as administrative agent, and the lenders party thereto from time to time.

8.    "*ABL FILO Claims*" means Claims arising under the ABL Loan Documents related to the ABL FILO Loans borrowed pursuant to the terms of the ABL Credit Agreement, which Claims were refinanced (or "rolled up") by the DIP FILO Facility pursuant to the authority granted in the interim DIP Order, subject to the challenge rights set forth in the DIP Order.

1

9.     "**ABL FILO Lender**" means GACP Finance Co., LLC, solely in its capacity as first in, last out lender under the ABL Credit Agreement.

10.    "**ABL FILO Loans**" means the first in, last out loans under the ABL Credit Agreement that, upon entry of the interim DIP Order, were converted into the DIP FILO Loans.

11.    "**ABL Loan Documents**" means, collectively, the ABL Credit Agreement and any related letter of credit documentation, security agreement, intercreditor agreement, and any other collateral and ancillary documents, including any forbearance agreements, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

12.    "**ABL Revolver Claims**" means Claims arising under the ABL Loan Documents other than the ABL FILO Claims, which Claims were repaid in full in Cash pursuant to the authority granted in the interim DIP Order, subject to the challenge rights set forth in the DIP Order.

13.    "**Ad Hoc Group of Superpriority Lenders**" has the meaning set forth in the RSA.

14.    "**Administrative Claim**" means a Claim for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date through and including the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) amounts owing pursuant to the DIP Order.

15.    "**Administrative Claim Bar Date**" means the deadline for filing requests for payment of Administrative Claims (other than (a) (x) Professional Fee Claims, (y) Administrative Claims arising in the ordinary course of business, or (z) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code, which are required to be filed in accordance with the Bar Date Order, and (b) DIP Claims), which shall be 30 days after the Effective Date.

16.    "**Administrative Claim Objection Bar Date**" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the later of (a) 60 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of the Administrative Claims; *provided* that the Administrative Claim Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

17.    "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

18.    "**Allowed**" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be filed), is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt:  (x) a Proof of Claim Filed

2

after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

19.     "*Acquired Assets*" means those "Purchased Assets" as defined in the Sale Transaction Documentation.

20.     "*Auction*" means the auction, if any, for some or all of the Debtors' assets, conducted in accordance with the Bidding Procedures.

21.     "*Avoidance Actions*" mean any and all avoidance, recovery, or subordination actions or remedies that may be brought by or on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 542, 544, 545, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code.

22.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 100–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

23.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Ohio, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of reference under section 157 of the Judicial Code and/or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of Ohio.

24.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

25.     "*Bar Date Order*" means the *Order (A) Setting Bar Dates for Filing Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. ●], entered by the Bankruptcy Court on [●].

26.     "*Bidding Procedures*" means the procedures governing the Auction and sale of all, substantially all, or certain of the Debtors' assets, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

27.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

28.     "*Case Management Order*" means the *Order Implementing Certain Notice and Case Management Procedures* [Docket No. 113], entered by the Bankruptcy Court on November 1, 2019, which, among other things, established the procedures for interim compensation and reimbursement of expenses for retain professionals.

29.     "*Cash*" or "*$*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

30.     "*Causes of Action*" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests;

3

(c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

31.    "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

32.    "***Claim***" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code against a Debtor or an Estate.

33.    "***Claims Bar Date***" means the dates established by the Bankruptcy Court by which Proofs of Claim must have been Filed with respect to such Claims (other than Claims required to be Filed by the Administrative Claims Bar Date), pursuant to (a) the Bar Date Order, (b) a Final Order of the Bankruptcy Court, or (c) the Plan.

34.    "***Claims Objection Bar Date***" means the later of:  (a) the first Business Day following 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing upon a motion either Filed on or before the day that is 180 days after the Effective Date or filed thereafter, for cause.

35.    "***Claims Register***" means the official register of Claims maintained by the Notice and Claims Agent.

36.    "***Class***" means a class of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

37.    "***Collective Bargaining Agreements***" means all of the collective bargaining agreements to which any Debtor is a party, including those certain Collective Bargaining Agreements by and between certain Debtors, on the one hand, and, as applicable, the United Mine Workers of America and The Seafarers International Union, on the other hand, as the same may have been amended from time to time.

38.    "***Confirmation***" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

39.    "***Confirmation Date***" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

40.    "***Confirmation Hearing***" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code, including any adjournments thereof.

41.    "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order must be acceptable to the Debtors, the Required Consenting Superpriority Lenders, and the Winning Bidder (solely with respect to provisions relating to the Sale Transaction).

42.    "***Consenting Equityholders***" means the holders of Class A and Class B Common Shares in Holdings that are party to the RSA, solely in their capacities as such.

43.    "***Consenting Superpriority Lenders***" means the Superpriority Lenders that are party to the RSA, together with their respective successors and permitted assigns and any subsequent Superpriority Lenders that become party to the RSA in accordance with the terms of the RSA.

44.    "***Contingent DIP Obligations***" means all of the Debtors' obligations under the DIP Documents and the DIP Order that are contingent and/or unliquidated, other than DIP Claims that are paid in full in Cash on or prior to the Effective Date and contingent indemnification obligations as to which a Claim has been asserted on or prior to the Effective Date.

45.    "***Consummation***" means the occurrence of the Effective Date.

46.     "*D&O Liability Insurance Policies*" means, collectively, (a) all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', members', trustees', managers', and officers' liability as of the Petition Date, and (b) all insurance policies (including any "tail policy") for directors', members', trustees', managers', and officers' liability maintained by the Debtors or the Estates as of the Effective Date.

47.     "*Debtor*" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

48.     "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.C of the Plan

49.     "*Debtors*" means, collectively: (a) Holdings; (b) AMCA Coal Leasing, Inc.; (c) AmCoal Holdings, Inc.; (d) American Compliance Coal, Inc.; (e) American Energy Corporation; (f) American Equipment & Machine, Inc.; (g) American Mine Services, Inc.; (h) American Natural Gas, Inc.; (i) AmericanHocking Energy, Inc.; (j) AmericanMountaineer Energy, Inc.; (k) AmericanMountaineer Properties, Inc.; (l) Anchor Longwall and Rebuild, Inc.; (m) Andalex Resources, Inc.; (n) Andalex Resources Management, Inc.; (o) Avonmore Rail Loading, Inc.; (p) Belmont Coal, Inc.; (q) Belmont County Broadcast Studio, Inc.; (r) Canterbury Coal Company; (s) CCC Land Resources LLC); (t) CCC RCPC LLC; (u) Central Ohio Coal Company; (v) Coal Resources Holdings Co.; (w) Coal Resources, Inc.; (x) Consolidated Land Company; (y) Consolidation Coal Company; (z) Corporate Aviation Services; (aa) Eighty-Four Mining Company; (bb) Empire Dock, Inc.; (cc) Energy Resources, Inc.; (dd) Energy Transportation, Inc.; (ee) Genwal Resources, Inc.; (ff) Kanawha Transportation Center, Inc.; (gg) KenAmerican Resources, Inc.; (hh) Keystone Coal Mining Corporation; (ii) Maple Creek Mining, Inc.; (jj) Maple Creek Processing, Inc.; (kk) McElroy Coal Company; (ll) Mill Creek Mining Company; (mm) Mon River Towing, Inc.; (nn) MonValley Transportation Center, Inc.; (oo) Murray American Coal, Inc.; (pp) Murray American Energy, Inc.; (qq) Murray American Kentucky Towing, Inc.; (rr) Murray American Minerals, Inc.; (ss) Murray American Resources, Inc.; (tt) Murray American River Towing, Inc.; (uu) Murray American Transportation, Inc.; (vv) Murray Colombian Resources, LLC; (ww) Murray Equipment & Machine, Inc.; (xx) Murray Global Commodities, Inc.; (yy) Murray Kentucky Energy Services, Inc.; (zz) Murray Kentucky Energy, Inc.; Murray Keystone Processing, Inc.(aaa); Murray South America, Inc.; (bbb) Murray Utah Energy Services, Inc.; (ccc) OhioAmerican Energy, Incorporated; (ddd) Ohio Energy Transportation, Inc.; (eee) Ohio Valley Resources, Inc.; (fff) Oneida Coal Company, Inc.; (ggg) PennAmerican Coal L.P.; (hhh) PennAmerican Coal, Inc.; (iii) Pennsylvania Transloading, Inc; (jjj) Pinski Corp.; (kkk) Pleasant Farms, Inc.; (lll) Premium Coal, Inc.; (mmm) Southern Ohio Coal Company; (nnn) Spring Church Coal Company; (ooo) Sunburst Resources, Inc.; (ppp) T D K Coal Sales, Incorporated; (qqq) The American Coal Company; (rrr) The American Coal Sales Company; (sss) The Franklin County Coal Company; (ttt) The Harrison County Coal Company; (uuu) The Marion County Coal Company; (vvv) The Marshall County Coal Company; (www) The McLean County Coal Company; (xxx) The Meigs County Coal Company; (yyy) The Monongalia County Coal Company; (zzz) The Muhlenberg County Coal Company; (aaaa) The Muskingum County Coal Company; (bbbb) The Ohio County Coal Company; (cccc) The Ohio Valley Transloading Company; (dddd) The Oklahoma Coal Company; (eeee) The Washington County Coal Company; (ffff) The Western Kentucky Coal Company; (gggg) Twin Rivers Towing Company; (hhhh) UMCO Energy, Inc.; (iiii) UtahAmerican Energy, Inc.; (jjjj) West Ridge Resources, Inc.; (kkkk) West Virginia Resources, Inc.; (llll) Western Kentucky Coal Resources; (mmmm) Western Kentucky Consolidated Resources, LLC; (nnnn) Western Kentucky Land Holding, LLC; (oooo) Western Kentucky Rail Loadout, LLC; (pppp) Western Kentucky Resources Financing, LLC; (qqqq) Western Kentucky Resources, LLC; (rrrr) Western Kentucky River Loadout, LLC.

50.     "*DIP Agents*" means, collectively, (a) the DIP Term Loan Agent and (b) GLAS Americas LLC, as collateral agent under the DIP Credit Agreement, each solely in its capacity as such.

51.     "*DIP Claims*" means, collectively, the DIP FILO Claims and the DIP Term Loan Claims.

52.     "*DIP Credit Agreement*" means that certain Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of October 31, 2019, by and among the Debtors, the DIP Agents, the DIP Term Loan Lenders, and the DIP FILO Lender, as may be amended, modified, restated, or supplemented from time to time.

53.     "*DIP Documents*" means, collectively, the DIP Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements,

intercreditor agreements, and other security agreements, as may be amended, modified, restated, or supplemented from time to time.

