# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) Case No. 19-56885 (JEH) |
| | ) |
| | ) Judge John E. Hoffman, Jr. |
| Debtors. | ) |
| | ) (Jointly Administered) |

**BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE STALKING HORSE PURCHASE AGREEMENT, (II) APPROVING THE BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (III) APPROVING THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**
[RELATED TO DOC. NO. 326]

Black Diamond Commercial Finance, L.L.C. (the "Agent"), as Administrative Agent with respect to the outstanding term loans (the "Outstanding Term Loans") issued under the Credit and Guaranty Agreement dated April 16, 2015, as amended or otherwise modified from time to time (the "Term Loan Agreement"), by and among Murray Energy Corporation as Borrower, Murray Energy Holdings Co., certain subsidiaries of Borrower as guarantors (collectively, the "Debtors"), the lenders party thereto from time to time and the Agent, by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter Into and Perform Under the Stalking Horse Purchase Agreement, (II) Approving the Bidding Procedures in Connection With the Sale of All or Substantially All of*

---

[1] Due to the large number of Debtors in these chapter 11 cases (the "Chapter 11 Cases"), a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Co.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 46226 National Road, St. Clairsville, Ohio 43950.

*the Debtors' Assets, (III) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Doc. No. 326] (the "<u>Motion</u>").[2] In support of this Objection, the Agent respectfully states as follows:

## PRELIMINARY STATEMENT

1. Through the Motion, the Debtors seek entry of an order (i) authorizing the Debtors to enter into and perform under a Stalking Horse Agreement (as defined below) with an entity to be formed by the Superpriority Term Lenders (as defined below) and (ii) approving bidding procedures for the sale of all or substantially all of their assets. The Debtors seek to effectuate the sale contemplated by the Stalking Horse Agreement through the Plan (as defined below), which was filed contemporaneously with the Motion. The foundational predicate for the Motion, Stalking Horse Agreement and Plan is a credit bid of "certain" debt held by the Superpriority Term Lenders.

2. The Motion, Stalking Horse Agreement and Plan presume that the Superpriority Term Lenders possess an indisputable right to credit bid their outstanding debt. By the plain words of Section 363(k) of the Bankruptcy Code, however, there are two instances in which a secured creditor cannot credit bid: (i) where the lender does not have an "allowed" claim and (ii) when the court, "for cause," orders otherwise. 11 U.S.C. § 363(k).

3. On November 20, 2019, the Agent filed the Adversary Complaint (as defined below), pursuant to which the Agent seeks a ruling that, among others things, (i) the 2018 Refinancing Transactions (as defined below) are null and void and (ii) the Term Loan Lenders (as defined below) are the true senior and first lien lenders with respect to the Term Loan Collateral (as defined below). The Adversary Complaint is an objection to the allowance of the Superpriority

---

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Motion.

Term Lenders' claims and, consequently, the Superpriority Term Lenders do not have "allowed" claims for purposes of Section 363(k). Moreover, the Adversary Complaint creates a bona fide dispute as to the validity and priority of the liens held by the Superpriority Term Lenders, justifying this Court finding "cause" for denying the Superpriority Term Lenders' right to credit bid their debt. For these reasons, this Court should deny the Superpriority Term Lenders the right to credit bid under Section 363(k) of the Bankruptcy Code.

4. Notwithstanding the foregoing, the Agent recognizes the need to advance these Chapter 11 Cases and that a sale in which the bid under the Stalking Horse Agreement serves as a "floor" may be in the best interests of the Debtors' estates. Accordingly, to resolve the Objection, the Agent sent to the Debtors and the Superpriority Term Lenders a markup of the Bidding Procedures (as defined below) and Bidding Procedures Order (as defined below), copies of which are attached hereto as Exhibit A. Among other changes, the Agent proposed that the Superpriority Term Lenders establish a cash reserve in an amount equal to the obligations due under the Term Loan Agreement in the event that the Superpriority Term Lenders are the successful bidder <u>and</u> the Adversary Complaint has not been dismissed or resolved in favor of the Defendants (as defined below) thereto. The changes will adequately protect the interests of the Term Loan Lenders while permitting a sales process in which the Stalking Horse Agreement serves as a "floor," regardless of whether the Adversary Complaint has been resolved by the time of the Sale Hearing.

