**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**



*John E. Hoffman, Jr.*
John E. Hoffman, Jr.
United States Bankruptcy Judge

**Dated: January 9, 2020**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) | Case No. 19-56885 (JEH) |
| | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING THE BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) APPROVING THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF [RELATED TO DOCKET NO. 326]**

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing the Debtors to enter into and perform under an asset purchase agreement (the "Stalking Horse Purchase Agreement"), consistent with the Term Sheet attached to the Motion, (b) authorizing and approving the bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures") in connection with the sale of the Assets, (c) approving procedures for assuming and assigning executory contracts and unexpired leases and certain related notices, (d) establishing dates and deadlines in connection with the Sale and the approval thereof, including the Preliminary Bid Deadline, the Final Bid Deadline, the date of the Auction, if any, and the Sale Hearing, (e) approving the manner of notice of the Sale and the Auction, if any, and (f) granting related relief, all as more fully set forth in the Motion; and upon the Declaration of John Startin; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order 30-3* from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4, 2019; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing establish just

cause for the relief granted herein; and upon all of the proceedings had before this Court; and after

due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

A.      Bidding Procedures.   The Debtors have articulated good and sufficient reasons for

authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate

under the circumstances and designed to maximize the recovery on, and realizable value of, the

Debtors' assets (the "Assets"), as determined by the Debtors in an exercise of their business

judgment.

B.      Stalking Horse Purchase Agreement.   The Debtors are negotiating an asset

purchase agreement (the "Stalking Horse Purchase Agreement"), consistent with the Term Sheet

and subject to compliance with the requirements of paragraph 10 of this Order, with an entity to

be formed at the direction of the Ad Hoc Group of Superpriority Lenders (the "Stalking Horse

Bidder"), for the Assets identified therein.   As of the date hereof, the Bidding Procedures and the

Term Sheet were negotiated at arm's-length and in good faith by the Debtors and the Stalking

Horse Bidder, without collusion, subject to (1) compliance by the Stalking Horse Bidder with the

Bidding Procedures and (2) entry of the Sale Order.   Subject to compliance by the Stalking Horse

Bidder with the Bidding Procedures, the Stalking Horse Bidder has provided a material benefit to

the Debtors and their creditors by increasing the likelihood that, given the circumstances, the best

possible price for the Assets will be received.

C.      Stalking Horse Bidder.   The Stalking Horse Bidder is not an "insider" or "affiliate"

of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no

3

common identity of incorporators, directors, or controlling stakeholders exist between the Stalking Horse Bidder and the Debtors. The Stalking Horse Bidder and its counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of the Bidding Procedures and the Term Sheet, subject to (1) compliance with the Bidding Procedures and (2) entry of the Sale Order.

D.  Sale Notice. The notice provided by the Debtors regarding the Sale (the "Sale Notice") is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Sale and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the assets for sale; (v) instructions for promptly obtaining a copy of the Stalking Horse Purchase Agreement; (vi) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds subject to customary exceptions for permitted liens; (vii) the commitment by the Stalking Horse Bidder to assume certain liabilities disclosed in the Stalking Horse Purchase Agreement; and (viii) notice of the proposed assumption and assignment of the Assigned Contracts (or to another Successful Bidder arising from the Auction, if any) and the right, procedures, and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

E.  Auction. The Auction, if held, is necessary to determine whether any entity other than the Stalking Horse Bidder is willing to enter into a definitive agreement on terms and conditions more favorable to the Debtors and their estates than the Stalking Horse Purchase Agreement.

4

F.      <u>Assumption Procedures</u>.  The Contract Assumption Notice (as defined herein) is reasonably calculated to provide counterparties to the Assigned Contracts with proper notice of the intended assumption and assignment of their executory contracts, any Cure Payments (as defined herein), and the Assumption Procedures (as defined herein).

G.      <u>Other Findings</u>.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the preceding findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the preceding conclusions of law constitute findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted to the extent set forth in this Order.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

**I.      Important Dates and Deadlines.**

3.      **Preliminary Bid Deadline**.  February 4, 2020, at 4:00 p.m., prevailing Eastern Time, is the deadline by which any party interested in participating in the bidding process is encouraged to deliver a preliminary Non-Binding Indication of Interest, including the Indication of Interest Documents.

4.      **Final Bid Deadline**.  March 16, 2020, at 4:00 p.m., prevailing Eastern Time, is the deadline by which all Qualified Bids must be **<u>actually</u> <u>received</u>** by the parties specified in the Bidding Procedures.

5.      **Auction**.  March 26, 2020, at 10:00 a.m., prevailing Eastern Time, is the date and time the Auction, if one is needed, will be held in accordance with the Bidding Procedures at the

5

offices of counsel to the Debtors: Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York, 10022. For the avoidance of doubt, the Debtors may also conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets. The Debtors shall send written notice of the date, time, and place of the Auction to the Qualified Bidders no later than two business days before such Auction, and will post notice of the date, time, and place of the Auction no later than two business days before such Auction on the website of the Debtors' notice, claims, and solicitation agent, Prime Clerk LLC, at https://cases.primeclerk.com/MurrayEnergy.

6.    **Sale Objection Deadline**.  May 26, 2020, at 4:00 p.m., prevailing Eastern Time (the "Sale Objection Deadline") is the deadline by which objections to the entry of an order by the Court approving the Sale must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, and (c) be filed with the Court and served so as to be actually received by the entities on the Master Service List (as defined in the case management order in these chapter 11 cases [Docket No. 113] (the "Case Management Order")).  Any party or entity who fails to timely make an objection to the Sale on or before the Sale Objection Deadline shall be forever barred from asserting any objection to the Sale, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances, and other interests.

7.    **Sale Hearing**.  June 2, 2020, at 10:00 a.m., prevailing Eastern Time, is the date and time for the hearing for the Court to consider the Successful Bid or Successful Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Sale; *provided*, *however*, that the Sale Hearing may be continued by the Debtors in accordance with the Bidding Procedures, from time to time, without further notice to creditors or parties in interest.

8.    If at the conclusion of the Auction, it is determined, in accordance with the Bidding Procedures and any other applicable agreements to which the Debtors are a party, that the Sale will

6

occur pursuant to section 363 of the Bankruptcy Code as opposed to pursuant to a chapter 11 plan, the Debtors in consultation with the Consultation Parties will contact the Court's chambers to obtain a new Sale Hearing date and time and, without further order of the Court, the Debtors must provide notice to the Notice Parties (as defined herein) of such updated Sale Hearing and the Sale Objection Deadline, which sale objection deadline will be 4:00 p.m., prevailing Eastern Time, on the date that is 7 calendar days before the updated Sale Hearing date.  If the Sale will occur pursuant to section 363 of the Bankruptcy Code, as soon as practicable after the conclusion of the Auction, but no later than five calendar days before the Sale Hearing, in consultation with the Consultation Parties, the Debtors shall file a proposed form of order approving the Sale as agreed upon between the Debtors and the Successful Bidder, which proposed form of order shall be reasonably acceptable to the Ad Hoc Group of Superpriority Lenders.

9.    The dates and deadlines set forth in this Order are subject to modification by the Debtors in accordance with the Bidding Procedures.

**II.    Stalking Horse Purchase Agreement.**

10.    <u>Stalking Horse Purchase Agreement</u>.  The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the bid of the Stalking Horse Bidder contemplated by the Stalking Horse Purchase Agreement (the "<u>Stalking Horse Bid</u>") shall be deemed a Qualified Bid.  By February 24, 2020, the Stalking Horse Bidder shall file a form of Stalking Horse Purchase Agreement that (a) discloses the amount of debt contemplated to be credit bid by the Stalking Horse Bidder, (b) includes a good faith description of the nature of the Assumed Liabilities and Excluded Liabilities (each, as defined in the Term Sheet), and (c) provides a reasonable allocation of the Purchase Price among the Assets being purchased (it being understood that such allocation may be made on an entity-by-entity, mine-by-mine, or similar basis).

7

### III.    Auction, Bidding Procedures, Sale Notice, and Related Relief.

11.    The Bidding Procedures, substantially in the form attached hereto as **<u>Exhibit 1</u>**, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale. Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order. The Debtors are authorized to take any and all reasonable actions necessary to implement the Bidding Procedures.

12.    No person or entity shall be entitled to any expense reimbursement, break-up fee, "topping," termination, or other similar fee or payment in connection with any Sale, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

13.    Any deposit provided by a Qualified Bidder shall be held in escrow by the Debtors or their agent in accordance with the Bidding Procedures, and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the applicable escrow agreement or order of this Court. The Debtors will treat such deposits in accordance with the terms and conditions of the DIP Orders and the DIP Credit Agreement (as defined by the DIP Orders).