54. "*DIP Facility*" means the DIP Term Loan Facility and the DIP FILO Facility.

55. "*DIP FILO Claims*" means all Claims of the DIP FILO Lender arising under, derived from, secured by, or based on the DIP Credit Agreement, the DIP Documents, or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP FILO Facility.

56. "*DIP FILO Facility*" means the debtor-in-possession first in, last out facility provided for under the DIP Credit Agreement.

57. "*DIP FILO Lender*" means GACP Finance Co., LLC, solely in its capacity as a lender under the DIP Credit Agreement, and any Person to whom GACP Finance Co., LLC assigned a DIP FILO Loan.

58. "*DIP FILO Loans*" means those ABL FILO Loans that, upon entry of the interim DIP Order, were converted into first in, last out loans under the DIP Facility.

59. "*DIP Lenders*" means, collectively, the DIP Term Loan Lenders and the DIP FILO Lender.

60. "*DIP Order*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and incur postpetition obligations thereunder, as such orders may be amended, supplemented, or modified from time to time.

61. "*DIP Term Loan Agent*" means GLAS USA LLC, as administrative agent under the DIP Credit Agreement, solely in its capacity as such.

62. "*DIP Term Loan Claims*" means all Claims of the DIP Term Loan Agent and the DIP Term Loan Lenders arising under, derived from, secured by, or based on the DIP Credit Agreement, the DIP Documents, or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP Term Loan Facility.

63. "*DIP Term Loan Facility*" means the new money term loan credit facility provided for under the DIP Credit Agreement.

64. "*DIP Term Loan Lenders*" means the banks, financial institutions, and other various lenders party to the DIP Credit Agreement from time to time (other than the DIP FILO Lender), each solely in their capacity as such.

65. "*Disbursing Agent*" means, as applicable, the Debtors or the Plan Administrator (as applicable) or any Entity or Entities selected by the Debtors or the Plan Administrator to make or facilitate distributions contemplated under the Plan.

66. "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of December 3, 2019, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, which must be reasonably acceptable to the Debtors and the Required Consenting Superpriority Lenders.

67. "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

6

68.     "*Disputed Claims Reserve*" means amounts in a bank account or accounts reserved for Disputed Claims.

69.     "*Distribution Record Date*" means, other than with respect to Holders of public Securities, the record date for determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the Effective Date or such other date as is designated in a Final Order of the Bankruptcy Court.

70.     "*DTC*" means The Depository Trust Company.

71.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B of the Plan and (b) no stay of the Confirmation Order is in effect, which shall be the day Consummation occurs.

72.     "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

73.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

74.     "*Exculpated Party*" means collectively, and in each case solely in its capacity as such: (a) the Debtors; (b) the UCC and each of its respective members; (c) the DIP Agents; (d) the DIP Term Loan Lenders; (e) the DIP FILO Lender; (f) the Consenting Superpriority Lenders; (g) the ABL FILO Lender; (h) the Plan Administrator; (i) DTC; and (j) with respect to each of the foregoing entities, such Entity and its current and former Affiliates, and such Entities' and their current Affiliates' directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided*, *further*, that notwithstanding anything to the contrary herein, no Non-Released Party shall be an Exculpated Party.

75.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

76.     "*Exit Facility*" means a new money term loan, asset-based revolving, or other facility or debt securities issued pursuant to the Exit Financing Documents, if any; *provided* that the aggregate amount of such facility, if any, shall be subject to the Total Maximum Leverage for Murray NewCo.

77.     "*Exit Facility Agent*" means the administrative agent, trustee, or other similar agent under the Exit Facility Agreement, solely in its capacity as such.

78.     "*Exit Facility Agreement*" means that certain credit, loan, or other agreement, if any, dated as of the Effective Date, by and among Murray NewCo, the Exit Facility Agent, and the lender parties thereto, which shall be included in the Plan Supplement.

79.     "*Exit Facility Documents*" means, collectively, the Exit Facility Agreement, if any, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors and the Required Consenting Superpriority Lenders.

80.     "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

81. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

82. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be Filed relating to such order shall not cause such order to not be a Final Order.

83. "*General Unsecured Claim*" means any Claim that is not Secured and is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) a Priority Tax Claim, or (c) an Other Priority Claim.

84. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

85. "*Holder*" means an Entity holding a Claim or an Interest in any Debtor.

86. "*Holdings*" means Murray Energy Holdings Co.

87. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

88. "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, members, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.

89. "*Indenture Trustees*" means, collectively, the trustees under the 1.5L Indenture, Stub 2L Indenture, and 2L Indenture.

90. "*Initial Distribution Date*" means the date on which the Disbursing Agent shall make initial distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date but in no event shall be later than 30 days after the Effective Date.

91. "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor arising before the Petition Date.

92. "*Intercompany Interest*" means an Interest in any Debtor, or a direct subsidiary of any Debtor, other than an Interest in Holdings.

93. "*Interest*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any

8

Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

94.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

95.    "*Lien*" means any lien, as such term is defined in section 101(37) of the Bankruptcy Code.

96.    "*Management Incentive Plan*" means the post-Effective Date management incentive plan of Murray NewCo, which shall provide for New Interests or other equity or similar interests in Murray NewCo to be reserved for directors, officers, and employees of Murray NewCo to be distributed on terms to be determined by the New Board; *provided* that the percent of the New Interests reserved for issuance under the Management Incentive Plan and the terms and conditions for the initial issuance of New Interests to Robert D. Moore under the Management Incentive Plan shall be set forth in the Plan Supplement.

97.    "*Murray NewCo*" means the entity to be formed at the direction of the Required Consenting Superpriority Lenders to act as the Stalking Horse Bidder (as defined in the Bidding Procedures) under the Bidding Procedures and pursuant to the terms of the Stalking Horse APA.

98.    "*New Board*" means the initial board of directors, members, or managers, as applicable, of Murray NewCo.

99.    "*New Employment Contracts*" means those certain new employment contracts between Murray NewCo and certain executive employees (including Robert D. Moore, as President and Chief Executive Officer), which shall be on terms acceptable to such executive and the Required Consenting Superpriority Lenders, in consultation with the Consenting Equityholders and the Debtors.

100.    "*New Interests*" means the equity interests in Murray NewCo.

101.    "*New Organizational Documents*" means the form of certificates or articles of incorporation, bylaws, trust agreements, or such other applicable formation documents of Murray NewCo and any of its subsidiaries, including any shareholders' or stockholders' agreement, if any, the terms of which shall be consistent with the RSA and otherwise acceptable to the Required Consenting Superpriority Lenders, *provided* that the Murray NewCo Organizational Documents shall contain provisions for a limited right of first offer in favor of Robert E. Murray, in form and substance acceptable to Robert E. Murray and the Required Consenting Superpriority Lenders.

102.    "*New Takeback Debt*" means, to the extent issued, that certain term loan facility or such other debt issued at Murray NewCo in form and on terms acceptable to the Required Consenting Superpriority Lenders pursuant to the New Takeback Debt Documents; *provided* that such New Takeback Debt shall be subject to the Total Maximum Leverage.

103.    "*New Takeback Debt Agent*" means the administrative agent, trustee, or other similar agent under the New Takeback Debt Agreement, solely in its capacity as such.

104.    "*New Takeback Debt Agreement*" means that certain agreement, if any, dated as of the Effective Date, by and among Murray NewCo, the New Takeback Debt Agent, and the lender parties thereto, in form and substance acceptable to the Required Consenting Superpriority Lenders, which will set forth the terms of the New Takeback Debt and shall be included in the Plan Supplement.

105.    "*New Takeback Debt Documents*" means, collectively, the New Takeback Debt Agreement, if any, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

106.    "*Non-Released Party*" means each party, if any, set forth on the Non-Released Party Schedule.

107.  "***Non-Released Party Schedule***" means a schedule that sets forth the identities of each Non-Released Party and is Filed with the Bankruptcy Court as part of the Plan Supplement.

108.  "***Notice and Claims Agent***" means Prime Clerk LLC in its capacity as notice and claims agent for the Debtors and any successor thereto.

109.  "***Other Priority Claim***" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

110.  "***Other Secured Claim***" means any Secured Claim that is not a DIP Claim, a Superpriority Claim, a Secured Tax Claim, a Term Loan Claim, a 1.5L Notes Claim, a Stub 2L Notes Claim, or a 2L Notes Claim.

111.  "***Person***" means a person as such term as defined in section 101(41) of the Bankruptcy Code.

112.  "***Petition Date***" means October 29, 2019, the date on which each of the Debtors commenced the Chapter 11 Cases.

113.  "***Plan***" means this *Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, as may be altered, amended, modified, or supplemented from time to time in accordance with Article X hereof, including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

114.  "***Plan Administrator***" means a person or Entity designated by the Debtors with the consent of the Required Consenting Superpriority Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, who will be disclosed prior to the Confirmation Hearing, will serve as the trustee and administrator for the Wind-Down Trust, and will have all power and authorities as set forth in Article IV.D of the Plan.

115.  "***Plan Supplement***" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, all subject to the consent rights set forth in the RSA, the initial draft of certain of such documents shall be Filed by the Debtors seven calendar days before the Voting Deadline, and additional documents Filed with the Bankruptcy Court prior to the Effective Date, as may be amended, supplemented, altered, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) the Sale Transaction Documentation; (b) the New Takeback Debt Agreement, if any; (c) the Exit Facility Agreement, if any; (d) the Schedule of Assumed Executory Contracts and Unexpired Leases; (e) the Schedule of Rejected Executory Contracts and Unexpired Leases; (f) the Schedule of Retained Causes of Action; (g) the Non-Released Party Schedule; (h) the form of the New Organizational Documents; (i) the terms and conditions for the initial issuance of New Interests to Robert D. Moore under the Management Incentive Plan; (j) the identity and terms of compensation of the Plan Administrator; (k) the Wind-Down Trust Agreement; (l) the Restructuring Steps Memorandum; and (m) any necessary documentation related to the Sale Transaction, each of which shall be in form and substance consistent with the RSA.

116.  "***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

117.  "***Pro Rata***" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

118.  "***Professional***" means an Entity retained in the Chapter 11 Cases pursuant to and in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

119.  "***Professional Fee Claims***" mean all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court and regardless of

10

whether a monthly fee statement or interim fee application has been Filed for such fees and expenses. To the extent a Bankruptcy Court or higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

120.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account to be funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount, *provided* that the Professional Fee Escrow Account shall be increased with Cash held or by the Wind-Down Trust to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

121.    "*Professional Fee Escrow Amount*" means the total amount of Professional fees and expenses estimated in consultation with the Required Consenting Superpriority Lenders pursuant to Article II.B.3 of the Plan.