5. Despite the Agent's attempt to compromise, the Superpriority Term Lenders have informed the Agent that they will not agree to the revisions to the Bidding Procedures and Bidding Procedures Order proposed by the Agent. The Agent, therefore, respectfully requests that, if this Court grants the Superpriority Term Lenders the right to credit bid, it do so with the changes to the Bidding Procedures and Bidding Procedures Order as reflected in Exhibit A hereto.

## BACKGROUND

6. Over four years ago, the Debtors entered into the Term Loan Agreement, pursuant to which the lenders party thereto issued to the Debtors $2,000,000,000 in senior secured term loans. To secure the term loans issued pursuant to the Term Loan Agreement (the "Original Term Loans"), the lenders were granted a first priority lien on certain fixed asset collateral (the "Term Loan Collateral").

7. On June 29, 2018, through a series of transactions and agreements—including the Waiver, Consent and Amendment No. 3 to Credit and Guaranty Agreement dated as of June 29, 2018 (the "Third Amendment"), the Second Amended and Restated Collateral Trust Agreement dated as of June 29, 2018 (the "CTA"),[3] the Superpriority Credit and Guaranty Agreement dated as of June 29, 2018, and the Second Amended and Restated Intercreditor Agreement dated as of June 29, 2018—the Debtors purportedly consummated refinancing transactions (the "2018 Refinancing Transactions") with, among others, certain lenders under the Term Loan Agreement (the "Superpriority Term Lenders").

8. Pursuant to the 2018 Refinancing Transactions, among other things, the Debtors issued new term loans (the "Superpriority Term Loans") to the Superpriority Term Lenders in exchange for the Superpriority Term Lenders relinquishing 97% of the Original Term Loans in connection with a purported modified Dutch auction (the "Auction"). Certain lenders holding approximately $51 million of the Original Term Loans did not participate in the 2018 Refinancing

---

[3] Although the CTA provides that the Agent will not oppose and will consent to the entry of an order relating to a sale of assets of the Debtors if consented to by certain Superpriority Term Lenders (CTA § 2.11(a)(4)), this provision is inapplicable for two reasons. *First*, the Agent is challenging the validity of the CTA and cannot be held to provisions of an agreement subsequently determined to be null and void. That would negate any judicial review of actions taken under invalid agreements. *Second*, through the Bid Procedures Motion, the Debtors only seek approval of procedures to accept bids for the Debtors' assets, not to effectuate the sale. The sale will be effectuated through the Plan. Accordingly, the restriction in Section 2.11(a)(4) of the CTA, to the extent it is even valid and enforceable, is inapplicable to the Motion.

Transactions (such lenders, the "Term Loan Lenders").  The terms of the 2018 Refinancing Transactions, specifically the CTA, provide that the Superpriority Term Loans are secured by liens on the Term Loan Collateral that rank senior to the liens securing the Outstanding Term Loans (such liens, the "Superpriority Liens").

9. After it became apparent that the Debtors could not continue to meet their financial obligations, the Debtors, an ad hoc group formed by certain of the Superpriority Term Lenders (the "Ad Hoc Group"), and certain other parties entered into a Restructuring Support Agreement, dated October 28, 2019 [Doc. No. 323-3] (the "RSA"), which provided for the backstop of $350 million in new money debtor in possession financing and set forth the framework for the going concern sale of substantially all of the Debtors' assets to be effectuated through a Chapter 11 plan. Pursuant to the RSA, the Ad Hoc Group agreed to direct the agent for the Superpriority Term Loans to form Murray NewCo to effectuate the sale and plan pursuant to a credit bid.

10. On October 29, 2019, each of the Debtors filed a voluntary petition for relief [Doc. No. 1] under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Ohio (the "Court").