14.    The Sale Notice, substantially in the form attached hereto as **<u>Exhibit 2</u>**, is hereby approved. As soon as reasonably practicable following the entry of this Order, the Debtors will cause the Bidding Procedures, Sale Notice, and Contract Assumption Notice to be served upon the following parties, and their respective counsel, if known (collectively, the "<u>Notice Parties</u>"): (a) the UCC; (b) the U.S. Trustee for the Southern District of Ohio; (c) the indenture trustees under

8

the Debtors' prepetition indentures; (d) the administrative agents under the Debtors' prepetition term loan facilities; (e) the administrative agent under the Debtors' debtor-in-possession financing facility; (f) counsel to the Ad Hoc Group of Superpriority Lenders; (g) the United States Attorney's Office for the Southern District of Ohio; (h) the Internal Revenue Service; (i) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors operate; (j) the attorneys general for the states in which the Debtors operate; (k) the Pension Benefit Guaranty Corporation; (l) the United Mine Workers of America ("UMWA"); (m) the Seafarers International Union; (n) the UMWA 1974 Pension Plan and Trust, UMWA 1992 Benefit Plan, UMWA 1993 Benefit Plan, and UMWA 1988 Cash Deferred Savings Plan; (o) any parties known or reasonably believed to have expressed an interest in the Debtors' assets; (p) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtors' assets; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In addition, as soon as practicable, after entry of this Order, the Debtors will publish the Sale Notice, with any modification necessary for ease of publication, once in *The Wall Street Journal*, the *New York Times*, *The Birmingham News*, *The Columbus Dispatch*, the *Herald Dispatch*, *The Lexington Herald Leader*, the *Courier Journal*, and the *Salt Lake Tribune* to provide notice to any other potential interested parties.

## IV.     The Assumption and Assignment Procedures.

15.     The procedures set forth below regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, if any) pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale (the "Assumption Procedures") are hereby approved to the extent set forth herein.

9

16.     These Assumption Procedures shall govern the assumption and assignment of all of the Debtors' executory contracts and unexpired leases to be assumed and assigned in connection with the Sale (each, an "<u>Assigned Contract</u>," and, collectively, the "<u>Assigned Contracts</u>"), subject to the payment of any payments necessary to cure any defaults arising under any Assigned Contract (the "<u>Cure Payments</u>"):

    a.    **Contract Assumption Notice.**  No less than 21 calendar days prior to the Sale Objection Deadline (the "<u>Assumption and Assignment Service Deadline</u>"), the Debtors shall file with the Court and serve a notice of contract assumption (the "<u>Contract Assumption Notice</u>"), in substantially the form attached hereto as **<u>Exhibit 3</u>**, via overnight delivery on all counterparties to all potential Assigned Contracts and provide a copy of the same to the Stalking Horse Bidder and the Consultation Parties.  The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the executory contract or unexpired leases, as applicable, (ii) the name of the counterparty to the executory contract or unexpired leases, as applicable, (iii) the Debtors' good faith estimates of the Cure Payments (if any) required in connection with the executory contract or unexpired leases, as applicable, (iv) the identity of the Stalking Horse Bidder (as potential assignee), (v) the Sale Objection Deadline, and (vi) the identity of the applicable Debtor-contractor; *provided*, *however*, that service of a Contract Assumption Notice does not constitute an admission that such contract is an executory contract or unexpired lease or that such stated Cure Payment constitutes a claim against the Debtors or a right against the Stalking Horse Bidder (all rights with respect thereto being expressly reserved).  Further, the inclusion of a contract or lease on the Contract Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

    b.    **Cure Payments.**  The payment of the applicable Cure Payments specified in the Contract Assumption Notice or Supplemental Assumption Notice (as applicable) by the Successful Bidder or the Debtors, as applicable, after the expiration of the applicable objection period and the failure of any applicable counterparty to object to the proposed Cure Payment or to the assumption or assignment of its unexpired lease or executory contract, shall (i) effect a cure of all defaults existing thereunder as of the filing of the Contract Assumption Notice or Supplemental Assumption Notice (as applicable), (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the Assigned Contracts by the Debtors and the assignment of

KE 64539587

the Assigned Contracts to the Stalking Horse Bidder (or other Successful Bidder), constitute adequate assurance of future performance thereof.

c.  **Additions.**  The Stalking Horse Bidder may designate, up to the Final Bid Deadline, additional executory contracts or unexpired leases as agreements to be assumed by the Debtors and assigned to the Stalking Horse Bidder (the "Additional Assigned Contracts"); *provided* upon their receipt of notice of the Additional Assigned Contracts, the Debtors shall promptly provide the Consultation Parties and Acceptable Bidders (if prior to the Auction) with notice of the Additional Assigned Contracts and corresponding Cure Payment; *provided, further,* that the Successful Bidder shall have the right to add any contract as an Assumed Contract (so long as the Successful Bidder agrees to either fund the related Cure Costs or take Cure Costs into account in Funded Liabilities, as defined by the Term Sheet) up until two business days before the closing date of the transaction.  By the later of (x) 3 business days of notice of the Additional Assigned Contracts and (y) the Assumption and Assignment Service Deadline, the Debtors shall file with the Court and serve a Supplemental Assumption Notice on each of the counterparties to such Additional Assigned Contracts and their counsel of record, if any, indicating (i) that the Debtors intend to assume and assign the counterparty's executory contract or unexpired lease to the Stalking Horse Bidder (or Successful Bidder, if applicable), and (ii) the corresponding Cure Payment.

d.  **Eliminations.**  The Stalking Horse Bidder may remove, up to the Final Bid Deadline, any executory contract or unexpired lease to be assumed by the Debtors and assigned to the Stalking Horse Bidder (the "Eliminated Agreements").  The Successful Bidder shall have the right to remove any executory contract or unexpired lease up until (but not later than) ten days before the closing date of the transaction.  Upon the Stalking Horse Bidder's (or Successful Bidder's, if applicable) removal of an Eliminated Agreement and solely to the extent such parties received a Contract Assumption Notice, the Debtors shall file with the Court and serve a notice on each of the impacted counterparties and their counsel of record, if any, and the Consultation Parties and Acceptable Bidders (if prior to the Auction) indicating that the Debtors no longer intend to assign the counterparty's executory contract or unexpired lease to the Stalking Horse Bidder (or Successful Bidder, if applicable) in connection with the Sale.

e.  **Supplemental Contract Assumption Notice.**  Although the Debtors intend to make a good faith effort to identify all Assigned Contracts that may be assumed and assigned in connection with a Sale, (i) the Debtors may discover certain executory contracts or unexpired leases inadvertently omitted from the Assigned Contracts list or (ii) a Successful Bidder(s) may identify other executory contracts or unexpired leases that it desires to assume and assign in connection with the Sale, or that such Successful

11

Bidder(s) identifies that it would seek to remove such executory contract or unexpired lease from the Assigned Contract list. Accordingly, the Debtors reserve the right, but only in accordance with the Successful Bid, or as otherwise agreed by the Debtors and the Successful Bidder, in consultation with the Consultation Parties, at any time after the Assumption and Assignment Service Deadline and up until (but not later than) (i) two business days before the closing of a Sale, to supplement the list of Assigned Contracts with previously omitted executory contracts or unexpired leases, and/or (ii) ten days before the closing of a Sale to (a) remove Assigned Contracts from the list of executory contracts or unexpired leases ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale, and/or (b) modify the previously stated Cure Payment associated with any Assigned Contracts. In the event the Debtors exercise any of these reserved rights, the Debtors will promptly file with the Court and serve a supplemental notice of contract assumption (a "Supplemental Assumption Notice") on each of the counterparties to such Assigned Contracts and their counsel of record, if any, and the Consultation Parties. Each Supplemental Assumption Notice will include the same information with respect to listed Assigned Contracts as was included in the Contract Assumption Notice.

f.      **Objections.** Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and Case Management Order, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by, (w) counsel to the Debtors, (x) counsel to the Ad Hoc Group of Superpriority Lenders, and (y) proposed counsel to the UCC, before the Sale Objection Deadline or the deadline set forth in the Supplemental Assumption Notice (which shall be the later of the Sale Objection Deadline or at 4:00 p.m., prevailing Eastern Time, on the date that is 14 calendar days after the date of service of the Supplemental Assumption Notice), as applicable.

g.      **Dispute Resolution.** In the event that the Debtors and the non-debtor counterparty cannot resolve any objection to the Cure Payment (including after closing), the Debtors shall segregate the disputed amount of the Cure Payment (including the disputed Cure Payment amount for Assigned Contracts for which the counterparty's deadline to object to the proposed Cure Payment occurs after closing) pending a resolution of the dispute by the Court or mutual agreement by the parties. Any objection to the proposed assumption and assignment of a contract or related cure proposed in connection with the Sale that remains unresolved as of the Sale Hearing,

12

shall be conditionally assumed and assigned, pending resolution of the objection after notice and a hearing (which may be the Sale Hearing or at a later date as fixed by the Court). Any counterparty to an Assigned Contract for which the Cure Payment is disputed as of or following the closing shall be entitled to request a prompt hearing in connection with such disputed Cure Payment, including fixing the liability, amount and timing of payment thereof.

h.    **Contract Assumption.**  No Assigned Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Assigned Contracts or (ii) the date the Sale has closed.

i.    **CONSOL Contracts and Leases**. Notwithstanding anything to the contrary in this Order, (i) in the Contract Assumption Notice the Debtors shall identify each and every executory contract and unexpired lease to which CONSOL Energy Inc. or any of its affiliates is a counterparty or an accommodation party (such as a co-maker, guarantor, or surety) (whether such executory contract or unexpired lease is or is not listed in Schedule G of the Debtors' respective Schedules of Assets and Liabilities) and that will be an Assigned Contract (collectively, the "CONSOL Contracts and Leases"), and (ii) the Contract Assumption Notice shall contain, as to each of the CONSOL Contracts and Leases, the information required by subparagraph (a) of this paragraph 16. For the avoidance of doubt, the Contract Assumption Notice shall be served on CONSOL Energy Inc. no later than 21 calendar days prior to the Sale Objection Deadline.