122.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

123.    "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtor in the Chapter 11 Cases.

124.    "*Quarterly Distribution Date*" means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30, and December 31 of each calendar year) occurring after the Effective Date, or as soon thereafter as is reasonably practicable.

125.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest not Impaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

126.    "*Released Party*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Consenting Superpriority Lenders; (c) the DIP Term Loan Lenders; (d) the ABL FILO Lender; (e) the DIP FILO Lender; (f) the DIP Agents; (g) the Plan Administrator; (h) the Winning Bidder; (i) DTC; and (j) with respect to each of the foregoing in clauses (a) through (i), such Entity and its current and former Affiliates, and such Entities' and their current Affiliates' directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any of the foregoing that opts out of the releases shall not be a "Released Party"; *provided, further*, that notwithstanding anything to the contrary herein, no Non-Released Party shall be a Released Party.

127.    "*Releasing Parties*" means, collectively, each of the following: (a) the Debtors; (b) the Consenting Superpriority Lenders; (c) the DIP Term Loan Lenders; (d) the ABL FILO Lender; (e) the DIP FILO Lender (f) the DIP Agents; (g) the Winning Bidder; (h) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (i) all Holders of Claims or Interests that vote to reject the Plan or do not vote to accept or reject the Plan but, in either case, do not affirmatively elect to "opt out" of the Third-Party Release; (j) all Holders of Claims or

Interests that are deemed to reject the Plan that do not affirmatively elect to "opt out" of the Third-Party Release; and (k) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (j), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed accounts or funds, participants, and each of their respective current and former equity holders, officers, directors, managers, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

128.     "*Required Consenting Superpriority Lenders*" has the meaning set forth in the RSA.

129.     "*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the restructuring contemplated by the Plan, which shall be in the Plan Supplement.

130.     "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

131.     "*RSA*" means that certain Restructuring Support Agreement, dated as of October 28, 2019, by and among the Debtors, the Consenting Superpriority Lenders, and the Consenting Equityholders, as may be amended, supplemented, or modified from time to time in accordance with the terms thereof.

132.     "*Sale Proceeds*" means all Cash and any non-cash proceeds of the Sale Transaction that the Debtors shall receive in accordance with the Sale Transaction Documentation.

133.     "*Sale Proceeds Distributable Consideration*" means, if the Winning Bidder or Winning Bidders are an Entity or Entities other than Murray NewCo, the excess, if any, of (i) the sum of (a) any Sale Proceeds and (b) any Cash proceeds of the Wind-Down Trust Assets, over (ii) amounts necessary to (a) satisfy the DIP Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims, Secured Tax Claims, and Other Secured Claims in full in Cash  (unless such Claims, other than DIP Claims, receive such other treatment that leaves such Claims Unimpaired) and (b) fund the Wind-Down Amount.

134.     "*Sale Transaction*" means the sale of certain of the Debtors' assets to the Winning Bidder to be consummated in accordance with the Bidding Procedures.

135.     "*Sale Transaction Documentation*" means (a) if Murray NewCo is deemed the Winning Bidder, the Stalking Horse APA, or (b) if any Entity or Entities other than Murray NewCo are chosen as the Winning Bidder, the applicable third-party asset purchase agreement, in each case pursuant to which the Debtors will effectuate the Sale Transaction.

136.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means that certain schedule filed with the Plan Supplement of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, or assumed by the Debtors and assigned to the Winning Bidder pursuant to the Plan and in accordance with the Sale Transaction Documentation, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, which shall be acceptable to the Debtors, the Required Consenting Superpriority Lenders, and the Winning Bidder.

137.     "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means that certain schedule filed with the Plan Supplement of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan and in accordance with the Sale Transaction Documentation, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, which shall be acceptable to the Debtors, the Required Consenting Superpriority Lenders, and the Winning Bidder.

138.     "*Schedule of Retained Causes of Action*" means that certain schedule filed with the Plan Supplement of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or the Sale Transaction Documentation, as such schedule may be amended, modified, or supplemented from time

KE 65249798

to time by the Debtors, which shall be acceptable to the Debtors, the Required Consenting Superpriority Lenders, and the Winning Bidder.

139.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified, or supplemented from time to time.

140.     "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; *provided* that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

141.     "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, which value shall be determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

142.     "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

143.     "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

144.     "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

145.     "*Stalking Horse APA*" means that certain Stalking Horse APA, dated as of [●], executed by and between the Debtors and the Murray NewCo for the sale of certain of the Debtors' assets to Murray NewCo, a copy of which has been filed with the Plan Supplement, together with all exhibits, appendices, supplements, documents, and agreements ancillary thereto, in each case as amended, modified, or supplemented from time to time.

146.     "*Stalking Horse Distributable Consideration*" means, if the Winning Bidder is Murray NewCo, the excess, if any, of (i) the sum of (a) any Sale Proceeds and (b) any Cash proceeds of the Wind-Down Trust Assets, over (ii) amounts necessary to (a) satisfy the Administrative Claims, Priority Tax Claims, Other Priority Claims, Secured Tax Claims, and Other Secured Claims in full in Cash (unless such Claims receive such other treatment that leaves such Claims Unimpaired) and (b) fund the Wind-Down Amount.

147.     "*Stub 2L Indenture*" means that certain Indenture, dated as of May 8, 2014, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among, Murray Energy Corporation, as issuer, each of the guarantors party thereto, U.S. Bank National Association, as collateral trustee, and Delaware Trust Company, as successor trustee to The Bank of New York Mellon Trust Company, N.A., pursuant to which Murray Energy Corporation issued its 9.5% Senior Secured Notes due 2020.

148.     "*Stub 2L Notes Claims*" means Claims outstanding under the Stub 2L Notes Documents.

149.     "*Stub 2L Notes Documents*" means, collectively, the Stub 2L Indenture and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

150.     "*Superpriority Agent*" means GLAS Trust Company LLC, solely in its capacity as administrative agent under the Superpriority Credit Agreement.

151.     "*Superpriority Claims*" means Claims outstanding under the Superpriority Loan Documents.

152.    "*Superpriority Credit Agreement*" means that certain Superpriority Credit and Guaranty Agreement, dated as of June 29, 2018, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among Murray Energy Corporation, as borrower, Holdings, as holdings, each of the guarantors party thereto, the Superpriority Agent, and the Superpriority Lenders.

153.    "*Superpriority Lenders*" means the various lenders party to the Superpriority Credit Agreement.

154.    "*Superpriority Loan Documents*" means, collectively, the Superpriority Credit Agreement and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, including any forbearance agreements, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

155.    "*Term Loan Agent*" means Black Diamond Commercial Finance, L.L.C., solely in its capacity as administrative agent under the Term Loan Credit Agreement.

156.    "*Term Loan Claims*" means any and all Claims relating to, arising out of, arising under, or arising in connection with the Term Loan Facility and the Term Loan Documents.

157.    "*Term Loan Credit Agreement*" means that certain Credit and Guaranty Agreement, dated as of April 16, 2015, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among Murray Energy Corporation, as borrower, Holdings, as holdings, each of the guarantors party thereto, Black Diamond Commercial Finance, L.L.C., as successor administrative agent to GLAS Trust Company LLC, and the lenders party to the Term Loan Credit Agreement.

158.    "*Term Loan Documents*" means, collectively, the Term Loan Credit Agreement and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

159.    "*Term Loan Facility*" means the term loan facility provided for under the Term Loan Credit Agreement.

160.    "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.D of the Plan.

161.    "*Total Maximum Leverage*" means the maximum total leverage of Murray NewCo on the Effective Date, as determined by, and as calculated pursuant to a formula acceptable to, the Required Consenting Superpriority Lenders in consultation with the Debtors prior to the Effective Date.

162.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Ohio.

163.    "*UCC*" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on May 30, 2019, pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 61].

164.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

165.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

166.    "*Voting Deadline*" means 4:00 p.m., prevailing Eastern Time, on _____, 2020, which date may be extended by the Debtors with the consent of the Required Consenting Superpriority Lenders (which consent may not be unreasonably withheld, conditioned, or delayed).

14

167.    "**Western Kentucky Debtors**" means, collectively, (a) Murray Kentucky Energy, Inc., (b) Western Kentucky Coal Resources, LLC, (c) Western Kentucky Resources Financing, LLC, (d) Western Kentucky Consolidated Resources, Inc., (e) Western Kentucky Consolidated Resources, Inc., (f) Western Kentucky Rail Loadout LLC, (g) Western Kentucky Resources, LLC, (h) Western Kentucky River Loadout LLC, (i) The Western Kentucky Coal Company, LLC, (j) The Muhlenberg Country Coal Company, LLC, and (k) Western Kentucky Land Holding, LLC.

168.    "**Wind-Down**" means the wind down, dissolution, and liquidation of the Debtors' Estates after the Effective Date.

169.    "**Wind-Down Amount**" means Cash in an amount determined by the Debtors and acceptable to the Required Consenting Superpriority Lenders, which amount shall be retained by the Debtors and used by the Plan Administrator to fund the Wind-Down in accordance with the Wind-Down Budget.

170.    "**Wind-Down Budget**" means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases, which budget, activities, and reasonable expenses shall be agreed to by the Required Consenting Superpriority Lenders.  The Wind-Down Budget shall include line item estimates for, among other things, post-Effective Date Professional fees.

171.    "**Wind-Down Trust**" means that certain trust to be created on the Effective Date, as described in Article IV.D of the Plan.

172.    "**Wind-Down Trust Account**" means the bank account or accounts used to fund all expenses and payments required to be made by the Plan Administrator, which shall be established by the Plan Administrator on or after the Effective Date.

173.    "**Wind-Down Trust Agreement**" means that certain agreement establishing the Wind-Down Trust, which shall be acceptable to the Debtors and the Required Consenting Superpriority Lenders, and the form of which shall be included in the Plan Supplement.

174.    "**Wind-Down Trust Assets**" means all of the assets of the Debtors' Estates remaining after the closing of the Sale Transaction, which assets shall be treated as transferred to and beneficially owned by the Wind-Down Trust as of the Effective Date.

175.    "**Winning Bidder**" means the Entity or Entities, which may include Murray NewCo, whose bid or bids for some or all of the Debtors' assets is selected in accordance with the Bidding Procedures and approved by the Bankruptcy Court as the highest or otherwise best bid pursuant to the Bidding Procedures.

B.    *Rules of Interpretation*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (9) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be

governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any effectuating provisions may be interpreted by the Debtors or Plan Administrator, in consultation with counsel to the Required Consenting Superpriority Lenders, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (15) except with respect to Article II hereof, any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (18) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (19) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Trust shall mean the Debtors and the Wind-Down Trust, as applicable, to the extent the context requires.