11. On November 20, 2019, the Agent, on behalf of the Term Loan Lenders, filed a complaint [Doc. No. 245] (the "Adversary Complaint") against certain of the Debtors, GLAS Trust Company LLC, as administrative agent for the Superpriority Term Loans, and U.S. Bank, N.A., as collateral trustee under the CTA (collectively, the "Defendants"), seeking, among other things, a declaratory judgment that (i) the 2018 Refinancing Transactions are invalid, null and void and (ii) the Term Loan Lenders are the true senior and first lien lenders with respect to the Term Loan Collateral.  The key documents supporting the request for declaratory relief (referenced in Paragraph 7 above) are attached to the Adversary Complaint as Exhibits; they are incorporated by

reference herein but not attached due to their voluminous nature. Moreover, the Debtors, Murray Energy Corporation and Murray Energy Holdings Co., Debtors' counsel, and other Defendants to the adversary proceeding have been served with the Adversary Complaint and all Exhibits thereto.[4]

12. On December 3, 2019, the Debtors filed the *Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Doc. No. 322] (the "Plan"). Pursuant to Article III(B)(4) of the Plan, the Debtors seek to effectuate the credit bid sale by distributing the equity interests in Murray NewCo to the Superpriority Term Lenders. No distribution is contemplated for the Term Loan Lenders.

13. On December 4, 2019, the Debtors filed the Motion seeking entry of an order (the "Bidding Procedures Order"), among other things, (i) authorizing the Debtors to enter into and perform under an asset purchase agreement with Murray NewCo (the "Stalking Horse Agreement"), and (ii) approving the proposed bidding procedures (the "Bidding Procedures"). The Debtors did not include the Stalking Horse Agreement with the Motion or Bidding Procedures; rather, the Debtors included a term sheet (the "Term Sheet") that sets forth only certain terms and conditions that will form the basis of the eventual Stalking Horse Agreement.

14. Pursuant to the Term Sheet, in exchange for a credit bid of "certain" debt owed to the Superpriority Term Lenders in "an amount to be determined" by the requisite consenting Superpriority Term Lenders, Murray NewCo has committed to (i) purchase, acquire, and take an assignment and delivery of substantially all of the Debtors' assets "free and clear of all liens, claims, encumbrances, and other interests" except as otherwise provided and (ii) assume certain liabilities associated with the Debtors' operations. To date, the Superpriority Term Lenders have not specified the amount of debt that they intend to credit bid.

---

[4] The key documents are also available via the Court's Case Management/Electronic Case Filing (CM/ECF) system and can be provided upon request to the undersigned counsel.

15.     The Bidding Procedures provide that the Stalking Horse Agreement will act as a "floor" for an overbid process. (Motion ¶ 6). Moreover, the Bidding Procedures set March 16, 2020 as the bid deadline (the "Bid Deadline") and March 26, 2020 as the date of the auction (the "Auction").[5]

16.     At the request of the Defendants, the Agent agreed to extend the time for the Defendants to answer or otherwise respond to the Adversary Complaint. On December 12, 2019, the Agent and Defendants filed the *Joint Stipulation to Entry of an Agreed Order Extending Response Time and Setting Briefing Schedule* [Doc. No. 430] pursuant to which (a) the Defendants' response/answer to the Adversary Complaint is due January 17, 2020, (b) the Agent's opposition to the response/answer is due February 7, 2020, and (c) the Defendants' reply in further support of the response/answer is due February 21, 2020. On December 27, 2019, the Court entered the *Agreed Order Extending Response Time and Setting Briefing Schedule [Related to Docket No. 24]* in Adversary Proceeding No. 19-02143 [Doc. No. 32].

17.     On December 12, 2019, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Doc. No. 431] (the "Final DIP Order"). Pursuant to the Final DIP Order, the Debtors made certain stipulations (the "Stipulations"), subject to paragraph 31 of the Final DIP Order, including, among other things, that (i) they were "justly and lawfully indebted and liable" to the Superpriority Term Lenders "without defense, challenge, objection, claim, counterclaim, or offset of any kind" in the aggregate amount of $1,726,555,184.84 (Final DIP Order ¶ 7(b)(ii)); and (ii) the liens

---

[5]  The original Bid Deadline was March 2, 2016 and the original Auction date was March 12, 2020. These dates were extended to resolve objections to the Final DIP Order (as defined below).

granted to the Superpriority Term Lenders on the Term Loan Collateral are valid and the priority of such liens are subject to Section 2.6 of the CTA (Final DIP Order ¶ 7(f)).