17.    Any party failing to timely file an objection to the Cure Payment or the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on the Contract Assumption Notice is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract or Additional Assigned Contract, (c) the related relief requested in the Motion, and (d) the Sale. Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code, and from asserting any

13

additional cure or other amounts against the Debtors and the Stalking Horse Bidder or Successful

Bidder, as applicable, with respect to such party's Assigned Contract or Additional Assigned

Contract.

**V.    Miscellaneous.**

18.    Nothing in this Order is intended to, or shall be deemed to, modify, waive or impair

any of the provisions of the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition*

*Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority*

*Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured*

*Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 431]

(the "DIP Order") and the DIP Documents (as defined in the DIP Order), or the rights and

obligations of the Debtors, the DIP Agent, the DIP Lenders, or any other party in interest (including

the UCC) thereunder.

19.    Notwithstanding anything to the contrary in this Order, nothing in this Order, the

Bidding Procedures, or the Stalking Horse Purchase Agreement shall impair or adversely affect

the right of the United States or any State to object to any credit bid for cause.

20.    Notwithstanding anything to the contrary contained herein or in the Bidding

Procedures, (a) the right of any party to credit bid (including the Stalking Horse Bidder and any

member of the Ad Hoc Group of Superpriority Lenders) is subject to the provisions of

section 363(k) of the Bankruptcy Code, (b) nothing in this Order shall be construed as a waiver of,

or a finding that any credit bid satisfies the requirements of, section 363(k) of the Bankruptcy

Code, (c) nothing in this Order shall prejudice any party in interest's rights to object to a credit bid

on any basis (subject to the limitations set forth in the DIP Order), or any other party's right to

oppose such objection, and (d) nothing in this Order shall limit or waive the rights of any party in

14

interest, including the UCC or CONSOL Energy Inc. and any of its affiliates, set forth in the DIP

Order.

21.     The failure to include or reference a particular provision of the Bidding Procedures

specifically in this Order shall not diminish or impair the effectiveness or enforceability of such a

provision.

22.     In the event of any inconsistencies between this Order and the Motion, this Order

shall govern in all respects.  In the event of any inconsistencies between this Order and the Bidding

Procedures, the Bidding Procedures shall govern in all respects.

23.     Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied

by such notice.

24.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order

are immediately effective and enforceable upon its entry.

25.     The Debtors shall serve this Order in accordance with all applicable rules and shall

file a certificate of service evidencing compliance with this requirement.

26.     The Debtors are authorized to take all reasonable actions necessary to effectuate

the relief granted in this Order in accordance with the Motion.

27.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.

28.     Nothing contained herein or in the Bidding Procedures (including, without

limitation, any of the factual findings set forth in paragraphs B and C hereof) shall prejudice any

right of any party (a) to object to the Sale and/or entry of the Sale Order on any grounds including,

without limitation, any right of Black Diamond Commercial Finance LLC to object to the right of

the Stalking Horse Bidder or any member of the Ad Hoc Group of Superpriority Lenders to credit bid or (b) to oppose any objection to the Sale and/or entry of the Sale Order.

29.     Nothing in the Bidding Procedures or in this Order (including, without limitation, any of the factual findings set forth in paragraph B hereof) shall prejudice or otherwise affect any rights or remedies (all of which hereby are reserved) of CONSOL Energy Inc. or any of its affiliates to object to the Sale and/or to entry of the Sale Order (including, without limitation, in connection with (a) the treatment that any Qualified Bidder or Successful Bidder proposes regarding any of the CONSOL Contracts and Leases, or (b) the Debtors', any Qualified Bidder's, or any Successful Bidder's inclusion, failure to include, elimination, or removal of any of the CONSOL Contracts and Leases in or from its Bid or in or from the Contract Assumption Notice, any Supplemental Assumption Notice, or any other list of executory contracts or unexpired leases that may be assumed and assigned).

SO ORDERED.


Copies to Default List.

16

**<u>Exhibit 1</u>**

**Bidding Procedures**

KE 64539587

**THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) | Case No. 19-56885(JEH) |
|  | ) |  |
|  | ) | Judge John E. Hoffman, Jr. |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BIDDING PROCEDURES FOR THE SUBMISSION, RECEIPT,
AND EVALUATION OF BIDS IN CONNECTION WITH THE SALE OF
ALL, SUBSTANTIALLY ALL, OR CERTAIN OF THE ASSETS OF THE DEBTORS**

On October 29, 2019, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court").

On [●], 2020, the Bankruptcy Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") approving, among other things, these bidding procedures (the "Bidding Procedures"). As set forth in the Bidding Procedures, the Ad Hoc Group of Superpriority Lenders will form an entity (the "Stalking Horse Bidder"), which entity will submit an asset purchase agreement (the "Stalking Horse Purchase Agreement"), pursuant to which, among other things, the Stalking Horse Bidder has committed to (a) purchase, acquire, and take assignment and delivery of, free and clear of all liens, claims, encumbrances, and other interests (except as otherwise provided in the Stalking Horse Purchase Agreement), certain assets associated with the Debtors' operations as set forth in the Stalking Horse Purchase Agreement, and (b) assume certain liabilities associated with the Debtors' operations as set forth in the Stalking Horse Purchase Agreement (collectively, the "Stalking Horse Bid"), in the form of a credit bid. The Stalking Horse Bidder will submit the Stalking Horse Bid and Stalking Horse Purchase Agreement by no later than February 24, 2020.

The Bidding Procedures set forth the process by which the Debtors are authorized to solicit the highest or otherwise best bid (each, a "Bid") for all, substantially all, or any combination of the Debtors' assets (the "Assets"), culminating in an auction (the "Auction") if competing bids are received. The sale (the "Sale") is contemplated to be implemented through a chapter 11 plan and

---

[1]    Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy. The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

pursuant to the terms and conditions of either (a) the Stalking Horse Purchase Agreement, as the same may be amended pursuant to the terms thereof, or (b) such other applicable asset purchase agreement upon the receipt of a Successful Bid (as defined herein) that the Debtors have determined in their business judgment is the best or highest bid in accordance with these Bidding Procedures.  In the event that one or more Qualified Bids (as defined herein) are designated as Successful Bids and contemplate the sale of less than all or substantially all of the Assets, then the sales contemplated by such Successful Bids may be implemented separate and apart from a chapter 11 plan, *provided*, *however*, that the liens and other interests in any Assets sold shall attach to the proceeds from such sale or sales (subject to the UCC's challenge rights under the DIP Order), and the disposition of such proceeds and any remaining Assets shall be subject to a chapter 11 plan or any otherwise applicable orders of the Bankruptcy Court.

The Debtors' proposed chapter 11 plan [Docket No. 322] (as may be modified, amended, or supplemented from time to time, the "Plan") currently contemplates that the Debtors and the Successful Bidder or Successful Bidders (as defined herein) will consummate the Sale through the Plan, or, if there is no third party Successful Bidder or Successful Bidders, the Stalking Horse Bidder will be designated the Successful Bidder and will purchase the Assets in accordance with the Plan and the Stalking Horse Purchase Agreement.

> Copies of the Bidding Procedures Order, the Plan, or any other documents in the Debtors' chapter 11 cases are available upon request to **Prime Clerk, LLC**, by calling (877) 422-5170 (Domestic) or (917) 947-2680 (International), or by visiting https://cases.primeclerk.com/MurrayEnergy.

**A.     Potential Bidder.**

For purposes of the Bidding Procedures, a "Potential Bidder" shall refer to any person or entity interested in submitting a bid.

**B.     Due Diligence.**

(i)     **Access to Due Diligence.**

Any Potential Bidder that executes a confidentiality agreement on customary terms that are reasonably acceptable to the Debtors (a "Confidentiality Agreement")[2] and provides sufficient evidence, as reasonably determined by the Debtors in consultation with the Consultation Parties, that the Potential Bidder intends to obtain due diligence and participate in the sale process for a bona fide purpose consistent with these Bidding Procedures (any such Potential Bidder being referred to as an "Acceptable Bidder") will be eligible to receive due diligence materials and access

---

[2]     Potential Bidders may obtain a copy of a Confidentiality Agreement by contacting the Debtors' advisors listed below.  No Confidentiality Agreement entered into after entry of the Bidding Procedures Order shall contain any restriction or limitation on an Acceptable Bidder's ability to purchase any debt issued by the Debtors, unless the Debtors, in their reasonable business judgement and in consultation with the Ad Hoc Group of Superpriority Lenders, determine that the inclusion of such restriction or limitation would further the goal of attaining the highest or otherwise best offer for the Assets.