C.      *Computation of Time*

        Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtors not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

E.      *Reference to Monetary Figures*

        All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Non-Consolidated Plan*

        Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan that addresses the reorganization of each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors and the Plan is a separate Plan for each Debtor.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, and with respect to any non-ordinary course Allowed Administrative Claims, with the consent of the Required Consenting Superpriority Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed), or the Plan Administrator, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 45 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Professional Fee Claims and DIP Claims (which are addressed in Article II.B and Article II.C, respectively), and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Plan Administrator no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Objections to such requests must be Filed and served on the Plan Administrator (if the Plan Administrator is not the objecting party) and the requesting party on or before the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims and DIP Claims, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Trust, the Plan Administrator, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors or the Plan Administrator or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

B.      *Payment of Fees and Expenses under DIP Order*

On the later of (1) the Effective Date and (2) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or the Wind-Down Trust, as applicable, shall pay (x) all fees, expenses, and disbursements of the DIP Agents and DIP Lenders, in each case that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the applicable DIP Order and (y) any Claim related to the reasonable and documented fees and expenses, contribution or indemnification obligations (including, for the avoidance of doubt, those that may accrue before or after the Effective Date (including in any appellate proceedings related to the Chapter 11 Cases)) of the Superpriority Lenders and their respective professionals payable pursuant to the DIP Order.  Such fees, expenses, or disbursements shall constitute Allowed Administrative

Claims. Nothing herein shall require the Superpriority Lenders, or their respective professionals, to file applications, a Proof of Claim, or otherwise seek approval of the Court as a condition to the payment of such Allowed Administrative Claims.

C.      *Professional Fee Claims*

    1.   Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Plan Administrator (or the authorized signatories to the Professional Fee Escrow Account, after consultation with the Plan Administrator) shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

    2.   Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, the Plan Administrator, or the Wind-Down Trust.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Plan Administrator, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Plan Administrator's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind-Down Trust Assets. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Trust without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

    3.   Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Plan Administrator shall use Cash from the Wind-Down Trust to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

18

4.   Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by (a) the Debtors after the Confirmation Date, and (b) the UCC after the Confirmation Date through and including the Effective Date, in the ordinary course of business. The Debtors and the Plan Administrator, as applicable, shall pay within ten business days after submission of a detailed invoice to the Debtors or the Plan Administrator, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors, as applicable. If the Debtors dispute the reasonableness of any such invoice, the Debtors or the Plan Administrator, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Case Management Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.   *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses. Upon the indefeasible payment or satisfaction in full in Cash of the Allowed DIP Claims in accordance with the terms of this Plan, or other such treatment as contemplated by this Article II.C of the Plan, and except with respect to the Contingent DIP Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Documents), on the Effective Date all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Notwithstanding the foregoing, the Contingent DIP Obligations shall survive the Effective Date and shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash on the Effective Date, or to the extent accrued after the Effective Date, on a current basis in full in Cash as invoiced and shall not be released pursuant to the Plan or Confirmation Order, and shall be paid by the Plan Administrator from the Wind-Down Trust Assets as and when due under the DIP Documents. After the Effective Date, the Plan Administrator shall continue to reimburse the DIP Agents and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agents and the DIP Lenders after the Effective Date that survive termination or maturity of the DIP Facility in accordance with the terms thereof and/or the DIP Order. The Plan Administrator shall pay all of the amounts that may become payable to the DIP Agents or any of the DIP Lenders under any of the foregoing provisions in accordance with the terms of the DIP Documents and the DIP Order.

1.   DIP Term Loan Claims

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed DIP Term Loan Claim, on the Effective Date and at the election of each such Holder of an Allowed DIP Term Loan Claim, shall (i) receive payment in full in Cash, (ii) exchange such DIP Term Loan Claims into the New Takeback Debt, if any, or (iii) receive such other treatment as acceptable to the DIP Term Loan Lender. The DIP Term Loan Claims shall be Allowed in the aggregate amount outstanding under the DIP Term Loan Facility as of the Effective Date.

Pursuant to the DIP Credit Agreement, all Cash distributions pursuant to this Article II.D.1 shall be made to the DIP Term Loan Agent for distributions to the DIP Term Loan Lenders in accordance with the DIP Credit Agreement and DIP Documents. The DIP Term Loan Agent shall hold or direct distributions for the benefit of the Holders of DIP Term Loan Claims. The DIP Term Loan Agent shall retain all rights as DIP Term Loan Agent under the DIP Documents in connection with the delivery of the distributions to the DIP Term Loan Lenders. The DIP Term Loan Agent shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Term Loan Agent, except for liability arising from gross negligence, willful misconduct, or actual fraud of

19

the DIP Term Loan Agent.  All cash distributions to be made hereunder to the DIP Term Loan Agent on account of the DIP Term Loan Claims shall be made by wire transfer.

       2.   <u>DIP FILO Claims</u>

Except to the extent that a Holder of an Allowed DIP FILO Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for, each Allowed DIP FILO Claim, each Holder of an Allowed DIP FILO Claim shall receive on the Effective Date either (i) payment in full in Cash of such Holder's Allowed DIP FILO Claim or (ii) such other treatment as acceptable to the DIP FILO Lender.  The DIP FILO Claims shall be Allowed in the aggregate amount outstanding under the DIP FILO Facility as of the Effective Date.

E.     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.     *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F hereof.  For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (other than Murray Colombian Resources, LLC, which will only exist for Class 5E to the extent of any Claims in such Class), except that (i) Class 5, Class 7, and Class 8 each will be vacant at Debtor Murray South America, Inc. and the Western Kentucky Debtors and (ii) Class 12 will be vacant at each Debtor other than Holdings.  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Superpriority Claims | Impaired | Entitled to Vote |
| Class 5 | Term Loan Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 6 | 1.5L Notes Claims | Impaired | Entitled to Vote |
| Class 7 | Stub 2L Notes Claims | Impaired | Entitled to Vote |
| Class 8 | 2L Notes Claims | Impaired | Entitled to Vote |
| Class 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 10 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 11 | Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 12 | Interests in Holdings | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

Subject to Article IV hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.   Class 1 – Other Priority Claims

(a)    *Classification*:  Class 1 consists of all Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor (in consultation with the Winning Bidder and the Required Consenting Superpriority Lenders) or the Plan Administrator, as applicable:

(i)    payment in full in Cash of the unpaid portion of its Other Priority Claim on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim; or

(ii)   such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of an Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Secured Claims

(a)    *Classification*:  Class 2 consists of all Other Secured Claims.

21

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (in consultation with the Winning Bidder and the Required Consenting Superpriority Lenders) or the Plan Administrator, as applicable:

(i)    payment in full in Cash of such Holder's Allowed Other Secured Claim; or

(ii)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of an Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Secured Tax Claims</u>

(a)    *Classification*:  Class 3 consists of all Secured Tax Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim and the applicable Debtor (in consultation with the Winning Bidder and the Required Consenting Superpriority Lenders) or the Plan Administrator agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, each such Holder shall receive, at the option of the applicable Debtor (in consultation with the Winning Bidder and the Required Consenting Superpriority Lenders) or the Plan Administrator, as applicable:

(i)    payment in full in Cash of the unpaid portion of such Holder's Allowed Secured Tax Claim on the later of the Effective Date and such date such Secured Tax Claim becomes an Allowed Secured Tax Claim; or

(ii)    such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)    *Voting*:  Class 3 is Unimpaired under the Plan.  Each Holder of a Secured Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a Secured Tax Claim is not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Superpriority Claims</u>

(a)    *Classification*:  Class 4 consists of Superpriority Claims.

(b)    *Allowance*:  The Superpriority Claims shall be deemed allowed in the amount of $1,753,616,131.58 (consisting of $1,593,188,196.27 in B-2 Superpriority Claims and $160,427,935.31 in B-3 Superpriority Claims) as of the Petition Date, plus interest, fees, and other expenses and amounts provided for in the Superpriority Credit Agreement, incurred after such date, through the Effective Date, solely to the extent Allowed by the Bankruptcy Code.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Superpriority Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement and release of and in exchange for such Allowed

22

Superpriority Claims, each Holder of an Allowed Superpriority Claim shall receive, up to the full amount of such Holder's Allowed Superpriority Claim, either:

(i)      if Murray NewCo is the Winning Bidder, its Pro Rata share of:

        a.      100 percent of the New Interests, subject to dilution for the Management Incentive Plan;

        b.      the New Takeback Debt, if any (less any New Takeback Debt issued in exchange for any DIP Term Loan Claims);

        c.      Cash proceeds of any of the Debtors' assets that are not Purchased Assets (as defined in the Stalking Horse APA) and that constitute collateral of the Superpriority Claims pursuant to the Superpriority Loan Documents; and

        d.      its Pro Rata share (along with Class 5, Class 6, Class 7, Class 8, and Class 9) of Stalking Horse Distributable Consideration, if any; or

(ii)     if an Entity other than Murray NewCo is the Winning Bidder, either (i) payment in full in Cash or (ii) its Pro Rata share of the Sale Proceeds Distributable Consideration, which amount of the Sale Proceeds Distributable Consideration must be acceptable to Required Consenting Superpriority Lenders.

(d)     *Voting*: Class 4 is Impaired under the Plan.  Holders of Superpriority Claims are entitled to vote to accept or reject the Plan.

5.     <u>Class 5 – Term Loan Claims</u>

(a)     *Classification*:  Class 5 consists of all Term Loan Claims.

(b)     *Allowance*:  The Term Loan Claims shall be deemed Allowed in the amount of $51,901,832.60 (consisting of $38,880,348.11 in B-2 Term Loan Claims and $13,021,484.49 in B-3 Term Loan Claims).

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Term Loan Claim, each Holder of an Allowed Term Loan Claim shall receive, up to the full amount of such Holder's Allowed Term Loan Claim, either:

(i)      if Murray NewCo is the Winning Bidder, its Pro Rata share (along with Class 4, Class 6, Class 7, Class 8, and Class 9) of Stalking Horse Distributable Consideration, if any; or

(ii)     if an Entity other than Murray NewCo is the Winning Bidder, solely after payment in full in Cash of the Superpriority Claims, its Pro Rata share of the Sale Proceeds Distributable Consideration.

(d)     *Voting*: Class 5 is Impaired under the Plan.  Holders of Term Loan Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 6 – 1.5L Notes Claims</u>

(a)     *Classification*:  Class 6 consists of 1.5L Notes Claims.