18. Notwithstanding the Stipulations, paragraph 31 of the Final DIP Order sets forth the requirements for parties in interest to Challenge (as defined in the Final DIP Order) the Stipulations. It provides that "[i]f no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding," then the Superpriority Term Loans shall "<u>constitute allowed claims</u> not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance for all purposes in the Chapter 11 Cases." (Final DIP Order ¶ 31) (emphasis added).

19. With respect to the Adversary Complaint, the Final DIP Order finds that "[t]he [Adversary Complaint] is a timely filed Challenge (timely filed within the 75 calendar day period set forth in this Final [DIP] Order) to certain of the stipulations, admissions, agreements and releases contained in this Final [DIP] Order, including, without limitation, in paragraph 7 of this Final [DIP] Order, subject to all claims and defenses of the Debtors, named defendants, and other parties in interest." (Final DIP Order ¶ 31).

20. Finally, with respect to credit bids, the Final DIP Order provides that the Superpriority Term Lenders have the right to credit bid, "[u]nless otherwise ordered by the Court . . . ." (Final DIP Order ¶ 43).

**OBJECTION**

**I. The Superpriority Term Lenders Cannot Credit Bid Under Section 363(k) Because They Do Not Have "Allowed" Claims And The Court Has "Cause" To Order Otherwise**

21. Section 363(k) of the Bankruptcy Code states that "[a]t a sale under subsection (b) of this section of property that is subject to a lien that secures an <u>allowed claim</u>, <u>unless the court</u>

8

<u>for cause orders otherwise</u> the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k) (emphasis added). "The right to credit bid its claim is an important protection for a secured party whose collateral is being liquidated" as it allows a secured creditor "to retake the property when it believes the price bid at the sale does not sufficiently reflect the value of the collateral." 3 Collier on Bankruptcy ¶ 363.06[10] (16th ed. 2019).

22. But "the right to credit bid is not absolute," and the Bankruptcy Code "plainly contemplates situations in which estate assets encumbered by liens are sold without affording secured lenders the right to credit bid." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 315 (3d Cir. 2010); *see also In re RML Dev., Inc.*, 528 B.R. 150, 155 (Bankr. W.D. Tenn. 2014) ("'[C]redit bidding' under § 363(k) does *not* allow the holder of an allowed secured claim to exercise an *absolute right* to purchase its collateral and offset that purchase by its allowed secured claim." (emphasis in original)); *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014) ("[T]he right to credit bid is not absolute.").

23. Indeed, the plain words of Section 363(k) specify two instances in which a secured creditor's right to credit bid may be denied: (a) when the lender does not hold an "allowed" claim or (b) where the court "for cause" orders otherwise. 11 U.S.C. § 363(k).

24. Because the Superpriority Term Lenders do not have "allowed" claims and the Court has "cause" to deny their right to credit bid, the Court must deny the Superpriority Term Lenders' right to credit bid.

    A.    **The Superpriority Term Lenders Do Not Have "Allowed" Claims As Required Under Section 363(k)**

25. A secured lender may only credit bid to the extent it has a lien on property that secures an "allowed" claim. 11 U.S.C. § 363(k). A claim is "deemed allowed, unless a party in

9

interest . . . objects." 11 U.S.C. § 502(a).[6] Upon a timely objection, the claim is no longer deemed "allowed" and may only be subsequently "allowed" after notice, hearing, and the court's determination. 11 U.S.C. § 502(b).

26. As a result of the provisions in the Final DIP Order, the filing of a Challenge is the only means by which a party in interest, including the Agent, may object to the allowance of the Superpriority Term Lenders' claims. If a Challenge is not timely filed, the Stipulations become binding on all parties in interest (including the Agent) and the Superpriority Term Loans will "<u>constitute allowed claims</u> not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance for all purposes in the Chapter 11 Cases." (Final DIP Order ¶ 31) (emphasis added).