2

to certain non-public information regarding the Assets.  The Debtors will provide each Acceptable Bidder with such information as is reasonably contemplated to enable such Acceptable Bidder to make a Bid for Assets.  The Debtors will also provide to each Acceptable Bidder reasonable due diligence information as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request.  The Debtors will post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room (the "Data Room").  The Debtors may restrict or limit access of an Acceptable Bidder to the Data Room if the Debtors determine, based on their reasonable business judgment and in consultation with the Consultation Parties, that certain information in the Data Room is sensitive, proprietary, or otherwise not appropriate for disclosure to such Acceptable Bidder.

The initial due diligence period will end on the Final Bid Deadline (as defined herein).  Following the Final Bid Deadline, the Debtors may, in their reasonable discretion and in consultation with the Consultation Parties,[3] furnish additional non-public information to a Qualified Bidder or Qualified Bidders that submitted a Qualified Bid (each as defined herein).

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors will not furnish any confidential information relating to the Debtors, the Debtors' Assets or liabilities, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement.

The Debtors and their financial advisors will coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, have not established that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate their Bid.  If the Debtors deny access or information to an Acceptable Bidder, the Debtors shall promptly inform the Consultation Parties.  No conditions relating to the completion of due diligence will be permitted to exist after the Final Bid Deadline.

The Debtors also reserve the right to withhold any diligence materials from an Acceptable Bidder who the Debtors reasonably determine in consultation with the Consultation Parties is a

---

[3] Each "Consultation Party," and collectively, the "Consultation Parties" means:  (i) counsel to the Ad Hoc Group of Superpriority Lenders, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Damian S. Schaible (damian.schaible@davispolk.com) and Adam L. Shpeen (adam.shpeen@davispolk.com); (ii) financial advisor to the Ad Hoc Group of Superpriority Lenders, Houlihan Lokey, 245 Park Avenue, 20th Floor, New York, NY, 10167, Attn: Eric Siegert (esiegert@HL.com), Fredrick Vescio (fvescio@HL.com) and Daniel Tobin (dtobin@HL.com); (iii) proposed counsel to the Official Committee of Unsecured Creditors (the "UCC"), Morrison & Foerster, LLP, 250 West 55th Street, New York, NY 10019, Attn:  Lorenzo Marinuzzi (lmarinuzzi@mofo.com), Jennifer Marines (jmarines@mofo.com), Todd Goren (tgoren@mofo.com), Erica Richards (erichards@mofo.com), and Benjamin Butterfield (bbutterfield@mofo.com); (iv) proposed financial advisor to the UCC, Moelis & Company, 399 Park Avenue, New York, NY 10022, Attn: William Q. Derrough (william.derrough@moelis.com), Barak Klein (barak.klein@moelis.com), and Adam Waldman (adam.waldman@moelis.com); and (v) proposed restructuring advisor to the UCC, AlixPartners LP, 909 Third Avenue, New York, NY 10022, Attn: Kevin Nystrom (knystrom@alixparnters.com) and David MacGreevey (dmacgreevey@alixpartners.com).

competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives will be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder. The Debtors will make any diligence information available to the Stalking Horse Bidder if such diligence has been made available to any other Acceptable Bidder.

Each Acceptable Bidder will be deemed to acknowledge and represent that it: (a) either directly or through its advisors has had an opportunity to conduct any and all due diligence regarding the Debtors' Assets and liabilities prior to making any Qualified Bid; (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making any Qualified Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Debtors' Assets or liabilities, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or the Stalking Horse Purchase Agreement. Neither the Debtors nor any of their employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors, or professionals are responsible for, and will bear no liability with respect to, any information obtained by Acceptable Bidders in connection with the Sale.

> **The Debtors have designated Evercore Group L.L.C., 55 E. 52nd Street, New York, NY 10055, Attn: John Startin (john.startin@evercore.com), Andrew Frame (andrew.frame@evercore.com), and Pavel Te (pavel.te@evercore.com), to coordinate all reasonable requests for additional information and due diligence access.**

(ii)  **No Communications Among Acceptable Bidders.**

There must be no communications regarding the Debtors' sale process between and amongst Acceptable Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder), or between Acceptable Bidders and the Consultation Parties, unless the Debtors have previously authorized such communication in writing; *provided* that nothing in this paragraph or any Confidentiality Agreement will preclude the Stalking Horse Bidder from communicating with the Debtors, the Consultation Parties, or the UCC; *provided, further,* that with the consent of the Debtors, not to be unreasonably withheld, the UCC may communicate with Acceptable Bidders. The Debtors will, in good faith and in consultation with the Consultation Parties, consider requests by parties in interest, including the Term Loan Agent, to communicate with the Acceptable Bidders up until the Final Bid Deadline, and the Debtors may, in their discretion, facilitate communication between such party and the Acceptable Bidder or Bidders. The United Mine Workers of America and the UMWA Funds[4] shall be entitled to communicate with Potential Bidders. The Debtors reserve the right, in their reasonable business judgment, in consultation with the Consultation Parties, to disqualify any Acceptable Bidders that have communications between and amongst themselves. The Debtors further reserve their right, in their reasonable business judgment, in consultation with the disinterested Consultation Parties, to disqualify any Acceptable Bidders that

---

[4]    As used herein, the term "UMWA Funds" refers to the UMWA 1974 Pension Plan and Trust, UMWA 1992 Benefit Plan, UMWA 1993 Benefit Plan, and UMWA 1988 Cash Deferred Savings Plan, collectively.

have communications with a Consultation Party, and to strip any Consultation Party that violates this provision (except as otherwise provided in this paragraph) of its consultation rights hereunder; *provided* that the Debtors shall provide such Consultation Party with two days' notice that the Debtors are exercising their rights to strip the Consultation Party of their consultation rights, and such Consultation Party shall have the right to seek an emergency hearing before the Court to contest the Debtors' decision to strip such Consultation Party of their consultation rights.

## C.    Preliminary Bid Deadline.

Potential Bidders are encouraged, on or before February 4, 2020, at 4:00 p.m., prevailing Eastern Time (the "Preliminary Bid Deadline"), to deliver a preliminary non-binding indication of interest (each, a "Non-Binding Indication of Interest") to each of (i) counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn:  Ross M. Kwasteniet, P.C. (rkwasteniet@kirkland.com) and Joseph M. Graham (joe.graham@kirkland.com) and 601 Lexington Avenue, New York, New York 10022, Attn: Nicole L. Greenblatt, P.C. (ngreenblatt@kirkland.com) and Alexander Nicas (alexander.nicas@kirkland.com) and (ii) financial advisor and investment banker to the Debtors, Evercore Group L.L.C., 55 E. 52nd Street, New York, NY 10055, Attn:    John Startin (john.startin@evercore.com), Andrew Frame (andrew.frame@evercore.com), and Pavel Te (pavel.te@evercore.com), which Non-Binding Indication of Interest should include the following documents (the "Indication of Interest Documents"):

(i)     a written disclosure of the identity of each entity that may be bidding for the Assets or otherwise participating in connection with such Bid;

(ii)    a non-binding description of the Assets and any liabilities (including, but not limited to, liabilities related to any prepetition collective bargaining agreements, pension obligations, and other post-employment benefits) such Potential Bidder may be interested in purchasing or assuming;

(iii)   a non-binding description of the consideration (e.g., cash, assumption of liabilities, or issuance of debt) the Potential Bidder may offer in connection with such Bid; and

(iv)    preliminary evidence by the Potential Bidder of its financial capacity to close a proposed transaction, which may (but need not) include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach by the Potential Bidder), the adequacy of which will be assessed by the Debtors and their advisors, in their reasonable discretion, in consultation with the Consultation Parties.

Submitting a Non-Binding Indication of Interest does not obligate the Potential Bidder to consummate a transaction, submit a binding Bid, or participate in the bidding process.  It also does not exempt such Potential Bidder from having to submit a Qualified Bid by the Bid Deadline (as

5

defined below) or comply with these Bidding Procedures to participate in any subsequent Auction, all as described below.  For the avoidance of doubt, a party that does not submit a Non-Binding Indication of Interest is not precluded from submitting a Qualified Bid by the Bid Deadline.

The Debtors shall provide copies of any Indication of Interest Documents received from Potential Bidders as soon as practicable, but no later than the earlier of one business day or two calendar days after receipt thereof, to each of the Consultation Parties and the Term Loan Agent Advisors.[5]

**D.     Bid Requirements.**

To be eligible to participate in the Auction, a Potential Bidder must deliver to the Debtors and their advisors, a written, irrevocable offer that must be determined by the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, to satisfy each of the following conditions (collectively, the "Bid Requirements"):

(i)     **Purpose**.  Each Potential Bidder must state that the Bid includes an offer by the Potential Bidder to purchase some or all of the Assets, and identify the Assets with reasonable specificity and the particular liabilities, if any, the Potential Bidder seeks to assume.  For the avoidance of doubt, a Qualified Bid may include a Bid for less than all or substantially all of the Debtors' liabilities.