KE 65249798

(b)     *Allowance*:  The 1.5L Notes Claims shall be deemed Allowed in the amount of $521,922,961.37.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed 1.5L Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed 1.5L Notes Claim, each Holder of an Allowed 1.5L Notes Claim shall receive, up to the full amount of such Holder's Allowed 1.5L Notes Claim, either:

(i)     if Murray NewCo is the Winning Bidder, its Pro Rata share (along with Class 4, Class 5, Class 7, Class 8, and Class 9) of Stalking Horse Distributable Consideration, if any; or

(ii)    if an Entity other than Murray NewCo is the Winning Bidder, solely after payment in full in Cash of the Superpriority Claims and the Term Loan Claims, its Pro Rata share of the Sale Proceeds Distributable Consideration.

(d)     *Voting*:  Class 6 is Impaired under the Plan.  Holders of 1.5L Notes Claims are entitled to vote to accept or reject the Plan.

7.     Class 7 – Stub 2L Notes Claims

(a)     *Classification*:  Class 7 consists of Stub 2L Notes Claims.

(b)     *Allowance*:  The Stub 2L Notes Claims shall be deemed Allowed in the amount of $1,983,751.89.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Stub 2L Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Stub 2L Notes Claim, each Holder of an Allowed Stub 2L Notes Claim shall receive, up to the full amount of such Holder's Allowed Stub 2L Notes Claim, either:

(i)     if Murray NewCo is the Winning Bidder, its Pro Rata share (along with Class 4, Class 5, Class 6, Class 8, and Class 9) of Stalking Horse Distributable Consideration, if any; or

(ii)    if an Entity other than Murray NewCo is the Winning Bidder, solely after payment in full in Cash of the Superpriority Claims, the Term Loan Claims, and the 1.5L Notes Claims, its Pro Rata share of the Sale Proceeds Distributable Consideration.

(d)     *Voting*:  Class 7 is Impaired under the Plan.  Holders of Stub 2L Notes Claims are entitled to vote to accept or reject the Plan.

8.     Class 8 – 2L Notes Claims

(a)     *Classification*:  Class 8 consists of 2L Notes Claims.

(b)     *Allowance*:  The 2L Notes Claims shall be deemed Allowed in the amount of $312,634,748.43.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed 2L Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed 2L Notes Claim, each Holder

24

of an Allowed 2L Notes Claim shall receive, up to the full amount of such Holder's Allowed 2L Notes Claim, either:

(i)      if Murray NewCo is the Winning Bidder, its Pro Rata share (along with Class 4, Class 5, Class 6, Class 7, and Class 9) of Stalking Horse Distributable Consideration, if any; or

(ii)     if an Entity other than Murray NewCo is the Winning Bidder, solely after payment in full in Cash of the Superpriority Claims, the Term Loan Claims, the 1.5L Notes Claims, and the Stub 2L Notes Claims, its Pro Rata share of the Sale Proceeds Distributable Consideration.

(d)     *Voting*:  Class 8 is Impaired under the Plan.  Holders of 2L Notes Claims are entitled to vote to accept or reject the Plan.

9.     Class 9 – General Unsecured Claims

(a)     *Classification*:  Class 9 consists of all General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such Holder's Allowed General Unsecured Claim, either:

(i)      if Murray Newco is the Winning Bidder, its Pro Rata share (along with Class 4, Class 5, Class 6, Class 7, and Class 8) of Stalking Horse Distributable Consideration, if any; or

(ii)     if an Entity other than Murray Newco is the Winning Bidder, solely after payment in full in Cash of the Superpriority Claims, the Term Loan Claims, the 1.5L Notes Claims, the Stub 2L Notes Claims, and 2L Notes Claims, its Pro Rata share of the Sale Proceeds Distributable Consideration.

(c)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

10.     Class 10 – Intercompany Claims

(a)     *Classification*:  Class 10 consists of all Intercompany Claims.

(b)     *Treatment*:  Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claims.  On or after the Effective Date, the Plan Administrator may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present, or future tax or similar liabilities by the Debtors, including as provided in the Restructuring Steps Memorandum.

(c)     *Voting*:  Class 10 is Impaired or Unimpaired under the Plan.  Holders of Intercompany Claims are either (i) conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

11.     <u>Class 11 – Intercompany Interests</u>

(a)     *Classification*:  Class 11 consists of all Intercompany Interests.

(b)     *Treatment*:  Intercompany Interests shall be, at the option of the Debtors, with the consent of the Required Consenting Superpriority Lenders if Murray NewCo is the Winning Bidder, either:

(i)      Reinstated in accordance with Article III.G of the Plan; or

(ii)     cancelled and released without any distribution on account of such Interests.

(c)     Voting:  Class 11 is Impaired or Unimpaired under the Plan.  Holders of Intercompany Interests are either (i) conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

12.     <u>Class 12 – Interests in Holdings</u>

(a)     *Classification*:  Class 12 consists of all Interests in Holdings.

(b)     *Treatment*:  On the Effective Date, all Interests in Holdings will be cancelled, released, and extinguished, and will be of no further force or effect.

(c)     *Voting*:  Class 12 is Impaired under the Plan.  Holders of Interests in Holdings are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Interests in Holdings are not entitled to vote to accept or reject the Plan.

13.     <u>Class 13 – Section 510(b) Claims</u>

(a)     *Classification*:  Class 13 consists of all Section 510(b) Claims.

(b)     *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

(c)     *Treatment*:  Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d)     *Voting*:  Class 13 is Impaired under the Plan.  Holders (if any) of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders (if any) of 510(b) Claims are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired; *provided*, *however*, that the Reinstatement or other

26

treatment of such Claims shall not be inconsistent with the Sale Transaction Documentation.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.       *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.       *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Plan Administrator reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.       *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

G.       *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Winning Bidder, and in exchange for the Debtors' agreement under the Plan to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors to the Holders of certain Allowed Claims.

H.       *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims and Interests*

As discussed in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

B.    *Restructuring Transactions*

On the Effective Date, the Debtors shall take all actions set forth in the Restructuring Steps Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the Debtors, the Winning Bidder, and the Required Consenting Superpriority Lenders determine to be necessary or appropriate in connection with the consummation of the Sale Transaction, including making filings or recordings that may be required by applicable law in connection with the Plan.

C.    *Sources of Consideration for Plan Distributions*

On and after the Effective Date, the Debtors or the Plan Administrator, as applicable, will fund the Debtors' distributions and obligations under the Plan with (i) the Sale Proceeds, (ii) the New Takeback Debt, if any (iii) the Exit Facility, if any, (iv) the issuance and distribution of New Interests, (v) Cash proceeds from the sale of any of the Debtors' assets that are not acquired by the Winning Bidder, (vi) the Wind-Down Amount, and (vii) Cash on hand. After the Effective Date, to the extent not held in the Professional Fee Escrow Account, the amounts held by the Wind-Down Trust shall be held in the Wind-Down Trust Account.

1.    <u>Sale Transaction and Sale Proceeds</u>

The Debtors will conduct a marketing and Auction process of some or all of the Debtors' assets in accordance with the Bidding Procedures to determine the Winning Bidder. The Debtors will seek to elicit a higher or otherwise better offer than the Stalking Horse APA pursuant to the process set forth in the Bidding Procedures. If the Debtors are unable to secure such higher or otherwise better offer than provided for in the Stalking Horse APA at the conclusion of the marketing and Auction process contemplated by the Bidding Procedures, Murray NewCo will be the Winning Bidder for purposes of the Plan, and the Debtors will seek Confirmation of the Plan as contemplated herein. If the Debtors are able to secure a higher or otherwise better offer than the Stalking Horse APA in accordance with the Bidding Procedures, and the Winning Bidder is an Entity other than Murray NewCo, the Sale Transaction will be consummated pursuant to the Plan in accordance with an asset purchase agreement or asset purchase agreements to be set forth in the Plan Supplement.

On the Effective Date, the Debtors shall consummate the Sale Transaction and, among other things, the Acquired Assets shall be transferred to and vest in the Winning Bidder free and clear of all Liens, Claims, charges, interests or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Sale Transaction Documentation, each as applicable. In exchange, the Winning Bidder shall pay to the Debtors the Sale Proceeds or other non-Cash consideration in accordance with the Sale Transaction Documentation. On and after the Effective Date, except as otherwise provided in the Plan, the Winning Bidder may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

2.    The New Interests

On the Effective Date, in the event Murray NewCo is the Winning Bidder, Murray NewCo is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Steps Memorandum, issue the New Interests for eventual distribution to the Holders of Superpriority Claims in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Interests shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Interests issued pursuant to the Plan, as contemplated by the Sale Transaction, shall be duly authorized and validly issued.

On the Effective Date, the Murray NewCo and all holders of the New Interests then outstanding shall be deemed to be parties to the New Organizational Documents, substantially in the form contained in the Plan Supplement, without the need for execution by any such holder. The New Organizational Documents shall be binding on the Murray NewCo and all parties receiving, and all holders of, New Interests.

3.    The New Takeback Debt

If Murray NewCo issues New Takeback Debt, on the Effective Date, Murray NewCo shall execute and deliver the New Takeback Debt Documents, if any, and such documents shall become effective in accordance with their terms. On and after the Effective Date, the New Takeback Debt Documents, if any, shall constitute legal, valid, and binding obligations of Murray NewCo and be enforceable in accordance with their respective terms. The terms and conditions of the New Takeback Debt Documents, if any, shall bind Murray NewCo and each other Entity that enters into such New Takeback Debt Documents as a guarantor. Any Entity's entry into the New Takeback Debt Agreement, if any, shall be deemed as its agreement to the terms of such New Takeback Debt Documents, as amended or modified from time to time following the Effective Date in accordance with its terms. Whether or not Murray NewCo shall issue New Takeback Debt shall be determined by the Required Consenting Superpriority Lenders in consultation with the Debtors prior to the Confirmation Hearing.

Confirmation shall be deemed approval of the New Takeback Debt Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees and expenses paid in connection therewith), if any, and, to the extent not approved by the Bankruptcy Court previously, Murray NewCo will be authorized to execute and deliver those documents necessary or appropriate to obtain the New Takeback Debt, including the New Takeback Debt Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as Murray NewCo may deem to be necessary to enter into the New Takeback Debt Documents, if any.

On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the New Takeback Debt Documents, if any, (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Takeback Debt Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such other liens and security interests as may be permitted under the New Takeback Debt Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or applicable non-bankruptcy law.

4.   The Exit Facility

If Murray NewCo enters into the Exit Facility, on the Effective Date, Murray NewCo shall execute and deliver the Exit Facility Documents, if any, and such documents shall become effective in accordance with their terms. On and after the Effective Date, the Exit Facility Documents, if any, shall constitute legal, valid, and binding obligations of the Murray NewCo and be enforceable in accordance with their respective terms.  The terms and conditions of the Exit Facility Agreement shall bind Murray NewCo and each other Entity that enters into such Exit Facility Agreement as a guarantor.  Any Entity's entry into the Exit Facility Agreement shall be deemed as its agreement to the terms of such Exit Facility Agreement, as amended or modified from time to time following the Effective Date in accordance with its terms.  Whether or not Murray NewCo shall enter into the Exit Facility shall be determined by the Required Consenting Superpriority Lenders in consultation with the Debtors prior to the Confirmation Hearing.