27. The Agent, however, filed a Challenge when it filed the Adversary Complaint, seeking a judgment declaring, among other things "that Section 2 of the Third Amendment was ineffective and any actions taken thereby (including the 2018 Refinancing Transactions and the amendment to the 2013 Collateral Trust Agreement) are null and void." (Adversary Complaint p. 20). Moreover, the Final DIP Order, agreed to by the Debtors and the Superpriority Term Lenders, explicitly acknowledges that the Adversary Complaint "is a timely filed Challenge . . . ." (Final DIP Order ¶ 31).

28. By filing the Adversary Complaint and commencing the "timely filed Challenge," the Agent objected to the allowance of the Superpriority Term Lenders' claims. *See also In re CS Mining, LLC*, 574 B.R. 259 (Bankr. D. Utah 2017) (holding that a secured creditor does not have an "allowed" claim where another creditor objected to the claim through the filing of an adversary

---

[6] "Party in interest" is defined broadly under the Bankruptcy Code. 11 U.S.C. § 1109(b); s*ee also In re Addison Community Hosp. Authority*, 175 B.R. 646, 650 (Bankr. E.D. Mich. 1994) ("1109(b) must be broadly construed to permit parties affected by the proceeding to appear and be heard.").

complaint). Consequently, pursuant to Section 502(b) of the Bankruptcy Code, the Superpriority Term Lenders' claims are not "allowed" absent a determination by this Court that the Challenge be overruled and, thus, until such time, the Superpriority Term Lenders cannot credit bid under Section 363(k) of the Bankruptcy Code.

### B. "Cause" Exists To Prevent The Superiority Term Lenders From Credit Bidding Because Their Liens Are In Bona Fide Dispute

29. A secured lender with an allowed claim may not credit bid if the court "for cause" determines that such a credit bid should not be permitted. 11 U.S.C. § 363(k). "The term 'cause' is not defined by the Bankruptcy Code, and it is left to the court to determine whether cause exists on a case-by-case basis." *In re: Aéropostale, Inc.*, 555 B.R. 369, 414 (Bankr. S.D.N.Y. 2016); *see also In re Olde Prairie Block Owner, LLC*, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011) ("cause" is "intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis" (quoting *In re N.J. Affordable Homes Corp.*, No. 05–60442(DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006)); *In re River Road Hotel Partners, LLC*, 2010 WL 6634603, at *1 (Bankr. N.D. Ill. Oct. 5, 2010) ("Section 363 gives courts the discretion to decide what constitutes 'cause' and the flexibility to fashion an appropriate remedy by conditioning credit bidding on a case-by-case basis."), *aff'd*, *River Road Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642 (7th Cir.2011), *aff'd sub nom. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012). As a result, courts have substantial discretion in determining whether "cause" exists and are only confined to the extent that they must "balance the interests of the debtor, its creditors, and other parties of interests in order to achieve the maximization of the estate and an equitable distribution to all creditors." *Aéropostale*, 555 B.R. at 415.

30. Courts have consistently denied or restricted a lender's opportunity to credit bid when there is a bona fide dispute regarding the validity of a lien. "If the lien or interest is in bona

11

fide dispute, the holder may not exercise an offset. This is because permitting the creditor to 'bid in' when its interest is in dispute would enable the creditor to avoid proper judicial resolution of the dispute." 3 Collier on Bankruptcy ¶ 363.06[10] (16th ed. 2019); *see Coulter v. Blieden*, 104 F.2d 29, 32 (8th Cir. 1939) ("[W]here the lien itself is in litigation, it is a matter within the discretion of the court to sell the property and save expense."); *Fisker Automotive Holdings*, 510 B.R. at 61 ("The law leaves no doubt that the holder of a lien the validity of which has not been determined . . . may not bid its lien."); *CS Mining*, 574 B.R. at 283 ("If there is a bona fide dispute with regards to a secured creditor's lien, credit bidding rights do not become automatic."); *In re L.L. Murphrey Co.*, No. 12-03837-8-JRL, 2013 WL 2451368 at *5 (Bankr. E.D.N.C. June 6, 2013) (denying a secured creditor's right to credit bid because a "bona fide dispute" regarding the validity of the creditor's liens existed); *In re Akard Street Fuels, L.P.*, No. CIV.A.3:01-CV-1927, 2001 WL 1568332 (Bankr. N.D. Tex. 2001) (holding that a bona fide dispute as to a creditor's liens satisfies the "for cause" requirements of Section 363(k) of the Bankruptcy Code preventing a secured creditor from credit bidding at a sale); *National Bank of Commerce of El Dorado v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (refusing to allow credit bidding where liens and security interests were "unresolved").