(ii)     **Purchase Price**.  Each Bid must clearly set forth the purchase price to be paid for the Assets (the "Purchase Price") and must (a) indicate the source of cash consideration, including funding commitments, and confirm that such consideration is not subject to any contingencies, (b) indicate the allocation of the Purchase Price among the Assets being purchased, and (c) identify separately the cash and non-cash components of the Purchase Price.  The Bid should include a detailed sources and uses schedule.

(iii)     **Minimum Bid.**  The value of each Bid, as determined by the Debtors in their business judgment, must exceed, with respect to Bids that contemplate purchasing all or substantially all Assets, (a) the aggregate sum of the aggregate consideration contemplated by the Stalking Horse Bid,[6] and (b) the minimum Bid increment of $1 million (or such other amount as the Debtors may determine in consultation with the Consultation Parties, which amount may be less than $1 million, including with respect to a Bid for less than all Assets).  Any Bids that contemplate purchasing the Assets must provide cash consideration sufficient to pay in full all accrued but

---

[5]   The "Term Loan Agent Advisors" means counsel to Black Diamond Commercial Finance, L.L.C., Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Gregg M. Galardi (Gregg.Galardi@ropesgray.com) and Matthew M. Roose (Matthew.Roose@ropesgray.com).  The "Term Loan Agent" means Black Diamond Commercial Finance, L.L.C., solely in its capacity as the administrative agent for the Prepetition Term Loan Credit Facility (as defined in the DIP Order).

[6]   For the avoidance of doubt, any debt that is credit bid in the Stalking Horse Bid shall be valued at its full principal amount for purposes of determining the consideration contemplated by the Stalking Horse Bid.

unpaid principal, interest, fees, expenses, and other costs under or on account of the DIP Facility.  The minimum Bid increment must be in the form of cash or cash equivalents and/or the assumption of liabilities.  The Debtors and their advisors, in consultation with the Consultation Parties, will determine, in their reasonable business judgment, the value of any assumed liabilities that differ from those included in the Stalking Horse Bid.

Each Bid seeking to acquire an individual asset or combination of assets that are less than all of the Debtors' Assets must have a value that in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, either independently or in conjunction with one or more other Bids, is in excess of the value attributable to such individual asset or combination of assets as set forth in the Stalking Horse Bid.

(iv)   **Bid Deposit**.  Each Bid must be accompanied by a cash deposit equal to ten percent of the aggregate value of the cash and non-cash consideration of the Bid (the "Good Faith Deposit"), which will be held in an escrow account established by the Debtors in consultation with the Consultation Parties pursuant to a customary and reasonable escrow agreement, by wire transfer or certified or cashier's check.  To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Qualified Bid, the Debtors reserve the right, in consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals ten percent of the increased Purchase Price.

(v)   **Committed Financing**.  If a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale transaction set forth in its Bid with cash on hand, each Bid must include committed financing  documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations (including, but not limited to, such mining permits, reclamation obligations, and surety bond obligations required under applicable nonbankruptcy law) under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors in their sole discretion.

(vi)   **Pro Forma Capital Structure**.  Each Bid must include a description of the Bidder's pro forma capital structure.

(vii)   **Good Faith Offer**.  Each Bid must constitute a good faith, bona fide offer to purchase the Assets set forth in such Bid.

(viii)   **Marked Agreement**.  Each Bid must be accompanied by clean and duly executed transaction documents including, at a minimum, a draft purchase agreement, the

7

form of which will be provided to any Potential Bidder prior to the Final Bid Deadline, including the exhibits and schedules related thereto, and any related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the Sale, along with redlines of such agreement marked to reflect any amendments and modifications from the form purchase agreement provided, which amendments and modifications may not be materially more burdensome than the Stalking Horse Purchase Agreement or otherwise inconsistent with these Bidding Procedures. The Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, will determine whether any such amendments and modifications are materially more burdensome.

(ix)     **Contracts and Leases**. Each Bid must identify with particularity each and every executory contract and unexpired lease (including, without limitation, each and every executory contract and unexpired lease to which CONSOL Energy Inc. or any of its affiliates is a counterparty or an accommodation party (such as a co-maker, guarantor, or surety) (whether such executory contract or unexpired lease is or is not listed in Schedule G of the Debtors' respective Schedules of Assets and Liabilities)), the assumption and assignment of which is a condition to closing a Sale; *provided* that to the extent the Debtors identify any additional executory contracts or unexpired leases after the Bid is submitted, the Bid may allow for the Potential Bidder to add such executory contracts and unexpired leases to the list of contracts to be assumed and assigned any time from and after the Bid is submitted. Each Bid must identify the party responsible for satisfying amounts that have accrued under assumed and assigned contracts and leases after the Petition Date and prior to Closing, including amounts that have accrued but not yet become due prior to the Closing.

(x)      **No Contingencies**. A Bid must contain a clear statement that it is not conditioned on any contingency, including, among others, on obtaining any of the following (a) financing, (b) shareholder, board of directors, or other approval, and/or (c) the outcome or completion of a due diligence review by the Potential Bidder.

(xi)     **Binding and Irrevocable**. A Potential Bidder's Bid is irrevocable unless and until the Debtors accept a higher Bid and such Potential Bidder is not selected as the Back-Up Bidder (as defined herein). In the event a Bid is chosen as the Back-Up Bid (as defined below), it must remain irrevocable until the Debtors and the Successful Bidder consummate the Sale.

(xii)    **Joint Bids**. The Debtors will be authorized to approve joint Bids in their reasonable discretion, in consultation with the Consultation Parties, on a case-by-case basis.

(xiii)   **Adequate Assurance Information**. Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the reasonable satisfaction of the Debtors, in consultation with the Consultation Parties, that such Potential Bidder (a) has the financial wherewithal and ability to consummate the acquisition of the Assets

8

(the "Closing"), and (b) can provide adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party. The Bid must also identify a contact person that parties may contact to obtain additional Adequate Assurance Information.

(xiv)  **Identity & Corporate Authority**. Each Bid must fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the purchaser is an entity formed for the purpose of consummating the acquisition of the Assets), and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties. A Bid must also fully disclose any connections or agreements with the Debtors, any known, potential, prospective bidder, or Qualified Bidder (as defined herein), or any officer, director, or equity security holder of the Debtors.

(xv)  **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body reasonably acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(xvi)  **No Fees**. Each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction. By submitting its Bid, each Potential Bidder agrees to waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code. Each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

(xvii)  **Adherence to Bidding Procedures**. By submitting its Bid, each Potential Bidder is agreeing to (a) abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction and (b) serve as Back-Up Bidder, if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable assets.

(xviii)  **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such governmental, licensing, regulatory, or third-party approvals (and in the case that receipt of any such approval is expected to take more than thirty days following execution and delivery of the asset purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).

9

(xix) **Employee Obligations**. Each Bid must (a) indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed at the assets included in the Bid, and (b) expressly provide for the assumption or other treatment of the Debtors' prepetition collective bargaining agreements (the "CBAs"), pension obligations, and other post-employment benefits (collectively, the "Employee Obligations").

(xx) **Transfer of Mining Permits/Assumption of Reclamation Obligations.** Each Bid must (i) provide that the Potential Bidder will (a) take transfer of or obtain permits for the mining operations to be acquired, (b) assume all associated reclamation obligations with respect to the mines subject to the Bid to the extent required under applicable nonbankruptcy law, and (c) obtain assignment of or replace the reclamation surety bonds associated with such permits, and (ii) provide evidence of (a) the Potential Bidder's ability to satisfy the conditions set forth in clause (i) of this paragraph (including verification that the Potential Bidder is not, and will not be as of the time of the transfer, "permit blocked" under the federal Surface Mining Control and Reclamation Act by application of the federal Applicant Violator System), and (b) the Potential Bidder's financial resources necessary to obtain assignment of or replace the reclamation surety bonds associated with such permits, which evidence may include a letter from a surety company confirming that the Potential Bidder is a "qualified buyer" (as such term is used in the surety industry).

(xxi) **As-Is, Where-Is**.   Each Bid must include a written acknowledgement and representation that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Debtors' Assets and liabilities prior to making its Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Potential Bidder's proposed purchase and sale agreement for the Assets.

(xxii) **Time Frame for Closing**. A Bid by a Potential Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame reasonably acceptable to the Debtors in consultation with the Consultation Parties.

(xxiii) **Consent to Jurisdiction**. The Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Plan, the Sale documents, and the Closing, as applicable.

10

Bids fulfilling all of the preceding requirements, as determined by the Debtors and their advisors, in their reasonable business judgment and in consultation with the Consultation Parties, will be deemed to be "Qualified Bids," and those parties submitting Qualified Bids will be deemed to be "Qualified Bidders." All information disclosed by any Potential Bidder in connection with all of the preceding requirements will be made available by the Debtors to the Consultation Parties promptly upon the Debtors' receipt thereof but in any event no later than the earlier of one business day or two calendar days following the Debtors' receipt of such information; *provided* that any confidential financing and/or equity commitment documents received from a Potential Bidder shall only be shared with the Consultation Parties and the Term Loan Agent Advisors on a professional-eyes'-only basis. The Debtors reserve the right, in consultation with the Consultation Parties, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. After a Bid is deemed a Qualified Bid, Qualified Bidders may engage in discussions with the United Mine Workers of America regarding the Employee Obligations. The Debtors may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Debtors' Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders will be treated as a single Qualified Bidder for purposes of the Auction; *provided* that the Debtors also reserve the right, in consultation with the Consultation Parties, to conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets).