Confirmation shall be deemed approval of the Exit Facility Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), if any, and, to the extent not approved by the Bankruptcy Court previously, Murray NewCo will be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, including the Exit Facility Documents, each as applicable, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Murray NewCo may deem to be necessary to enter into the Exit Facility Documents.

On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents, if any, (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or applicable non-bankruptcy law.

D.     *Plan Administrator and the Wind-Down Trust*

1.   Plan Administrator

On the Effective Date, the Plan Administrator shall be appointed for the purpose of conducting the Wind-Down and shall succeed to such powers as would have been applicable to the Debtors' officers, directors, and shareholders, and the Debtors shall be authorized to be (and, upon the conclusion of the Wind-Down, shall be) dissolved by the Plan Administrator.  The Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, articles of incorporation or amendment by-laws, and related documents, as applicable, are deemed amended pursuant to the Plan to permit and authorize the same).  From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for the post-Effective Date Debtors and their Estates.

Among other things, the Plan Administrator shall be responsible for: (1) implementing the Wind-Down as expeditiously as reasonably possible and administering the liquidation of the post-Effective Date Debtors and their Estates and any assets held by the Wind-Down Trust after the Effective Date and after consummation of the Sale Transaction, (2) resolving any Disputed Claims, (3) paying Allowed Claims, (4) filing appropriate tax returns, and (5) administering the Plan.

All property of the Estates not distributed to the Holders of Claims or Interests on the Effective Date, or transferred pursuant to the Sale Transaction Documents, shall be transferred to the Wind-Down Trust and managed and distributed by the Plan Administrator pursuant to the terms of the Wind-Down Trust Agreement and shall be held in the name of the Wind-Down Trust free and clear of all Claims and Interests except for rights to such distributions provided to Holders of Allowed Claims and Allowed Interests as provided in the Plan.  The Plan Administrator shall represent the Wind-Down Trust and shall have the right to retain the services of attorneys, accountants, and other

30

professionals that the Plan Administrator determines, in its sole discretion, are necessary to assist the Plan Administrator in performing his or her duties. The Plan Administrator shall pay the reasonable fees and expenses of such professionals upon the monthly submission of statements to the Plan Administrator without further order of the Bankruptcy Court. Any and all reasonable and documented costs and expenses incurred by the Plan Administrator in connection with the Wind-Down shall be paid from the funds of the Wind-Down Trust, subject to the terms and conditions of the Wind-Down Trust Agreement. The Plan Administrator shall be compensated and reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Wind-Down Trust Agreement. The Plan Administrator shall provide Murray NewCo with all non-privileged budgets, records, projections, financial information, reports, and other information that Murray NewCo (or its consultants and advisors) may reasonably request. In the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Plan Administrator, the Wind-Down Trust Agreement shall set forth the process for appointing a new Plan Administrator.

2.   The Wind-Down

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan, and the Plan Administrator shall have the power and authority to take any reasonable action necessary to implement the Wind-Down. On and after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Sale Transaction and Sale Transaction Documentation, and take such other reasonable actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind-Down, from and after the Effective Date, the Debtors (1) for all purposes, shall be deemed to have withdrawn their business operations from any state or province in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. The filing of the final monthly operating or disbursement report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

On the Effective Date, the Wind-Down Trust will be formed pursuant to the Wind-Down Trust Agreement and immediately after the consummation of the Sale Transaction to receive all of the remaining assets of the Debtors. The Wind-Down Trust will be established for the primary purpose of liquidating the Wind-Down Trust Assets and winding down the Estates, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Wind-Down Trust. The Debtors will have no reversionary or further interest in or with respect to the Wind-Down Trust Assets upon the transfer of the Wind-Down Trust Assets as more fully set forth in the Wind-Down Trust Agreement. The Debtors have agreed to take the position that grantor trust treatment applies to the extent reasonably practicable, in which case, for all U.S. federal income tax purposes, the beneficiaries of the Wind-Down Trust would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that the Wind-Down Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately foregoing sentence, it is intended for U.S. federal income tax purposes that the beneficiaries of the Wind-Down Trust be treated as if they had received an interest in the Wind-Down Trust's assets and then contributed such interests to the Wind-Down Trust. As soon as possible after the transfer of the Wind-Down Trust Assets to the Wind-Down Trust, the Plan Administrator, in consultation with any financial advisors it deems appropriate, shall make a good faith valuation of the Wind-Down Trust Assets. This valuation will be made available from time to time as may be relevant for tax reporting purposes. Each of the Debtors, the Plan Administrator, and the Holders of Claims receiving interests in the Wind-Down Trust shall take consistent positions with respect to the valuation of the Wind-Down Trust Assets, and such valuation shall be utilized for all U.S. federal income tax purposes. The Wind-Down Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Trusts Assets, make timely distributions to the beneficiaries of the Wind-Down Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration.

The Debtors expect that the Disputed Claims Reserve will be treated as a "disputed ownership fund" governed pursuant to section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate U.S. federal income tax return shall be filed with the U.S. Internal Revenue Service for the Disputed Claims Reserve, and the Disputed Claims Reserve will be subject to tax annually on a separate entity

basis.  Any taxes (including with respect to interest, if any, earned in the account, or any recovery on the portion of assets allocable to such account in excess of the Disputed Claims Reserve's basis in such assets) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

On the Effective Date, any Estate non-Cash assets remaining after the Sale Transaction is consummated shall vest in the Wind-Down Trust for the purpose of facilitating the above tasks.  Such assets shall be held free and clear of all Liens, Claims, and Interests, except as otherwise provided in the Plan.  The Debtors, the Plan Administrator, and the Wind-Down Trust shall be deemed to be fully bound to the terms of the Plan, the Confirmation Order, and the Wind-Down Trust Agreement.

On the Effective Date or as soon as reasonably practicable thereafter, the Wind-Down Trust shall be funded with the Wind-Down Amount pursuant to the Wind-Down Trust Agreement for the purpose of (a) satisfying all fees, expenses, and disbursements that the Plan Administrator may incur in connection with the Wind-Down, (b) paying fees and expenses that any attorney, accountant, or other professional that the Plan Administrator has retained to facilitate its duties, (c) until all Superpriority Claims are paid or otherwise satisfied in full, the Ad Hoc Group of Superpriority Lenders shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Ad Hoc Group of Superpriority Lenders, are necessary or desirable to assist the Ad Hoc Group of Superpriority Lenders, and the fees and expenses of such professionals shall be paid by the Plan Administrator from the Wind-Down Trust within 5 business days of submission of statements to the Plan Administrator and shall not be subject to the approval of the Bankruptcy Court, and (d) compensating the Plan Administrator, each in accordance with this Article IV.D and the Wind-Down Trust Agreement.

    3.   Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, provincial, and local tax returns for each of the Debtors and the Wind-Down Trust.

    4.   Dissolution of the Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Trust shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction.  Notwithstanding the foregoing, the Plan Administrator shall retain the authority to take all necessary actions to dissolve the Debtors in, and withdraw the Debtors from, applicable states and provinces to the extent required by applicable law.

E.    *New Organizational Documents*

On or prior to the Effective Date, Murray NewCo will file its applicable New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization.  The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, Murray NewCo may amend and restate their respective New Organizational Documents as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization; *provided* that the New Organizational Documents for Murray NewCo shall contain provisions for a limited right of first offer in favor of Robert E. Murray in form and substance acceptable to Robert E. Murray and the Required Consenting Superpriority Lenders.

F.    *New Board*

As of the Effective Date, except as set forth in this Article IV.F, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority

from and after such time to the extent not expressly included in the roster of the applicable New Board.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the New Board.  To the extent any such director or officer of the Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents, and other constituent documents of Murray NewCo.

The New Board shall consist of an odd number of directors, which shall be comprised of (i) Robert E. Murray, as Chairman of the New Board, (ii) Robert D. Moore, as Chief Executive Officer and President, and (iii) the remaining directors with industry and financial experience and expertise selected by the Required Consenting Superpriority Lenders in reasonable consultation with Robert E. Murray and Robert D. Moore.

G.      *New Employment Contracts*

On the Effective Date, Murray NewCo shall enter into New Employment Contracts with the employees covered by such New Employment Contracts, and such New Employment Contracts shall become effective in accordance with their terms and the Plan.

H.      *Cancellation of Existing Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Superpriority Credit Agreement, the Term Loan Credit Agreement, the 1.5L Indenture, the 2L Indenture, Stub 2L Indenture, and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors, and the Wind-Down Trust shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released. Notwithstanding the foregoing, (a) no executory contract or unexpired lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, (b) the Superpriority Credit Agreement, Term Loan Credit Agreement, 1.5L Indenture, Stub 2L Indenture, and 2L Indenture shall continue in effect solely for the purpose of (I) allowing Holders of the Superpriority Claims, Term Loan Claims, 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims, as applicable, to receive the distributions provided for under the Plan, (II) allowing the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees to receive or direct distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan, (III) preserving all rights, including rights of enforcement, of the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees to indemnification or contribution pursuant and subject to the terms of the Superpriority Credit Agreement, Term Loan Credit Agreement, 1.5L Indenture, Stub 2L Indenture, and 2L Indenture in respect of any Claim or Cause of Action asserted against the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees, as applicable, *provided* that any Claim or right to payment on account of such indemnification or contribution shall be an Administrative Claim, and (IV) permitting each of the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, *provided* that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Plan Administrator, as applicable, except as expressly provided for in the Plan and (2) except as otherwise provided herein, the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan, and (c) the foregoing shall not affect the cancellation of shares issued pursuant to the Plan nor Intercompany Interests, which shall be treated as set forth in Article III.B.12.

Each of the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees and their respective representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, each of the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees shall be relieved of and released from any obligations and duties arising thereunder. The fees, expenses, and costs of the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees, including costs of their respective professionals incurred after the Effective Date in connection with any obligation that survive under the Plan will be paid by the Debtors or Plan Administrator, as applicable, in the ordinary course.

Except as provided in this Plan, on the Effective Date, the DIP Agents and their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Documents. The commitments and obligations, if any, of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date. To the extent that any provision of the DIP Documents or DIP Order are of a type that survives repayment of the subject indebtedness, such provisions shall remain in effect notwithstanding satisfaction of the DIP Claims.