31.  If the creditor seeking to credit bid "has a junior lien, the creditor will be required to pay off or otherwise settle with the senior lienors in the sale." 3 Collier on Bankruptcy ¶ 363.09[3] (16th ed. 2019); *see also In re Daufuskie Island Props., LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) ("[T]he credit bidding creditor must pay the mortgages and liens (if any) which have priority senior to its mortgage.") (citing *In re Simpson Creek Dev., Inc.*, Case No. 90–03836–WTB, slip op. at pages 17 and 24 (Bankr. D.S.C. Nov. 27, 1991) ("In applying the Section 363(k) offset bid provision to the trustee's sale, a junior lienholder can offset bid its lien claim against the

12

purchase price of the property only after all senior lien indebtedness on the particular property has been satisfied.")).

32. When secured creditors have attempted to credit bid a senior lien that is involved in a priority dispute, "courts have required secured creditors to put cash in escrow, pay a portion of the bid in cash, or furnish a letter of credit . . . ." *River Rd. Hotel Partners*, No. 09 B 30029, 2010 WL 6634603, at *2 (citing *In re Octagon Roofing*, 124 B.R. 522 (Bankr. N.D. Ill. 1991); *In re Die bart Bancroft*, 1993 WL 21423, *5 (E.D. La. Jan. 26, 1993)). Alternatively, a court has denied the right to credit bid when a bona fide dispute existed regarding the priority of the lien that served as the debt for the credit bid. *See Daufuskie Island Props.*, 441 B.R. at 63 (holding that a secured creditor was not eligible to credit bid under Section 363(k) because the priority of his claim was in a bona fide dispute after an opposing secured creditor filed an adversary proceeding seeking to equitably subordinate the mortgage of the creditor attempting to credit bid).

33. Although the phrase "bona fide dispute" is not defined by the Bankruptcy Code, courts agree that "it entails some sort of meritorious, existing conflict." *Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 715 (4th Cir. 1993). Generally, a dispute is bona fide if "there is 'an objective basis' for either a factual or legal dispute as to the validity of the debt." *In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991) (citing *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)); *see also L.L. Murphrey Co.*, No. 12-03837-8-JRL, 2013 WL 2451368 at *4. "Under this standard, a court need not determine the probable outcome of the dispute, but merely whether one exists." *Octagon Roofing*, 123 B.R. at 590.

34. The Adversary Complaint raises a bona fide dispute as to the validity and priority of the Superpriority Term Lenders' liens: it alleges that the Term Loan Lenders are the true senior and first lien lenders with respect to the Term Loan Collateral because the 2018 Refinancing

13

Transaction triggered multiple Defaults or Events of Default under the Term Loan Agreement that rendered invalid the agreement by which the refinancing transaction was effectuated. Among other things, the Agent alleges that the Auction that was conducted as part of the 2018 Refinancing Transaction was not conducted in accordance with the express terms of the Credit Agreement. The new obligations under the 2018 Refinancing Transaction also violated the Term Loan Agreement because they were secured by additional guarantors and by liens that purport to be senior to, and not *pari passu* with, the liens held by the Term Loan Lenders under the Term Loan Agreement, violating its refinancing provisions. Further, the subordination required a 100% vote under the Credit Agreement that was never obtained.