For the avoidance of doubt, the Stalking Horse Bidder will be deemed a Qualified Bidder by the Debtors in accordance with these Bidding Procedures, and the Stalking Horse Bid will be deemed a Qualified Bid, which qualify such Stalking Horse Bidder to participate in the Auction as a Qualified Bidder. If the Stalking Horse Bid is chosen as the Successful Bid, the rights and obligations of the Stalking Horse Bidder shall be as set forth in the Stalking Horse Purchase Agreement. If the Stalking Horse Bid is selected as the Back-Up Bid, it must remain irrevocable only for so long as is required under the Stalking Horse Purchase Agreement. The Debtors must file an executed Stalking Horse Purchase Agreement on or prior to the Final Bid Deadline.

Within three days after the Final Bid Deadline, the Debtors and their advisors, in consultation with the Consultation Parties, will determine which Potential Bidders are Qualified Bidders and will notify the Potential Bidders whether Bids submitted constitute, alone or together with other Bids, Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. Any Bid that is not deemed a Qualified Bid will not be considered by the Debtors. The Debtors will provide the Term Loan Agent Advisors with the Qualified Bids and the Qualified Bidders eligible to participate in the Auction no later than two calendar days prior to the date of the Auction.

**Qualified Bids must be received by each of the Debtors' advisors so as to be actually received no later than March 16, 2020, at 4:00 p.m., prevailing Eastern Time (the "Final Bid Deadline").**

**E.     Evaluation of Qualified Bids.**

Prior to the Auction, the Debtors and their advisors will evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, the highest or otherwise best Bid (the "Starting Bid"). For the

11

avoidance of doubt, the Debtors may select more than one Qualified Bid to collectively serve as the Starting Bid if each such Qualified Bid contemplates the purchase of different Assets. In making such determination, the Debtors will take into account, among other things, (i) the amount of the Qualified Bid, (ii) the impact on customers, vendors, and employees, (iii) the extent to which a Qualified Bid provides for the assumption of reclamation obligations, (iv) the certainty of a Qualified Bid leading to a confirmed plan, and (v) the execution risk attendant to any submitted Bids. Not later than two business days prior to the date of the Auction, the Debtors will (1) notify the UCC, the Term Loan Agent, and the Stalking Horse Bidder as to which Qualified Bid is the Starting Bid and (2) distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid and the Consultation Parties.

If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Potential Bidder's Good Faith Deposit and all accumulated interest thereon on or within ten business days, or as soon as reasonably practicable thereafter, after the Final Bid Deadline.

**F.      No Qualified Bids.**

If no Qualified Bids, other than the Stalking Horse Bid, are received by the Final Bid Deadline, then the Auction will not occur, the Stalking Horse Bidder will be deemed the Successful Bidder, and the Debtors will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse Purchase Agreement and authorizing the Sale to the Stalking Horse Bidder at the Sale Hearing (as defined herein).

**G.      Auction.**

If one or more Qualified Bids is received by the Final Bid Deadline, the Debtors will conduct the Auction with respect to the Debtors' Assets. For the avoidance of doubt, the Debtors may also conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets. The Auction will commence on **March 26, 2020, at 10 a.m., prevailing Eastern Time**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later time or other place as the Debtors will timely notify the Stalking Horse Bidder and all other Qualified Bidders, in consultation with the Consultation Parties, subject to the terms of the DIP Credit Agreement.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

(i)      the Auction will be conducted openly;

(ii)     only the Qualified Bidders, including the Stalking Horse Bidder, will be entitled to bid at the Auction;

(iii)    the Qualified Bidders, including the Stalking Horse Bidder, must appear in person or through duly-authorized representatives at the Auction;

(iv)     only such authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder), the Ad Hoc Group of Superpriority Lenders, the

12

Debtors, their respective advisors, the members of the UCC, UCC advisors, the Term Loan Agent, and Term Loan Agent Advisors, and the issuers of surety bonds will be permitted to attend the Auction; *provided* that any party in interest may request permission to attend the Auction, and the Debtors may, in their discretion, permit such party to attend the Auction in consultation with the Consultation Parties;

(v)     bidding at the Auction will begin at the Starting Bid;

(vi)    subsequent Bids at the Auction, including any Bids by any Stalking Horse Bidder, must be made in minimum increments of $1 million (or such other amount as the Debtors may determine in consultation with the UCC advisors or, if the Stalking Horse Bidder is not participating in the Auction with respect to the Asset or Assets subject to such Auction or is no longer bidding on such Asset or Assets, the Consultation Parties, which amount may be higher or lower than $1 million) of additional value, if applicable, *provided* that the Stalking Horse Bidder may credit bid any remaining amounts of its secured claims in connection with a subsequent Bid;

(vii)   each Qualified Bidder will be informed of the terms of the previous Bids and the Debtors shall, during the course of the Auction, promptly inform each Qualified Bidder of which subsequent Bids reflect, in the Debtors' reasonable business judgment, and in consultation with the UCC advisors or, if the Stalking Horse Bidder is not participating in the Auction with respect to the Asset or Assets subject to such Auction or is no longer bidding on such Asset or Assets, the Consultation Parties, the highest or otherwise best bid(s) for the applicable Assets;

(viii)  the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

(ix)    each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale;

(x)     the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest or otherwise best Bid, subject to the Debtors' right to require, in consultation with the UCC advisors or, if the Stalking Horse Bidder is not participating in the Auction with respect to the Asset or Assets subject to such Auction or is no longer bidding on such Asset or Assets, the Consultation Parties, last and final Bids to be submitted on a "blind" basis;

(xi)    the Debtors reserve the right, in their reasonable business judgment and in consultation with the UCC advisors or, if the Stalking Horse Bidder is not participating in the Auction with respect to the Asset or Assets subject to such Auction or is no longer bidding on such Asset or Assets, the Consultation Parties, subject to the terms of the DIP Credit Agreement, to adjourn the Auction one or

13

more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment and in consultation with the UCC advisors or, if the Stalking Horse Bidder is not participating in the Auction with respect to the Asset or Assets subject to such Auction or is no longer bidding on such Asset or Assets, the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

(xii)   the Auction will be governed by such other Auction Procedures as may be announced by the Debtors and their advisors, after consultation with the UCC advisors or, if the Stalking Horse Bidder is not participating in the Auction with respect to the Asset or Assets subject to such Auction or is no longer bidding on such Asset or Assets, the Consultation Parties, from time to time on the record at the Auction; *provided* that such other Auction Procedures are (a) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any other order of the Bankruptcy Court, (b) disclosed orally or in writing to all Qualified Bidders and other attendees at the Auction and recorded on the record, and (c) determined by the Debtors, in good faith and in consultation with the advisors to the Ad Hoc Group of Superpriority Lenders and the UCC (*provided*, *however*, that if the Stalking Horse Bidder is participating in the Auction with respect to the Asset or Assets, the Ad Hoc Group of Superpriority Lenders will not have such consultation rights), to further the goal of attaining the highest or otherwise best offer for the Assets.

To remain eligible to participate in the Auction for a particular Asset, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, and (ii) to the extent a Qualified Bidder fails to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors, in their reasonable business judgment and in consultation with the UCC advisors or, if the Stalking Horse Bidder is not participating in the Auction with respect to the Asset or Assets subject to such Auction or is no longer bidding on such Asset or Assets, the Consultation Parties, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Asset.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors in consultation with their outside legal counsel).

## H.   Acceptance of the Successful Bid or Successful Bids.

Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable business judgment and in consultation with the UCC advisors or, if

the Stalking Horse Bidder is not participating in the Auction with respect to the Asset or Assets subject to such Auction or is no longer bidding on such Asset or Assets, the Consultation Parties (which consultation shall include, without limitation, a meaningful opportunity for the UCC advisors or the Consultation Parties, as the case may be, to respond to the Debtors' determination prior to any announcement of a Successful Bid), will identify the highest or otherwise best Qualified Bid or Qualified Bids for the Assets (each, a "Successful Bid," and each person or entity submitting a Successful Bid, a "Successful Bidder"), and will, prior to closing the Auction, inform the Term Loan Agent Advisors of such determination, which will be determined by considering, among other things, (a) the type and amount of Assets sought to be purchased in the Bid or Bids and whether such Assets should or can be severed from other Assets (whether subject to competing Bids or otherwise), (b) the total expected consideration to be received by the Debtors, (c) the likelihood of the Qualified Bidder or Qualified Bidders' ability to close a transaction and the timing thereof (including any anticipated delays to Closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, (e) the impact on customers, vendors, employees, including, but not limited to, any union, and retirees, (f) the proposed treatment of the Employee Obligations, (g) the certainty of the Debtors being able to confirm a plan (whether the Plan or some other plan), and (h) any other criteria as may be considered by the Debtors in their reasonable business judgment (including the consideration of any considerations raised by the Consultation Parties that the Debtors determine, in their reasonable business judgment, are pertinent to the decision of the highest or otherwise best Bid). For the avoidance of doubt, the Debtors may select more than one Qualified Bid to collectively serve as a Successful Bid if each such Qualified Bid contemplates the purchase of different Assets. The Successful Bidder or Successful Bidders and the Debtors must, as soon as commercially reasonably practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which such Successful Bid or Successful Bids were made.