If the record Holder of either of the 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims is DTC or its nominee or another securities depository or custodian thereof, and Holders of such 1.5L Notes Claims, Stub 2L Notes Claims, or 2L Notes Claims are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of such 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims shall be deemed to have surrendered such Holder's note, debenture, or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

I.      *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (1) selection of the Plan Administrator; (2) implementation of the Restructuring Transactions; (3) consummation of the Sale Transaction; (4) performance under the Sale Transaction Documentation; (5) execution of the Sale Transaction Documentation; and (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Trust, and any corporate action required by the Debtors or the Wind-Down Trust in connection with the Plan or corporate structure of the Debtors or the Wind-Down Trust shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Plan Administrator. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Plan Administrator, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors or the Wind-Down Trust, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Sale Transaction, and the instruments issued pursuant to the Plan in the name of and on behalf of the Wind-Down Trust, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

K.    *Exemption from Securities Act Registration*

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder, the offering, issuance, exchange, or distribution of any securities pursuant to the Plan is or shall be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.

The New Interests (to the extent they are deemed to be securities) to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.  Should the Debtors or Murray NewCo, as applicable, elect on or after the Effective Date to reflect any ownership of the New Interests (to the extent they are deemed to be securities) to be issued under the Plan through the facilities of DTC, the Debtors or Murray NewCo, as applicable, need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Interests (to the extent they are deemed to be securities) to be issued under the Plan under applicable securities laws.  DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Interests (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Interests (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

To the extent the New Interests are deemed to be "securities," the issuance of such units under the Plan is exempt, pursuant to (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder (including with respect to an entity that is an "underwriter").

L.    *Exemption from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers of property under the Plan (including pursuant to the Sale Transaction Documentation) or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Trust, including in accordance with the Sale Transaction Documentation, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Sale Transaction), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

KE 65249798

M.     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII hereof and the Sale Transaction Documentation, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) acquired by the Winning Bidder in accordance with the Sale Transaction or (b) released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII, which shall be deemed released and waived by the Debtors and the Wind-Down Trust as of the Effective Date.

The Plan Administrator may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Trust.  The Plan Administrator shall retain and may exclusively enforce any and all such Causes of Action.  The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Administrator will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Winning Bidder in accordance with the Sale Transaction Documentation or otherwise expressly provided in the Plan, including this Article IV and Article VIII of the Plan.**  Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or transferred to the Winning Bidder in accordance with the Sale Transaction Documentation, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) have been previously assumed or rejected by the Debtors pursuant to a Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date; or (4) are a contract, release, or other agreement or document entered into in connection with the Plan.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases assumed, assumed and assigned, or rejected pursuant to the Plan or the Sale Transaction Documentation.  Any Filed motions to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases (or Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Plan Administrator, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party on or prior to the Effective Date, shall revest in the Debtors and be fully enforceable by the Plan Administrator in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Wind-Down Trust, the Plan Administrator, the Winning Bidder, or the property of any of the foregoing Entities without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, of the applicable cure amount identified on the Schedule of Assumed Executory Contracts or Unexpired Leases or other applicable Filed motion, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Debtors, the Winning Bidder, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, any such dispute shall be resolved as set forth in Article V.A above with any related cure payments required by section 365(b)(1) of the Bankruptcy Code to be made following the entry of a Final Order resolving the dispute and approving the assumption.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, the Sale Transaction Documentation, or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan, the Sale Transaction Documentation, or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.    *Insurance Policies*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed or assumed and assigned to the Winning Bidder, solely to the extent set forth in the Sale Transaction Documentation, and explicitly provided in the Schedule of Assumed Executory Contracts and Unexpired Leases, all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; *provided* that any insurance policies that are not assumed and assigned to the Winning Bidder shall be assumed by the Debtors for the sole purpose of resolving any Claims covered by such insurance policies, resolving any Causes of Action retained in connection with such insurance policies, and collecting any and all outstanding deposits, restricted cash, and letters of credit related thereto to the extent reasonably necessary to implement the Wind-Down in accordance with the Plan and the Wind-Down Trust Agreement.

Except as set forth in Article V.F of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Plan Administrator (or the Winning Bidder, solely to the extent assumed and assigned to the Winning Bidder under the Sale Transaction Documentation) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

F.    *Director, Officer, Manager, and Employee Liability Insurance*

After the Effective Date, nothing herein shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including, if applicable, any "tail policy") with respect to conduct occurring on or prior to the Effective Date, and nothing herein shall prejudice any officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date from being entitled to the full benefits of any such policy for the full term of such policy (including with respect to the purchase of a "tail policy," the full six-year term or other applicable term of such policy), following the purchase of such policy, regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

G.    *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations will be assumed and irrevocable and will survive the effectiveness of the Plan.  Before the Effective Date, the Debtors, and after the Effective Date, the Plan Administrator will not amend and/or restate the Debtors' respective governance documents to terminate or adversely affect any of the Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification right.

38

H.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

I.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and amendments or the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

J.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

K.      *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed or assumed and assigned by such Debtor, will be performed by the Debtor, the Plan Administrator, or the Winning Bidder, as applicable, in the ordinary course of business.  Accordingly, such contracts and leases (including any assumed or assumed and assigned Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI.
# PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Initial Distribution Date, on the next Quarterly Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the

distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Distributions on Account of Obligations of Multiple Debtors*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan, *provided* that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor.  Any such Claims shall be released pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

C.    *Distributions Generally*

Except as otherwise provided herein, distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Trust.

Notwithstanding any provision of the Plan to the contrary, distributions to Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims shall be made to or at the direction of each of the Indenture Trustees, as applicable, each of which shall act as Disbursing Agent for distributions to the respective Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims under the 1.5L Indenture, Stub 2L Indenture, and 2L Indenture, as applicable.  The Indenture Trustees shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.  The Indenture Trustees may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims.  All distributions to be made to Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the 1.5L Indenture, Stub 2L Indenture, or 2L Indenture, as applicable.

D.    *Rights and Powers of Disbursing Agent*

1.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash from the Wind-Down Trust.

E.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    <u>Record Date for Distribution</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, with respect to Holders of Superpriority Claims and Term Loan Claims, distributions shall be made to such Holders that are listed on the register or related document maintained by the Superpriority Agent and Term Loan Agent.  Notwithstanding the foregoing, the Distribution Record Date shall not apply to the Indenture Trustees with respect to Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims.

2.    <u>Delivery of Distributions</u>

(a)      Initial Distribution Date

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records or the register or related document maintained by, as applicable, the DIP Term Loan Agent or the Superpriority Agent as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the reasonable discretion of the Disbursing Agent; *provided, further,* that the address for each Holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such Holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

(b)      Quarterly Distribution Date

Except as otherwise determined by the Plan Administrator in its reasonable discretion, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims and Interests under the Plan on such date.  Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim or Interest on such date, shall be distributed on the first Quarterly Distribution Date after such Claim or Interest is Allowed.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.I of the Plan.

(c)      Distributions to Holders of Superpriority Claims

Except as set forth in this Article VI.E.2(c), the Superpriority Agent shall be deemed to be the Holder of all Superpriority Claims for purposes of distributions to be made hereunder, and all distributions on account of such Superpriority Claims shall be made to or on behalf of the Superpriority Agent.  The Superpriority Agent shall hold or direct such distributions for the benefit of the Holders of Superpriority Claims.  As soon as practicable following compliance with the requirements set forth in this Article VI, the Superpriority Agent shall arrange to deliver or direct the delivery of such distributions for which it is the deemed Holder to or on behalf of such Holders of Allowed Superpriority Claims.

Notwithstanding anything to the contrary herein, the Superpriority Agent shall be entitled to maintain a record of Holders of Superpriority Claims in the ordinary course of business and shall be entitled without regard to the general occurrence of the Distribution Record Date, to make distributions that it receives under the Plan to Holders of Superpriority Claims based upon its books and records.  The Superpriority Agent shall not be held liable to any person with respect to distributions made or directed to be made by the Superpriority Agent except for liability arising from gross negligence, willful misconduct, or actual fraud of the Superpriority Agent.

3.   Minimum Distributions

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $100 in value (whether cash or otherwise), and each such Claim to which this limitation applies shall be released pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting such Claim against the Debtors, the Wind-Down Trust, the Plan Administrator, or their property.

4.   Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Trust automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be released and forever barred.

A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Plan Administrator of an intent to accept a particular distribution; (c) responded to the Debtors' or Plan Administrator's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

F.     *Distributions on Account of Claims or Interests Allowed After the Effective Date*

1.   Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Effective Date, but which later become Allowed Claims or Interests, as applicable, shall be deemed to have been made on the applicable Quarterly Distribution Date after they have actually been made, unless the Plan Administrator and the applicable Holder of such Claim or Interest agree otherwise. No interest shall accrue or be paid on a Disputed Claim before it becomes an Allowed Claim in accordance with Article VI.I of the Plan.

2.   Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Plan Administrator, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until the Disputed Claim or Interest has become an Allowed Claim or Interest, as applicable, or has otherwise been resolved by settlement or Final Order; *provided* that if the Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated Holders of Allowed Claims pursuant to the Plan.

G.     *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Plan Administrator, as applicable, reserve

42

the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.    *Allocations Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.    *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan, the DIP Order, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

J.    *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.    *Setoffs and Recoupment*

Except as expressly provided in this Plan, the Plan Administrator may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided, however,* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any and all claims, rights, and Causes of Action that such Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Plan Administrator, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, all rights of counterparties to unexpired leases of nonresidential real property that have been rejected for setoff, recoupment, and subrogation are preserved and shall continue unaffected by Confirmation or the occurrence of the Effective Date.

L.    *Claims Paid or Payable by Third Parties*

1.    <u>Claims Paid by Third Parties</u>

The Debtors or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Plan Administrator.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of

the date of any such distribution under the Plan. If the Debtors or the Plan Administrator, as applicable, become aware of any payment of a Claim by a third party, the Debtors or Plan Administrator, as applicable, will send a notice of wrongful payment to the Holder of such Claim requesting the return of any excess payments and advising the recipient of the provisions of the Plan requesting turnover of excess estate funds. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Plan Administrator annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.   Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.   *Allowance of Claims*

After the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date except for such rights and defenses assigned or transferred to the Winning Bidder in accordance with the Sale Transaction Documentation.

B.   *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, the Plan Administrator shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.   *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under

44

the Plan (including for purposes of distributions), and the relevant Debtor or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Plan Administrator without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim against or Interest in the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Plan Administrator without the Plan Administrator having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

F.      *Disallowance of Claims*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Trust. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Plan Administrator.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H.     *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.     *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.     *Settlement, Compromise, and Release of Claims and Interests*

Pursuant to, and to the maximum extent provided by, section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (including Article IV.H) or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, compromise, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.