35. Accordingly, the Adversary Complaint seeks the following relief: (i) "declaring that Section 2 of the Third Amendment was ineffective and any actions taken thereby (including the 2018 Refinancing Transactions and the amendment to the 2013 Collateral Trust Agreement) are null and void" and (ii) "declaring the Term Loan lenders are the true senior and first lien lenders with respect to the Term Loan Collateral." (Adversary Complaint p. 20, ¶¶ A(ii), (iv), B(ii), (iii), Adv. Pro. No. 19-02143 [Doc. No. 1]).

36. Notwithstanding this bona fide dispute, none of the Bidding Procedures, Bidding Procedures Order or the Plan includes a provision for payment of the Term Loans by way of reserve, escrow or cash as part of the credit bid. Consequently, this Court must deny the right of the Superpriority Term Lenders to credit bid. Anything less will unduly prejudice the Term Loan Lenders.

## II. The Bidding Procedures Require Certain Changes To Adequately Protect The Term Loan Lenders And Ensure The Bids Are Not Chilled And A Fair And Transparent Bid Process Ensues

37. Although the Superpriority Term Lenders cannot credit bid because they do not have "allowed" claims and the Court has "cause" to deny their right to credit bid, the Agent recognizes the need to advance these Chapter 11 Cases and that a sale in which the bid under the Stalking Horse Agreement serves as a "floor" may be in the best interests of the Debtors' estates. Accordingly, the Agent proposes that the Court allow the Superpriority Term Lenders to credit bid but require the Debtors to make certain changes to the Bidding Procedures and Bidding Procedures Order to ensure the bid and auction process adequately protects the interests of the Term Loan Lenders, maximizes value of the Debtors' estates, and is fair and transparent. Attached hereto as Exhibit A is a markup of the Bidding Procedures and Bidding Procedures Order reflecting the Agent's requested changes.

### A. The Superpriority Term Lenders Must Establish A Cash Reserve Pending Resolution Of The Adversary Complaint

38. Notwithstanding this Objection, the Agent is willing to consent to the credit bid if the Superpriority Term Lenders fund a cash reserve. Specifically, if the Superpriority Term Lenders are the Successful Bidders and the Adversary Complaint has not been resolved or dismissed in favor of the Defendants, the Superpriority Term Lenders must, within three (3) business days after the Sale Hearing, fund an escrow account with cash in an amount equal to the obligations due under the Term Loan Agreement. Thereafter, if the Adversary Complaint is decided in favor of the Superpriority Term Lenders, the amount in the escrow account shall be released to the Superpriority Term Lenders. If not, then the Superpriority Term Lenders can proceed with the credit bid while maintaining sufficient available cash to repay the senior Term Loan Lenders. This will avoid disruption to the sales process by permitting the Superpriority Term

15

Lenders to credit bid regardless of whether the Adversary Complaint has been resolved by the time of the Sale Hearing.

39. Funding the escrow account will not prejudice the Superpriority Term Lenders in any way. The Superpriority Term Lenders are a collection of the nation's largest and most sophisticated hedge funds, mutual funds and private equity firms, which collectively hold claims against the Debtors' estates in excess of $1.6 billion.[7] The amount required to fund the escrow account is *de minimus* compared to the size of the claims held by the Superpriority Term Lenders and the collective assets they have under management. In addition, such amount is less than the deposit that other potential bidders are required to fund.

40. Moreover, the funding of the escrow account will adequately protect the interests of the Term Loan Lenders by ensuring there is sufficient available cash to repay the senior Term Loan Lenders should the Term Loan Lenders prevail in the Adversary Complaint. 11 U.S.C. § 363(e) (a bankruptcy court "shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest"); *see also Clear Channel Outdoor, Inc. v. Knufper (In re PW, LLC)*, 391 B.R. 25, 45 n.24 (9th Cir. B.A.P. 2008) ("A sale under § 363(f) is subject to § 363(e), which also conditions the sale on the provision of adequate protection.").

41. Accordingly, should this Court approve the Motion, it should do so only with the changes as reflected on Exhibit A hereto incorporated into the Bidding Procedures and Bidding Procedures Order.

---

[7] *See Amended Verified Statement of Frost Brown Todd LLC Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Doc. No. 404].