The Debtors shall file a notice identifying the Successful Bidder as soon as practicable following the conclusion of the Auction. If the Successful Bidder is not the Stalking Horse Bidder, the Debtors shall file a copy of the proposed asset purchase agreement with the Successful Bidder at least 14 days prior to the Sale Hearing.

The Debtors will present the results of the Auction to the Bankruptcy Court at the Sale Hearing, at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Successful Bidder or Successful Bidders were selected, in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, and (c) consummation of the Successful Bid or Successful Bids will provide the highest or otherwise best value for the Debtors' Assets and is in the best interests of the Debtors' estates.

If an Auction is held, the Debtors will be deemed to have accepted a Qualified Bid only when (a) such Qualified Bid is declared a Successful Bid at the Auction, and (b) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid or Successful Bids and entry of an order approving such Successful Bid or Successful Bids (the "Sale Order"), which Sale Order may be the order confirming the Plan or such other chapter 11 plan as contemplated by the Successful Bid

15

or Successful Bids, and in the case the Stalking Horse Bid is the Successful Bid, is anticipated to be the order confirming the Plan.

**I.      Sale Hearing.**

A hearing before the Bankruptcy Court to consider approval of the Successful Bid or Successful Bids (the "Sale Hearing"), pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Sale, will be held on **June 2, 2020, at 10:00 a.m.,** prevailing Eastern Time, before the Honorable John E. Hoffman, Jr., United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Ohio, Courtroom A, 5th Floor, 170 North High Street, Columbus, Ohio 43215.  The Sale Hearing may be the hearing to consider confirmation of the Plan or such other chapter 11 plan as contemplated by the Successful Bid or Successful Bids.

**The Sale Hearing may be continued to a later date by the Debtors, upon consultation with the Consultation Parties, by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Debtors will present the Successful Bid or Successful Bids to the Bankruptcy Court for approval.

**J.      Designation of Back-Up Bidder or Back-Up Bidders.**

If for any reason the Successful Bidder or Successful Bidders fail to consummate the Qualified Bid or Qualified Bids within the time permitted after the entry of the Confirmation Order approving the Sale to the Successful Bidder or Successful Bidders, then the Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid or Bids (each, a "Back-Up Bidder"), as determined by the Debtors after consultation with their advisors and the UCC advisors, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid or Bids (each, a "Back-Up Bid"), and the Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid or Back-Up Bids as soon as commercially reasonably practicable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.  Upon designation of the Back-Up Bidder or Back-Up Bidders at the Auction, the Back-Up Bid or Back-Up Bids must remain open until the Closing of the Successful Bid or Successful Bids, as applicable.

**K.      Return of Good Faith Deposit to Qualified Bidders that Submit Qualified Bids.**

The Good Faith Deposit of the Successful Bidder or Successful Bidders will, upon consummation of the Successful Bid or Successful Bids, become property of the Debtors' estates and be credited to the portion of the Purchase Price.  If the Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable) fails to consummate the Successful Bid or Successful Bids (or Back-Up Bid or Back-Up Bids, if applicable), then the Good Faith Deposit of such Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable) will be irrevocably forfeited to the Debtors and may be retained by the Debtors as

16

damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors.  The Debtors will treat any forfeited Good Faith Deposit in accordance with the DIP Credit Agreement and DIP Order.

The Good Faith Deposit of any unsuccessful Qualified Bidders (except for the Back-Up Bidder or Back-Up Bidders and the Stalking Horse Bidder) will be returned within the earlier of five business days after the conclusion of the Auction or upon the permanent withdrawal of the proposed Sale of the Debtors' Assets.  The Good Faith Deposit of the Back-Up Bidder or Back-Up Bidders, if any, will be returned to such Back-Up Bidder or Back-Up Bidders no later than five business days after the Closing with the Successful Bidder or Successful Bidders for the Assets bid upon by such Back-Up Bidder or Back-Up Bidders.

Except as set forth in the first paragraph of this Section K, all deposits shall be held in escrow and at no time shall be deemed property of the Debtors' estates absent further order of the Bankruptcy Court.

**L.**     **Reservation of Rights.**

The Debtors reserve their rights, with the consent of the advisors to the Ad Hoc Group of Superpriority Lenders, which consent shall not be unreasonably withheld, delayed, or conditioned (*provided*, *however*, any modifications to the Auction Procedures set forth in section G hereof shall be governed by section G.xii hereof, shall not require the consent of the Ad Hoc Group of Superpriority Lenders, and shall only require the Debtors to consult with Ad Hoc Group of Superpriority Lenders if the Stalking Horse Bidder is not participating in the Auction with respect to the Asset or Assets subject to such Auction), and in consultation with the UCC advisors, and with prior notice to the Term Loan Agent Advisors, to modify these Bidding Procedures in good faith, including by setting procedures for an Auction or Auctions for individual Assets or sub-groups of the Assets, to further the goal of attaining the highest or otherwise best offer for the Assets, or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.  The Debtors shall provide notice of any such modification to any Qualified Bidder, including the Stalking Horse Bidder.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).  All Consultation Parties and the Term Loan Agent will be permitted to seek relief from the Bankruptcy Court on an expedited basis if they disagree with any actions or decision made by the Debtors as part of these Bidding Procedures or during the Auction.  The rights of all Consultation Parties and the Term Loan Agent with respect to the outcome of the Auction are reserved.

For the avoidance of doubt and notwithstanding anything herein to the contrary, nothing in these Bidding Procedures shall, or shall be construed to, in any way amend, impair, prejudice, alter, or otherwise modify the terms of any DIP Document or the rights of the DIP Agent or any DIP Lender thereunder (each as defined in the DIP Order).

## M.    Consent to Jurisdiction.

All Qualified Bidders at the Auction will be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Sale, the Auction, the construction and enforcement of these Bidding Procedures, and/or the Indication of Interest Documents, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Bankruptcy Court on an expedited basis.

## N.    Fiduciary Out.

Nothing in these Bidding Procedures will require the board of directors, board of managers, or such similar governing body of a Debtor or non-debtor affiliate to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body reasonably determines in good faith, in consultation with outside counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

## O.    Sale Is As Is/Where Is.

The Assets sold pursuant to these Bidding Procedures will be conveyed at the Closing in their then present condition, "as is, with all faults, and without any warranty whatsoever, express or implied."

*        *        *        *        *

**<u>Exhibit 2</u>**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) | Case No. 19-56885 (JEH) |
|  | ) |  |
|  | ) | Judge John E. Hoffman, Jr. |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF BIDDING PROCEDURES,
POTENTIAL AUCTION, AND SALE HEARING**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Ohio (the "Court") on October 29, 2019.

**PLEASE TAKE FURTHER NOTICE** that on December 3, 2019, the Debtors filed the *Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [Docket No. 322] and the *Disclosure Statement for the Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 323].

**PLEASE TAKE FURTHER NOTICE** that on [●], 2020, the Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") approving, among other things, (a) the Debtors' bidding procedures (the "Bidding Procedures") in connection with the proposed auction (the "Auction") for some or all of the Debtors' assets (the "Assets"), (b) scheduling dates and deadlines in connection with approval of the Sale (the "Sale Schedule"), and (c) approving procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the Sale (the "Assumption Procedures").

**PLEASE TAKE FURTHER NOTICE** that the Debtors expect to seek approval of the Sale at a hearing confirming the Plan on **June 2, 2020, at 10:00 a.m., prevailing Eastern Time** (the "Sale Hearing"). If after the conclusion of the Auction, the Debtors determine in accordance with the Bidding Procedures that a sale will occur pursuant to section 363 of the Bankruptcy Code,

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

[2]   Capitalized terms used in this notice and not immediately defined have the meanings given to such terms in the Bidding Procedures (as defined herein).

then the Debtors will contact the Court's chambers to obtain a new date and time for the Sale Hearing, and the Debtors will provide notice of the updated Sale Hearing and Sale Objection Deadline.

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth in detail the requirements for submitting Indication of Interest Documents and Qualified Bids, and any person interested in making an offer to purchase the Assets **must** comply strictly with the Bidding Procedures. **Only Indication of Interest Documents and Qualified Bids that are submitted in accordance with the Bidding Procedures will be considered by the Debtors**. Any persons interested in making an offer to purchase the Assets should contact:

| Financial Advisor and Investment Banker to the Debtors | Counsel to the Debtors |
| --- | --- |
| Evercore Group L.L.C.<br>55 E. 52nd Street<br>New York, New York 10055<br>Attn: John Startin (john.startin@evercore.com)<br>Andrew Frame (andrew.frame@evercore.com)<br>Pavel Te (pavel.te@evercore.com) | Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn: Ross M. Kwasteniet, P.C.<br>(rkwasteniet@kirkland.com)<br>Joseph M. Graham (joe.graham@kirkland.com)<br>Tricia Schwallier (tricia.schwallier@kirkland.com)<br><br>-and-<br><br>601 Lexington Avenue<br>New York, New York 10022<br>Attn: Nicole L. Greenblatt, P.C.<br>(ngreenblatt@kirkland.com)<br>Alexander Nicas<br>(alexander.nicas@kirkland.com) |

## Obtaining Information

Copies of the Bidding Procedures Order, the Bidding Procedures, the Plan, and any other related documents are available upon request to Prime Clerk, LLC, the Debtors' notice and claims agent, by calling (877) 422-5170 (Domestic) or (917) 947-2680 (International), or by visiting the case website at http://cases.primeclerk.com/MurrayEnergy.