B.     **Release of Liens**

**On the Effective Date, concurrently with the consummation of the Sale Transaction and except as otherwise set forth in the Sale Transaction Documentation, the Acquired Assets shall be transferred to and vest in the Winning Bidder free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Sale Transaction Documentation, each as applicable.  Without limiting the foregoing, except as otherwise provided in the Plan, the Plan Supplement, the Exit Facility Documents, if any, the New Takeback Debt Documents, if any, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim or Secured Tax Claim, satisfaction in full of the portion of the Other Secured Claim or Secured Tax Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.2 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests**

46

against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Plan Administrator to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

C.      *Debtor Release*

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date each Released Party is deemed released and discharged by each and all of the Debtors, their Estates, and the Wind-Down Trust, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Wind-Down Trust, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, their Estates, or the Wind-Down Trust, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Superpriority Loan Documents, the ABL Loan Documents, the Restructuring Transactions, the Sale Transaction, entry into the Sale Transaction Documentation, the Exit Facility, if any, the New Takeback Debt, if any, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Disclosure Statement, the DIP Term Loan Facility, the Sale Transaction, the Sale Transaction Documentation, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Term Loan Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of the Winning Bidder to the Debtors relating to the Sale Transaction Documentation, (2) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including the Sale Transaction Documentation and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan, and (3) any Causes of Action listed on the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and

definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their respective Estates, or the Wind-Down Trust asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

D.    *Third-Party Release*

Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, on and after the Effective Date each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Superpriority Loan Documents, the ABL Loan Documents, the Restructuring Transactions, the Sale Transaction, entry into the Sale Transaction Documentation, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Disclosure Statement, the DIP Term Loan Facility, the Sale Transaction, the Sale Transaction Documentation, the Plan, the Plan Supplement, the Exit Facility, if any, the New Takeback Debt, if any, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Term Loan Facility, the Exit Facility, if any, the New Takeback Debt, if any, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any liabilities or obligations of any Entity to the Winning Bidder relating to the Sale Transaction Documentation, or any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including the Sale Transaction Documentation and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each Third-Party Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their respective Estates, or the Wind-Down Trust asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

48

E.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Cause of Action for any claim related to any act or omission based on the negotiation, execution, and implementation of any and all transactions approved by the Bankruptcy Court in the Chapter 11 Cases, including the RSA, the Sale Transaction Documentation, the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order, or created or entered into in connection with the RSA, the Sale Transaction Documentation, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance of any securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement, and the implementation of the Sale Transaction and the Restructuring Transactions contemplated by the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, except for claims related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity relating to the Sale Transaction Documentation, or for any post-Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

F.    *Injunction*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.A of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of liens pursuant to Article VIII.B of the Plan), or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Trust, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan; *provided* that the foregoing shall not enjoin any Consenting Superpriority Lender from exercising any of its rights under the RSA in accordance with the terms thereof.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.**

G.      *Protections Against Discriminatory Treatment*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention*

On and after the Effective Date, the Plan Administrator may maintain documents in accordance with the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Plan Administrator.

I.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

J.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

K.      *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim

50

or any distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, their respective property, and Holders of Claims and Interests and is fair, equitable, and reasonable.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall not have been stayed, modified, or vacated on appeal;

2.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the Sale Transaction;

3.    if applicable, the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility shall be deemed to occur concurrently with the occurrence of the Effective Date;

4.    if applicable, the New Takeback Debt Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Takeback Debt shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New Takeback Debt shall be deemed to occur concurrently with the occurrence of the Effective Date;

5.    to the extent required by the Winning Bidder, the Debtors shall have (a) reached an agreement with the applicable authorized representatives of the employees and retirees regarding modifications to the Debtors' Collective Bargaining Agreements and retiree benefits, respectively, in form and substance acceptable to the Required Consenting Superpriority Lenders or the Winning Bidder (to the extent Murray NewCo is not the Winning Bidder), or (b) absent such agreement, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Required Consenting Superpriority Lenders or the Winning Bidder (to the extent Murray NewCo is not the Winning Bidder), authorizing the rejection of the Debtors' Collective Bargaining Agreements under section 1113 of the Bankruptcy Code and the modification of the Debtors' retiree benefits under section 1114 of the Bankruptcy Code and such order shall have become a Final Order;

6.    the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

7.    the RSA shall not have been terminated and shall remain in full force and effect, and the Required Consenting Superpriority Lenders shall not have provided notice to the Debtors that an event or occurrence that, with the passage of time, would give rise to a right of such Required Consenting Superpriority Lenders to terminate the RSA, which right such Required Consenting Superpriority Lenders have informed the Debtors they intend to exercise;

8.    all unpaid fees and expenses incurred on or before the Effective Date by all attorneys, advisors, and other professionals payable under the RSA, the DIP Order, or the Plan shall have been paid in Cash; and

51

9.    all conditions precedent to the consummation of the Sale Transaction shall have been satisfied in accordance with the terms thereof, and the closing of the Sale Transaction shall be deemed to occur concurrently with the occurrence of the Effective Date.

B.    *Waiver of Conditions*

Subject to and without limiting the rights of each party to the RSA, the conditions to Consummation set forth in Article IX may be waived by the Debtors with the consent of the Required Consenting Superpriority Lenders and the Winning Bidder (solely to the extent relating to or concerning the Sale Transaction) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

C.    *Substantial Consummation*

The "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date.

D.    *Effect of Failure of Conditions*

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

# ARTICLE X.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Required Consenting Superpriority Lenders and the Winning Bidder (solely to the extent relating to or concerning the Sale Transaction as contemplated in the Sale Transaction Documentation), reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, in each case subject to the consent rights set forth in the RSA.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans, in each case subject to any applicable consent rights as set forth in the RSA, the DIP Order, or the DIP Term Loan Facility.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests),

assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Causes of Action, or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the extent legally permissible, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Professional Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Plan Administrator amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.    ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

8.    enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, 1141, or 1146(a) of the Bankruptcy Code;

9.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

53

11.    resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.    resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid in accordance with the Plan;

13.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or, subject to any applicable forum selection clauses, any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order or any Entity's obligations incurred in connection with the Plan, including, subject to any applicable forum selection clauses, disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

21.    adjudicate, decide, and resolve any cases, controversies, suits, or disputes related to (and/or arising under, as applicable) the Sale Transaction or the Sale Transaction Documentation; *provided, however,* that the Bankruptcy Court's jurisdiction shall not be exclusive;

22.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

24.    enforce all orders previously entered by the Bankruptcy Court; and

25.    hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective

54

and enforceable and deemed binding upon the Debtors, the Wind-Down Trust, the Plan Administrator, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Payment of Certain Fees*

The Debtors and, after the Effective Date, the Plan Administrator shall continue to pay, reimburse, and honor the Contingent DIP Obligations.  Counsel to each of the DIP Agents, the DIP Term Loan Lenders, and the DIP FILO Lender shall be authorized to disburse any and all retainer monies in its possession to reimburse the reasonable fees and expenses of such counsel.

C.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Plan Administrator, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.      *Payment of Statutory Fees*

Each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors) shall pay all fees payable pursuant to section 1930(a)(6) of the Judicial Code, together with any interest thereon pursuant to 31 U.S.C. § 3717, on or before the Effective Date in Cash, based on disbursements in and outside the ordinary course of the Debtors' business and Plan payments.  Thereafter, such fees and any applicable interest shall be paid by the Wind-Down Trust (or the Disbursing Agent on behalf of each of the Wind-Down Trust) until the earlier of entry of a final decree closing such Chapter 11 Case or an order of dismissal or conversion, whichever occurs first.

E.      *UCC and Cessation of Fee and Expense Payment*

On the Effective Date, the UCC shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the UCC and its Professionals.  Neither the Debtors nor the Wind-Down Trust shall be responsible for paying any fees or expenses incurred by the members of or advisors to the UCC after the Effective Date.

F.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

G.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.      *Notices*

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by courier or registered or certified mail (return receipt requested) or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

1.    If to the Debtors, to:

> Murray Energy Holdings Co.
> 46226 National Road,
> St. Clairsville, Ohio 43950
> Attention:  Mike McKown
>                     Robert Moore
> E-mail:     mmckown@coalsource.com
>                 rmoore@coalsource.com

> with copies (which shall not constitute notice) to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attention:  Nicole L. Greenblatt, P.C.
>                     Mark McKane, P.C.
> E-mail:     nicole.greenblatt@kirkland.com
>                 mark.mckane@kirkland.com

> - and -

> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois 60654
> Attention:  Ross M. Kwasteniet, P.C.
>                     Joseph M. Graham
>                     Tricia Schwallier
> E-mail:     ross.kwasteniet@kirkland.com
>                 joe.graham@kirkland.com
>                 tricia.schwallier@kirkland.com

2.    If to the Consenting Superpriority Lenders or the DIP Term Loan Lenders, to:

> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, New York 10017
> Attention:  Damian S. Schaible
>                     Adam L. Shpeen
> E-mail:     damian.schaible@davispolk.com
>                 adam.shpeen@davispolk.com

3.    If to the UCC, to:

> Morrison Foerster
> 250 West 55th Street
> New York, New York 10019
> Attention:  Lorenzo Marinuzzi
>                     Jennifer Marines

56

E-mail:     lmarinuzzi@mofo.com
jmarines@mofo.com

After the Effective Date, the Plan Administrator may notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses.  This Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to Plan and the documents comprising the Plan Supplement is part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

J.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice and Claims Agent at https://cases.primeclerk.com/MurrayEnergy  (or for a fee) the Bankruptcy Court's website at http://www.ecf.ohsb.uscourts.gov/.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.  Notwithstanding anything to the contrary in this Plan, in the event of any inconsistency between the Sale Transaction Documentation and this Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, the Sale Transaction Documentation shall control solely with respect to the assumption and assignment of Executory Contracts and Unexpired Leases, the Causes of Action listed on the Schedule of Retained Causes of Action, the Acquired Assets, the Assumed Liabilities (as defined in the Sale Transaction Documentation), and any other matter between or among the Winning Bidder and the Debtors or the Plan Administrator, their successors and permitted assigns, or any other Entity, relating to the Sale Transaction Documentation.

K.      *Non-Severability of Plan Provisions*

The provisions of the Plan, including its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

L.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

M.      *Closing of Chapter 11 Cases*

The Plan Administrator shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

N.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 65249798

Respectfully submitted, as of the date first set forth above,

Murray Energy Holdings Co.


By:     */s/ Robert D. Moore*
Name:   Robert D. Moore
Title:  President, Chief Executive Officer, and Chief Financial Officer