### B. The Superpriority Term Lenders Must Disclose The Amount Of The Credit Bid Sufficiently Prior To The Bid Deadline

42. It is well established that a court may deny a secured lender from credit bidding when permitting the credit bidding would chill the bidding process. *CS Mining*, 574 B.R. at 285 (finding cause to prevent credit bid where bidding creditor had close ties to the debtor and the credit bid would freeze the bidding process); *Philadelphia Newspapers*, 599 F.3d at 316 n.14 (stating, in dicta, that the ability of a secured lender to credit bid may be denied if credit bidding would "chill" bidding at the auction).

43. Neither the Bidding Procedures nor the Term Sheet specifies the amount of debt the Superpriority Term Lenders intend to credit bid. Rather, the Term Sheet provides that the "Purchase Price" will be a "credit bid of certain debt . . . in an amount to be determined by the Requisite Consenting Superpriority Lenders as set forth in the definitive Purchase Agreement . . . ." (Term Sheet p. 2 (emphasis added)). Yet, the Bidding Procedures do not establish a date by when the Stalking Horse Agreement must be finalized and made available to other potential bidders. This will undoubtedly chill bidding as potential bidders will not know what price they will need to overbid in order to be a qualified bidder and participate in the Auction. Accordingly, the Bidding Procedures must be amended to require that the Stalking Horse Agreement be finalized and include the amount of debt the Superpriority Term Lenders intend to credit bid, filed on the docket in these cases, and made available to potential bidders at least sixty (60) days prior to the March 16, 2020 Bid Deadline. This change will ensure that all potential bidders have sufficient time to evaluate the Stalking Horse Agreement and prepare topping bids.

### C. The Agent Should Be A Consultation Party

44. Regardless of whether the Agent is successful in the Adversary Complaint, the Agent is a material party to these Chapter 11 Cases and has a significant interest in the outcome

of the sale process.  Accordingly, the Agent should be a consultation party with the same rights as the Official Committee of Unsecured Creditors (the "Committee").  On the one hand, if the Agent is successful in the Adversary Complaint, the Agent will have a senior and first lien on the Term Loan Collateral and thus be entitled to the first dollars obtained in the bid and auction process.  On the other hand, if the Agent is unsuccessful in the Adversary Complaint, the Agent is, under the Plan, first in line after repayment of the Superpriority Term Loans.  In both scenarios, depending on the potential success of the Auction, the Agent and the Term Loan Lenders will have material interests in the bidding process but will have no consultation party looking out for such interests.  Consequently, the Court should require that the Debtors provide the Agent with the same consultation party rights as the Committee.

## RESERVATION OF RIGHTS

45.     In filing this Objection, the Agent reserves all of its rights, including, without limitation, the right to amend, modify, or supplement this Objection in all respects, to seek discovery, and to raise additional objections during the hearing on the Motion.

## CONCLUSION

46.     For the foregoing reasons, the Agent respectfully requests that this Court (i) only grant the Motion with the changes to the Bidding Procedures and Bidding Procedures Order as reflected in Exhibit A hereto and (ii) grant such other relief as it deems appropriate.

Dated: January 2, 2020
New York, New York

    */s/ Tyson A. Crist*
Tyson A. Crist (0071276)
John C. Cannizzaro (0085161)
ICE MILLER LLP
250 West Street, Suite 700
Columbus, OH 43215
Telephone: (614) 462-2243
Facsimile: (614) 224-3266
Tyson.Crist@icemiller.com
John.Cannizzaro@icemiller.com

-and-

Gregg M. Galardi (*admitted pro hac*)
Matthew M. Roose (*admitted pro hac*)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: († 212) 596-9090
Gregg.Galardi@ropesgray.com
Matthew.Roose@ropesgray.com

-and-

Lawrence S. Robbins (*admitted pro hac*)
Kathryn S. Zecca (*admitted pro hac*)
Ariel N. Lavinbuk
Jack A. Herman
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
lrobbins@robbinsrussell.com
kzecca@robbinsrussell.com
alavinbuk@robbinsrussell.com
jherman@robbinsrussell.com

*Counsel to Black Diamond Commercial Finance, L.L.C.*