## The Sale Schedule

1.    The deadline to submit the Indication of Interest Documents (the "Preliminary Bid Deadline") is **February 4, 2020, at 4:00 p.m., prevailing Eastern Time**.

2.    The deadline to submit a Qualified Bid (the "Final Bid Deadline") is **March 16, 2020, at 4:00 p.m., prevailing Eastern Time**.

3.    The Auction for the Assets, if one is necessary, will commence on **March 26, 2020, at 10:00 a.m., prevailing Eastern Time**, at the offices of Kirkland & Ellis LLP,

2

601 Lexington Avenue, New York, New York 10022, or at such later time or other place as the Debtors will timely notify the Stalking Horse Bidder and all other Qualified Bidders.

4. The deadline to file an objection with the Court to the entry of an order approving the Sale is **May 26, 2020, at 4:00 p.m., prevailing Eastern Time** (the "Sale Objection Deadline").

5. A hearing to consider approval of the proposed Sale will be held before the Honorable John E. Hoffman, Jr. on **June 2, 2020, at 10:00 a.m., prevailing Eastern Time**, or such other date as determined by the Court, at the **United States Bankruptcy Court for the Southern District of Ohio, Courtroom A, 5th Floor, 170 North High Street, Columbus, Ohio 43215**.

## **Filing Objections to the Sale**

Any objection to the Sale must:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of Ohio, *General Order 30-3* from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4, 2019 (the "General Order"), and the *Order Implementing Certain Notice and Case Management Procedures*  [Docket No. 113] (the "Case Management Order") approved by the Court; (c) be filed electronically with the Court on the docket of *In re Murray Energy Holdings Co.*, Case 19-56885 (JEH), by registered users of the Court's electronic filing system and in accordance with the General Order (which is available on the Court's website at http://www.ohsb.uscourts.gov); and (d) be served so as to be **actually received** on or prior to the Sale Objection Deadline, by (i) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at https://cases.primeclerk.com/MurrayEnergy) and (ii) any person or entity with a particularized interest in the subject matter of the motion.

## **Consequences of Failing to Timely File an Objection**

**Any party or entity who fails to timely file an objection to the Sale on or before the Sale Objection Deadline in accordance with the Bidding Procedures Order, shall be forever barred from asserting any objection to the Sale of the Assets.**

\*       \*       \*       \*       \*

3

## **Exhibit 3**

**Contract Assumption Notice**

KE 64539587

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) | Case No. 19-56885 (JEH) |
|  | ) |  |
|  | ) | Judge John E. Hoffman, Jr. |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT OF
## CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Ohio (the "Court") on October 29, 2019.

**PLEASE TAKE FURTHER NOTICE** that on [●], 2020, the Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") approving, among other things, (a) the Debtors' bidding procedures (the "Bidding Procedures") in connection with the proposed auction (the "Auction") for some or all of the Debtors' assets (the "Assets"), (b) scheduling dates and deadlines in connection with approval of the Sale (the "Sale Schedule"), and (c) approving procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the Sale (the "Assumption Procedures").

**PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder or any other Successful Bidder the executory contracts and unexpired leases set forth on **Exhibit 1** hereto (each, an "Assigned Contract," and collectively, the "Assigned Contracts"). In addition, the cure payments, if any, necessary for the assumption and assignment of the Assigned Contracts (the "Cure Payments") are set forth on **Exhibit 1**.

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy. The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

[2]   Capitalized terms used in this notice and not immediately defined have the meanings given to such terms in the Bidding Procedures (as defined herein).

**PLEASE TAKE FURTHER NOTICE** that nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract.

**YOU ARE RECEIVING THIS NOTICE BECAUSE THE STALKING HORSE BIDDER HAS IDENTIFIED YOU AS A COUNTERPARTY TO A POTENTIAL ASSIGNED CONTRACT OR UNEXPIRED LEASE, BUT THE INCLUSION OF YOUR CONTRACT ON THE NOTICE DOES NOT MEAN THAT THE STALKING HORSE BIDDER HAS DETERMINED WHETHER TO SEEK ASSUMPTION AND ASSIGNMENT OF YOUR CONTRACT OR LEASE.** Under the terms of the Assumption Procedures, the Stalking Horse Bidder may modify the list of Assigned Contracts on **Exhibit 1** until the Final Bid Deadline (as defined herein). The Stalking Horse Bidder or other Successful Bidder may further modify the list of Assigned Contracts by (a) adding any contract as an Assumed Contract (subject to the terms of the Stalking Horse Purchase Agreement) at any time prior to two business days before the closing of the Sale or (b) removing any contract Assumed Contract that Stalking Horse Bidder or other Successful Bidder does not wish to assume at any time prior to ten business days before the closing of the Sale. Any counterparty impacted by such a modification will receive notice thereof (the "Supplemental Assumption Notice") and, if applicable, an opportunity to object to the proposed assumption and assignment of the Assigned Contract. To the extent a Qualified Bidder other than the Stalking Horse Bidder is the Successful Bidder and such Successful Bidder adds or removes an Assigned Contract from the list of Assigned Contracts, the Debtors will send notice to impacted counterparties as soon as practicable following the Auction.

## Obtaining Additional Information

Copies of the Bidding Procedures Order, the Bidding Procedures, the Plan, and any other related documents are available upon request to Prime Clerk, LLC, the Debtors' notice and claims agent, by calling (877) 422-5170 (Domestic) or (917) 947-2680 (International), or by visiting the case website at http://cases.primeclerk.com/MurrayEnergy.

## Important Dates and Deadlines

1. The deadline to submit a Qualified Bid (the "Final Bid Deadline") is **March 16, 2020, at 4:00 p.m., prevailing Eastern Time**.

2. The Auction for the Assets, if one is necessary, will commence on **March 26, 2020, at 10:00 a.m., prevailing Eastern Time**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or at such later time or other place as the Debtors will timely notify the Stalking Horse Bidder and all other Qualified Bidders.

2

3.      The deadline to file an objection with the Court to the entry of an order approving the Sale is **May 26, 2020, at 4:00 p.m., prevailing Eastern Time** (the "Sale Objection Deadline").

4.      A hearing to consider approval of the proposed Sale will be held before the Honorable John E. Hoffman, Jr. on **June 2, 2020, at 10:00 a.m., prevailing Eastern Time**, or such other date as determined by the Court, at the **United States Bankruptcy Court for the Southern District of Ohio, Courtroom A, 5th Floor, 170 North High Street, Columbus, Ohio 43215**.

### Filing Assumption and Assignment Objections

Pursuant to the Assumption Procedures, objections to the proposed assumption and assignment of an Assigned Contract, including any objection relating to the Cure Payment and/or adequate assurance of future performance, must:  (a) be in writing; (b) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and the Case Management Order; (c) state with specificity the nature of such objection and, if the objection pertains to the Cure Payment, the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof; and (d) be filed with the Court and served so as to be actually received by (i) counsel to the Debtors, (ii) counsel to the Ad Hoc Group of Superpriority Lenders, (iii) proposed Counsel to the UCC, and the (iv) the United States Trustee, before the Sale Objection Deadline or such deadline set forth in the Supplemental Assumption Notice, as applicable.

Failure to timely file an objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder or any other Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties:

| Counsel to the Debtors | United States Trustee |
|---|---|
| Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn:  Steve Toth, Joseph M. Graham | Office of the United States Trustee<br>J.W. Peck Federal Building<br>550 Main Street, Suite 4-812<br>Cincinnati, Ohio 45202 |
| **Counsel to the Ad Hoc Group of Superpriority Lenders** | **Proposed Counsel to the UCC** |
| Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY 10017<br>Attn:  Damian S. Schaible and Adam L. Shpeen | Morrison & Foerster, LLP<br>250 West 55th Street<br>New York, NY 10019<br>Lorenzo Marinuzzi and Jennifer Marines |

KE 65251525

### Consequences of Failing to Timely File and Serve an Objection

**Any counterparty to an Assigned Contract who fails to timely file and serve an objection to the proposed assumption and assignment of an Assigned Contract in accordance with the Bidding Procedures Order and Assumption Procedures incorporated therein shall be forever barred from asserting any objection to the assumption and assignment of the Assigned Contract and/or the Cure Payment set forth on <u>Exhibit 1</u>, including asserting additional cure amounts with respect to an Assigned Contract relating to any period prior to the time of assumption and assignment.**

\*     \*     \*     \*     \*

4