## **Exhibit A**

**Stalking Horse Purchase Agreement**

**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

DATED AS OF MARCH 16, 2020

BY AND AMONG

MINING PURCHASER, INC., AS BUYER

AND

MURRAY ENERGY HOLDINGS CO.

AND

CERTAIN SUBSIDIARIES OF MURRAY ENERGY HOLDINGS CO., AS THE SELLERS

# Table of Contents

**Page**

### Article 1
### Definitions

1.1    Definitions..................................................................................................................2
1.2    Other Definitions and Interpretive Matters................................................................21

### Article 2
### Purchase and Sale

2.1    Purchase and Sale .....................................................................................................23
2.2    Excluded Assets.........................................................................................................27
2.3    Assumed Liabilities ...................................................................................................29
2.4    Excluded Liabilities...................................................................................................30
2.5    Assignment and Assumption of Contracts..................................................................33
2.6    Further Assurances.....................................................................................................37
2.7    Certain Payments or Instruments Received from Third Parties....................................38

### Article 3
### Purchase Price

3.1    Consideration ............................................................................................................38
3.2    Allocation of Purchase Price......................................................................................39
3.3    Withholding ..............................................................................................................39

### Article 4
### Closing and Deliveries

4.1    Closing Date..............................................................................................................39
4.2    Buyer's Deliveries .....................................................................................................39
4.3    Sellers' Deliveries......................................................................................................40
4.4    Buyer Designees ........................................................................................................41

### Article 5
### Representations and Warranties of the Company

5.1    Organization and Good Standing.................................................................................42
5.2    Specified Entities .......................................................................................................43
5.3    Authority; Validity; Consents....................................................................................44
5.4    No Conflict................................................................................................................45
5.5    Real Property .............................................................................................................45
5.6    Environmental and Health and Safety Matters ...........................................................46
5.7    Title to Acquired Assets.............................................................................................48
5.8    Sufficiency of Assets .................................................................................................49
5.9    Taxes.........................................................................................................................49

5.10    Legal Proceedings ........................................................................................51
5.11    Compliance with Legal Requirements; Permits ........................................51
5.12    Labor Matters ..............................................................................................53
5.13    Employee Benefits .......................................................................................54
5.14    Sellers' Intellectual Property .......................................................................55
5.15    Contracts ......................................................................................................56
5.16    Insurance ......................................................................................................56
5.17    Brokers or Finders .......................................................................................57
5.18    Affiliate Interests .........................................................................................57
5.19    Bank Accounts .............................................................................................57
5.20    Undue Influence ...........................................................................................57
5.21    Financial Statements ....................................................................................57
5.22    No Undisclosed Material Liabilities ............................................................58
5.23    Absence of Certain Changes ........................................................................58
5.24    Mining ..........................................................................................................59
5.25    Buildings and Improvements .......................................................................60
5.26    Equipment and Fixed Assets ........................................................................61
5.27    MSHA; OSHA ..............................................................................................61
5.28    Coal Act; Black Lung Act ...........................................................................61
5.29    Warranties Exclusive ...................................................................................62

## Article 6
## Representations and Warranties of Buyer

6.1    Organization and Good Standing ................................................................62
6.2    Authority; Validity; Consents .....................................................................62
6.3    No Conflict ...................................................................................................63
6.4    Brokers or Finders .......................................................................................63
6.5    Legal Proceedings ........................................................................................63
6.6    Qualification .................................................................................................63
6.7    Financial Capability .....................................................................................64
6.8    No Other Representations or Warranties; Condition of the Business; Buyer's
       Reliance ........................................................................................................64
6.9    Information ...................................................................................................65
6.10   Warranties Exclusive ...................................................................................65

## Article 7
## Actions Prior to the Closing Date

7.1    Access and Reports; Confidentiality ............................................................65
7.2    Operations Prior to the Closing Date ..........................................................66
7.3    Regulatory Matters; Cooperation ................................................................68
7.4    Tax Cooperation ...........................................................................................70
7.5    Bankruptcy Court Matters ...........................................................................70
7.6    Surety Bonds; Permits .................................................................................72
7.7    Sale Free and Clear ......................................................................................74
7.8    Funded Liabilities; Wind-Down Amount; Adjusted Wind-Down Amount ......75

7.9    Transition Services...........................................................................................76
7.10   Insurance Policies ..........................................................................................76

## Article 8
### Additional Agreements

8.1    Taxes..............................................................................................................76
8.2    Partnership Audit Rules ..................................................................................77
8.3    Alternative Transaction Structure ...................................................................77
8.4    Bulk Sales .......................................................................................................78
8.5    Assumed Contracts: Adequate Assurance and Performance ...........................78
8.6    Employee Matters ...........................................................................................78
8.7    Post-Closing Books and Records and Personnel .............................................80
8.8    Casualty Loss ..................................................................................................80
8.9    Change of Name ..............................................................................................81
8.10   No Successor Liability ....................................................................................81
8.11   Notification of Certain Events .........................................................................82
8.12   Sellers' Obligations........................................................................................82
8.13   Murray Met Restructuring Support Agreement ................................................82

## Article 9
### Conditions Precedent to Obligations of Buyer and the Sellers to Close

9.1    No Order ..........................................................................................................83
9.2    Confirmation Order.........................................................................................83
9.3    Plan .................................................................................................................83
9.4    Termination of Waiting Period .........................................................................83

## Article 10
### Conditions Precedent to Obligations of Buyer to Close

10.1   Accuracy of Representations ...........................................................................84
10.2   Sellers' Performance.......................................................................................84
10.3   Permits. ...........................................................................................................84
10.4   Restructuring Support Agreement ....................................................................85
10.5   Plan .................................................................................................................85
10.6   Assumed Contracts .........................................................................................85
10.7   Sellers' Deliveries ...........................................................................................86
10.8   Material Adverse Effect ...................................................................................86
10.9   Agreement of Certain Amounts .......................................................................86
10.10  Collective Bargaining Agreements ..................................................................86
10.11  Seller Cure Costs............................................................................................86
10.12  Certain Approvals ...........................................................................................86

## Article 11
### Conditions Precedent to the Obligations of the Sellers to Close

11.1   Accuracy of Representations ...........................................................................87

11.2  Buyer's Performance ...................................................................................87
11.3  Buyer's Deliveries ......................................................................................87
11.4  Buyer Cure Costs ........................................................................................87
11.5  Buyer's Financial Ability ...........................................................................88
11.6  Satisfaction of the Final Wind-Down Amount ..........................................88

**Article 12**
**Termination**

12.1  Termination Events......................................................................................88
12.2  Effect of Termination...................................................................................90

**Article 13**
**General Provisions**

13.1   Survival .......................................................................................................91
13.2   Confidentiality ............................................................................................91
13.3   Public Announcements ................................................................................91
13.4   Notices .........................................................................................................92
13.5   Waiver..........................................................................................................93
13.6   Entire Agreement; Amendment ..................................................................93
13.7   Assignment ..................................................................................................93
13.8   Severability ..................................................................................................94
13.9   Expenses ......................................................................................................94
13.10  Company Schedules .....................................................................................94
13.11  Buyer Schedules...........................................................................................94
13.12  Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.........94
13.13  Counterparts.................................................................................................95
13.14  Parties in Interest; No Third Party Beneficiaries .......................................95
13.15  Acknowledgements......................................................................................95
13.16  Remedies......................................................................................................96
13.17  Specific Performance ..................................................................................96
13.18  Certain Waivers ..........................................................................................96
13.19  Fiduciary Obligations..................................................................................97
13.20  Sellers' Representative.................................................................................97

### ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of March 16, 2020, (the "Execution Date"), is made and entered into by and among Mining Purchaser, Inc., a Delaware corporation ("Buyer"), Murray Energy Holdings Co., a Delaware corporation (the "Company"), and the Additional Sellers (as defined below) (together with the Company, the "Sellers").

### RECITALS

**WHEREAS**, the Sellers are engaged in the business of mining, processing, marketing and selling coal through certain mining complexes;

**WHEREAS**, on October 28, 2019, the Company, certain of its Subsidiaries and certain other parties entered into a Restructuring Support Agreement (the "RSA");

**WHEREAS**, on October 29, 2019, the Sellers (collectively, the "Debtors") filed voluntary petitions (the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court");

**WHEREAS**, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Confirmation Order, the Sellers desire to sell to Buyer all of the Acquired Assets and to assign to Buyer all of the Assumed Liabilities, Buyer desires to purchase from the Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated hereby, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Confirmation Order, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363, 365, 1123(a)(5)(D), 1129, 1141 and 1146, of the Bankruptcy Code, and Rules 4001, 6004, 6006, 3020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

**WHEREAS**, the performance under this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Confirmation Order by the Bankruptcy Court and such transactions are expected to be consummated concurrently with the effective date of the Plan;

**WHEREAS**, Buyer has been advised by the Superpriority Lenders that the Superpriority Lenders believe that it is in their (and in Buyer's) best interest to enter into this Agreement and consummate the transactions contemplated hereby, and as a result thereof, the Superpriority Lenders have directed Buyer to submit this credit bid in furtherance thereof; and

**WHEREAS**, the board of directors, the board of managers or similar governing body, as applicable, of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Confirmation Order and each has approved the same.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     <u>Definitions</u>. For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"<u>Accounts Receivable</u>" means, with respect to each Seller, all accounts receivable, notes receivable and other rights to payment in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon owed to such Seller and any payments with respect thereto.

"<u>Acquired Assets</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Acquired Equity Interests</u>" means all of the equity interests held by the Sellers (or any of their Affiliates (other than the interests in Murray Met held directly by Javelin Investment Holdings LLC ("<u>Javelin LLC</u>"))) directly or indirectly, in the Specified Entities; <u>provided</u>, that no later than 15 days prior to first day of the hearing to consider approval of the sale of all or substantially all of the Company's assets and confirmation of the Plan, Buyer may elect, by providing written notice to the Company, that the equity interests (or such portion thereof that Buyer elects) held by the Sellers (or any of their Affiliates), directly or indirectly, in Foresight GP, Foresight LP, Murray South America, Inc., and/or Murray Met be deemed not to be Acquired Equity Interests, in which case such equity interests of the Sellers and their Affiliates in such entity or entities will be deemed to be Excluded Assets for all purposes of and under this Agreement.

"<u>Action</u>" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter by or before, or otherwise involving, any Governmental Authority or arbitrator.

"<u>Additional Sellers</u>" means: (a) CCC Land Resources LLC, (b) CCC RCPC LLC, (c) Consolidation Coal Company, (d) Eighty-Four Mining Company, (e) The Ohio Valley Coal Company, (f) McElroy Coal Company, (g) UMCO Energy, Inc., (h) The American Coal Sales Company, (i) The Ohio Valley Transloading Company, (j) Murray American River Towing, Inc., (k) Murray American Transportation, Inc., (l) Ohio Energy Transportation, Inc., (m) Energy Transportation, Inc., (n) Anchor Longwall and Rebuild, Inc., (o) American Mine Services, Inc., (p) American Equipment & Machine, Inc., (q) Murray Equipment & Machine, Inc., (r) West Virginia Resources, Inc., (s) Kanawha Transportation Center, Inc., (t) AMCA Coal Leasing, Inc., (u) West Ridge Resources, Inc., (v) Andalex Resources, Inc., (w) The American Coal Company,

(x) Murray Kentucky Energy Services, Inc., (y) OhioAmerican Energy, Incorporated, (z) Western Kentucky Resources, LLC, (aa) Murray Global Commodities, Inc., (bb) Murray Energy Corporation, (cc) UtahAmerican Energy, Inc., (dd) Genwal Resources, Inc., (ee) American Energy Corporation, (ff) The Harrison County Coal Company, (gg) The Marshall County Coal Company, (hh) The Ohio County Coal Company, (ii) The Monongalia County Coal Company, (jj) The Marion County Coal Company, (kk) KenAmerican Resources, Inc., (ll) The Western Kentucky Coal Company, LLC, (mm) The Muhlenberg County Coal Company, LLC, (nn) The Franklin County Coal Company, (oo) PennAmerican Coal, Inc., (pp) PennAmerican Coal L.P., (qq) Pinski Corp., (rr) Keystone Coal Mining Corporation, (ss) Premium Coal, Inc., (tt) T D K Coal Sales, Incorporated, (uu) Spring Church Coal Company, (vv) Mon River Towing, Inc., (ww) Empire Dock, Inc., (xx) Canterbury Coal Company, (yy) Maple Creek Mining, Inc., (zz) Energy Resources, Inc., (aaa) Murray Keystone Processing, Inc., (bbb) The Washington County Coal Company, (ccc) American Compliance Coal, Inc., (ddd) Murray American Energy, Inc., (eee) Mill Creek Mining Company, (fff) AmCoal Holdings, Inc. (ggg) American Natural Gas, Inc., (hhh) AmericanHocking Energy, Inc., (iii) AmericanMountaineer Energy, Inc., (jjj) AmericanMountaineer Properties, Inc., (kkk) Andalex Resources Management, Inc., (lll) Avonmore Rail Loading, Inc., (mmm) Belmont Coal, Inc., (nnn) Belmont County Broadcast Studio, Inc., (ooo) Central Ohio Coal Company, (ppp) Coal Resources Holdings Co., (qqq) Coal Resources, Inc., (rrr) Consolidated Land Company, (sss) Corporate Aviation Services, Inc., (ttt) Maple Creek Processing, Inc., (uuu) MonValley Transportation Center, Inc., (vvv) Murray American Coal, Inc., (www) Murray American Kentucky Towing, Inc., (xxx) Murray American Minerals, Inc., (yyy) Murray American Resources, Inc., (zzz) Murray Energy Holdings Co., (aaaa) Murray Kentucky Energy, Inc., (bbbb) Murray Utah Energy Services, Inc., (cccc) Ohio Valley Resources, Inc., (dddd) Oneida Coal Company, Inc., (eeee) Pennsylvania Transloading, Inc., (ffff) Pleasant Farms, Inc., (gggg) Southern Ohio Coal Company, (hhhh) Sunburst Resources, Inc., (iiii) The Mclean County Coal Company, (jjjj) The Meigs County Coal Company, (kkkk) The Muskingum County Coal Company, (llll) The Oklahoma Coal Company, (mmmm) Twin Rivers Towing Company, (nnnn) Western Kentucky Coal Resources, LLC, (oooo) Western Kentucky Consolidated Resources, LLC, (pppp) Western Kentucky Land Holding, LLC, (qqqq) Western Kentucky Rail Loadout, LLC, (rrrr) Western Kentucky Resources Financing, LLC, (ssss) Western Kentucky River Loadout, LLC, (tttt) Murray Metallurgical Coal Properties II, LLC, and (uuuu) Murray Metallurgical Coal Properties, LLC.

"Adjusted Wind-Down Amount" has the meaning set forth in Section 7.8(c).

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Exchange Act.

"Agent" has the meaning set forth in Section 6.7.

"Agreement" has the meaning set forth in the preamble.

"Allocation" has the meaning set forth in Section 3.2.

"Alternative Transaction Structure" has the meaning set forth in Section 8.3.

"Alternative Transaction Structure Election" has the meaning set forth in Section 8.3.

"Antitrust Law" means, collectively, the HSR Act, Title 15 of the United States Code §§ 1-7, (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§§ 41, et seq.) and the rules and regulations promulgated thereunder and any other Legal Requirements that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Applicant Violator System" means the applicant violator system established pursuant to the SMCRA (or any applicable state system).

"Assumed Contracts" has the meaning set forth in Section 2.5(a)(i).

"Assumed Contracts Schedule" has the meaning set forth in Section 2.5(a)(i).

"Assumed Funded Liabilities" has the meaning set forth in Section 7.8(c).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption Agreement" means an Assignment and Assumption Agreement in customary form reasonably acceptable to the Parties.

"Available Contracts" has the meaning set forth in Section 2.5(a)(i).

"Avoidance Action" means any avoidance, preference, recovery, claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code or under any analogous state or federal bankruptcy or non-bankruptcy laws; for the avoidance of doubt, the Seller's right to raise any Avoidance Action as a defense to a disputed Claim pursuant to Section 502(d) of the Bankruptcy Code shall not itself constitute an Avoidance Action.

"Back-Up Bidder" has the meaning set forth in the Bidding Procedures Order.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" has the meaning set forth in the recitals.

"Benefit Plan" has the meaning set forth in Section 5.13.

"Bid Deadline" has the meaning set forth in Section 7.5(a).

"Bidding Procedures" means the Bidding Procedures (as defined in the Bidding Procedures Order) approved by the Bidding Procedures Order, together with such changes therein, as shall have been made in accordance with the Bidding Procedures Order.

"Bidding Procedures Order" means the *Order (I) Approving the Bidding Procedures In Connection With the Sale of All or Substantially All of the Debtors' Assets, (II) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 742], as such order may be amended, supplemented or modified from time to time.

"Bill of Sale" means a Bill of Sale in customary form reasonably acceptable to the Parties.

"Black Lung Act" means the Federal Coal Mine Safety and Health Act of 1969, the Black Lung Benefits Act of 1972, the MSHA, the Black Lung Benefits Reform Act of 1977, and the Black Lung Benefits Amendments of 1981.

"Black Lung Liability" means any liability or benefit obligations related to black lung claims and benefits under the Black Lung Act, and liabilities and benefits related to pneumoconiosis, silicosis, exposure to isocyanates or other lung disease arising under any federal or state law.

"Business" means (1) the business and operations of the Sellers and their Affiliates (wherever such business and operations are situated or conducted) related to: (a) the following mining complexes (or, if the subclause begins with an entity, the mining complexes owned by such entity) listed in the following subclauses, as applicable: (i) the Harrison County mine, (ii) the Marion County mine, (iii) the Marshall County mine (including the Conner Run Impoundment), (iv) the Monongalia County mine (including the Hughes Hollow Slurry Impoundment), (v) the Century Mine (including the Century Mine Disposal Area, the Century Mine Benoc Disposal Area, and the Century Mine Sewage Treatment Plant 2), (vi) the Ohio County mine (including the Cunningham Hollow Refuse Area), (vii) the Lila Canyon mine, (viii) the Genesis mine, (ix) the Pride mine, (x) the Paradise mine, (xi) The Ohio Valley Coal Company Powhatan #6 Mine, (xii) the Crandall Canyon Mine, (xiii) the West Ridge Mine, (xiv) the Tower Mine (xv) Murray American River Towing, Inc., (xvi) PennAmerican Coal, Inc., (xvii) PennAmerican Coal L.P., (xviii) Pinski Corp., (xix) Keystone Coal Mining Corp., (xx) Premium Coal Inc., (xxi) TDK Coal Sales, Incorporated, (xxii) Spring Church Coal Company, (xxiii) Mon River Towing, Inc., (xxiv) Empire Dock, Inc., (xxv) the American Energy Corporation Allison Mine and Bethesda Portal Waste Water Treatment Plant and (xxvi) all idled and closed mines, including (A) the Lewis Creek Surface Mine, (B) the Midway Surface Mine, and (C) The American Coal Company (including the New Era Mine, New Future Mine, and Galatia Mine (including the Kerr-McGee and Bunkhouse Refuse Areas)), (D) the Equality Boot Surface Mine, (E) the Paradise #9 Mine, (F) OhioAmerican Energy, Incorporated (including Salt Run Mine #1, Sale Run North Adjacent Area, Star Ridge West Prep/Slurry, Star Ridge/Marfork Mine, Star Lake #1/Red Bird West, North Star 2 (a/k/a North Star), Star Buck, Redbird South, and Riddles Run Refuse Disposal/Coal Processing Plant) (G) the South Crandall Canyon Mine, (H) Canterbury Coal Company (including the David Diane and Kunkle Sub F mines, Refuse Areas Nos. 5 and 6), (I) Maple Creek Mining, Inc. (including the Maple Creek Mine and Ginger Hill Refuse Areas I and II), (J) Eighty-Four Mining Company (including the Mine 84 Refuse Area), (K) Energy Resources, Inc. (including the 21 Mine), (L) Murray Keystone Processing, Inc. (including the Keystone Processing Plant), (M) UMCO Energy, Inc. (including the High Quality Mine), (N) The Washington County Coal Company (Washington Country Mine (Mine

No. 84)), (O) American Compliance Coal, Inc., (P) Murray American Energy Inc. – Blacksville #1 and Blacksville 1 Deep Mine, (Q) Mill Creek Mining Company, (R) The Franklin County Coal Company – Rend Lake Mine, (S) West Virginia Resources, Inc. (including Dundas Tipple/Preparation Plant, Dundas Refuse Pit, and Cheshire/Waterloo Dock), (T) The Ohio Valley Coal Company McMahon Portal Waste Water Treatment Plant, and (U) the Consolidation Coal Co. Blacksville 1 Mine Refuse Area, (b) the land and livestock business owned by Pleasant Farms, Inc., and (c) the oil and gas business operated by American Natural Gas, Inc., in each case, in the case of clauses (a), (b) and (c), other than with respect to such business and operations to the extent solely relating to any Excluded Assets or Excluded Liabilities, (2) the ownership by the Sellers and their Affiliates of (and the exercise of their related rights and performance of their related obligations with respect to) the Acquired Equity Interests and (3) the Company's corporate overhead function including the ownership and operation of the Company's corporate headquarters and all tangible personal property and interests therein.

"Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

"Buyer" has the meaning set forth in the preamble and shall also include any Buyer Designee.

"Buyer Approved CBA" means as applicable, (i) a Buyer Existing/Modified CBA or (ii) a new Collective Bargaining Agreement entered into effective as of the Closing by Buyer and any applicable Union.

"Buyer Cure Costs" means the Cure Costs in respect of the Assumed Contracts solely to the extent such Cure Costs are included in the Assumed Funded Liabilities as determined pursuant to Section 7.8(c).

"Buyer Designee" has the meaning set forth in Section 4.4.

"Buyer Employees" has the meaning set forth in Section 8.6(a).

"Buyer Existing/Modified CBA" means any existing or modified Collective Bargaining Agreement to which a Seller is a party that Buyer expressly agrees in writing will be an Assumed Contract.

"Buyer Existing/Modified CBA Assumed Liabilities" has the meaning set forth in Section 2.3(c).

"Buyer Schedules" means the Schedules, dated as of the Execution Date, delivered by Buyer to the Company in connection with the execution of this Agreement.

"Capital Stock" means: (a) any shares, interests, participations or other equivalents (however designated) of capital stock or share capital of a company or corporation; and (b) any ownership interests in a Person other than a corporation, including membership interests, partnership interests, joint venture interests and beneficial interests.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Coal Act" means the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701, et seq.

"Coal Reserves" means, any and all of the coal located upon or within the Owned Real Property or Leased Real Property, to the extent owned or leased, as applicable, by the Sellers (but in the case of Leased Real Property, only to the extent the applicable lease is an Assumed Contract).

"Code" means the Internal Revenue Code of 1986.

"Collective Bargaining Agreement" has the meaning set forth in Section 5.12(a).

"Company" has the meaning set forth in the preamble.

"Company Schedules" means the Schedules to be dated as of the Execution Date and delivered by the Company to Buyer no later than 5 p.m. (New York time) on March 19, 2020 (the "Schedules Deadline") in a form mutually agreed by the Company and Buyer each acting in its sole discretion.

"Confidential Information" has the meaning set forth in Section 13.2.

"Confirmation Order" has the meaning set forth in Section 9.2. References to the Confirmation Order refer also to the Plan as if it were incorporated by reference in the Confirmation Order.

"Conner Run Impoundment" means that certain coal refuse and flyash impound located in Marshall County, West Virginia and associated with the operation of the Marshall County mine.

"Conner Run Impoundment Settlement Agreement" means that certain settlement agreement among and between The Marshall County Coal Company, the U.S. Army Corps of Engineers, and the U.S. Department of Justice related to the Conner Run Impoundment.

"Contract" means any legally binding agreement, contract, obligation, promise, undertaking, lease (including Leases and Lessor Leases), sublease, purchase order, license, commitment, insurance policy or other legally binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"Controlled Specified Entities" means Murray Met, the Foresight Entities, Murray South America, Inc. and each of their respective Subsidiaries.

"Controlled Specified Entities Permits" has the meaning set forth in Section 5.11(b).

"Credit Bid and Release" has the meaning set forth in Section 3.1.

"Cure Costs" means, with respect to any given Contract of any Seller or Sellers, all monetary liabilities, including pre-petition monetary liabilities, of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under such Contract pursuant to Section 365 of the Bankruptcy Code in order for such Contract to be assumed and assigned to Buyer (if applicable) as provided hereunder, as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order, Confirmation Order, or herein.

"Cure Notice" means, with respect to any given Contract, the notice submitted by the Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth, among other things the Cure Costs with respect thereto as calculated by the Sellers; provided, that such amount is approved by Buyer (such approval not to be unreasonably conditioned, withheld or delayed).

"Data Room" means that certain Intralinks virtual data room maintained under the name "Project Magnet Data Room" by or on behalf of the Company in connection with the Bankruptcy Cases at https://intralinks.com.

"Debtors" has the meaning set forth in the recitals.

"Deeds" means (i) unless otherwise provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Owned Real Property, special (or limited) warranty deeds or, with respect to any parcel of Owned Real Property any of the Sellers received via quitclaim deed, quitclaim deeds, or jurisdictional equivalents, as the case may be, in recordable form for the appropriate jurisdiction, reasonably acceptable to Buyer, transferring title to the Owned Real Property (subject only to Permitted Encumbrances), and (ii) if expressly provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Owned Real Property, the type of deed or other instrument so specified.

"DIP Credit Agreement" has the meaning set forth in the Final DIP Order.

"DIP Lenders" has the meaning set forth in the Final DIP Order.

"Direction Letter" has the meaning set forth in Section 6.7.

"Disclosure Statement" has the meaning set forth in Section 7.5(f).

"Disclosure Statement Order" has the meaning set forth in Section 7.5(f).

"Employees" means all of the current or former employees of the Sellers or any of their Subsidiaries or predecessors in interest as of the Execution Date, as well as any additional persons who, subject to Section 7.2(b), become employees of the Sellers or any of their Subsidiaries during the period from the Execution Date through and including the Closing Date.

"Encumbrance" means, with respect to any property or asset, any "interest", as that term is used in Section 363(f) and, as applicable, Section 1141(c), of the Bankruptcy Code, charge,

lien, Claim, right, demand, title defect, mortgage, lease, debt, losses, damage, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, sublease, hypothecation, deed of trust, pledge, security interest, bailment (in the nature of a pledge or for purposes of security), option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, servitude, conditional sales and title retention agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise, including any lease or license in the nature thereof), encroachment, encumbrance, third-party interest or other restriction or limitation of any kind, whether imposed by Contract, Legal Requirement, equity or otherwise.

"Environmental Permit" means any and all Permits required under any applicable Environmental, Health and Safety Law (including those required under any applicable Environmental, Health and Safety Laws for the construction, maintenance and operation of any coal mine or related processing facilities or Reclamation and restoration of land, water and any current, abandoned or former mines, and of any other environment affected by such mines, as required pursuant to any applicable Environmental, Health and Safety Law).

"Environmental, Health and Safety Laws" means any and all applicable Legal Requirements concerning or relating to (a) public health and safety (to the extent relating to the actual or potential Release of or exposure to Hazardous Substances), (b) worker/occupational health and safety, (c) subsidence, land use, zoning, odor or noise, (d) pollution or protection of the environment, (e) the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup involving Hazardous Substances, (f) human health as affected by hazardous or toxic substances, (g) acid mine drainage, and (h) mining operations and activities to the extent relating to Reclamation, and shall include SMCRA and MSHA and any of their implementing regulations and state analogues.

"Equipment" means all pumps, transformers, power poles, electric lines, water lines, ventilation fans, motors, furniture, furnishings, fixtures, infrastructure, equipment, office equipment, computers, machinery, vehicles, aircrafts, boats, vessels, rail cars, apparatus, appliances, implements, telephone systems, signage, supplies, tooling and all other tangible personal property or fixed assets of every kind and description, (including all mobile mining equipment, parts, supplies, tires and components), in each case, used, or held for use, in connection with the operation of the Business, wherever located, including pipes, communications equipment, information technology assets, and any attached and associated hardware or software, servers, workstations, routers, hubs, switches, data communication lines, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties, indemnities, licenses and all similar rights from or against the vendor applicable thereto, and all other equipment, fixed assets and tangible assets, in each case, used, or held for use, in connection with the operation of the Business.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person, trade or business that would be considered a single employer with any Seller or any Subsidiary of any Seller under Sections 414(b), (c), (m) or (o) of

the Code or Section 4001(b) of ERISA or would be under "common control" with any Seller or any Subsidiary of any Seller within the meaning of Section 4001(a)(14) of ERISA. Any former ERISA Affiliate shall continue to be considered an ERISA Affiliate within the meaning of this definition with respect to the period such entity was an ERISA Affiliate and with respect to Liabilities arising during such period (but, for the avoidance of doubt, not after such period) for which such Person could be liable under the Code or ERISA.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.5(a)(i).

"Excluded Funded Liabilities" has the meaning set forth in Section 7.8(c).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Pre-Closing Fines" has the meaning set forth in Section 2.4(g).

"Execution Date" has the meaning set forth in the preamble.

"FASB 410" has the meaning set forth in Section 5.24(b).

"FCPA" has the meaning set forth in Section 5.20.

"Final DIP Order" means the Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief [Docket No. 431] (as amended, modified or supplemented from time to time in accordance with the terms thereof).

"Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"Final Wind-Down Amount" has the meaning set forth in Section 7.8(c).

"FLSA" means the Fair Labor Standards Act and any state or local laws governing wages, hours, and/or overtime pay.

"Foreign Antitrust Approvals" has the meaning set forth in Section 7.3(a).

"Foresight Cases" has the meaning set forth in Section 8.13(b).

"Foresight Entities" has the meaning set forth in the definition of Specified Entities.

"Foresight Equity" means the equity interests held by the Sellers (or any of their Affiliates) directly or indirectly in the Foresight Entities.

"Foresight GP" has the meaning set forth in the definition of Specified Entities.

"Foresight LP" has the meaning set forth in the definition of Specified Entities.

"Fraud" means any knowing and intentional misrepresentation which satisfies all of the elements of common law fraud under the laws of the State of Delaware.

"Fundamental Representations" means the representations and warranties set forth in Section 5.1 (Organization and Good Standing), Section 5.2 (Specified Entities), the first and second sentences of Section 5.3 (Authority; Validity; Consents), Section 5.4 (No Conflict), Section 5.17 (Brokers or Finders) and Section 5.18 (Affiliate Interests).

"Funded Liabilities" means collectively: (i) any claims related to the Acquired Assets entitled to priority status under Section 507(b) of the Bankruptcy Code asserted as of the applicable bar date for such claim, (ii) any administrative expense claims related to the Acquired Assets arising under Section 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code asserted as of the applicable bar date for such claim, (iii) any Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed DIP Claims, and Allowed Secured Tax Claims (each as defined in the Plan) and, in the case of each of clause (i), (ii) and (iii), solely to the extent the reinstatement, assumption, or payment of the allowed amount of each such claim is required to confirm and effectuate the Plan under Section 1129 of the Bankruptcy Code, and (iv) all Cure Costs with respect to the Assumed Contracts.

"Funded Shortfall Amount" has the meaning set forth in Section 7.8(c).

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Governmental Authority" means any United States federal, state or local or any foreign government, international authority, multi-national organization, quasi-governmental authority, or other similar recognized governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction.

"Governmental Authorization" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hazardous Substance" means any "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" defined as such under any Environmental, Health and Safety Laws or any other substance, pollutant, contaminant, chemical, waste or related material, or combination thereof, whether solid, liquid, or gaseous in nature, subject to regulation, investigation, remediation, control or corrective action under any Environmental, Health and Safety Laws.

"Hearing" means the hearing to consider approval of the Confirmation Order, the transactions contemplated thereby, and the transactions contemplated hereby.

"HSR Act" means the Hart-Scot-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder.

"Improvements" means the buildings, structures, fixtures, systems, facilities, plant, shafts, property and Equipment (to the extent such property or such Equipment constitutes real property), and all other improvements located on the real property and interests therein comprising part of the Acquired Assets (including, for the avoidance of doubt, any such items on any Leased Real Property under any Lease that is an Assumed Contract).

"Included Policies" has the meaning set forth in Section 2.1(w).

"Indebtedness" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (not including trade payables in the Ordinary Course of Business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even if the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under letter of credit or similar facilities, to the extent drawn; and (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person; and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means any and all intellectual property or similar proprietary rights in any jurisdiction throughout the world, including all (i) patents, patent applications and invention disclosures, together with all reissuances, continuations, continuations in part,

revisions, divisionals, extensions and reexaminations thereof; (ii) trademarks, service marks, trade dress, logos, slogans, trade names, internet domain names, corporate names, social media identifiers and other indications of origin, together with all goodwill associated with any of the foregoing; (iii) copyrights, mask works and copyrightable works, including derivative works, moral rights, renewals, extensions, reversions or restorations of or associated with any of the foregoing; (iv) trade secrets and confidential information (including research and development information, know-how, inventions, technology, manufacturing and production processes, designs, specifications, techniques, technical data, financial and marketing plans, pricing and cost information, and customer and supplier lists); (v) computer software (including source code, object code, data, databases, and operating systems); (vi) registrations and applications for registration of any of the foregoing; and (vii) rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement, misappropriation or other violation of any of the foregoing.

"Inventory" has the meaning set forth in Section 2.1(g).

"IRS" has the meaning set forth in Section 5.13(b).

"Knowledge" means, with respect to any matter in question, in the case of the Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(a)-1 after due inquiry.

"Javelin Global" has the meaning set forth in the definition of Specified Entities.

"Javelin LLC" has the meaning set forth in the definition of Acquired Equity Interests.

"Latest Balance Sheet Date" has the meaning set forth in Section 5.21.

"Lease" has the meaning set forth in the definition of Leased Real Property.

"Lease Assignments" means one or more assignment and assumption agreements to assign to Buyer any Leases that are to be assumed by Buyer pursuant to this Agreement, in customary form and reasonably acceptable to the Parties.

"Leased Real Property" means, in each case, the interests in the real property, including any and all underground and surface coal reserves, mineral rights, oil and gas rights and interests, mining rights, gas drilling rights, timber rights, surface rights, water rights, rights of way unrecouped minimum, advance or pre-paid production royalties related thereto or Improvements located thereon, all fixtures, systems and Equipment attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing (and any present or future rights, title and interests arising from or related to the foregoing), used, held for use or occupied by the Sellers (or which the Sellers have the right to occupy) in connection with the Business or the Acquired Assets, leased or subleased by the Sellers, as tenant, subtenant, lessee or sublessee, or in which a Seller has been granted a possessory interest or right to use or occupy all or any portion of the same including as the same are evidenced by any and all of the following agreements: (i) Mining leases, coal leases, coal mining leases, underground coal mining and gob gas leases, coal land leases, coal degasification leases, use agreements or other occupancy agreements and all short form leases, memoranda and amendments relating to the foregoing, (ii) easements or (iii) licenses (each such agreement a "Lease", and collectively, the "Leases").

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted, promulgated, issued or applied by any Governmental Authority or other similar authority, including for the avoidance of doubt, the Bankruptcy Code, the Bankruptcy Rules, MSHA, OSHA, and any Mining Law.

"Lessor Leases" has the meaning set forth on Section 5.5(b).

"Liability" means any debt, loss, liability, commitment, judgment, undertaking, damage, expense, fine, penalty, cost, royalty or legally binding obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), or Encumbrance of any kind or nature whatsoever whether known or unknown, disclosed or undisclosed, primary or secondary, direct or indirect, matured or unmatured, determined or indeterminable, disputed or undisputed, secured or unsecured, joint or several, asserted or unasserted, fixed, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, whether due or to become due, whether in contract, tort or otherwise, and whether or not required to be accrued on the financial statements of any entity or individual, including those arising under any Legal Requirement, or imposed by any Governmental Authority or arbitrator.

"Material Adverse Effect" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (a) the Acquired Assets or the assets, properties, condition (financial or otherwise) or results of operations of the Business (excluding the Excluded Assets and the Excluded Liabilities), in each case, taken as a whole or (b) the ability of the Sellers to consummate the transactions contemplated hereby or to perform, in all material respects, their obligations under this Agreement, but excluding in the case of clause (a) and clause (b) (with respect to clause (vii) only) any change or effect to the extent that it results from or arises out of (i) any reasonably anticipated effects of the filing, pendency, commencement or prosecution of the Bankruptcy Cases, including the loss of any vendors, customers, employees or other commercial relationships as a result of the Bankruptcy Cases; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby (provided, that this clause (ii) shall not apply to any representation or warranty that, by its terms, speaks specifically of the consequences arising out of the execution or performance of this Agreement or any of the Transaction Documents or the consummation of any of the transactions contemplated hereby or thereby); (iii) changes in Legal Requirements, accounting regulations (including GAAP) or official interpretations of the foregoing after the Execution Date; (iv) any specific action required to be taken (or omitted) hereby or taken (or omitted) at the written request of Buyer; (v) general or technological changes in the industries in which the Sellers compete or in which the Business is conducted, including any changes in the general conditions in the coal mining industry; (vi) any failure of the Business to achieve external or internal forecasts or financial projections (provided, that this clause (vi) shall not prevent a determination that any event, circumstance, effect or change underlying such failure to meet projections or forecasts has resulted in a Material Adverse Effect); (vii) any breach of this Agreement by Buyer; (viii) any changes in financial or securities markets (including changes in the commodity markets) or any change or effect of economic, regulatory or political conditions (including acts

14

of terrorism, hostilities, sabotage, military actions or war, or any material worsening of such acts of terrorism, hostilities, sabotage, military actions or war); or (ix) acts of nature (including earthquakes, storms, severe weather, fires, floods and natural catastrophes), in each case of clauses (iii), (v), (viii), and (ix) to the extent that such conditions do not disproportionately affect the Business, taken as a whole, as compared to other companies that are principally engaged in the same business as the Sellers in the same geographic regions.

"Material Contract" means (a) any Available Contract, (b) any other Contract to which any Seller is a party that relates to the Business and (x) pursuant to which the Sellers are entitled or expected to receive payments greater than or equal to, (1) $5,000,000 per annum or (2) $10,000,000 for any given Contract (or set of related Contracts) for the term of such Contract (excluding any Excluded Assets hereunder), (y) the Sellers are obligated to make payments greater than or equal to, or that are expected to be greater than or equal to, (1) $5,000,000 per annum or (2) $10,000,000 for any given Contract (or set of related Contracts) for the term of such Contract (excluding any Excluded Liabilities hereunder) or (z) is otherwise individually material to the Business, or (c) any Contract to which any Controlled Specified Entity is a party (i) relating to Indebtedness in excess of $5,000,000, or (ii) that is a management services (or similar) agreement, or (iii) relating to its Capital Stock.

"Mining" has the meaning set forth in the definition of Mining Law.

"Mining Financial Assurances" has the meaning set forth in Section 5.24(a).

"Mining Law" means all Legal Requirements relating to the exploration, extraction, processing, storage and transportation of coal and non-coal minerals and to the Reclamation of lands used for such activities (collectively referred to as "Mining"), including (i) SMCRA, (ii) the Mineral Leasing Act and (iii) MSHA, and any of their implementing regulations and state analogues.

"Mining Permits" means all applicable Permits related to Mining or otherwise required by Mining Law.

"MSHA" means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801, et seq., and state analogues.

"Multiemployer Plan" means a "multiemployer plan," within the meaning of Section 4001(a)(3) of ERISA.

"Murray Met Cases" the proceedings pursuant to the voluntary petitions by Murray Met and its Subsidiaries under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio.

"Murray Met DIP Facilities" means the Senior DIP Facility and the Junior DIP Facility (as each is defined in the Murray Met RSA).

"Murray Met Equity" means the equity interests held by the Sellers (or any of their Affiliates (other than the interests in Murray Met held directly by Javelin LLC)) directly or indirectly in Murray Met.

"<u>Murray Met Exit Facilities</u>" means the New First Lien Term Loan Facility and the New Second Lien Term Loan Facility (as each is defined in the Murray Met RSA).

"<u>Murray Met Prepetition Credit Agreement</u>" means that certain Credit Agreement, dated as of April 29, 2019, as amended, amended and restated, supplemented or otherwise modified from time to time, by and among Murray Met, Wilmington Savings Fund Society, FSB, as administrative agent, and the other parties thereto.

"<u>Murray Met RSA</u>" has the meaning set forth in <u>Section 8.13</u>.

"<u>Oil & Gas Reserves</u>" means any and all of the oil and natural gas located within the Owned Real Property or Leased Real Property, to the extent owned or leased, as applicable, by the Sellers (but in the case of Leased Real Property, only to the extent the applicable lease is an Assumed Contract).

"<u>Ongoing Trade Partner</u>" has the meaning set forth in <u>Section 2.3(f)</u>.

"<u>Order</u>" means any award, writ, injunction, judgment, order, ruling, stipulation, verdict, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination, agreement or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other judicially sanctioned Person or body.

"<u>Ordinary Course of Business</u>" means, with respect to any Person (or the Business, as applicable), the ordinary and usual course of normal day-to-day operations of such Person (or the Business, as applicable), consistent with its past practice.

"<u>OSHA</u>" means the Occupational Safety and Health Act and state analogues.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 12.1(b)(ii)</u>.

"<u>Overlapping Permit Property</u>" has the meaning set forth in <u>Section 7.6(c)</u>.

"<u>Overlapping Transferred Permits</u>" has the meaning set forth in <u>Section 7.6(c)</u>.

"<u>Owned Intellectual Property</u>" has the meaning set forth in <u>Section 5.14(a)</u>.

"<u>Owned Real Property</u>" means the real property (or interests therein) owned by any Seller, and all right, title and interest of such Seller therein, together with all of any Seller's right, title and interest in, to or under the following, in each case used or held by any Seller in connection with the Business or the Acquired Assets: (i) all buildings, structures, systems, hereditaments and Improvements, in each case, located on such real property owned by such Seller, (ii) all Improvements, fixtures, systems, mine infrastructure, preparation plant structures and Improvements related thereto, all loadout structures and Improvements related thereto, all storage facilities, all rail sidings, and all Equipment affixed to such real property (to the extent such Equipment constitutes real property), (iii) all rights of way, easements, if any, appurtenant to such real property owned by such Seller, (iv) licenses and all rights-of-way, beneficial easements, licenses, and other rights, privileges and appurtenances belonging or in any way pertaining to such real property interests owned by such Seller (including the right, title and

interest of such Seller in and to any Coal Reserves, mineral rights, underground and surface coal and mining rights, gas drilling rights, timber rights, royalty rights, air emissions rights, support rights and waivers, subsidence rights, water and water rights relating or appurtenant to such real property owned by such Seller), (v) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property owned by such Seller, and (vi) any leases out to third parties affecting such real property owned by such Seller, subject to any consents as may be required.

"Party" or "Parties" means, individually or collectively, as applicable, Buyer and the Sellers.

"Permit Applications" has the meaning set forth in Section 7.6(a).

"Permit Transfer Agreements" means the Permit Transfer Agreements with respect to the Transferred Permits dated as of the Closing Date between the applicable Sellers and Buyer and/or any applicable Buyer Designee in a form to be mutually agreed between the Parties and consistent with Section 7.6.

"Permits" means any and all permits (including Environmental Permits and Mining Permits), licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, certificates of occupancy, notifications, exemptions, clearances, and authorizations, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Authority or issued or granted pursuant to Legal Requirements, as amended, supplemented and modified through the Execution Date, that are necessary or required, as applicable, for (i) the Sellers to own the Acquired Assets or operate the Business or (ii) the Specified Entities Group Members to own or operate their business or assets.

"Permitted Encumbrances" means (i) statutory liens for Taxes and assessments that are (A) not yet delinquent and for which adequate reserves have been established in accordance with GAAP, (B) being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP or (C) attributable to Taxes the nonpayment of which is permitted or required pursuant to the Bankruptcy Code; (ii) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's or repairmen's statutory liens, that, in each case, arise in the Ordinary Course of Business; (iii) easements, covenants, conditions, restrictions and other similar Encumbrances on real property that arise in the Ordinary Course of Business and that do not materially detract from the value of the affected Real Property and do not materially interfere with the present or intended use of such Real Property; (iv) zoning, building codes and other land use laws regulating the use or occupancy of the Real Property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property which are not violated by the current or proposed use or occupancy of such Real Property or the current or proposed operation of the Business; (v) in the case of Real Property, any matters that would be disclosed by an accurate survey or inspection of such Real Property; (vi) nonexclusive licenses of Intellectual Property granted in the Ordinary Course of Business consistent with past practice; and (vii) those Encumbrances listed on Schedule 5.5(a)(i).

"Permitted New Contracts" has the meaning set forth in Section 7.2(b)(vii).

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in Section 13(d)(3) of the Exchange Act) or Governmental Authority.

"Petition Date" means October 29, 2019.

"Plan" means the joint plan filed by the Debtors under Chapter 11 of the Bankruptcy Code implementing the restructuring transactions, including the transaction contemplated in this Agreement, which plan, including the treatment of the Superpriority Lenders' claims shall be in substantially the same form and substance as the plan filed by the Debtors on December 3, 2019, at Docket No. 322 in the Bankruptcy Court, as may be amended, modified or supplemented from time to time in accordance with the RSA.

"Post-Closing Tax Period" means (1) any taxable period beginning after the Closing Date and (2) the portion of any Straddle Period beginning after the Closing Date.

"Post-Closing Trade Payables" means accounts payable obligations of the Sellers solely to the extent that such obligations are incurred in the Ordinary Course of Business, relate to the Acquired Assets or the Business, and first arise after the Closing Date.

"Pre-Closing Tax Period" means (1) any taxable period ending on or before the Closing Date and (2) the portion of any Straddle Period ending on the Closing Date.

"Pre-Paid Expenses" means any of the Sellers' rights with respect to all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, cash collateral securing letters of credit issued on behalf of any Seller, pre-paid expenses, prepayments, rights under warranties or guarantees, excess or unearned premiums and other refunds of every kind and nature (whether known or unknown or contingent or non-contingent), except that professional fees retained and pre-paid deposits related thereto and Tax Refunds shall not be included in the definition of "Pre-Paid Expenses."

"Prepetition Superpriority Credit Agreement" means that certain *Superpriority Credit and Guaranty Agreement*, dated as of June 29, 2018, as amended, supplemented, restated or otherwise modified among the Company, Murray Energy Corporation, as borrower, GLAS Trust Company LLC, as administrative agent, and the other parties thereto.

"Prepetition Superpriority Obligations" means the Obligations (as defined in the Prepetition Superpriority Credit Agreement).

"Previously Omitted Contract" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Designation" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Notice" has the meaning set forth in Section 2.5(b)(ii).

"<u>Professional</u>" means any Person retained by the Sellers or a statutory committee of unsecured creditors in the Bankruptcy Cases pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code, or any Person retained by the DIP Lenders in connection with the Bankruptcy Cases.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Qualified Bid</u>" has the meaning set forth in the Bidding Procedures.

"<u>Real Property</u>" and "<u>Real Properties</u>" mean the Owned Real Property and the Leased Real Property.

"<u>Reclamation</u>" means reclamation, revegetation, recontouring, abatement, control, remediation, clean-up or prevention of adverse effects of mining activities.

"<u>Release</u>" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the migration of Hazardous Substances through or in the air, soil, surface water, groundwater, surface or subsurface strata or property and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing Hazardous Substances.

"<u>Representative</u>" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"<u>Required Consenting Superpriority Lenders</u>" has the meaning set forth in the RSA.

"<u>Restricted Names</u>" has the meaning set forth in <u>Section 8.9</u>.

"<u>RSA</u>" has the meaning set forth in the recitals.

"<u>Schedules</u>" means the Company Schedules and Buyer Schedules.

"<u>Schedules Deadline</u>" has the meaning set forth in the definition of Company Schedules.

"<u>SEC</u>" means the U.S. Securities and Exchange Commission.

"<u>Seller Cure Costs</u>" means all Cure Costs in respect of Assumed Contracts other than the Buyer Cure Costs.

"<u>Seller Related Parties</u>" has the meaning set forth in <u>Section 5.18(a)</u>.

"<u>Sellers</u>" has the meaning set forth in the preamble.

"<u>Sellers' Representative</u>" has the meaning set forth in <u>Section 13.20(a)</u>.

"<u>Shortfall Amount</u>" has the meaning set forth in <u>Section 7.8(c)</u>.

"SMCRA" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201, et seq.

"Specified Entities" means (1) Foresight Energy GP LLC ("Foresight GP"), (2) Foresight Energy LP ("Foresight LP" and together with Foresight GP, the "Foresight Entities"), (3) Javelin Global Commodities Holdings LLP ("Javelin Global"), (4) Murray Metallurgical Coal Holdings, LLC ("Murray Met"), (5) Javelin LLC, (6) KEWA US Inc. and (7) Murray South America, Inc.

"Specified Entities Group Members" means each of the Specified Entities and each of the Specified Entity Subsidiaries.

"Specified Entities Permit" means any Permit held by any of the Specified Entities Group Members.

"Specified Entity Subsidiaries" means each of the Subsidiaries of any Specified Entity.

"Straddle Period" means any taxable period that includes but does not end on the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more other Subsidiaries of such Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"Successful Bidder" has the meaning set forth in the Bidding Procedures.

"Superpriority Lenders" has the meaning set forth in the RSA.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, coal severance, unmined mineral, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not).

"Tax Records" means all Tax Returns, schedules and work papers, and all material records and other documents relating to Tax matters.

"Tax Refund" means any Tax refund, credit or similar benefit with respect to or related to Taxes (including any interest paid or credited with respect thereto).

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, information or amendments) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Taxing Authority" means any Governmental Authority having jurisdiction over the assessment, determination, collection or other imposition of any Taxes.

"Transaction Documents" means this Agreement, the Assumption Agreement, Lease Assignments, the Bill of Sale, the Permit Transfer Agreements and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"Transfer Taxes" means transfer, real estate property transfer, documentary, sales, use, stamp, registration, value added, or other such taxes and fees (including any penalties and interest) incurred or imposed with respect to the transactions described in this Agreement.

"Transferred Permits" has the meaning set forth in Section 2.1(y).

"Treasury Regulations" means the Treasury regulations promulgated under the Code.

"TSA" means a transition services agreement whereby Buyer shall provide transition services to the Sellers' bankruptcy estates for a term of up to nine (9) months (except as otherwise agreed by Buyer and the Sellers' Representative or the successors thereto) to assist with an orderly wind-down of Sellers' bankruptcy estates at no cost to Sellers, in a form acceptable to Buyer and Sellers' Representative.

"UMWA" means the United Mine Workers of America.

"Unaudited Financial Statements" has the meaning set forth in Section 5.21.

"Union" has the meaning set forth in Section 5.12(a).

"WARN Act" has the meaning set forth in Section 5.12(d).

"Wind-Down Account" has the meaning set forth in Section 7.8(d).

"Wind-Down Amount" has the meaning set forth in Section 7.8(b).

"Wind Down Expenses" has the meaning set forth in Section 7.8(b).

1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)  <u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)  <u>Contracts, Agreements and Orders</u>. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof, <u>provided</u>, that for purposes (or if an oral amendment, modification or supplement, a written summary of the material terms thereof) of any representation or warranty any such written amendment, modification or supplement must be made available to Buyer.

(iii)  <u>Day</u>. Any reference in this Agreement to "<u>days</u>" (but not Business Days) means to calendar days.

(iv)  <u>Dollars</u>. Any reference in this Agreement to "<u>$</u>" means United States dollars.

(v)  <u>Exhibits and Schedules</u>. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(vi)  <u>Gender and Number</u>. Any reference in this Agreement to gender includes all genders, and any singular term shall be deemed to include the plural, and any plural term the singular.

(vii)  <u>Headings</u>. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "<u>Section</u>," "<u>Article</u>" or "<u>Schedule</u>" are to the corresponding Section, Article or Schedule of this Agreement unless otherwise specified.

(viii)  <u>Herein</u>. Words such as "<u>herein</u>," "<u>hereof</u>," "<u>hereby</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear.

(ix)  <u>Including</u>. The word "<u>including</u>" or any variation thereof means "<u>including, without limitation,</u>" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)  <u>Law</u>. Any reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time together with any rules or regulations promulgated thereunder.

(xi)  <u>Other</u>. The words "to the extent" shall be interpreted to mean "to the extent (but only to the extent)".

(xii)  <u>Relating To</u>. Any reference to "related to", "relating to" or a similar phrase, in each case, in respect of the Business, the Acquired Assets, or any other matter means, unless the context otherwise requires, "related in whole or in part to", "relating in whole or in part to" or a similar construction in the case of a similar phrase, as applicable.

(xiii)  <u>Used or Held for Use</u>. Any reference to "<u>used or held for use</u>" (or words of similar import) in relation to the Business or the Acquired Assets shall be interpreted to mean "used or held for use in whole or in part" (or a similar construction in the case of a similar phrase), as applicable.

(xiv)  <u>Specified Entities Group Members</u>. Any references to organizational documents of any Specified Entities Group Member shall be deemed to include any agreement relating to the ownership thereof.

(xv)  <u>Sole Cost and Expense</u>. Any reference to "<u>Buyer's sole cost and expense</u>" (or words of similar import) in the context of paying the Sellers' costs shall be interpreted to include only reasonable third-party costs incurred by the Sellers.

(xvi)  <u>Person</u>. Any reference to a Person shall include such Person's successors and permitted assigns.

(xvii)  <u>Provided or Made Available</u>. Any reference in this Agreement to "<u>provided to Buyer</u>" or "<u>made available</u>" shall mean that such documents or information referenced shall have been (a) provided in the Data Room prior to the Schedule Deadline or (b) provided to Buyer's legal and financial advisors via email prior to 5 pm on March 18, 2020 in an email referencing this definition.

(xviii)  <u>Transactions Contemplated</u>. Any reference in this Agreement to "transactions contemplated by this Agreement" or words of similar import includes the transactions contemplated by the other Transaction Documents except as the context may otherwise require.

(b)  <u>No Strict Construction</u>. Buyer, on the one hand, and the Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and the Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2
## PURCHASE AND SALE

2.1  <u>Purchase and Sale</u>. Subject to the entry of the Confirmation Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer and/or to one or more Buyer Designees, and Buyer (and/or such Buyer

Designees) shall purchase, acquire and accept from the Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), all of the Sellers' right, title and interest in, to or under the following properties, rights, claims and assets, wherever situated or located, whether real, personal or mixed, whether tangible or intangible, whether identifiable or contingent, whether owned, leased or licensed, in each case used or held for use, in or relating to the Business, and whether or not reflected on the books and records of the Sellers, as the same shall exist on the Closing Date (collectively, the "Acquired Assets"); provided, that Buyer may, in its sole discretion, add or remove any assets to or from, as applicable, the "Acquired Assets" (and, in the event an asset is added or removed, add or remove any related Liabilities to or from the "Assumed Liabilities") from time to time prior to the Bid Deadline (and any affected Schedule will be updated accordingly), subject to an adjustment to the Purchase Price as set forth in Section 3.1:

(a)      (i) the Owned Real Property, (ii) Leased Real Property under any Lease that is an Assumed Contract (and any rights under any Contract related thereto to the extent that such Contract is an Assumed Contract), (iii) the Lessor Leases, in each case to the extent relating to a Contract that is an Assumed Contract, in each case, in the case of clauses (i)-(iii), together with all rights in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(b)      all Equipment (in the case of any leased equipment, to the extent the applicable underlying Contract is an Assumed Contract, if applicable), including those specified assets set forth on Schedule 2.1(b);

(c)      subject to Section 2.5, all Assumed Contracts (other than Buyer Existing/Modified CBAs, which are addressed in Section 2.1(d) below);

(d)      subject to Section 2.5 and to Section 2.3(c), all Buyer Existing/Modified CBAs;

(e)      all Coal Reserves;

(f)      all Oil & Gas Reserves;

(g)      all inventory of any kind or nature, merchandise and goods, related to the Business or the Acquired Assets and maintained, held or stored by or for the Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, including all coal inventory and gas inventory located upon or within the Owned Real Property or Leased Real Property (in the case of Leased Real Property, to the extent the underlying Lease is an Assumed Contract) or otherwise belonging to the Sellers, and all disposables and consumables used, or held for use, in connection with the Business, including any goods in transit ("Inventory");

(h)      water treatment facilities and operating wells;

(i)      all rights to subside lands associated with mining operations, all relocation rights associated with utility easements, and all rights to the waiver of and release from subsidence liability and indemnity rights under any and all conveyances, representations and instruments or agreements of any kind and nature, in each case to the extent relating to the Owned Real

24

Property, Leased Real Property (in the case of Leased Real Property, to the extent the underlying Lease is an Assumed Contract) or the Assumed Liabilities;

(j)      all Intellectual Property owned, licensed, used or held for use by any Seller (including the "Murray" word mark);

(k)      all goodwill, customer and referral relationships, other intangible property and all privileges, relating to, arising from or associated with any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities and/or the Business;

(l)      all Pre-Paid Expenses;

(m)      all Accounts Receivable;

(n)      all rights of the Sellers to use haul roads, utility easements and other rights of way and easements used or held for use in the operation of the Business;

(o)      except to the extent prohibited by Legal Requirements, all rights of the Sellers to the warranties and licenses received from manufacturers or sellers of the Equipment, Improvements or any component thereof;

(p)      except to the extent (i) prohibited by Legal Requirements or (ii) solely relating to the Excluded Assets or the Excluded Liabilities, all documents and other books and records (including financial or accounting records, and any personnel files or records related to Buyer Employees), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in or intended to be used in, or that arise in any way out of or are related to, the Acquired Assets, the Assumed Liabilities or the Business; provided, that the Sellers shall be permitted to keep copies of all of the foregoing to the extent necessary or required by the Bankruptcy Court or in connection with the Bankruptcy Cases or to the extent necessary in order to wind-down the Sellers' estates, subject to Section 13.2; provided, further, that this Section 2.1(p) shall not apply with respect to or in connection with Tax Records;

(q)      all claims (other than Avoidance Actions, which shall be addressed solely by Section 2.1(u)), interests, rebates, abatements, remedies, recoveries, demands, reimbursements, indemnification rights, causes of action and rights of whatever nature, arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the Business, including those arising out of the Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others or arising from the breach by third parties of their obligations under the Assumed Contracts, to the extent relating to the operation of the Business or affecting the Equipment, Inventory or other Acquired Assets (and in any case, any component thereof); provided, that this Section 2.1(q) shall not apply with respect to or in connection with Taxes or Tax Refunds;

(r)      the Acquired Equity Interests and all rights relating thereto;

(s)     all assets that relate to the Company's corporate overhead function, including with respect to the Real Property at the Company's corporate headquarters and all tangible personal property and interests therein; provided, that if the Real Property is Leased Real Property or any tangible personal property or other interests are leased, then only to the extent that the underlying Lease or Contract, respectively, is an Assumed Contract;

(t)     all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements (in each case, to the extent transferrable) or key employee retention plans or similar arrangements with (or for the benefit of) employees and agents of the Sellers or with third parties (including any such non-disclosure or confidentiality, non-compete, or non-solicitation agreements or any key employee retention plans or similar arrangements entered into in connection with or in contemplation of the auction contemplated by the Bidding Procedures (in each case, to the extent transferable) to the extent relating to the Acquired Assets or the Business and included as an Assumed Contract);

(u)     all Avoidance Actions, except to the extent such Avoidance Actions have been waived or released by the Sellers pursuant to the Plan;

(v)     all insurance proceeds, reserves, benefits or claims (other than in respect of director and officer insurance policies) of any Seller under any insurance policies of Sellers to the extent relating to the Acquired Assets, the Assumed Liabilities or the Business;

(w)     all insurance policies of the Sellers (to the extent transferable and subject to the receipt of any requisite consents), (other than director and officer insurance policies) relating to the Acquired Assets or the Assumed Liabilities and solely to the extent Buyer has provided written notice to the Sellers prior to the Bid Deadline of its intention to acquire such insurance policies (the "Included Policies");

(x)     all assets, if any, listed on Schedule 2.1(x) (regardless of whether such assets are covered by any of the foregoing);

(y)     subject to Sections 2.5(c) and 7.6 and, as applicable, obtaining the consents set forth on Schedule 5.2; all Permits (including Environmental Permits and Mining Permits) held by the Sellers that relate to the Business or the Acquired Assets, to the extent transferable or assignable, including those designated as "Transferred Permits" on Schedule 2.1(y) (the "Transferred Permits"); provided, that Schedule 2.1(y) and the definition of "Transferred Permits" shall be deemed updated and amended to exclude, without further action by any Party, any Permit that is not transferred or assigned to Buyer or a Buyer Designee as provided in Section 2.5(c) or relates solely to an Excluded Asset;

(z)     excluding any bank account designated or created as the escrow account described in the Bidding Procedures to receive a deposit from a Potential Bidder (as defined in the Bidding Procedures Order) and cash or cash equivalents contained therein but only to the extent such cash or cash equivalents was provided by or on behalf of such Potential Bidder, all cash and cash equivalents of the Sellers or the Business in excess of the amount of the Final Wind-Down Amount, including checks, commercial paper, treasury bills, certificates of deposit,

bank accounts and other bank deposits, instruments and investments, including any cash collateral used to secure surety bonds or other transactional assurances;

(aa)    any Tax Refunds of the Sellers attributable to (i) the Acquired Assets for a Post-Closing Tax Period, (ii) Taxes that are Assumed Liabilities or (iii) the Acquired Assets to the extent such Taxes are paid by or on behalf of Buyer;

(bb)    any Tax Records relating (i) primarily to the Acquired Assets or the Business or (ii) solely to the Acquired Equity Interests (disregarding for this purpose any election by Buyer pursuant to the proviso in the definition of "Acquired Equity Interests"); provided, that the Sellers shall be permitted to keep copies of all of the foregoing to the extent necessary or required by the Bankruptcy Court, in connection with the Bankruptcy Cases or to the extent necessary in order to wind-down the Sellers' estates;

(cc)    all claims and rights of Murray Energy Corporation under the Murray Met DIP Facilities, the Murray Met Prepetition Credit Agreement and the Murray Met Exit Facilities, including, for the avoidance of doubt, all assets (including equity interests) distributed in respect thereof;

(dd)    all telephone, telex and telephone facsimile numbers and other directory listings;

(ee)    all surety bonds (and all rights related to surety bonds) and all collateral (and all rights to collateral), in each case, used to secure any workers' compensation Liabilities assumed by Buyer pursuant to Section 2.3(k) or any bonding or security arrangement relating thereto; and

(ff)    all other assets of Sellers primarily related to the Business, except for assets that are specifically excluded in any of the foregoing clauses or as specifically listed or described as an Excluded Asset in any of clauses (a) through (o) in Section 2.2.

If the addition of any non-Seller Affiliate of the Company as a Seller hereunder would result in any asset that is not an Acquired Asset becoming an Acquired Asset, or if any non-Seller Affiliate owns any Acquired Assets, the Company shall cause (or, in the case of any such Affiliate that is not directly or indirectly wholly owned by the Sellers, use commercially reasonable efforts to cause) such Affiliate to become a Seller under this Agreement and comply with the related obligations hereunder. The preceding covenant is expressly intended to survive the Closing. For the avoidance of doubt, any asset that is physically located at the Owned Real Property or Leased Real Property (or was as of the Petition Date physically located at the Owned Real Property or Leased Real Property but has been transported off-site for repair, rebuilding, refurbishment or the like) shall be deemed to be an Acquired Asset, unless specifically listed or described as an Excluded Asset whether or not it has been returned as of Closing.

2.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and the Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" shall consist of all assets of the Sellers and their Affiliates that are not Acquired Assets, including the following items, assets and properties; provided, that Buyer may, in its sole discretion, add or remove any assets of any of the Sellers or their Affiliates to or

from, as applicable, the Excluded Assets from time to time prior to the Bid Deadline (and any affected Schedule will be updated accordingly), subject to an adjustment to the Purchase Price as set forth in Section 3.1:

(a)     the assets, if any, listed on Schedule 2.2(a);

(b)     any and all Contracts that are not Assumed Contracts, including any and all Collective Bargaining Agreements (other than any Buyer Existing/Modified CBAs);

(c)     (i) any personnel files or records relating to any Employee that does not become a Buyer Employee and (ii) any and all Benefit Plans, and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(d)     other than the Acquired Equity Interests or any equity interests distributed pursuant to Section 2.1(cc), (i) any shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock of other equity interest in or issued by any Seller, and (ii) any shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller (including, for the avoidance of doubt, any foreign Subsidiary of any Seller) or other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller or other entity in which any Seller holds an equity interest, including the capital stock or equity interest set forth on Schedule 2.2(d);

(e)     subject to Sections 2.1(p) and 2.1(bb), the limited liability company, partnership and corporate books and records, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers and other records of the Sellers as they pertain to ownership, organization, qualification to do business or existence of the Sellers; provided, however, that copies of the foregoing items shall be provided by the Sellers to Buyer upon request;

(f)     all proceeds, reserves, benefits, claims or rights under or arising out of insurance policies to the extent not set forth in Sections 2.1(u) and 2.1(w);

(g)     all insurance policies of Sellers (other than the Included Policies);

(h)     all expenses and deposits that have been prepaid by the Sellers to the extent unrelated to the Business or the Acquired Assets, including any prepaid deposits related to Professional fee retainers;

(i)     all bank accounts listed on Schedule 2.2(i) (but without limitation to Section 2.1(z) with respect to the cash in such accounts);

(j)     any rights, claims or causes of action of the Sellers under this Agreement or any other Transaction Document;

(k)      any documents and agreements relating solely to the Bankruptcy Cases or solely to the sale or other disposition of the Business, the Acquired Assets or any other asset of any Seller or any of its Affiliates other than those to be delivered to Buyer in accordance with this Agreement;

(l)      all Permits (including Environmental Permits and Mining Permits) that are related exclusively to any other Excluded Asset or the Excluded Liabilities;

(m)      cash and cash equivalents in an amount equal to the Final Wind-Down Amount;

(n)      all rights to any Tax Refunds, except as expressly listed in Section 2.1(aa); and

(o)      all Tax Records of the Sellers and each Subsidiary thereof, other than such Tax Records (i) solely related to the Acquired Equity Interests (disregarding for this purpose any election by Buyer pursuant to the proviso in the definition of "Acquired Equity Interests") or (ii) primarily related to the Acquired Assets or the Business.

Notwithstanding anything to the contrary in this Agreement, if any asset or property is specifically identified in any of Sections 2.1(a) through 2.1(dd), a corresponding schedule or otherwise as an Acquired Asset, such asset or property will be deemed for purposes of this Agreement to be an Acquired Asset.

2.3      Assumed Liabilities. Subject to entry of the Confirmation Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer and/or a relevant Buyer Designee shall, effective at the time of the Closing, assume and discharge and perform when due, the following Liabilities of the Sellers (and only the following Liabilities of the Sellers) (the "Assumed Liabilities"):

(a)      all Liabilities under the Assumed Contracts (other than Buyer Existing/Modified CBAs, which are addressed in Section 2.3(c) below) to the extent first arising or first becoming due after the Closing (and for the avoidance of doubt, not to the extent arising from any breach on or prior to Closing);

(b)      all Buyer Cure Costs (which for the avoidance of doubt are part of the Assumed Funded Liabilities);

(c)      all Liabilities under Buyer Existing/Modified CBAs to the extent arising after the Closing, or as of such earlier date expressly agreed to by Buyer in writing with respect to any Liability under a Buyer Existing/Modified CBA (but, for the avoidance of doubt, in any event, not to the extent arising from any breach on or prior to Closing) (the "Buyer Existing/Modified CBA Assumed Liabilities");

(d)      all Post-Closing Trade Payables;

(e)      all Liabilities for Transfer Taxes;

(f)      to the extent Buyer, in consultation with the Company, determines they shall be Assumed Liabilities, all unsecured claims against Sellers that arise solely on account of the

receipt of goods or services by the Sellers prior to the Closing Date where the holder of such claim will have an ongoing, go-forward business relationship with Buyer and its Subsidiaries after Closing (each holder, an "Ongoing Trade Partner"); provided, that such assumption may be conditioned on entry by the Ongoing Trade Partner and Buyer into a trade agreement acceptable to Buyer;

(g)    all Liabilities for Taxes (other than income Taxes of the Sellers) with respect to the Acquired Assets attributable to any Post-Closing Tax Period as determined in accordance with Section 8.1(a);

(h)    to the extent (i) required by applicable Legal Requirements (including Permits) to be a Liability of Buyer as owner or operator of the Acquired Assets and (ii) related to the Business or the Acquired Assets (including the ownership or operation thereof), all Liabilities to the extent arising out of or relating to compliance with Environmental, Health and Safety Laws or Mining Law or any Release of Hazardous Substances at any of the Acquired Assets requiring investigation, remediation or other response action pursuant to Environmental, Health and Safety Laws or Mining Law, including the Conner Run Impoundment Settlement Agreement and any Reclamation obligations under the Transferred Permits, in each case, excluding any fines or penalties arising from or related to pre-Closing violations of Legal Requirements;

(i)    the Assumed Funded Liabilities (without duplication);

(j)    all Liabilities set forth on Schedule 2.3(j);

(k)    (i) all workers' compensation Liabilities relating to any Buyer Employee to the extent such Liabilities arise out of an event that first occurs after the Closing Date and (ii) subject to Buyer entering into arrangements with the applicable providers of workers' compensation insurance bonding on terms acceptable to Buyer in its sole discretion relating to any given Employee or group of Employees, all workers' compensation Liabilities relating to such Employee or group of Employees (other than as included in clause (i));

(l)    all obligations of Murray Energy Corporation under the Murray Met DIP Facilities, the Murray Met Prepetition Credit Agreement and the Murray Met Exit Facilities; and

(m)    all Liabilities for base wages, base salaries and commissions accrued from the Petition Date through the Closing Date with respect to Buyer Employees to the extent not paid as of the Closing Date and included as part of the Assumed Funded Liabilities;

(n)    any and all Black Lung Liabilities relating to any Buyer Employee to the extent first occurring on or after the lapse of the statutory period following the Closing Date for Buyer to become a responsible operator to and with respect to such Buyer Employee under the Black Lung Act.

The assumption by Buyer and/or a relevant Buyer Designee of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4    Excluded Liabilities. Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay,

perform or otherwise discharge any Liability of, or Liability against, the Sellers, the Sellers' Subsidiaries, the Business or the Acquired Assets, of any kind or nature, whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not related to the Acquired Assets or the Business, and whether known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and however arising, whether before, on or after the Closing Date, other than the Assumed Liabilities, and, subject to any discharge under Section 1141 of the Bankruptcy Code and any other terms of the Confirmation Order as applicable, the Sellers (and any third party that may assume them, as applicable) shall be solely and exclusively liable with respect to all Liabilities of, or against, the Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of the Sellers:

(a)     all Liabilities with respect to (i) any Taxes with respect to any Excluded Assets and (ii) Taxes of any Seller or its stockholders or members, in each case, that are not Assumed Liabilities;

(b)     all Liabilities (other than Taxes) with respect to Actions (i) pending before the Closing or (ii) arising out of or relating to the ownership or operation of the Acquired Assets or the Business prior to the Closing, even if instituted after the Closing Date;

(c)     all Liabilities to any owner or former owner of capital stock, options or warrants or other securities, or to any current or former officer or director of any Seller or Subsidiary of any Seller;

(d)     any Liability of the Sellers or their Affiliates under any Indebtedness, including Indebtedness owed by any Seller to any direct or indirect Affiliate of such Seller;

(e)     all Liabilities arising out of or relating to any Excluded Asset, including (i) all Liabilities under any Benefit Plan, (ii) all Liabilities under Contracts that are not Assumed Contracts, (iii) all Liabilities under any and all Collective Bargaining Agreements (other than Buyer Existing/Modified CBA Assumed Liabilities), and (iv) in respect of any compensation or benefit plans, agreements, policies, practices, programs and arrangements of any ERISA Affiliate, including any Benefit Plan;

(f)     all Liabilities pursuant to Environmental, Health and Safety Laws relating to any property not included in the Acquired Assets (including to the Excluded Assets or any property formerly owned or operated by the Sellers or in connection with the Business), including any Liabilities (i) arising from or related to any use, transportation, release, treatment, storage or disposal of, or human exposure to, Hazardous Substances at or relating to such property, (ii) relating to Reclamation at such property, or (iii) relating to any offsite disposal location used in connection with the Business;

(g)     any monetary fines or penalties imposed in connection with any Environmental, Health and Safety Laws or Mining Laws arising from facts or circumstances first existing or occurring on or prior to the Closing Date (including any fines or penalties with respect to the pending Consent Decree with the West Virginia Department of Environmental Protection

relating to alleged violations of SMCRA and the Clean Water Act with respect to the Marion County Mine, Harrison County Mine, Marshall County Mine, and Murray American Energy Inc.) ("Excluded Pre-Closing Fines");

(h)    drafts or checks outstanding at Closing;

(i)    other than the Liabilities expressly assumed by Buyer in Sections 2.3(h) and 2.3(j), any Liabilities arising out of, in respect of or in connection with the failure by any Seller or any of its Affiliates to comply with any Legal Requirement or order by any Governmental Authority; provided this Section 2.4(i) shall not apply in connection with or with respect to Taxes;

(j)    all trade payables, accounts payable, obligations relating to any earn-out or bonus payments, accrued expenses and all other current liabilities of the Sellers or any of their Subsidiaries, except for Post-Closing Trade Payables and Assumed Liabilities pursuant to Section 2.3(f);

(k)    except as expressly set forth in Section 2.3(k), all workers' compensation Liabilities related to any Employees;

(l)    any Liability or other obligations of the Sellers, any of their Subsidiaries or any ERISA Affiliate (or any predecessor of any of the foregoing) arising under, relating to or with respect to any multiple employer pension plan, single employer pension plan or Multiemployer Plan, including any withdrawal liability under such plans, and any Liability or other obligations of any ERISA Affiliate arising under, relating to or with respect to any compensation or benefits agreement, arrangement, plan, policy, practice or program, including any Benefit Plan;

(m)    all Liabilities or other obligations with respect to (i) Employees (or their representatives, dependents, spouses or beneficiaries), (ii) contractors or consultants of any Seller or any of their Subsidiaries, (iii) current or former employees, contractors or consultants of any ERISA Affiliate, (iv) anyone who may be assigned to any Seller, any Subsidiary or any Seller or any ERISA Affiliate, whether as a "related person," a "successor in interest," (each as defined in the Coal Act) or otherwise, and (v) retirees and their dependents for whom any Seller, any Subsidiary of a Seller or any ERISA Affiliates are required to provide medical benefits, including Liabilities with respect to the Coal Act and any and all Liabilities or other obligations relating to any Benefit Plan;

(n)    all Liabilities (whether arising before, on or after the Closing Date) with respect to any former employees or Employees who do not become Buyer Employees;

(o)    except as expressly set forth in Sections 2.3(k) and 2.3(n), all Liabilities arising under the Black Lung Act and workers' compensation Liabilities related to the Acquired Assets, including with respect to any Employees, and further including, but not limited to, any such Liabilities arising under the Black Lung Act or the Coal Act and workers' compensation Liabilities of any Seller, any of their Subsidiaries or any of their respective predecessors;

(p)    any and all Liabilities or other obligations to any Employee, consultant or contractor or any spouse, dependent and/or any beneficiary thereof, relating or with respect to any Benefit Plan including with respect to which the Sellers, their Subsidiaries or their respective

ERISA Affiliates have any Liabilities or other obligations relating to any retiree medical or other welfare plan or underfunded pension liability to any benefit plan, the Pension Benefit Guaranty Corporation, the IRS, the Department of Labor or otherwise;

(q)      any and all Liabilities or other obligations arising under any employment or consulting agreement or arrangement, or severance, retention or termination agreement, plan, policy, practice, program or arrangement with any Employee, consultant or contractor (or its representatives) of any Seller, any of their Subsidiaries or their respective ERISA Affiliates or their predecessors, including UMWA successorship;

(r)      except as expressly set forth in Sections 2.3(a)- 2.3(n), other Liabilities relating to the conduct of the Business or the Acquired Assets (and the use thereof) arising or accruing at any time on or prior to the Closing;

(s)      the Excluded Funded Liabilities;

(t)      all Liabilities (other than Assumed Liabilities) accruing, arising out of, or relating to any federal, state or local investigations of, or Claims or actions against, any Seller or any Employee, agents, vendors or representatives of any Seller, to the extent arising out of actions taken prior to the Closing;

(u)      all Seller Cure Costs (which for the avoidance of doubt are part of the Excluded Funded Liabilities); and

(v)      all Liabilities of the Specified Entities Group Members (for the avoidance of doubt, Liabilities of the Specified Entities Group Members shall remain Liabilities of the Specified Entity Group Members); provided, for the avoidance of doubt, that this Section 2.4(v) shall not apply to any Post-Closing Taxes of Buyer by reason of its ownership of a Specified Entities Group Member that is a pass-through or disregarded entity for tax purposes.

If a Liability is identified both as an Assumed Liability in Section 2.3 and an Excluded Liability in this Section 2.4, it will be treated as an Excluded Liability and not as an Assumed Liability.

2.5      Assignment and Assumption of Contracts.

(a)      (i) Schedule 2.5(a) sets forth a list of all executory Contracts (including all supply agreements, joint venture agreements, operating and joint operating agreements, participation agreements, exploration agreements (including minerals and coalbed gas exploration agreements), Leases and Lessor Leases) relating to the Business, the Acquired Assets or the Assumed Liabilities to which one or more of the Sellers are party (the "Available Contracts"), which Schedule 2.5(a) shall be updated from time to time pursuant to Section 2.5(b)(i) herein. Prior to the Bid Deadline, Buyer shall designate in writing which Available Contracts from Schedule 2.5(a) Buyer wishes to "Assume" (together with all Permitted New Contracts, but subject to the remainder of this Section 2.5, the "Assumed Contracts" and Buyer's designated list of Assumed Contracts, the "Assumed Contracts Schedule"), and the Sellers' assumption and assignment to Buyer or the Buyer Designee(s), as applicable, of the Assumed Contracts shall be deemed assumed effective as of the Closing Date, subject to the next sentence and satisfaction of

all applicable Legal Requirements. Notwithstanding anything in this Agreement to the contrary, Buyer may, from time to time in its sole discretion, (x) at any time prior to the date that is ten (10) days prior to the Closing Date, amend or revise, in writing, the Assumed Contracts Schedule to remove any Assumed Contracts (other than the Murray Met RSA) that Buyer does not wish to "Assume", and any Contracts so removed shall no longer be considered "Assumed Contracts" for purposes of this Agreement (and, for the avoidance of doubt, the Cure Costs for such Contracts will not be Funded Liabilities) or (y) at any time prior to the date that is two (2) Business Days prior to the Closing date, add any Available Contracts that Buyer wishes to "Assume", and any Contracts so added will be "Assumed Contracts" for purposes of this Agreement (and, for the avoidance of doubt, the Cure Costs for such Contracts will be Funded Liabilities); provided, that the Sellers shall promptly file on the docket in the Bankruptcy Cases and serve on the affected counterparty a notice of any actions taken by Buyer pursuant to (x) or (y) of this sentence pursuant to and in accordance with the Bidding Procedures Order. Subject to the preceding sentence, all Contracts of the Sellers that are listed on Schedule 2.5(a) and which Buyer does not designate in writing for assumption shall not be considered an Assumed Contract or Acquired Asset and shall automatically be deemed "Excluded Contracts" and, for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs of any Excluded Contracts, such that any related Cure Costs shall not be Funded Liabilities. If the amount of Cure Costs for any given Available Contract have not been finally determined at least four (4) Business Days prior to the Closing Date, Buyer may elect to defer the decision as to whether such Contract should be an "Assumed" Contract or an "Excluded" Contract until five (5) Business Days after such Cure Costs are finally determined.

(ii)     In addition to the payment of Cure Costs as set forth in this Agreement, each of the Sellers and Buyer, as applicable, shall use commercially reasonable efforts to assign, or cause to be assigned, the Assumed Contracts to Buyer, or to the applicable Buyer Designee, including taking all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code; provided, however, the Sellers shall not be obligated to pay, and shall not pay, any consideration to any third party from whom consent or approval is requested with respect to such assignment, other than to the extent any such consideration is otherwise required under applicable Legal Requirement for purposes of obtaining such consent or approval. Buyer shall use commercially reasonably efforts to comply with all of the requirements of Section 365 of the Bankruptcy Code necessary to permit such assumption and assignment.

(iii)     At the Closing, pursuant to the Confirmation Order and the Assumption Agreement, and subject to Section 2.5(c) hereof, (x) the Sellers shall, assign, or cause to be assigned, to Buyer or the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assumed Contracts, (y) Buyer shall pay all Buyer Cure Costs (except to the extent such Buyer Cure Costs shall have been reserved to be paid by the Plan Administrator) in respect of such Assumed Contracts in connection with such assignment and assume the Assumed Liabilities (if any) under the Assumed Contracts as and to the extent set forth in Section 2.3(a) and the Sellers shall pay all Seller Cure Costs in respect of such Assumed Contracts in connection with such assignment.

(b)     Previously Omitted Contracts.

(i)      If prior to or following the Closing, it is discovered that a Contract should have been listed on Schedule 2.5(a) but was not listed on Schedule 2.5(a) and has not been rejected by the Sellers (any such Contract, a "Previously Omitted Contract"), the Sellers shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all estimates of Cure Costs (if any) for such Previously Omitted Contract. If such Contract is identified at a time when it is possible to address such Contract in accordance with Section 7.5(i), then it will be addressed in accordance with such Section; provided, that the Cure Notice with respect to any Previously Omitted Contract must promptly be filed by the Sellers on the docket in the Bankruptcy Cases and served by the Sellers on the applicable counterparty, and such counterparty shall have at least fourteen (14) days to object, in writing to the Sellers and Buyer, to the Sellers' estimate of the Cure Costs or the assumption of its Contract. For each other Previously Omitted Contract, Buyer shall deliver written notice to the Sellers, no later than ten (10) Business Days following notification of such Previously Omitted Contract from the Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "Previously Omitted Contract Designation"). A Previously Omitted Contract designated in accordance with this Section 2.5(b)(i) as "Rejected," or with respect to which Buyer fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract subject to the other provisions hereof. Each Previously Omitted Contract will be added to the list of Available Contracts.

(ii)      If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.5(b)(i), the Sellers shall promptly file on the docket in the Bankruptcy Cases and serve on the counterparties to such Previously Omitted Contract a Cure Notice (the "Previously Omitted Contract Notice") notifying such counterparties of the Sellers' estimate of the Cure Costs with respect to such Previously Omitted Contract, the Sellers' intention to assign such Previously Omitted Contract in accordance with this Section 2.5, and the identity of the party to which the Sellers propose to assign such Previously Omitted Contract (i.e., Buyer or any applicable Buyer Designee). The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fourteen (14) days to object, in writing to the Sellers and Buyer, to the Seller's estimate of the Cure Costs or the assumption of its Contract. If the counterparties, the Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, the Sellers shall seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and, once so determined, if still acceptable to Buyer, approve the assumption; provided, that if the Cure Costs so determined are not acceptable to Buyer in its sole discretion, then neither Buyer nor any Buyer Designee shall "Assume" such Previously Omitted Contract and Buyer shall notify the Sellers in writing of same and such Contract shall be an Excluded Contract. If no objection is served on the Sellers and Buyer, the Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Costs and, subject to Buyer's other rights hereunder, approving the assumption of the Previously Omitted Contract. Cure Costs relating to Previously Omitted Contracts that are in fact assumed as Assumed Contracts will be taken into account in Funded Liabilities. For the avoidance of doubt, such Previously Omitted Contract will be subject to the third sentence of Section 2.5(a)(i).

(c)      Non-Assignment of Contracts, Acquired Equity Interests and Permits. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract, any Acquired Equity Interest or any

Permit, if, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would in any way materially (in relation to such Contract, Acquired Equity Interest or Permit) adversely affect any rights or obligations of Sellers, Buyer or a Buyer Designee with respect to such Contract, Acquired Equity Interest or Permit, as the assignee or transferee, or constitute a violation of a Legal Requirement or a breach of such Contract (including any organizational document of any Specified Entity Group Member with respect to the Acquired Equity Interests) or Permit (as the case may be). If, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of the Sellers (which, for the avoidance of doubt, shall not include an obligation to pay any consideration for such consent or approval), such consent or approval is required but not obtained with respect to a Contract, Acquired Equity Interest or a Permit, neither the Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to Buyer's termination right set forth in <u>Section 12.1</u>) shall the Closing be delayed in respect of the Contracts, Acquired Equity Interest or the Permits; <u>provided</u>, <u>however</u>, if the Closing occurs, then, with respect to any Contract, Acquired Equity Interest or Permit for which consent or approval is required but not obtained, from and after the Closing, the Sellers shall reasonably cooperate, without further consideration other than reimbursement for reasonable out-of-pocket expenses, with Buyer in any reasonable arrangement Buyer may request to provide Buyer or a Buyer Designee, as applicable, with all of the benefits of, or under, the applicable Contract, applicable Acquired Equity Interest (and related organizational document of the applicable Specified Entity Group Member) or applicable Permit, including enforcement for the benefit of Buyer or a Buyer Designee, as applicable, of any and all rights of the Sellers against any party to the applicable Contract, applicable organizational document of a Specified Entity Group Member or applicable Permit arising out of the breach or cancellation thereof by such party; <u>provided</u>, <u>further</u>, that (i) to the extent that any such arrangement has been made to provide Buyer or a Buyer Designee with the benefits of, under or with respect to, the applicable Contract, applicable Acquired Equity Interest (and related organizational document of a Specified Entity Group Member) or applicable Permit, from and after the Closing, Buyer or a Buyer Designee, as applicable, shall be responsible for, and shall promptly pay and perform all payment and other obligations (including any requirement to post collateral or provide other security) under such Contract, organizational document of a Specified Entity Group Member or Permit for the period during which Buyer or a Buyer Designee, as applicable, is receiving the benefits under the applicable Contract, applicable Acquired Equity Interest (and related organizational documents of a Specified Entities Group Member) or applicable Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Contract, Acquired Equity Interest or Permit had been assigned or transferred at the Closing, and (ii) to the extent that any such arrangement has not been made promptly after the Closing Date or Buyer does not request to receive the benefits under such applicable Contract, applicable Acquired Equity Interest (and related organizational documents of a Specified Entities Group Member) or applicable Permit, and for any period during which Buyer or a Buyer Designee, as applicable, is not receiving the benefits under the applicable Contract, applicable Acquired Equity Interest (and related organizational documents of a Specified Entity Group Member) or applicable Permit, all payment and other obligations under such Contract, applicable organizational document of a Specified Entity Group Member or applicable Permit shall be considered Excluded Liabilities and the Sellers may reject any such Contract, organizational document of the applicable

Specified Entities Group Member or Permit after the Closing Date upon ten (10) Business Days written notice to Buyer (so long as within such ten (10) Business Day period, Buyer has not requested to receive the benefits under the applicable Contract or applicable Acquired Equity Interest (and related organizational documents of a Specified Entities Group member) or applicable Permit). Any assignment to Buyer or a Buyer Designee of any Contract, Acquired Equity Interest or Permit that shall, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

(d)     No Seller shall agree to, settle or compromise any dispute with respect to, the amount of Cure Costs in respect of any Contract without the prior written approval of Buyer (not to be unreasonably withheld, conditioned or delayed).

(e)     Notwithstanding anything to the contrary in this Section 2.5, to the extent that after the Closing the Buyer determines that any Assumed Contract was required to be disclosed on Schedule 5.18(a) but was not so disclosed, Buyer shall at its election be entitled to treat such Assumed Contract as "Rejected" and such Contract shall be deemed not to have been an Assumed Contract for any purpose under this Agreement.

2.6     Further Assurances.

(a)     Except as otherwise provided herein and subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, from and after the Execution Date, the Sellers and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, all things necessary or desirable under applicable Legal Requirements to consummate the transactions contemplated hereby, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation reasonably required to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) using commercially reasonable efforts to obtain and maintain all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated hereby, in each case, after giving effect to the Confirmation Order; provided, however, that none of the Sellers, Buyer or any Buyer Designee shall be obligated to pay, and Sellers shall not pay, any consideration therefor.

(b)     At and after the Closing, and without further consideration therefor, other than payment of reasonable and documented out-of-pocket expenses related thereto, the Sellers shall execute and deliver to Buyer such further instruments and certificates as reasonably requested by Buyer, (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, the Sellers' right, title or interest in, to or under any or all of the Acquired Assets, including the Owned Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances) or (ii) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets and exercising rights with respect thereto. From and after the Closing Date, each of the Parties shall take, or cause to be taken, and cooperate with the other Parties to take, or cause to be taken, all reasonable actions, do or cause to be done all things

as may be reasonably requested by Buyer in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be reasonably required to consummate the transactions contemplated hereby, it being specifically understood and agreed that, notwithstanding anything to the contrary herein, no Seller shall have any obligation to (A) record or pay any recording fees and Taxes in connection with the foregoing, or (B) pay any title insurance fee or premium in connection with any title insurance commitment or policy Buyer may obtain, in each case, including any related costs and expenses (except, in the case of clauses (A) and (B), to the extent Buyer agrees to reimburse the Sellers for any reasonable and documented out-of-pocket expenses incurred by the Sellers in connection with such commitment or policy).

2.7     Certain Payments or Instruments Received from Third Parties. To the extent that, after the Closing Date, (i) Buyer or a Buyer Designee receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document, Buyer or such Buyer Designee shall promptly deliver such amount or instrument to the relevant Seller, and (ii) any of the Sellers or any of their Affiliates receives any payment or instrument that is for the account of Buyer or a Buyer Designee according to the terms of any Transaction Document, the Sellers shall, and shall cause their respective Affiliates to, promptly deliver such amount or instrument to Buyer or such Buyer Designee; provided, that if this Agreement does not provide for whose account a payment or instrument referenced in this sentence is to be and such item relates to both the Business and a business or business segment of the Sellers or their Affiliates other than the Business, such item shall be apportioned between Buyer and the relevant Seller on the basis of the extent to which it relates to each. All amounts due and payable under this Section 2.7 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its commercially reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party. Any payments received under this Section 2.7 by the applicable Party will be treated by the other Party as being received by the applicable Party in its capacity as an agent for the other Party solely for U.S. federal income tax purposes.

**ARTICLE 3**
**PURCHASE PRICE**

3.1     Consideration. The aggregate consideration for the purchase, sale, assignment and conveyance of the Sellers' right, title and interest in, to and under the Acquired Assets shall consist of (a) a credit bid of a portion of the Prepetition Superpriority Obligations in an aggregate amount equal to $1,200,000,000 (subject to the proviso to this sentence, the "Purchase Price") under Section 363(k) of the Bankruptcy Code (the "Credit Bid and Release"); provided, that to the extent the Acquired Assets or Excluded Assets are modified by Buyer between the date of this Agreement and the Bid Deadline as permitted by this Agreement, the Purchase Price shall be adjusted by Buyer in an amount and manner mutually agreed by Buyer and Sellers to account for the value of the applicable changes in assets (and the Purchase Price as so adjusted, will be the "Purchase Price" for all purposes of this Agreement); and (b) the assumption by Buyer or the Buyer Designee(s), as applicable, of the Assumed Liabilities.

3.2     <u>Allocation of Purchase Price</u>. The sum of the Purchase Price and the amount of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "<u>Allocation</u>"). The Allocation shall be delivered by Buyer to the Sellers within sixty (60) days after the Closing Date. The Sellers will have the right to raise reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, in which event Buyer and the Sellers will negotiate in good faith to resolve such dispute. If Buyer and the Sellers cannot resolve such dispute within fifteen (15) days after the Sellers notify Buyer of such objections, Sellers and Buyer shall be free to file their own Allocation statements.

3.3     <u>Withholding</u>. Buyer and its Affiliates, and the Sellers and their Affiliates, shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement such amounts as such Person is required to deduct and withhold under applicable Legal Requirements. Before making any such deduction or withholding, the withholding agent shall use commercially reasonable efforts to provide the Person in respect of which deduction or withholding is proposed to be made reasonable advance written notice of the intention to make such deduction or withholding, and the withholding agent shall cooperate with any reasonable request from such Person to obtain reduction of or relief from such deduction or withholding. To the extent that amounts are so deducted and withheld and paid over to the appropriate Governmental Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.

**ARTICLE 4**
**CLOSING AND DELIVERIES**

4.1     <u>Closing Date</u>. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place at the offices of Kirkland & Ellis LLP, 601 Lexington, Avenue, New York, NY 10022, no later than three (3) Business Days following the date on which all the conditions set forth in <u>Article 10</u> and <u>Article 11</u> have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or on such other date and time as the Company and Buyer may mutually agree in writing. The date and time at which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date.</u>" Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 11:59 p.m. (New York time) on the Closing Date.

4.2     <u>Buyer's Deliveries</u>. Subject to satisfaction or (if permissible) waiver of the conditions set forth in <u>Article 10</u> and <u>Article 11</u>, at the Closing, Buyer shall deliver (or cause one or more of its Affiliates or Buyer Designees to deliver):

(a)     to the Sellers, the Bill(s) of Sale, Lease Assignment(s), the Assumption Agreement(s), the Permit Transfer Agreements and each other Transaction Document to which

Buyer or a Buyer Designee is a party, duly executed by Buyer and/or Buyer Designees, as applicable;

(b)      to the Sellers, the certificates of Buyer to be received by the Sellers pursuant to Sections 11.1 and 11.2;

(c)      to the Sellers, a payoff letter, release letter or other similar document, duly executed by Buyer and the other applicable parties, regarding the Credit Bid and Release;

(d)      to the Sellers, such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby;

(e)      the TSA duly executed by Buyer; and

(f)      cash in an amount equal to the Funded Shortfall Amount, if any, to an account designated by the Sellers as the Wind-Down Account.

4.3      Sellers' Deliveries. At the Closing, the Sellers shall deliver to Buyer (or, in the case of Section 4.3(i), to an account designated by the Sellers as the Wind-Down Account):

(a)      the Bill(s) of Sale, Deeds, Lease Assignment(s) and the Assumption Agreement(s), the Permit Transfer Agreement(s) and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers; provided, that in the event one or more of the railcar, motor vehicle or trailer titles is not delivered by the Sellers to Buyer on or before the Closing Date, the Sellers shall deliver such railcar, motor vehicle and trailer titles to Buyer as promptly as reasonably practicable following the Closing Date; provided, further, that, for the avoidance of doubt, the failure of the Sellers to deliver any railcar, motor vehicle or trailer titles to Buyer on or before the Closing Date shall not be deemed a failure to satisfy this delivery obligation;

(b)      with respect to the Real Property included in the Acquired Assets, possession of such Real Property, together with copies or originals, each to the extent in the Sellers' possession, of all Leases, instruments and agreements evidencing the Sellers' interest in the same, and any existing surveys, legal descriptions and title policies concerning such Real Property that are in the possession of the Sellers which shall be deemed to be delivered to the extent located at any of the Real Property;

(c)      a copy of the Confirmation Order in the form entered by the Bankruptcy Court on the docket in the Bankruptcy Cases;

(d)      the certificates of the Sellers to be received by Buyer pursuant to Sections 10.1 and 10.2;

(e)      certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b) and Internal Revenue Service Notice 2018-29, that such Seller is not a foreign person within the meaning of Section 1445(f)(3) or Section 1446(f)(2) of the Code;

(f)      such other bills of sale, Deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer or Buyer Designee all of the right, title and interest of the Sellers in, to or under any or all the Acquired Assets, including all Owned Real Property, subject only to Permitted Encumbrances;

(g)      such ordinary and customary documents (including any factually accurate affidavits) as may be required by any title company or title insurance underwriter to enable Buyer to acquire, at Buyer's sole election and Buyer's sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Real Property included in the Acquired Assets in form and substance reasonably acceptable to Buyer;

(h)      instruments of assignment of the Intellectual Property rights that are owned by the Sellers and included in the Acquired Assets, if any, duly executed by the applicable Sellers, in form for recordation with the appropriate Governmental Authorities, in customary form and reasonably acceptable to Buyer;

(i)      cash in an amount equal to the Final Wind-Down Amount less the Funded Shortfall Amount, if any, to an account designated by the Sellers as the Wind-Down Account;

(j)      the TSA duly executed by the Company; and

(k)      such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby.

4.4      Buyer Designees. At least ten (10) days prior to the Closing Date, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 4.4, one or more Affiliates of Buyer to (i) purchase specified Acquired Assets, (ii) assume specified Assumed Liabilities and/or (iii) employ specified Buyer Employees, in each case, as of the Closing Date (any Person that shall be properly designated by Buyer in accordance with this clause, a "Buyer Designee"); it being understood and agreed, however, that any such right of Buyer to designate a Buyer Designee is conditioned upon (a) the Buyer Designee(s) delivering a signed counterpart to this Agreement and each other Transaction Document to which Buyer is party, (b) such Buyer Designee(s) undertaking the relevant obligations and liabilities of Buyer under this Agreement and the Transaction Documents, (c) after taking into account any support that Buyer commits in a writing (including this Agreement) with the Company to provide, such Buyer Designee being able to perform the applicable covenants under this Agreement and, as applicable, any other transaction agreement to which Buyer is party and demonstrate satisfaction of the requirements of Section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance with respect to the Acquired Assets and Assumed Liabilities, (d) any such designation not creating any Liability (including any Liability relating to Taxes other than Taxes for which Buyer is liable pursuant to Section 2.3(e)) for the Sellers or their Affiliates that would not have existed had Buyer purchased the Acquired Assets and/or assumed the Assumed Liabilities, and which Liability is not fully reimbursed by or on behalf of Buyer and (e) such designation not being reasonably expected to cause a material delay, or prevent or hinder the

41

consummation of the transactions contemplated hereby. As soon as reasonably practicable and in no event later than ten (10) days prior to the Closing Date, Buyer shall make any such designations of Buyer Designees by way of a written notice to be delivered to the Company. Any such designation shall contain information about the identity and jurisdiction of incorporation of the Buyer Designee(s) and shall indicate which Acquired Assets, Assumed Liabilities and Buyer Employees that Buyer intends such Buyer Designee(s) to purchase, assume and/or employ, as applicable, hereunder. No such designation shall relieve Buyer of any of its obligations hereunder and any breach hereof by a Buyer Designee shall be deemed a breach by Buyer. Buyer and Buyer Designee(s) shall be jointly and severally liable for any obligations of Buyer and such Buyer Designees hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Buyer Designees appointed in accordance with this Section 4.4 shall be included in the definition of "Buyer" for all relevant purposes under this Agreement and all such Buyer Designees shall be deemed to have made all of the covenants, representations and warranties of Buyer set forth in this Agreement to the extent relevant to such Buyer Designee, or the Acquired Assets to be acquired, Assumed Liabilities to be assumed or Buyer Employees to be employed by such Buyer Designee.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as (a) set forth in the Company Schedules and (b) in the case of any representation or warranty to the extent relating to the Foresight Entities, as disclosed in any reports, schedules, registration statements and other documents publicly filed with or publicly furnished to the SEC by the Foresight Entities publicly filed or furnished on or after January 1, 2019 and publicly available not less than two (2) Business Days prior to the Execution Date (and excluding (i) any supplement, modification or amendment thereto made after two (2) Business Days prior to the Execution Date and (ii) any disclosures set forth in such filings (x) under the captions "Risk Factors" or "Forward-Looking Statements" or words of similar import and (y) in any other section relating to forward-looking statements to the extent they are cautionary, predictive or forward-looking in nature), provided, that any matter disclosed in such filings shall not be deemed disclosed for purposes of Section 5.1, Section 5.2 or Section 5.3, and, in each case, subject to Section 13.10, the Company represents and warrants to Buyer as of the date of this Agreement and as of the Closing Date, that:

5.1     Organization and Good Standing. Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Subject to the applicable provisions of the Bankruptcy Code, each Seller has all requisite corporate or limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect. The Company has made available complete and accurate copies of all organizational documents, including any shareholder agreements, limited liability company agreements or any agreements similar in nature for each of the Controlled Specified Entities, and to the Sellers' Knowledge, the other Specified Entities.

5.2     Specified Entities.

(a)     Schedule 5.2(a) sets forth a true and complete description of all of the authorized, issued and outstanding Capital Stock in the Controlled Specified Entities, and to the Sellers' Knowledge, the other Specified Entities, as of the Execution Date and, to the Sellers' Knowledge, the owners thereof. Except as set forth on Schedule 5.2(a), to the Sellers' Knowledge, as of the Execution Date (i) there is no Capital Stock of the Controlled Specified Entities issued, reserved for issuance or outstanding, and (ii) there are no outstanding or authorized options, warrants, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), calls (including capital calls) or commitments of any character whatsoever, relating to the Capital Stock of, or other voting interests in, the Controlled Specified Entities, to which any of the Controlled Specified Entities is a party or is bound, requiring the issuance, delivery or sale of Capital Stock of any of the Controlled Specified Entities. To the Sellers' Knowledge, as of the Execution Date (A) there are no outstanding or authorized equity appreciation, phantom equity, profit participation or similar rights with respect to the Capital Stock of, or other voting interest in, any of the Controlled Specified Entities to which any of the Controlled Specified Entities is a party or is bound, (B) the Controlled Specified Entities have no authorized or outstanding bonds, debentures, notes or other Indebtedness, the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote), and (C) there are no Contracts to which any Controlled Specified Entity is a party or by which it is bound to: (i) repurchase, redeem or otherwise acquire any equity interests of, or other voting interests in, the Controlled Specified Entities; or (ii) vote or dispose of any equity interests of, or voting interests in, the Controlled Specified Entities. There are no irrevocable proxies and no voting agreements with respect to the Sellers' equity or voting interests in, the Controlled Specified Entities.

(b)     To the Sellers' Knowledge, as of the Execution Date all of the issued and outstanding Capital Stock owned by Sellers in the Specified Entities is (i) duly authorized and validly issued, (ii) not subject to any preemptive rights, restrictions on transfer (other than restrictions on transfer under applicable state and federal securities laws), rights of first refusal or similar rights that would prevent, delay or interfere with the transactions contemplated in this Agreement, and (iii) free and clear of all Encumbrances (other than restrictions on transfer under applicable state and federal securities laws). Schedule 5.2(b) sets forth a true and complete description of all of the Capital Stock owned by the Sellers in the Specified Entities as of the Execution Date.

(c)     Schedule 5.2(c) sets forth a complete and accurate list of the names and jurisdiction of organization, incorporation or formation of each of the Subsidiaries of the Controlled Specified Entities and, to the Sellers' Knowledge, as of the Execution Date the authorized, issued and outstanding Capital Stock of each Subsidiary of a Controlled Specified Entity, except for any Subsidiary of a Controlled Specified Entity that is directly or indirectly wholly owned by a Controlled Specified Entity. To the Sellers' Knowledge, as of the Execution Date the Capital Stock of each Subsidiary of a Controlled Specified Entity is duly authorized, validly issued, fully paid and non-assessable (to the extent applicable) and, in each case, is (i) directly owned of record by the Controlled Specified Entities or a Subsidiary thereof that is directly or indirectly wholly owned by a Controlled Specified Entity, and (ii) free and clear of all Encumbrances. To the Sellers' Knowledge, as of the Execution Date there is no other Capital

Stock of any Subsidiary of a Controlled Specified Entity authorized, issued, reserved for issuance or outstanding and there are no outstanding or authorized options, warrants, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), equity appreciation rights, calls (including capital calls) or commitments of any character whatsoever to which any Subsidiary of a Controlled Specified Entity is a party or may be bound requiring the issuance, delivery or sale of Capital Stock of any Subsidiary of a Controlled Specified Entity. To the Sellers' Knowledge, as of the Execution Date no Subsidiary of a Controlled Specified Entity has any authorized or outstanding bonds, debentures, notes or other Indebtedness, the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the equityholders of such Subsidiary on any matter. To the Sellers' Knowledge, as of the Execution Date there are no Contracts to which any Subsidiary of a Controlled Specified Entity is a party or by which it is bound to: (i) repurchase, redeem or otherwise acquire any equity or voting interest in any Subsidiary of a Controlled Specified Entity; or (ii) vote or dispose of any equity or voting interest in any Subsidiary of a Controlled Specified Entity. To the Sellers' Knowledge, as of the Execution Date there are no irrevocable proxies and no voting agreements with respect to any of the Sellers' equity or voting interest in any Subsidiary of a Controlled Specified Entity.

(d)     To the Sellers' Knowledge, as of the Execution Date no Controlled Specified Entity owns, directly or indirectly, any equity ownership or voting interest in any Person (other than a Specified Entity Subsidiary).

(e)     Schedule 5.2(e) sets forth a true and complete list of all non-*de minimis* Contracts between any Seller or any Affiliate of any Seller (other than a Specified Entities Group Member), on the one hand, and any of the Specified Entities Group Members, on the other hand.

5.3     Authority; Validity; Consents. Each Seller has, subject to entry of the Confirmation Order, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is, or will be, a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Confirmation Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate or limited liability company action on the part of the Sellers. Subject to entry of the Confirmation Order, this Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to entry of the Confirmation Order, this Agreement and the other Transaction Documents constitute (or in the case of Transaction Documents to be executed at Closing, will constitute), with respect to each Seller that is (or will be) party thereto, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to entry of the Confirmation Order, except (a) to the extent applicable, as required to comply with the HSR Act and the Antitrust Laws of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business (including the Foreign

Antitrust Approvals, if any), (b) for entry of the Confirmation Order, (c) for notices, filings and consents required in connection with the Bankruptcy Cases, including the requirements of the Bidding Procedures Order, (d) for the notices, filings and consents set forth on <u>Schedule 5.3</u>, (e) compliance with any applicable requirements of the Securities Act of 1933 or the Securities Exchange Act of 1934, and (f) for any notices, registrations, declarations, filings, consents, waivers or approvals as to which the failure to make or obtain would not, individually or in the aggregate, have a Material Adverse Effect, no Seller or any Controlled Specified Entity is required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents to which a Seller is a Party or the consummation or performance of any of the transactions contemplated hereby and thereby.

5.4     <u>No Conflict</u>. Neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Confirmation Order and the Bidding Procedures Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Confirmation Order and the Bidding Procedures Order, compliance by it with any of the provisions hereof or thereof will (a) conflict with or result in a violation of (i) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller, any Controlled Specified Entity or, to the Sellers' knowledge, any other Specified Entity Group Member or (ii) any Legal Requirement or any material Order binding upon any Seller or any Controlled Specified Entity or by which the Business or any Acquired Assets or any business or assets of any Controlled Specified Entities is subject or bound, (b) (i) violate, conflict with, or result in a material breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under any license or Permit held by any Seller or to the Sellers' Knowledge, any Controlled Specified Entities, or any authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority or (ii) result in a material breach of or constitute a material default under or give rise to any right of termination, modification, cancellation or acceleration under any Material Contract which is an Available Contract or (c) result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon the properties or assets of such Seller being sold or transferred hereunder except, in the case of clauses (a)(ii) and (b), as would not, individually or in the aggregate, have a Material Adverse Effect.

5.5     <u>Real Property</u>.

(a)     <u>Owned Real Property</u>. <u>Schedule 5.5(a)</u> sets forth an accurate and complete list of the Owned Real Property as of the Execution Date. Except for Permitted Encumbrances and except as set forth on <u>Schedule 5.5(a)(i)</u>, the Sellers have good and marketable title in the Owned Real Property set forth on <u>Schedule 5.5(a)</u>. Except for the Lessor Leases, none of the Owned Real Property is subject to any material lease or grant to any third party of any material right to the use, purchase, occupancy or enjoyment of such Owned Real Property or any material portion thereof used in the conduct of the Business. Except for Permitted Encumbrances and the applicable terms of Permits held by the Sellers and their Affiliates, the Owned Real Property is not subject to any Encumbrances (other than liens that will be removed pursuant to the Confirmation Order). There are no pending or, to the Sellers' Knowledge, threatened condemnation proceedings relating to any of the Owned Real Property except those which, if

adversely determined, would not reasonably be expected to materially impair or materially restrict the current use of the Owned Real Property subject thereto. Other than as set forth on Schedule 5.5(a)(ii) hereto and the rights of Buyer pursuant to this Agreement, there are no outstanding options, rights of first refusal or similar rights to purchase any of the Owned Real Property or any interest therein.

(b)      Lessor Leases.  Schedule 5.5(b) lists all material unexpired leases, subleases, licenses, sublicenses, occupancy or other agreements whereby any Seller leases, subleases, licenses or grants an interest in any Owned Real Property or Leased Real Property to a third party (the "Lessor Leases"). The Sellers have made available, to the extent that they are in the Sellers' possession or control, true, complete and correct copies of the Lessor Leases set forth or required to be set forth on Schedule 5.5(b) to Buyer, including any amendments thereto through the Execution Date. Other than as set forth on Schedule 5.5(b) or as a result of the Bankruptcy Cases, the Sellers are not in material breach of or in material default under the Lessor Leases and, no party to any Lessor Lease set forth or required to be set forth on Schedule 5.5(b) has given the Sellers written notice of or, to the Sellers' Knowledge, made a claim with respect to any material breach or material default by any Seller thereunder (other than as a result of the Bankruptcy Cases).

(c)      Leased Real Property. Schedule 5.5(c) contains a list of all material Leased Real Property leased by the Sellers and used or held for use in the operation of the Business. The Sellers have made available to Buyer, to the extent that they are in the Sellers' possession or control, true and complete copies of all Leases for the Leased Real Property set forth on Schedule 5.5(c), including all amendments thereto. With respect to each Lease under which any Leased Real Property set forth on Schedule 5.5(c) is demised, except for Permitted Encumbrances and except as set forth on Schedule 5.5(c): (i) other than as a result of the Bankruptcy Cases, the Sellers which are a party to such Lease are not in material breach or in material default under such Lease and no party to such Lease has given the Sellers written notice of or, to the Sellers' Knowledge, made a claim with respect to any material breach or material default thereunder by any Seller thereunder; (ii) to the Sellers' Knowledge, there are no conditions that currently exist that constitute, or with the passage of time or notice or both will result in, a material default or material breach of any material term by any party to such Lease; (iii) to the Sellers' Knowledge, none of the Leased Real Property demised under such Lease is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of such Leased Real Property or any portion thereof that would materially impair the use of such Leased Real Property in the operation of the Business; (iv) to the Seller's Knowledge, the Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations that materially impair the use of such Leased Real Property (other than any such restrictions, exceptions, reservations or limitations expressly written in any Lease that has been provided to Buyer); and (v) to the Sellers' Knowledge, such Lease is legal, valid, binding, enforceable and in full force and effect, subject to the application of any bankruptcy or other creditor's right laws, and will continue on the same material terms immediately following the consummation of the transactions contemplated hereby.

5.6      Environmental and Health and Safety Matters.

(a)      Except for ordinary course violations that would not individually or in the aggregate be material, the Sellers with respect to the Business and the Acquired Assets have at all times during the past four (4) years complied and are in compliance in all material respects with all applicable Environmental, Health and Safety Laws;

(b)      Except with respect to ordinary course violations that would not individually or in the aggregate be material, the Sellers have not received, and to the Sellers Knowledge, Controlled Specified Entities have not received, any written or, to the Sellers' Knowledge, oral notice, report or other communication regarding any actual or alleged material violation, non-compliance, liability or potential liability regarding Hazardous Substances or Environmental, Health and Safety Laws with regard to any of the Acquired Assets, the Business, Controlled Specified Entities or any prior business for which any Seller or any Controlled Specified Entity has retained liability under any Contract, in each case the subject matter of which remains unresolved (it being understood that any matters subject to a stay in connection with the Bankruptcy Cases shall not be considered resolved for the purposes of this Section 5.6(b));

(c)      Except with respect to facts or circumstances relating to Reclamation and permitting obligations arising in the ordinary course of business not constituting a material failure to comply with Environmental, Health and Safety Laws, the Real Properties, and to the Sellers' Knowledge, any real property formerly owned, leased or operated by any Seller or any predecessor of any Seller, and to the Sellers' Knowledge, any real property currently or formerly owned, leased or operated by any Controlled Specified Entity or any of their predecessors, do not contain, and, to the Sellers' Knowledge, have not previously contained, any Hazardous Substances in amounts or concentrations which (i) constitute a material violation of, or (ii) could reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental, Health and Safety Laws;

(d)      Except with respect to facts or circumstances relating to Reclamation and Permitting obligations arising in the ordinary course of business not constituting a material failure to comply with Environmental, Health and Safety Laws, with respect to the Business, the Acquired Assets and, to the Sellers' Knowledge, the Controlled Specified Entities, neither Seller, the Controlled Specified Entities nor, to the Sellers' Knowledge, any other Person to the extent reasonably expected to give rise to material liability of any Seller or any Controlled Specified Entity, has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or Released any Hazardous Substances, or owned or operated any property or facility contaminated by any Hazardous Substance, in a manner that constitutes a material violation of or material liability under, or could reasonably be expected to give rise to a material liability under, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, any applicable Environmental, Health and Safety Laws, excluding matters that have been fully resolved (it being understood that any matters subject to a stay in connection with the Bankruptcy Cases shall not be considered resolved for the purposes of this Section 5.6(d));

(e)      Except for ordinary course violations that would not individually or in the aggregate be material, no proceeding is pending or, to the Sellers' Knowledge, threatened under any Environmental, Health and Safety Laws against the Sellers, with respect to the Acquired

Assets or the Business, or, to the Sellers' Knowledge and except as would not reasonably be expected to be material, against any Controlled Specified Entity, there are no Orders outstanding or pending under and no Orders are being proposed or negotiated between any Seller or any Controlled Specified Entity and any Governmental Authorities with respect to, any Environmental, Health and Safety Law with respect to the Acquired Assets, the Business or the business or assets of the Controlled Specified Entities nor, to the Sellers' Knowledge, are there any facts or circumstances that are reasonably likely to result in any such Orders;

(f)     The Sellers (i) hold all Environmental Permits (each of which is in full force and effect and is not currently subject to appeal, except as is being contested in good faith by appropriate proceedings diligently conducted, which proceedings are described in Schedule 5.6(f)(i) required for the current coal mining-related operations of the Sellers or the Business, including all Environmental Permits, required for the current coal mining-related operations of the Sellers or the Business and, to the extent currently required, any pending construction or expansion related thereto; (ii) are, and have been during the past four (4) years, in material compliance with all such Environmental Permits, except for ordinary course violations that would not individually or in the aggregate be material or as is being contested in good faith by appropriate proceedings diligently conducted, which proceedings are described in Schedule 5.6(f)(ii); and (iii) have not received any written notice that the Environmental Permits will not be renewed;

(g)     To the Sellers' Knowledge, each of the Controlled Specified Entities (i) are in compliance in all material respects with all applicable Environmental, Health and Safety Laws; (ii) hold all material Environmental Permits (each of which is in full force and effect and is not currently subject to appeal, except as is being contested in good faith by appropriate proceedings diligently conducted, which proceedings are described in Schedule 5.6(g)(ii)) required for the business operations of Controlled Specified Entities, including all material Environmental Permits required for the business operations of the Controlled Specified Entities and, to the extent currently required, any pending construction or expansion related thereto; (iii) are in material compliance with their Environmental Permits, except as is being contested in good faith by appropriate proceedings diligently conducted, which proceedings are described in Schedule 5.6(g)(iii); and (iv) have not received any written notice that any material Environmental Permits will not be renewed;

(h)     With respect to the Business and the Acquired Assets, the Sellers have not contractually assumed any material liabilities, including any material obligation for corrective or remedial action, of any other Person relating to Environmental, Health and Safety Laws, nor, to the Sellers' Knowledge, has any Controlled Specified Entity contractually assumed any such Liabilities;

(i)     The Sellers have made available or provided Buyer with copies of all material written environmental assessments, audits (including compliance audits), evaluations, studies, reports and tests in their possession relating to the Business, the Acquired Assets or the Controlled Specified Entities.

5.7     <u>Title to Acquired Assets</u>.

(a)     The Sellers have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by <u>Section 4.3</u>, and upon entry of the Confirmation Order, the Sellers will thereby transfer to Buyer (or a Buyer Designee, as applicable) and Buyer (or a Buyer Designee, as applicable) will (subject to <u>Section 2.5(a)</u>) be vested with good, valid and marketable title to, or, in the case of property leased or licensed by the Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except for Permitted Encumbrances.

(b)     There are no controlled Affiliates of the Company that are not Subsidiaries of the Company.

5.8     <u>Sufficiency of Assets</u>. The Acquired Assets constitute all of the material property and assets used or held for use by the Sellers or their Affiliates in connection with the Business, except for the Excluded Assets. The Acquired Assets, when taken together with the Excluded Assets (disregarding Buyer's right to exclude Assumed Contracts pursuant to <u>Sections 2.5(a)</u> and <u>2.5(c)</u>) and the rights of Buyer (and/or any applicable Buyer Designee) under any of the Transaction Documents, when utilized by a labor force substantially similar to that employed by Sellers and their Affiliates in connection with the conduct of the Business as of the date of this Agreement, are sufficient to permit Buyer to conduct the Business immediately following the Closing in substantially the same manner as conducted by Sellers as of the date of this Agreement.

5.9     <u>Taxes</u>.

(a)     All material Tax Returns of the Sellers relating to the Acquired Assets and the Business, and, to the Sellers' Knowledge, all income and other material Tax Returns of the Controlled Specified Entities, that were required to be filed with any appropriate Taxing Authority have been duly and timely filed (taking into account any extension of time to file). All such material Tax Returns are correct and complete in all material respects and were prepared in substantial compliance with all Legal Requirements. All material Taxes of the Sellers, including those relating to the Business and/or the Acquired Assets that are due and payable, whether or not shown to be payable on such material Tax Returns, have been or will be timely paid before the Closing, except for (1) any unpaid Taxes which are specified in <u>Section 8.1</u> to be paid at the Closing, (2) any such Taxes that are Funded Liabilities that are not assumed by Buyer, (3) any such Taxes that are Assumed Liabilities, or (4) any such Taxes which constitute prepetition Claims under the Plan that are not entitled to payment in full under the Plan. No examination of any such Tax Return relating to the Acquired Assets or the Business, or to the Sellers' Knowledge, the Controlled Specified Entities, is currently in progress by any Taxing Authority and no Seller, or to the Sellers' Knowledge, any Controlled Specified Entity has received written notice of any contemplated examination of any such Tax Return and no material adjustment has been proposed in writing with respect to any such Tax Returns for the last five (5) years by any Taxing Authority.

(b)     Sellers have established, in accordance with GAAP applied on a basis consistent with that of preceding periods, adequate reserves for the payment of all material Taxes which arise from or with respect to the Acquired Assets or the operation of the Business and are incurred in or attributable to the Pre-Closing Tax Period, the non-payment of which would result

in a lien on any Acquired Asset, would otherwise adversely affect the Business or would result in Buyer becoming liable therefor.

(c)      To the Sellers' Knowledge, each Controlled Specified Entity has established, in accordance with GAAP applied on a basis consistent with that of preceding periods, adequate reserves for the payment of all material Taxes incurred in or attributable to the Pre-Closing Tax Period of such Person, the non-payment of which would adversely affect the applicable Controlled Specified Entity or would result in Buyer becoming liable therefor.

(d)      The Sellers have not received written notice of any material Tax deficiency outstanding, proposed or assessed against or allocable to the Sellers and have not executed any waiver of any statute of limitations in respect of any income or other material Taxes nor agreed to any extension of time with respect to a material Tax assessment or deficiency with respect to the Acquired Assets or the Business. With respect to the Sellers, there are no pending or threatened in writing audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any Liability for material Taxes. There is no dispute or claim concerning any material Tax liability of the Sellers claimed or raised by any Taxing Authority in writing or, to the Sellers' Knowledge, threatened in writing by any Taxing Authority.

(e)      The Sellers and, to the Sellers' Knowledge, the Controlled Specified Entities are not in default under any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the Business or Controlled Specified Entities, except for such defaults or conditions which would not, individually or in the aggregate, have a Material Adverse Effect.

(f)      Each Seller and, to the Sellers' Knowledge, each Controlled Specified Entity has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed.

(g)      No Seller and, to the Sellers' Knowledge, no Controlled Specified Entity is a party to any Tax allocation or sharing agreement (other than agreements that are not primarily related to Taxes and are entered into in the ordinary course of business (including, for the avoidance of doubt, the provisions of a Seller's or a Controlled Specified Entity's organizational documents)). To the Sellers' Knowledge, other than those Sellers and Controlled Specified Entities set forth on Schedule 5.9(g), no Seller and no Controlled Specified Entity (i) has, within the past four (4) years, been a member of an affiliated group (other than an affiliated group the common parent of which is a Seller or an Affiliate thereof) filing a consolidated federal income Tax Return or (ii) has any material liability for the Taxes of any Person (other than a Seller or any Subsidiary thereof) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

(h)      There are no Encumbrances for Taxes (other than Permitted Encumbrances) on the Acquired Assets.

(i)     No claim has been made in writing by any Governmental Authority in a jurisdiction where the Sellers do not file Tax Returns that the Sellers are or may be subject to taxation by that jurisdiction.

(j)     No power of attorney with respect to Taxes has been executed or filed with any Taxing Authority by or on behalf of any of the Sellers that will remain in effect after the Closing Date.

No representation or warranty in this <u>Section 5.9</u> is made with respect to Taxes for any Post-Closing Tax Period.

5.10   <u>Legal Proceedings</u>. Except for the Bankruptcy Cases (and proceedings related thereto), there is no Action or Order pending, outstanding or, to the Sellers' Knowledge, threatened against or related to the Business, the Acquired Assets or to the Sellers' Knowledge, any Controlled Specified Entities, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to the Sellers' Knowledge, are there any investigations relating to the Business, the Acquired Assets or to the Sellers' Knowledge, any of the Controlled Specified Entities pending or, to the Sellers' Knowledge, threatened by or before any arbitrator or any Governmental Authority, which, in any such case, if determined adversely, would individually or in the aggregate be material to the Business or the Acquired Assets, taken as a whole, or which would or would reasonably be expected to impair any Seller's ability to consummate any of the transactions contemplated hereby or by any of the other Transaction Documents.

5.11   <u>Compliance with Legal Requirements; Permits</u>.

(a)     The Sellers hold all of the material Permits necessary or required for the Sellers to own the Acquired Assets or operate the Business and to the Knowledge of Sellers, the Controlled Specified Entities hold all material Permits necessary or required to own or operate their business or assets.

(b)     <u>Schedule 5.11(b)</u> sets forth a true and complete list of (i) all Permits (including Environmental Permits and Mining Permits) held by the Sellers or any of their Subsidiaries, excluding any Subsidiaries that are Specified Entities Group Members, together with a description of the permitted property, facility or operation, covered by each such Permit, an indication of the state that issued each such Permit, the expiration date for each Permit and a true and complete list of all pending applications for additional Permits, renewals of existing Permits, or amendments to existing Permits held by the Sellers or any of their Subsidiaries, excluding any Subsidiaries that are Specified Entities Group Members, which have been submitted to any Governmental Authority or other entity by any Seller or any of their Subsidiaries applicable to the operation of the Business or the Acquired Assets, and (ii) the applicable surety bonds (or other financial assurances) and the amount of the surety bonds (or other financial assurances) under such Permits, in each case, as amended, supplemented and modified through the Execution Date. All such Permits and all Permits held by any Controlled Specified Entity ("<u>Controlled Specified Entities Permits</u>") are final, unappealed, valid, in good standing and in full force and effect and no Seller, none of their Subsidiaries, excluding any Subsidiaries that are Specified

Entities Group Members, and none of the Controlled Specified Entities is in material default under or in material violation of any such Permit.

(c)      The Sellers have conducted the Business for the past three (3) years and currently own and operate the Acquired Assets and, to the Sellers' Knowledge, each of the Controlled Specified Entities currently owns and operates its assets, in each case, in accordance, in all material respects, with all applicable Legal Requirements, Orders and Permits, and the Business, and, to the Sellers' Knowledge, each of the Controlled Specified Entities is in compliance in all material respects with all applicable Legal Requirements, Orders and Permits (including any anti-bribery Legal Requirements and any Legal Requirements relating to data privacy and data protection) and has obtained all approvals necessary for owning and operating its assets and has made all necessary filings with all Governmental Authorities having jurisdiction necessary for owning and operating the Acquired Assets, and there are no Orders outstanding under any Mining Law or MSHA with respect to the Real Properties, the Business or to the Sellers' Knowledge, the Controlled Specified Entities.

(d)      Neither the Sellers, nor to the Sellers' Knowledge, any of their Representatives or, except as would not reasonably be expected to be material, any of the Controlled Specified Entities have received, within the past three (3) years, any written notice or other communication from any Governmental Authority that alleges that the Business or any Controlled Specified Entity is not in compliance with any applicable Legal Requirement, Order or Permit or that threatens or states the intention on the part of any issuing authority to revoke, cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business, the ownership of any of the Acquired Assets or the business operations or the assets of any Controlled Specified Entity (except with respect to regular periodic expirations and renewals thereof). No suspension, revocation or cancellation of any of the Permits is threatened or to the Sellers' Knowledge contemplated, except with respect to regular periodic expirations and renewals thereof, which renewals no Seller or any Subsidiary of such Seller has reason to believe will not be granted.

(e)      Except as would not be material to the Business, the Acquired Assets or, to the Sellers' Knowledge, the business operations or the assets of any Controlled Specified Entity, or to the transfer of any Transferred Permit or the approval of the change of ownership and control of the Controlled Specified Entities with respect to the Controlled Specified Entities Permits: (i) no Permits have been the subject of an appeal, denial, revocation, restriction or suspension during the past three (3) years and (ii) no Seller and no Controlled Specified Entity is currently a party to any proceeding involving the possible appeal, denial, revocation, restriction or suspension of any Permits or any of the privileges granted thereunder. No Seller, nor any Affiliate, Subsidiary, officer or director of any Seller, nor any Controlled Specified Entity, nor to the Sellers' Knowledge any other Person listed on or connected to a Permit or officer or director of any Controlled Specified Entity is "permit blocked" on the Applicant Violator System by any Governmental Authority and to the Sellers' Knowledge, there are no facts or circumstances reasonably expected to result in any such "permit block".

(f)      Except as set forth on Schedule 5.11(f), there are no Transferred Permits that encompass or pertain to, or would be reasonably expected to impose any Liability on Buyer or

any Buyer Designee for, any Excluded Asset or Excluded Liability or any acreage or operations other than the Acquired Assets.

5.12   Labor Matters.

(a)     None of the Sellers are party to, subject to or would reasonably be expected to have any liability under any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, and similar agreements or arrangements (each a "Collective Bargaining Agreement") with any union, works council, or labor organization (each a "Union").

(b)     (i) In the past three (3) years, no Union or group of Employees has (a) to the Sellers' Knowledge, sought to organize any Employees for purposes of collective bargaining, (b) made a written demand for recognition or certification as an employee representative for purposes of collective bargaining, (c) sought to bargain collectively with any of the Sellers through a written demand, or (d) filed a petition for recognition with any Governmental Authority; (ii) as of this date, without the express written consent of Buyer, no Collective Bargaining Agreement is being negotiated by any of the Sellers; and (iii) in the past three (3) years there have been no actual or, to the Sellers' Knowledge, threatened strikes, lockouts, slowdowns, or work stoppages, boycotts, picketing, walkouts or other material forms of organized labor disruptions with respect to any Employees of the Sellers, including demonstrations, leafleting, sit-ins or sick-outs.

(c)     Schedule 5.12(c) sets forth a true, complete and accurate list as of the Execution Date of the name, title, employment status (e.g., full-time or part-time), leave status, union affiliation (if any), annual salary or hourly wage rate (as applicable) and place of employment of all current employees of the Sellers.

(d)     (i) Within the past three (3) years, none of the Sellers have failed to provide advance notice of layoffs or terminations as required in any material part by the Worker Adjustment and Retraining Notification Act of 1988, and including any similar state or local Legal Requirement (the "WARN Act"), or any applicable Legal Requirements for employees outside the United States, regarding the termination or layoff of employees or have incurred any material liability or material obligation under such Legal Requirements; (ii) within the past three (3) years, the Sellers have been in material compliance with all applicable Legal Requirements relating to labor and employment, including but not limited to all Legal Requirements relating to employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; sexual harassment; equal employment opportunities; disability; labor relations; wages and hours; FLSA, classification of independent contractors, and hours of work; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks, working conditions; occupational safety and health; family and medical leave; data privacy and data protection; or employee terminations; (iii) except pursuant to procedures established in connection with the Bankruptcy Cases, there are no pending or, to the Sellers' Knowledge, threatened, material lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, actions, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against the Sellers brought by or on behalf of any applicant for employment, any Employee, representative, agents, consultant,

independent contractor, subcontractor, or leased employee, volunteer, or "temp" of the Sellers, or any group or class of the foregoing, any Governmental Authority, any person alleging to be an Employee, or any group or class of the foregoing, alleging violation of any labor or employment Legal Requirements, breach of any Collective Bargaining Agreement, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship; (iv) to Sellers' Knowledge, no Employee of any Seller has in the past three (3) years been or is being investigated in connection with any misconduct, nor subject to any disciplinary action in connection with such misconduct, that could reasonably be expected to cause any material damage to the reputation or business of the Sellers, or any Employee; (v) to the Sellers' Knowledge, no Employee has in the past three (3) years engaged in any conduct or cover-up of such conduct, or aided or assisted any other person or entity to engage in any conduct that could cause or has caused any material damage to the reputation or business of the Sellers or any Employee, including but not limited to any conduct constituting sexual misconduct, harassment (including sexual harassment), or discrimination; and (vi) within the past three (3) years, to Sellers' Knowledge, each Employee has all work permits, immigration permits, visas or other authorization required by Legal Requirements for such Employee given the duties and nature of such Employee's employment.

5.13     Employee Benefits.

(a)     Schedule 5.13 sets forth a true and complete list of each material Benefit Plan (excluding (i) at-will offer letters and (ii) employment and consulting agreements, in each case, terminable upon sixty (60) days' notice or less and without material Liability). For purposes of this Agreement, "Benefit Plan" shall mean any "employee benefit plan" within the meaning of Section 3(3) of ERISA (including any Multiemployer Plan) and any plan, program, policy, practice, arrangement, Contract or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, compensation, benefit, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller(s) is the owner, the beneficiary, or both), Section 125 of the Code "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, policy, practice, arrangement, Contract or agreement, whether written or oral, including any other employee benefit plan, agreement, program, policy, arrangement, Contract or practice, including any payroll practice, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated hereby or otherwise), in each case, (x) under which any current or former officer, director, employee, leased employee or consultant (or any of their respective beneficiaries) of any of the Sellers or has any present or future right to benefits, (y) which any of the Sellers or is a party to or any of the Sellers or sponsors, maintains, contributes to, or has any obligation to sponsor, maintain or contribute to, or (z) pursuant to, under or with respect to which any of the Sellers has or has any direct or indirect Liability, whether contingent or otherwise, including by reason of their affiliation with any ERISA Affiliate.

(b)     Except as would not be material to the Business, (i) each Benefit Plan has been established, operated and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Legal Requirements; and (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the Internal Revenue Services (the "IRS"), the United States Department of Labor or any other Governmental Authority, or to the participants or beneficiaries of such Benefit Plan have been filed or furnished on a timely basis in all material respects. Each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS or may rely on a favorable opinion letter issued by the IRS.

5.14    Sellers' Intellectual Property.

(a)     Schedule 5.14(a) sets forth a true and complete list of all U.S. and foreign issuances, registrations and applications for registration of Intellectual Property, in each case which are owned by a Seller and which are material to the Business. Except as set forth on Schedule 5.14(a), (i) the Sellers are the sole and exclusive owners of all of the Intellectual Property owned or purported to be owned by the Sellers (the "Owned Intellectual Property"), (ii) there exist no material restrictions on the disclosure, use, license or transfer of the Owned Intellectual Property, and (iii) to the Sellers' Knowledge, all such Owned Intellectual Property is valid, enforceable, in effect and subsisting.

(b)     Except as disclosed on Schedule 5.14(b), (i) to the Sellers' Knowledge, the conduct of the Business by the Sellers as currently conducted (including the products and services currently sold or provided by the Sellers) does not infringe, misappropriate or otherwise violate, and in the five (5) years prior to the date hereof, has not infringed, misappropriated or otherwise violated, any Person's Intellectual Property rights, and no written notice has been received by Sellers in the five (5) years prior to the date hereof, and no claims are pending or, to the Sellers' Knowledge, threatened in writing against the Sellers, alleging any such infringement, misappropriation or other violation of any Intellectual Property, and (ii) to the Sellers' Knowledge, no Person is infringing, misappropriating or otherwise violating any Owned Intellectual Property, and no such claims are pending or threatened in writing against any Person by the Sellers.

(c)     The Sellers own or have the valid and enforceable right to use all Owned Intellectual Property and all other material Intellectual Property used or held for use in the current operations of the Business, free and clear of any Encumbrance (other than Permitted Encumbrances). To the Sellers' Knowledge, the Acquired Assets and any rights provided to Buyer pursuant to the Transaction Documents include all third-party Intellectual Property rights licensed to the Sellers that are required to conduct the Business as it is presently being conducted by the Sellers in all material respects, except such Intellectual Property rights as exist under the Excluded Contracts.

(d)     There has been no interruption, modification or corruption of any information technology assets included in the Acquired Assets that has materially disrupted the operation of the Business and to the Sellers' Knowledge there has been no breach, or unauthorized use of or

access to such information technology assets, and all such information technology assets operate and perform in a manner that permits the Sellers to conduct the Business as currently conducted.

5.15    Contracts.

(a)    Schedule 5.15(a) sets forth a complete list, as of the Execution Date, of all Material Contracts (including Leases and Lessor Leases).

(b)    Prior to the date hereof, the Company has provided to Buyer in writing the Company's estimate of the Cure Costs with respect to each of the Available Contracts.

(c)    Except as set forth on Schedule 5.15(c), no Seller or to Sellers' Knowledge, any Controlled Specified Entity has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract.

(d)    Each Material Contract is in full force and effect and is a valid and binding obligation of each Seller party thereto and to the Sellers' Knowledge, each Controlled Specified Entity party thereto, and to the Sellers' Knowledge, each of the other parties thereto, in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (y) as set forth on Schedule 5.15(d) and (z) as would not, individually or in the aggregate, have a Material Adverse Effect. Upon entry of the Confirmation Order and payment of the related Cure Costs, (i) no Seller will be in breach or default of its obligations under any Available Contract, (ii) no condition exists that with notice or lapse of time or both would constitute a default by any Seller under any Available Contract and (iii) to the Seller's Knowledge, no condition exists that with notice or lapse of time or both would constitute a default by any Controlled Specified Entity under any Material Contract and (iv) to the Sellers' Knowledge, no other party to any Available Contract is in breach or default thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect.

(e)    The Cure Cost amounts calculated by the Sellers and specified in the Cure Notices to be submitted by the Sellers with respect to each of the Available Contracts to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order will be, to the Sellers' Knowledge, true and correct. To the Sellers' Knowledge, the statement in the first sentence of Section 2.5(a) is accurate in all material respects.

5.16    Insurance. Schedule 5.16 sets forth a true and complete list of all insurance policies held by the Sellers covering the property, assets, Employees and operations of the Business and any Acquired Assets (including policies providing property, casualty, liability and workers' compensation coverage, but excluding any policies relating to any Benefit Plan that are set forth on Schedule 5.13). Such policies are in full force and effect (subject to periodic renewals thereof). Except as set forth on Schedule 5.16, the Sellers have paid all premiums on such policies due and payable prior to the Execution Date, or, if not yet due, have properly accrued for such payables, except as otherwise would be immaterial to the Business. Since the

Petition Date, to the Sellers' Knowledge, the Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.17   <u>Brokers or Finders</u>. The Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

5.18   <u>Affiliate Interests</u>.

(a)   Other than travel advances entered into or provided in the Ordinary Course of Business of the Sellers, all Contracts between any Seller, on the one hand, and (i) except for any other Seller or any Controlled Specified Entity, any Affiliate of, or holder of five percent (5%) or more of the equity of, any Seller, (ii) any director or officer of any Seller or of any Person referenced in clause (i), or (iii) except for any other Seller or any Controlled Specified Entity, any "associate" or "immediate family" member (as such terms are respectively defined in Rule 12b-2 and Rule 16a-1 of the Exchange Act) of any Person referenced in clause (i) or (ii) (the Persons referenced in clauses (i), (ii) and (iii) collectively, the "<u>Seller Related Parties</u>"), on the other hand, are listed on <u>Schedule 5.18(a)</u>. To the Sellers' Knowledge, no such Seller Related Party has any direct or indirect interest in, or controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, (A) any Person which does business with any Seller or is competitive with the Business, in each case, in any material respect, or (B) any material property, asset or right which is used by any Seller. All Indebtedness of any such Seller Related Party to any Seller, and all Indebtedness of any Seller to any such Seller Related Party, is listed on <u>Schedule 5.18(a)</u>.

(b)   No Seller Related Party owns or has any interest in any property, asset or right constituting an Acquired Asset (or that would be an Acquired Asset if such Seller Related Party were a Seller hereunder), in each case, other than in a *de minimis* amount in the aggregate. None of the property, assets or rights referenced in <u>Schedule 2.2(a)</u> is material, individually or in the aggregate, to the business of the Sellers.

5.19   <u>Bank Accounts</u>. <u>Schedule 5.19</u> sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of the Sellers related to the Business.

5.20   <u>Undue Influence</u>. In the past five (5) years, in connection with the ownership or operation of the Business, no Seller or, to the Sellers' Knowledge, no director, officer, agent, employee or Affiliate, in each case, of any Seller or of any Controlled Specified Entities, has taken any action, directly or indirectly, with respect to the Business that would result in a material violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "<u>FCPA</u>"). In the past five (5) years, the Sellers, and, to the Sellers' Knowledge, their Affiliates, have conducted the Business in compliance with the FCPA in all material respects and maintain procedures which are reasonably expected to ensure compliance therewith.

5.21   <u>Financial Statements</u>. The Sellers have made available to Buyer the unaudited consolidated balance sheet and cash flow statement of the Company and its Subsidiaries as of

September 30, 2019 (the "Latest Balance Sheet Date"), and the related unaudited consolidated statements of operations and comprehensive income for the nine months ended September 30, 2019, and the unaudited statements of changes in equity and cash flows for the nine months ended September 30, 2019 (collectively, the "Unaudited Financial Statements"). The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with the Sellers' past practice except for the absence of footnotes. The Unaudited Financial Statements (i) are true, correct and complete in all material respects, (ii) are in accordance in all material respects with the books and records of the Sellers, and (iii) fairly present in all material respects the consolidated financial position, results of operations and comprehensive income, changes in equity and cash flows of the Sellers at the date specified and for the period covered. The copies of the Unaudited Financial Statements delivered to Buyer are true, correct and complete copies.

5.22    No Undisclosed Material Liabilities. There are no Liabilities of or relating to the Business or the Acquired Assets, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in any such Liabilities, other than:

(a)    Liabilities provided for in the balance sheet included in the Unaudited Financial Statements;

(b)    Liabilities incurred in the Ordinary Course of Business after the Latest Balance Sheet Date and in amounts consistent with past practices;

(c)    Liabilities disclosed on Schedule 5.14(b); and

(d)    other undisclosed Liabilities which, individually or in the aggregate, are not material to the Business or the Acquired Assets.

5.23    Absence of Certain Changes.

(a)    Since September 30, 2019, (i) except as authorized by the Bankruptcy Court prior to the date hereof, the Business and the Acquired Assets have been owned and operated in the Ordinary Course of Business, and (ii) there has not been a Material Adverse Effect.

(b)    Except as set forth on Schedule 5.23(b), or as expressly contemplated hereby or the Final DIP Order or any other orders entered in the Bankruptcy Cases from and after the Petition Date through the Execution Date, the Sellers have not:

(i)    except for executory contracts and unexpired leases rejected by the Sellers with the prior written consent of Buyer, terminated, modified or amended any Material Contract other than terminations due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such Material Contract;

(ii)    (A) purchased or otherwise acquired any material properties (including Real Property) or assets (tangible or intangible) or sold, leased, licensed, transferred, abandoned or otherwise disposed of any material Acquired Assets (including Intellectual Property) (or assets that would have been Acquired Assets if the Closing had occurred immediately before such action), except for purchases of materials, and sales of coal, coke and surplus equipment

inventory, in each case, in the Ordinary Course of Business, (B) permitted, allowed or suffered any of the Acquired Assets to be subjected to any Encumbrance (other than Permitted Encumbrances), or (C) removed any Equipment or other material assets from any of the Real Property other than in the Ordinary Course of Business;

(iii)    suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(iv)    made, revoked or changed any material Tax election, filed any material amended Tax Return, revoked or changed any material Tax accounting method, entered into any closing agreement within the meaning of Section 7121 of the Code, entered into or obtained any Tax ruling with or from a Taxing Authority, or settled any material Tax proceeding, in each case, with respect to the Acquired Assets, or caused any Controlled Specified Entity to do any of the foregoing;

(v)    changed in any material respect the Sellers' accounting methods, principles or practices other than required by changes in GAAP;

(vi)    allowed any material Permit held by any Seller to terminate, expire or lapse, except for Permits no longer needed for or used in the Business;

(vii)    hired any Employees having base or guaranteed compensation in excess of $200,000 annually or terminated any such Employee (other than for "cause");

(viii)    (A) increased the annual rate of base salary or any target bonus opportunity of any Employee whose annual rate of base salary prior to such increase was in excess of $200,000; (B) paid any bonus or other incentive compensation; (C) awarded any equity or equity-based compensation awards with respect to the equity of the Sellers or any of its Affiliates; (D) entered into, adopted, modified, amended or terminated any Benefit Plan; or (E) adopted any new arrangement or policy with respect to Employees that would be a Benefit Plan if it existed on the Execution Date, except, in the case of each of clauses (A) through (E), (i) to the extent permitted by any order of the Bankruptcy Court or as required by applicable Legal Requirements; (ii) to the extent required pursuant to the terms of any Benefit Plan, as in effect on the Execution Date; or (iii) for immaterial changes, modifications or amendments to Benefit Plans available to all employees generally (other than changes, modifications or amendments that, in the aggregate, materially increase the amount of benefits to be paid, or that materially accelerate the timing, of the payment of benefits); or

(ix)    agreed or committed in writing to do any of the foregoing.

5.24    Mining.

(a)    Except as would not, individually or in the aggregate, be material individually or in the aggregate to the Business, the Acquired Assets or, to the Sellers' Knowledge, the business operations or assets of any Controlled Specified Entity, or to the transfer of any Transferred Permit or the approval of the change of ownership and control of the Controlled Specified Entities with respect to the Controlled Specified Entities Permits, the Sellers, and, to the Sellers' Knowledge, the Controlled Specified Entities, have, in the amounts and forms required thereby,

obtained all performance bonds and surety bonds and related letters of credit, cash collateral and other collateral, lease bonds, or otherwise provided any financial assurance as (i) required under the applicable Mining Permits or Legal Requirements (including Mining Laws) for Reclamation of land, water or other natural resources at any property included in the Acquired Assets or any assets owned or operated by any Controlled Specified Entity, (ii) required pursuant to any applicable Mining Permit or Legal Requirements (including Mining Laws) to mitigate any actual or potential environmental impact at any property included in the Acquired Assets or any assets owned or operated by any Controlled Specified Entity, or (iii) otherwise required or desirable in the Ordinary Course of Business of the Sellers or the Controlled Specified Entities (collectively, the "Mining Financial Assurances"). Schedule 5.24(a) sets forth a complete and accurate list of all such Mining Financial Assurances held by or provided for the benefit of the Sellers or any Controlled Specified Entities and relating to the Acquired Assets, categorized by Transferred Permit or Acquired Asset, and including the name of the provider, amount provided and amounts of collateral held by provider. The Sellers and to the Sellers' Knowledge, the Controlled Specified Entities have posted or otherwise provided all Mining Financial Assurances that have been requested in writing by the applicable Governmental Authorities in respect of any applicable Permits and Legal Requirements having to do with Reclamation in connection with the Business subject to the discretion of any applicable Governmental Authority to require additional or supplemental Mining Financial Assurances from time to time (except for such requests that are being properly contested in good faith). None of the Mining Financial Assurances relating to any assets owned or operated by any Controlled Specified Entity require replacement as a result of the transactions contemplated by this Agreement.

(b) All Reclamation performed by or on behalf of any Seller or in connection with the Business or to the Sellers' Knowledge, by or in connection with the Controlled Specified Entities has been performed in a manner in compliance in all material respects with all Legal Requirements and meets in all material respects the requirements of the applicable Mining Permit and any associated mine Reclamation requirements of any applicable Governmental Authority. The liability for mine closing and Reclamation obligations recorded on the Unaudited Financial Statements of the Sellers made available to Buyer has been properly accrued in accordance with the requirements of Financial Accounting Standards Board Codification Topic 410, Asset Retirement and Environmental Obligations, formerly known as Financial Accounting Standard No. 143 ("FASB 410") and the amount of such liability is equal to or in excess of the amount of such obligations, determined on the basis of the Sellers' best estimates, including estimates prepared by third parties, or historic Reclamation and closure costs and mine life as of the Latest Balance Sheet Date and escalated for inflation, in accordance with FASB 410 and applicable Legal Requirements. All Mining Financial Assurances have been approved as adequate by the required Governmental Authority to complete Reclamation in accordance with all applicable Permits and Legal Requirements.

5.25 Buildings and Improvements. The buildings, improvements, load out facilities, structures and other fixtures, used in connection with the Business and Acquired Assets are in all material respects in good operating condition and state of repair, normal wear and tear excepted. Except as would not reasonably be expected to be material to the Business, no Seller has received written notice or, to the Sellers' Knowledge, oral notification (that has not been resolved or abandoned) which states that a Seller or any of its Subsidiaries is, with respect to the

Business or the Acquired Assets, in violation of any applicable building, zoning, subdivision, platting, fire, insurance, safety, health or other applicable laws or ordinances.

5.26 <u>Equipment and Fixed Assets</u>. The Sellers have good and marketable title to all Equipment and fixed assets, free and clear of all Encumbrances other than Permitted Encumbrances, except where the failure to have such good and marketable title would not reasonably be expected, individually or in the aggregate, to be material to the Business. Except as would not reasonably be expected to be material to the Business, all Equipment and fixed assets are in good operating condition and state of repair for the purposes for which they are used by the Sellers in the operation of the Business, normal wear and tear excepted.

5.27 <u>MSHA; OSHA</u>. For the past four (4) years, except for fully paid, discharged and settled citations and notices of violation by MSHA or other Governmental Authority, the Sellers, with respect to the Acquired Assets, have conducted their respective business and operations, and their respective assets have been maintained, in compliance in all material respects with MSHA or OSHA, as applicable. There are no Actions pending or, to the Sellers' Knowledge, threatened by any Governmental Authority or other third Person that would result in the imposition of any material Liability on any Seller pursuant to MSHA or OSHA. The Sellers do not owe any material assessments, penalties, fines, liens, charges, surcharges, nor are there any other material amounts due or owing pursuant to MSHA or OSHA, and there have been no imminent danger orders, unwarrantable failure orders, failure to abate orders, or cessation orders, notices of a pattern of violations, or material assessments, under MSHA or OSHA during the previous four (4) years with respect to the Business. <u>Schedule 5.27</u> sets forth all reports of any MSHA or OSHA audits of the Sellers and of any Subsidiaries, excluding any Subsidiaries that are Specified Entities Group Members, with respect to the Business performed within the previous four (4) years by any Person (including the Seller). <u>Schedule 5.27</u> sets forth all Orders issued under MSHA or OSHA with respect to the Sellers and of any Subsidiaries, excluding any Subsidiaries that are Specified Entities Group Members, together with any appeals thereof, with respect to the Business within the past three (3) years by any Governmental Authority. The Sellers have made available to Buyer copies of all Orders and reports under MSHA or OSHA within their possession, together with the minutes of all joint health and safety committee meetings within their possession, with respect to the Sellers for the past three (3) years.

5.28 <u>Coal Act; Black Lung Act</u>.

(a) The Sellers, with respect to the Business and Acquired Assets, and their "<u>related persons</u>" and "<u>successors in interest</u>" (each as defined in the Coal Act) are in compliance in all material respects with the Coal Act and any regulations promulgated thereunder except for any instances of non-compliance, and none of the Sellers or their "<u>related persons</u>" or "<u>successors in interest</u>" (each as defined in the Coal Act) has any Liability under the Coal Act, except as disclosed in the Unaudited Financial Statements or which would not, individually or in the aggregate, have a Material Adverse Effect, or with respect to premiums or other material payments required thereunder which have been paid when due, or which Liability is being contested in good faith by appropriate proceedings diligently conducted.

(b)       Sellers have satisfied all security obligations that may be imposed on Liabilities under the Coal Act and the Black Lung Act, including bonding, escrow, letter of credit, reserve or deposit obligations.

(c)       The Sellers are in compliance in all material respects with the Black Lung Act except for any instances of non-compliance and the Sellers have not incurred any, assumed or become liable for any Black Lung Liability, except as disclosed in the Unaudited Financial Statements or which would not, individually or in the aggregate, have a Material Adverse Effect, or with respect to premiums, contributions or other material payments required thereunder which have been paid when due or which Black Lung Liability is being contested in good faith by appropriate proceedings diligently conducted.

5.29    Warranties Exclusive. EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 5 OR IN ANY TRANSACTION DOCUMENT, AND EXCEPT IN THE CASE OF FRAUD, THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR THE BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Sellers, that:

6.1    Organization and Good Standing. Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2    Authority; Validity; Consents. Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the other Transaction Documents by Buyer and the consummation by Buyer of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is or will be a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is, or will be, a party constitute, or will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as required to

comply with the HSR Act or the Antitrust Laws of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business (including the Foreign Antitrust Approvals, if any) or as required to comply with the Securities Act of 1933 or the Securities Exchange Act of 1934, Buyer is not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, registrations, declarations or filings and consents, (i) the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby or (ii) as would be required by another similarly situated buyer of the Acquired Assets.

6.3    No Conflict. Neither the execution and delivery by Buyer of this Agreement or the Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer subject to compliance with (x) the HSR Act and the Antitrust Laws of each other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business (including the Foreign Antitrust Approvals, if any), (y) the Securities Act of 1933 or the Securities Exchange Act of 1934 and (z) such other requirements as would be required by another similarly situated buyer of the Acquired Assets, or (b) violate, conflict with, or result in a material breach of any of the terms of, or constitute a material default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority that has been made by or granted to Buyer

6.4    Brokers or Finders. Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated hereby for which any Seller (or any Affiliate of any Seller) is or will become liable, and Buyer shall hold harmless and indemnify the Sellers and their Affiliates from any claims with respect to any such fees or commissions.

6.5    Legal Proceedings. There is no Action or Order pending against, or to the knowledge of Buyer, threatened against or affecting, Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby and the other Transaction Documents or which would or would reasonably be expected to impair Buyer's ability to consummate the transactions contemplated hereby and the other Transaction Documents.

6.6    Qualification.

(a)     To the knowledge of Buyer, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)     As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts.

(c)     As of the Closing, and subject to the satisfaction of Section 10.3 and assuming the accuracy of Section 5.11(e), Buyer and/or each relevant Buyer Designee, as applicable, (i) will be eligible, subject to Section 7.6, to take transfer or assignment of, or obtain a replacement for, the Transferred Permits and/or (ii) will not have been denied any application for any Mining Permit or other Governmental Authorization, due to the application of the Applicant Violator System, other than any denial for violations that may reasonably be expected to be cured by the time of such transfer or obtaining of Permits as contemplated by Section 7.6.

6.7     Financial Capability. Buyer has provided to the Company a copy of (i) a direction letter (the "Direction Letter") from certain Directing Lenders (as defined therein) to GLAS Trust Company LLC as administrative agent under the Prepetition Superpriority Credit Agreement (the "Agent") pursuant to which, among other things, the Directing Lenders (as defined therein) have directed the Agent to deliver at Closing such portion of the Prepetition Superpriority Obligations as is necessary to allow for Buyer to pay the Purchase Price by exercising the Collateral Trustee's (as defined in the Direction Letter) rights that are assigned to Buyer and (ii) a direction letter from certain Directing Lenders (as defined therein) to U.S. Bank National Association, as Collateral Trustee (the "Collateral Trustee") pursuant to which, among other things, the Directing Lenders (as defined therein) have appointed the Agent as a sub-agent of the Collateral Trustee.

6.8     No Other Representations or Warranties; Condition of the Business; Buyer's Reliance. Buyer acknowledges that, except as expressly set forth in Article 5 hereof or in any Transaction Document (as modified by the Company Schedules) and except in the case of Fraud, neither the Sellers nor any other Person has, directly or indirectly, made any representation or warranty, statutory, expressed or implied, written or oral, at law or in equity, as to the accuracy or completeness of any information that the Sellers furnished or made available to Buyer and its Representatives in respect of the Business, and the Sellers' operations, assets, stock, Liabilities, condition (financial or otherwise) or prospects. Except as set forth in Article 5 hereof or in any Transaction Document and except in the case of Fraud, Buyer acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis. Buyer acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Acquired Assets (including Buyer's own estimate and appraisal of the extent and value of the Acquired Assets and an independent assessment and appraisal of the environmental risks associated with the acquisition of the Acquired Assets). Buyer hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Action of any kind against Sellers or any of their respective Affiliates or Subsidiaries, alleging facts contrary to the foregoing acknowledgment and affirmation.

6.9    <u>Information</u>. Buyer has conducted such investigations of the Sellers, the Acquired Assets and the Assumed Liabilities as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transaction contemplated hereby and thereby. Except for rights under this Agreement or any Transaction Document, and except in the case of Fraud, none of the Sellers or any other Person (including any officer, director, member or partner of the Sellers or any of their respective Affiliates) shall have or be subject to any liability to Buyer, resulting from Buyer's use of any information, documents or material made available to Buyer in any "<u>data rooms</u>," management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by the other Transaction Documents.

6.10    <u>Warranties Exclusive</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>ARTICLE 6</u>, AND EXCEPT IN THE CASE OF FRAUD, BUYER MAKES NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS OR BUSINESS, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

## ARTICLE 7
## ACTIONS PRIOR TO THE CLOSING DATE

7.1    <u>Access and Reports; Confidentiality</u>.

(a)    During the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of <u>Article 12</u>, the Sellers shall (i) afford Buyer and its Representatives reasonable access to its personnel, properties, books, Permits, Contracts and records, and furnish promptly to Buyer all available information concerning the Acquired Assets, the Business, Assumed Liabilities, properties, any Benefit Plans and personnel as may be reasonably requested in connection with the transactions contemplated hereby, and shall use commercially reasonable efforts to cause the Specified Entities Group Members to provide equivalent access; (ii) furnish to Buyer such financial and operating data and other information relating to the Sellers, the Business and the Acquired Assets (including documents and information with respect to any significant pending or threatened Action or Orders or any liabilities or obligations arising under Environmental, Health and Safety Laws relating thereto) as may be reasonably requested, and use commercially reasonable efforts to furnish the same with respect to the Controlled Specified Entities and their business; (iii) permit Buyer to make such reasonable inspections and, at Buyer's sole cost and expense, copies thereof as Buyer may require and (iv) instruct the executive officers and senior business managers, employees, counsel, auditors and financing advisors of the Sellers to reasonably cooperate with Buyer and its Representatives regarding the same; <u>provided</u>, that any such access shall be conducted consistent with and not in violation of the Bidding Procedures Order, during regular business hours, upon reasonable advance notice and in a manner not to unreasonably interfere with the conduct of the Business. All requests for information made pursuant to this <u>Section 7.1</u> shall be directed to John Startin (john.startin@evercore.com), Andrew Frame (andrew.frame@evercore.com) and Pavel Te (pavel.te@evercore.com) or such other person as designated by such person or the Company. Notwithstanding the foregoing, (A)

Buyer and its Representatives shall not have access to personnel records of the Sellers nor the Controlled Specified Entities relating to individual performance or evaluation records, medical histories or other personnel information which in the Company's good faith opinion could reasonably be expected to subject a Seller to risk of liability and (B) Buyer and its Representatives shall not conduct or cause to be conducted any sampling, testing or otherwise surface or subsurface invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media related to the Real Property, Business and the Acquired Assets, except with the prior written consent of the Company not to be unreasonably withheld. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the Execution Date shall affect or be deemed to modify any representation or warranty made by the Sellers herein.

(b)     Notwithstanding the foregoing, but subject in all respects to the Bidding Procedures Order, this Section 7.1 shall not require the Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that the Sellers would be entitled to assert to be undermined or waived with respect to such information or (ii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that in the case of clause (i), the Parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege or work product protection to be undermined with respect to such information or (B) could reasonably be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

(c)     Buyer shall, and shall use commercially reasonable efforts to cause its Affiliates and Representatives to, hold all documents and information concerning the Business or the Acquired Assets furnished to Buyer or its Affiliates in connection with the transactions contemplated hereby (including any information provided pursuant to this Section 7.1) and the other Transaction Documents confidential in accordance with the confidentiality provisions (including any exceptions or limitations set forth therein) of the DIP Credit Agreement.

7.2     Operations Prior to the Closing Date. The Sellers covenant and agree that, except (a) as expressly contemplated hereby, (b) as disclosed on Schedule 7.2(a), (c) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), or (d) as otherwise required or restricted by Legal Requirements after the Execution Date and prior to the Closing Date:

(a)     The Sellers shall:

(i)     carry on the Business in the Ordinary Course of Business of the Sellers and use commercially reasonable efforts to maintain, preserve and protect the Acquired Assets in the condition in which they exist on the Execution Date, except for ordinary wear and tear and

except for replacements, modifications or maintenance in the Ordinary Course of Business of the Sellers;

(ii) maintain their books, accounts and records in the Ordinary Course of Business of the Sellers;

(iii) use commercially reasonable efforts to pay all post-petition trade payables and collect all Accounts Receivable after the Petition Date, in each case in the Ordinary Course of Business;

(iv) use commercially reasonable efforts to (A) retain employees who are in good standing and are necessary to conduct the Business as it is currently being conducted (provided, however, that the issuing of WARN Act notices as contemplated hereunder shall not be a violation of this provision and provided, further, that this provision shall not be interpreted to require the Sellers to provide any enhanced compensation or benefit to such employees) and (B) maintain their relationships with, and preserve for the Business the goodwill of, their key suppliers and customers;

(v) (A) use commercially reasonable efforts to comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) use commercially reasonable efforts to comply in all material respects with contractual obligations applicable to or binding upon them pursuant to any Material Contracts (other than those obligations the compliance with which is excused during the Bankruptcy Cases) and (C) use commercially reasonable efforts to maintain in full force and effect all Permits and comply with the terms of each such Permit;

(vi) use commercially reasonable efforts to cause any of their current directors and officers liability, property or casualty insurance policies with respect to the Business or that apply to any of the Acquired Assets not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(vii) use commercially reasonable efforts to maintain, preserve and protect in full force and effect the existence of all material Owned Intellectual Property included in the Acquired Assets; and

(viii) except in accordance with the Bidding Procedures, use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of the Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

(b) The Sellers shall not:

(i) take any action enumerated in Section 5.23(b) (other than Section 5.23(b)(iii) and Section 5.23(b)(iv)), except as set forth on Schedule 7.2(b);

(ii)    make, revoke or change any material Tax election, file any amended material Tax Return, revoke or change any material Tax accounting method, enter into any closing agreement within the meaning of Section 7121 of the Code, enter into or obtain any Tax ruling with or from a Taxing Authority or settle any material Tax proceeding, in each case, with respect to the Acquired Assets, or, other than as required by Legal Requirements, cause any of the Controlled Specified Entities (other than the Foresight Entities) to do any of the foregoing;

(iii)    remove any Acquired Asset from any Real Property or other location of the Business such that the Acquired Asset is no longer located within any property of the Business that is an Acquired Asset, except for sales of inventory, maintenance and repair of Acquired Assets, warehousing of Acquired Assets and removal of old and obsolete Equipment, in each case, in the Ordinary Course of Business;

(iv)    waive, release, assign, settle or compromise any rights or claims that constitute Acquired Assets to the extent any such actions, individually or in the aggregate, would be material to the Business, or any material litigation or arbitration that constitute Acquired Assets;

(v)    except as set forth in Section 8.6(e), enter or commit to enter into or amend any Collective Bargaining Agreement or other labor agreement with any Union or other labor organization;

(vi)    assume, reject or assign any Material Contract other than pursuant to Section 2.5;

(vii)    enter into or renew any Contract other than (i) Contracts entered into or renewed with the prior written consent of Buyer or (ii) Contracts entered into or renewed in the Ordinary Course of Business of the Sellers, provided, that in the case of this clause (ii), (A) such Contracts are not reasonably anticipated to result in (x) annual expenditures or receipts in excess of $5,000,000 for any given Contract (or set of related Contracts) or (y) aggregate expenditures or receipts in excess of $10,000,000 for any given Contract (or set of related Contracts) for the term of such Contract and (B) the entry into or renewal of such Contracts shall be promptly noticed to Buyer in writing (the Contracts in clauses (i) and (ii), (the "Permitted New Contracts")); provided, further, that nothing in this Section 7.2(b)(vii) shall (x) restrict the Sellers' ability to enter into any Contracts that are necessary (in the Sellers' reasonable discretion) to address any emergency that threatens health, safety or the environment and (y) to the extent a consent of Buyer is required pursuant to this Section 7.2(b)(vii), if Buyer does not respond within three (3) Business Days following its receipt of such request (which must be made in accordance with Section 13.4) it shall be deemed to have consented to such action; or

(viii)    agree or commit to do any of the foregoing.

7.3    Regulatory Matters; Cooperation.

(a)    The Sellers, on one hand, and Buyer, on the other hand, shall cooperate, and reasonably determine upon the advice of counsel within fifteen (15) Business Days of the Execution Date, other than the notifications required to be filed under the HSR Act, any notifications, filings, consents, clearances, waivers, waiting periods and approvals, if any,

required under any applicable Antitrust Law in connection with the transactions contemplated by this Agreement (including by any persons that will hold, directly or indirectly, any equity interest in Buyer as of or immediately after the Closing) (the "Foreign Antitrust Approvals"). Subject to Section 7.3(c), as soon as reasonably practicable (and, with respect to any notification required to be filed under the HSR Act, within ten (10) Business Days, or a later date as agreed by the Parties) after the Execution Date, the Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed under the HSR Act and any Foreign Antitrust Approvals, and request early termination of the waiting periods applicable to such notifications. Buyer shall, on the one hand, and the Sellers, on the other hand, shall promptly respond to any requests for additional information or documentary materials in connection with such filings and shall take all commercially reasonable actions necessary to cause the waiting periods applicable to such notifications to terminate or expire at the earliest practicable date after the date of filing. The Sellers shall be responsible for payment of the applicable filing fees for the Buyer's acquisition of the Acquired Assets or the Businesses contemplated hereby under the HSR Act or Foreign Antitrust Approvals (but the Sellers shall not be responsible for the filing fees of persons, other than the Buyer, that will hold, directly or indirectly, any equity interest in Buyer as of or immediately after the Closing), and except as otherwise expressly provided in this Agreement or any order of the Bankruptcy Court, each Party shall be responsible for any other payment of its own respective costs and expenses incurred by such Party (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

(b)     Subject to the provisions of Section 7.5(h), including the limitations set forth therein, the Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to obtain (and Buyer shall cause its Subsidiaries to use reasonable best efforts to obtain), at the earliest practicable date, all necessary Governmental Authorizations and all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities and any change in control requirements relating to any consent decrees, decisions, judgments, settlements, consent orders, stipulations, decrees or similar orders relating to the Acquired Assets, if any) and use reasonable best efforts to avoid any Action by any Governmental Authority. Subject to the provisions of Section 7.5(h), including the limitations set forth therein, in addition to such actions, the Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take (and Buyer shall cause its Subsidiaries to use reasonable best efforts to take), or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner reasonably practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following: (i) cause the conditions precedent set forth in Article 9, Article 10 and Article 11 to be satisfied, (ii) defending of any Actions challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, (iii) take all acts necessary in connection with meeting with any Governmental Authority regarding the transferring of the Transferred Permits and (iv) executing and delivering any additional instruments reasonably necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(c)     The Sellers, on the one hand, and Buyer, on the other hand, (i) to the extent permissible, shall promptly inform each other of any material communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) to the extent permissible, shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless, to the extent permissible, such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent reasonably practicable. Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and the Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

7.4     <u>Tax Cooperation</u>. Prior to the Closing, the Sellers and Buyer agree to furnish or cause to be furnished to the other, upon reasonable request and at the requesting party's expense for any out-of-pocket costs, as promptly as reasonably practicable, information and assistance relating to the Acquired Assets, including access to books and records (including any Tax Records), as is reasonably necessary in connection with (a) the preparation or filing of any Tax Return by Buyer or the Sellers, (b) the making of any Tax election by Buyer or the Sellers, (c) Buyer or the Sellers' claim for any Tax Refund, (d) the determination of liability for Taxes, and (e) any audit, examination or other proceeding in respect of Taxes related to the Acquired Assets or the Business. The Sellers and their respective Affiliates shall (i) abide by all record retention agreements entered into with any Taxing Authority, and (ii) give Buyer thirty (30) days' written notice prior to transferring, destroying or discarding any Tax Records solely or primarily related to the Acquired Assets and, if Buyer so requests, shall allow Buyer to take possession of such Tax Records.

7.5     <u>Bankruptcy Court Matters</u>.

(a)     <u>Qualified Bids</u>. Subject to the terms of the Bidding Procedures Order, on or prior to March 16, 2020 (or such later date as agreed in writing by all of the Parties hereto, which may be by email correspondence among counsel) (the "<u>Bid Deadline</u>"), any and all Qualified Bids shall have been submitted pursuant to the Bidding Procedures Order.

(b)        Auction. Subject to the terms of the Bidding Procedures Order, on or prior to March 26, 2020 (or such later date as agreed in writing by all of the Parties hereto, which may be by email correspondence among counsel), the Sellers shall commence the auction contemplated by the Bidding Procedures, if any Qualified Bid is submitted prior to the Bid Deadline.

(c)        Filing of Confirmation Order. On or prior to June 2, 2020 (or such later date as agreed in writing by all of the Parties hereto), the Sellers shall file with the Bankruptcy Court a proposed form of Confirmation Order, in form and substance acceptable to the Company and Buyer.

(d)        Plan. The Sellers covenant and agree that the terms of any Plan submitted by the Sellers to the Bankruptcy Court (including any amended Plan previously submitted by the Sellers to the Bankruptcy Court) for confirmation shall require the prior written consent of Buyer.

(e)        Hearing. On or prior to June 8, 2020, the Bankruptcy Court shall hold a hearing to consider approval of the Confirmation Order, in form and substance acceptable to the Company and Buyer, in each case solely to the extent Buyer is the Successful Bidder or the Back-Up Bidder. In connection therewith, the Sellers shall take all commercially reasonable steps as may be necessary or appropriate to permit the Bankruptcy Court to approve the Confirmation Order at the Hearing or as promptly as practicable thereafter.

(f)        Reasonable Efforts. The Sellers shall use reasonable best efforts to (i) obtain entry of the Bidding Procedures Order and an order of the Bankruptcy Court (the "Disclosure Statement Order") approving the disclosure statement related to the Plan (the "Disclosure Statement"), (ii) promptly commence solicitation on the Plan upon entry of the Disclosure Statement Order, and (iii) (A) facilitate the solicitation, confirmation and consummation of the Plan and the transactions contemplated hereby, (B) obtain entry of the Confirmation Order and (C) consummate the Plan.

(g)        Confirmation Order. The Sellers shall use reasonable best efforts to cause the Bankruptcy Court to enter a Confirmation Order, in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Company and Buyer, on or prior to June 8, 2020 (or such later date as agreed in writing by all of the Parties hereto). The Sellers acknowledge and agree, and the Confirmation Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising Liabilities and Encumbrances of, against or created by the Sellers or their bankruptcy estates, shall be fully released from and with respect to the Acquired Assets, which shall be transferred to Buyer free and clear of all Liabilities and Encumbrances except for Permitted Encumbrances and Buyer (or a Buyer Designee) shall at Closing be required to assume the Assumed Liabilities as set forth hereunder. The Sellers covenant and agree that if the Confirmation Order is entered, they will pursue the transactions contemplated by the Confirmation Order and in this Agreement.

(h)        Bankruptcy Filings. From and after the Execution Date and until the Closing Date, the Sellers shall deliver to Buyer, at least two (2) Business Days in advance of the Sellers' filing or submission thereof, drafts of any and all pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with or related to this Agreement for Buyer's prior review and comment, including any Tax motions, and such

filings shall be acceptable to Buyer to the extent they relate to the Business, the Acquired Assets, any Assumed Liabilities or the transactions contemplated hereby, including any of Buyer's rights or obligations hereunder. The Sellers shall use reasonable best efforts to consult and cooperate with Buyer regarding (i) any such pleadings, motions, notices, statements, schedules, applications, reports or other papers, (ii) any discovery taken in connection with seeking entry of the Disclosure Statement Order or Confirmation Order (including any depositions) and (iii) any hearing relating to the Disclosure Statement Order or Confirmation Order, including the submission of any evidence, including witness testimony, in connection with such hearing. The Sellers agree to diligently prosecute the entry of the Disclosure Statement Order and Confirmation Order as provided herein. In the event the entry of the Bidding Procedures Order, Disclosure Statement Order, Confirmation Order or any other Order reasonably necessary in connection with the transactions contemplated by this Agreement shall be appealed, the Sellers shall use their reasonable best efforts to defend such appeal. The Sellers shall comply with all notice requirements (i) of the Bankruptcy Code, the Bankruptcy Rules and the Bidding Procedures Order or (ii) imposed by the Confirmation Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(i)     Contracts. The Sellers shall serve on all non-Seller counterparties to all of their Available Contracts no later than May 4, 2020 a Cure Notice stating that the Sellers are or may be seeking the assumption and assignment of such Available Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the amount of Cure Costs proposed by the Sellers, if any, which deadline shall be the objection deadline for the Hearing or the date that is fourteen (14) days after the service of the Supplemental Assumption Notice (as defined in the Bidding Procedures Order), as applicable. The Sellers shall seek authority to assume and assign, or sell and transfer, as applicable, to Buyer the Assumed Contracts. At Closing, the Sellers shall assume and assign or sell and transfer to Buyer the Assumed Contracts. From the Execution Date until the Closing, the Sellers shall not seek Bankruptcy Court approval to reject any Available Contract unless agreed to in writing by Buyer. Additionally, the Sellers shall file with the Bankruptcy Court such motions or pleadings as may be appropriate or otherwise as may be reasonably requested by Buyer to preserve the Sellers' right or ability to assume and assign any of the Available Contracts (including without limitation, pursuant to Section 365(d)(4) of the Bankruptcy Code) prior to or after the Closing in accordance with this Agreement.

7.6     Surety Bonds; Permits.

(a)     As promptly as reasonably practicable after the Execution Date and, in any event, no later than the earlier of the Closing Date or as required by applicable Legal Requirements, the Sellers and Buyer shall cooperate to prepare, at the Sellers' sole cost and expense to the extent incurred prior to the Closing Date, and at Buyer's sole cost and expense to the extent incurred on or after the Closing Date, all applications, notices, forms and other documents, including any advance approval documents, required to (i) transfer the Transferred Permits to Buyer or the relevant Buyer Designee (which shall include, to the extent necessary to permit Buyer to conduct the Business and operate the Acquired Assets pursuant to the Transferred Permits as of Closing, the necessary applications, notices, forms and other documents, including any advance approval documents, to appoint Buyer and/or the relevant Buyer Designee, as applicable, as the designated operator on the Transferred Permits with the appropriate Governmental Authority) and (ii) obtain the approval by all applicable Governmental Authorities of the change of ownership and control

of the Specified Entities Group Members with respect to the Specified Entities Permits (collectively, the "Permit Applications") and shall deliver such Permit Applications to Buyer for approval, such approval not to be unreasonably withheld. Buyer shall cooperate with Sellers to provide information relating to Buyer or any applicable Buyer Designee(s) required to complete the Permit Applications. Buyer shall submit such completed and approved Permit Applications to the appropriate Governmental Authorities as soon thereafter as reasonably practicable and legally permissible in accordance with applicable Legal Requirements. Buyer and/or the relevant Buyer Designee, as applicable, shall use commercially reasonable efforts to take, or cause to be taken, all actions and do, or cause to be done, at the Sellers' sole cost and expense to the extent incurred prior to the Closing Date, and at the Buyer's sole cost and expense to the extent incurred on or after the Closing Date, all things necessary or desirable under applicable Legal Requirements to put in place with the appropriate Governmental Authorities as promptly as commercially reasonably possible after the filing of the applicable Permit Applications (but no earlier than the later of (i) such time as the applicable Governmental Authorities have provided notice of intent to approve the transfer of the applicable Transferred Permits, unless any such Governmental Authorities require they be put in place at an earlier time as a condition to such Governmental Authorities commencing or continuing their review of the applicable Permit Applications, and (ii) the Closing) financial assurances necessary to transfer such Transferred Permits from the Sellers and their Affiliates to Buyer and/or the relevant Buyer Designee, as applicable; provided, that neither Buyer nor the relevant Buyer Designee, nor their respective Affiliates, shall be obligated to take or consummate a transfer of any of the Transferred Permits if (y) such Transferred Permits are not primarily related to any of the Acquired Assets and Buyer so elects not to have them be transferred, in which case such Transferred Permits will not be considered Transferred Permits notwithstanding anything in this Agreement to the contrary, or (z) any Governmental Authority (I) seeks to impose new or additional conditions to any Transferred Permits that would materially increase the cost of compliance or operating a covered operation or (II) demands an increase in the amount of any bond or other security for any such Transferred Permits and, in either case, Buyer so elects, in which case such Transferred Permits will not be considered Transferred Permits notwithstanding anything in this Agreement to the contrary. The Sellers agree to provide any cooperation reasonably requested by Buyer to complete the transfer of the Transferred Permits, obtain the approval of all applicable Governmental Authorities of the change of ownership and control of the Specified Entities Group Members with respect to the Specified Entities Permits (including, to the extent necessary, causing the Specified Entities Group Members to take all actions necessary to obtain such approval, including providing necessary information and preparing and executing necessary documentation) and complete the appointment of Buyer and/or the relevant Buyer Designee, as applicable, as approved or designated operator. The Sellers and Buyer and/or the relevant Buyer Designee shall be subject to the Permit Transfer Agreement in connection with the transfer of the Transferred Permits, the appointment of Buyer and/or the relevant Buyer Designee, as applicable, as approved or designated operator and obtaining the approvals of applicable Governmental Authorities of the change of ownership and control of the Specified Entities Group Members with respect to the Specified Entities Permits, which Permit Transfer Agreements shall provide for the assumption of Liabilities with respect to the Transferred Permits by Buyer or the relevant Buyer Designee consistent with and subject to the terms of this Agreement.

(b)      The Sellers shall pay or otherwise resolve all Excluded Pre-Closing Fines timely and the Sellers shall have all rights to negotiate and settle the resolution of the Excluded Pre-

Closing Fines, and will coordinate with Buyer in, and keep Buyer reasonably informed of, such negotiations and settlements; provided, that the Sellers shall not resolve any Excluded Pre-Closing Fines without Buyer's consent (not to be unreasonably withheld) if such settlement or resolution would materially modify or materially affect the Transferred Permits or the ongoing operation of the Business or the Acquired Assets.

(c)    Notwithstanding anything to the contrary in this Agreement (including this Section 7.6), if any of the Transferred Permits encompasses or pertains to or would impose liability on Buyer or any Buyer Designee for any Excluded Asset or Excluded Liability or any acreage or operations other than the Acquired Assets (collectively, "Overlapping Permit Property" and such Transferred Permits, "Overlapping Transferred Permits"), the Sellers and Buyer or Buyer Designees (as the case may be), as their interests appear, shall diligently cooperate in the filing of all applications, notices, forms and other documents with the appropriate Governmental Authority required to complete an incidental boundary revision, an overpermit, an overlap or another similar permitting action, in each case reasonably acceptable to Buyer, to remove all Overlapping Permit Property from the applicable Transferred Permits.

(d)    At the Closing, the Sellers shall execute and deliver to Buyer limited powers of attorney in form reasonably satisfactory to Buyer appointing Buyer and/or any applicable Buyer Designee(s) to act as the Sellers' attorney-in-fact for all purposes related to filing notification of the change of control with respect to the Specified Entities Permits and/or obtaining approval of the transfer of the Transferred Permits to Buyer and/or any applicable Buyer Designee(s) contemplated hereby; provided, however, that such limited powers of attorney shall not permit Buyer to subject the Sellers to any Liability other than those contemplated in the Transaction Documents.

(e)    Any Permits of the Sellers or their Affiliates that are related to the Business and are reasonably determined by Buyer or any Buyer Designee to be necessary for the operation of the Business or the Acquired Assets shall, at the election of Buyer, constitute Transferred Permits under this Agreement and be subject to this Section 7.6 to the extent such permits are transferable or assignable.

(f)    On or prior to the Closing, the Parties will negotiate in good faith the terms of the Permit Transfer Agreements.

7.7    Sale Free and Clear. The Sellers shall use commercially reasonable efforts to cause the Confirmation Order to provide, pursuant to Section 363(f) of the Bankruptcy Code, that on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all obligations, Liabilities and Encumbrances arising from any coal severance or ad valorem real property taxes, and all successor liability, including any successorship obligations under any Collective Bargaining Agreement that is not a Buyer Existing/Modified CBA, and/or with respect to any Benefit Plan or the Coal Act) of, against or created by the Sellers or their bankruptcy estate, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, pursuant to Section 363(f) of the Bankruptcy Code, free and clear of all obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all obligations, Liabilities and

Encumbrances arising from any coal severance or ad valorem real property taxes, and all successor liability, including any successorship obligations under any Collective Bargaining Agreement that is not a Buyer Existing/Modified CBA, and/or with respect to any Benefit Plan or the Coal Act), other than the Permitted Encumbrances.

       7.8     <u>Funded Liabilities; Wind-Down Amount; Adjusted Wind-Down Amount</u>.

       (a)     Buyer and the Company shall negotiate in good faith to mutually agree upon the amount of the Funded Liabilities (which, for the avoidance of doubt, shall include a breakdown of the amount of each of the Liabilities that constitutes a part of the Funded Liabilities) for all purposes of this Agreement and such amount shall be disclosed in a supplement to the Plan that is filed at least fourteen (14) days prior to the first day of the hearing to consider confirmation of the Plan.

       (b)     The Required Consenting Superpriority Lenders and the Company shall negotiate in good faith to mutually agree, by no later than fourteen (14) days prior to the first day of the hearing to consider confirmation of the Plan, upon the amount of cash necessary to fund costs for the wind down of the Sellers' bankruptcy estates not including any Funded Liabilities (the "<u>Wind Down Expenses</u>", and the amount of such Wind Down Expenses, the "<u>Wind-Down Amount</u>"), and such amount shall be disclosed in a supplement to the Plan that is filed at least fourteen (14) days prior to the first day of the hearing to consider confirmation of the Plan.

       (c)     By written notice to the Company no later than five (5) Business Days prior to the Closing, Buyer shall elect, in its sole discretion, (i) which of the Funded Liabilities (including, for the avoidance of doubt, which of the Cure Costs in respect of Assumed Contracts) shall be assumed by Buyer as an Assumed Liability hereunder (the "<u>Assumed Funded Liabilities</u>") and (ii) which of the Funded Liabilities (including, for the avoidance of doubt, which of the Cure Costs in respect of Assumed Contracts) shall not be assumed by Buyer (and shall be treated as an Excluded Liability) (the "<u>Excluded Funded Liabilities</u>"), in which case, in the case of this clause (ii), the Wind-Down Amount shall be adjusted upward dollar for dollar by the amount of the Excluded Funded Liabilities (net of any associated refunds, credits or similar benefits utilized or reasonably expected to be utilized by Sellers) (the Wind-Down Amount as so adjusted, the "<u>Adjusted Wind-Down Amount</u>"); <u>provided</u>, that if the cash and cash equivalents of the Sellers at the Closing is less than the Adjusted Wind-Down Amount (any such shortfall, the "<u>Shortfall Amount</u>") then Buyer shall at its election either (a) at Closing, fund all or a portion of such Shortfall Amount (any such portion, the "<u>Funded Shortfall Amount</u>") into the Sellers' estates (which shall be paid as set forth in <u>Section 4.2(f)</u>) for purposes of facilitating the wind down of Sellers' bankruptcy estates (and in order to provide such funding, the Adjusted Wind-Down Amount shall be adjusted accordingly) or (b) at Closing assume additional Funded Liabilities; <u>provided</u>, that in combination the actions under clauses (a) and (b) shall be in an amount necessary to ensure that no Shortfall Amount exists. For purposes of this Agreement, the "<u>Final Wind-Down Amount</u>" means (i) the Wind-Down Amount determined pursuant to <u>Section 7.8(b)</u>, if no adjustment to the Wind-Down Amount is required to be made pursuant to this <u>Section 7.8(c)</u>, or (ii) if such an adjustment is necessary, the Adjusted Wind-Down Amount as determined pursuant to this <u>Section 7.8(c)</u>.

(d)     At Closing, the Company shall cause cash in an amount equal to the Final Wind-Down Amount to be placed in an account it so designates (the "Wind-Down Account"). The Final Wind-Down Amount shall be used solely to fund the Wind-Down Expenses and the Excluded Funded Liabilities. Any funds remaining in the Wind-Down Account after payment of the expenses described in the preceding sentence of this Section 7.8(d) shall be transferred to Buyer.

(e)     Any funds received by Buyer pursuant to Section 7.8(d) shall constitute a decrease of the Purchase Price for U.S. federal income Tax purposes, unless otherwise required by applicable law.

7.9     Transition Services. On or prior to the Closing, the Parties will negotiate in good faith the terms of the TSA. The form of the TSA shall be disclosed in a supplement to the Plan that is filed prior to the first day of the hearing to consider confirmation of the Plan.

7.10     Insurance Policies.  As promptly as reasonably practicable after the Execution Date, the Sellers and Buyer shall in cooperation with each other use commercially reasonable efforts to obtain, at Buyer's sole cost and expense (to the extent such cost or expense is payable after the Closing), insurance policies to cover the Business and the Acquired Assets from and after Closing, including directors and officers liability and property and casualty insurance policies, in each case on terms reasonably satisfactory to Buyer.

# ARTICLE 8
## ADDITIONAL AGREEMENTS

8.1     Taxes.

(a)     Buyer shall assume responsibility for, and shall bear and pay, all Transfer Taxes that are not eliminated through the application of Section 1146(a) of the Bankruptcy Code. The Sellers and Buyer shall reasonably cooperate to (i) mitigate and/or eliminate the amount of Transfer Taxes resulting from the transactions contemplated herein and (ii) timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Buyer shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by any Seller, Buyer shall deliver it to such Seller not less than ten (10) Business Days before the due date thereof, and the Seller shall reasonably promptly, and in no event less than three (3) days before the due date thereof execute such Tax Return and return it to Buyer.

(b)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (x) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, or payroll or receipts Tax, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date, and (y) in the case of any Taxes other than Taxes specified in (x), deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the

number of days in the entire Straddle Period. The amount of any item that is taken into account only once for each taxable period (e.g., the benefit of graduated Tax rates, exemption amounts, etc.) shall be allocated between the two portions of the Straddle Period in proportion to the number of days in each portion.

(c)     After the Closing, Buyer and the Sellers agree to cooperate and to furnish or cause to be furnished to each other, upon reasonable request, as promptly as reasonably practicable, such information and assistance relating to the Business, the Acquired Assets and the Assumed Liabilities (including access to books and Tax Records and related working papers dated before the Closing) as is reasonably necessary for financial reporting, the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer or the Sellers of any federal, state or local business tax credits or incentives that Buyer or the Sellers may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that Buyer shall not be required to disclose the contents of its income Tax Returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(c) shall be borne by the Party requesting it. Buyer and the Sellers shall retain all Tax Records relating to the Acquired Assets and Assumed Liabilities for a period at least three (3) years following the Closing Date. On or after the end of such period, each Party shall provide the other with at least ten (10) Business Days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records.

(d)     Subject, for the avoidance of doubt, to Section 3.3, each Seller (or any Affiliate thereof) shall reasonably promptly pay to Buyer any Tax Refunds it receives that are described in Section 2.1(aa), and Buyer (or any Affiliate thereof) shall reasonably promptly pay to the applicable Seller any Tax Refunds it receives that are described in Section 2.2(n).

8.2     Partnership Audit Rules. Notwithstanding anything herein to the contrary, after the Closing, none of Buyer or its Affiliates shall cause any Specified Entity to make an election under Section 1101(g)(4) of the Bipartisan Budget Act of 2015 for any taxable year ended on or prior to December 31, 2017, without the prior written consent of the Company (which consent may be withheld in the Company's sole discretion for any reason).

8.3     Alternative Transaction Structure. The parties hereto agree that if Buyer delivers written notice of an election to invoke this Section 8.3 at any time prior to ten (10) Business Days prior to the Closing (an "Alternative Transaction Structure Election"), and if the Company consents to such election prior to Closing (such consent not to be unreasonably withheld, conditioned, or delayed), the acquisition of the Acquired Assets specified in such Alternative Transaction Structure Election by Buyer from the Sellers shall not occur by way of the acquisition of such Acquired Assets, but rather shall occur through the purchase by Buyer and sale by one or more Sellers of all of the equity interests of the Seller(s) that directly or indirectly own such Acquired Assets  (the "Alternative Transaction Structure"); provided, that the assets indirectly acquired pursuant to the Alternative Transaction Structure shall constitute substantially all of the Acquired Assets that would have otherwise been acquired from the applicable Sellers pursuant to this Agreement (in the absence of this Section 8.3). In the event of an Alternative Transaction Structure Election by Buyer which is consented to by the Company, the Parties

agree to enter into an amendment to this Agreement to the extent necessary to implement such Alternative Transaction Structure in a manner which is mutually agreeable to Buyer and the Company; provided, that it is understood that such amendment shall provide that prior to the consummation of the transaction pursuant to the Alternative Transaction Structure, the Sellers shall use their reasonable best efforts to remove all assets and liabilities that would be Excluded Assets and Excluded Liabilities pursuant to this Agreement from the relevant entities. For avoidance of doubt, the parties hereto acknowledge and agree that to the extent that the purchase and sale of the equity interests of one or more Sellers pursuant to the Alternative Transaction Structure is a taxable sale of such stock by one or more Sellers for U.S. federal income tax purposes, then no election under Section 338 of the Code (including Section 338(h)(10) of the Code) shall be made with respect to such sale. Notwithstanding anything in this Agreement to the contrary, the Company may withhold its consent from an Alternative Transaction Structure Election in its sole discretion if the structuring of the transactions contemplated by this Agreement in the manner contemplated by such Alternative Transaction Structure Election would be adverse (other than by a de minimis amount) to the Sellers as compared to the consequences to the Sellers if such Alternative Transaction Structure Election were not made.

8.4     Bulk Sales. The Sellers shall use commercially reasonable efforts to cause the Confirmation Order to provide either that (a) the Sellers have complied with the requirements of any Legal Requirement relating to bulk sales and transfer or (b) compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

8.5     Assumed Contracts: Adequate Assurance and Performance. Buyer shall, and shall cause its controlled Affiliates to, use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under Section 365 of the Bankruptcy Code. Buyer and the Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Representatives of Buyer and the Sellers available to testify before the Bankruptcy Court.

8.6     Employee Matters.

(a)     Employees. Prior to the Closing Date, Buyer shall set initial terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignment for Buyer Employees. Buyer shall determine which Employees, if any, to offer employment to, in its sole discretion. Only Employees who are offered and accept such offers of employment with Buyer based on the initial terms and conditions set by Buyer and further then actually commence employment with Buyer will become "Buyer Employees" after the Closing. The Sellers shall terminate, or shall cause to be terminated, on or prior to the Closing Date, the employment of all Employees who are offered and accept offers of employment with Buyer pursuant to this Section 8.6. For the avoidance of doubt, the terms and conditions of employment for any Buyer Employees covered by a Buyer Approved CBA, if any, shall be governed by such Buyer Approved CBA until its expiration, modification or termination in accordance with its

terms or applicable law. Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment. Except as described in the remaining sentences of this Section 8.6, the employment of each such Buyer Employee with Buyer will commence immediately after the Closing Date. In the case of any individual who is offered employment by Buyer and accepts such offer, but who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of any such individual with Buyer would commence upon his or her return to active work (provided, that such return to active employment occurs within ninety (90) days after the Closing Date), and such individual would become a Buyer Employee as of such date. Except as otherwise required by Legal Requirement, specified in this Agreement, or otherwise agreed in writing by Buyer, Buyer shall not be obligated to provide any severance, separation pay, or other payments, rights or benefits, including any key employee retention payments, to any Employee on account of any termination of such Employee's employment on or before the Closing Date, and such payments, rights and/or benefits (if any) shall remain obligations of the Sellers. Buyer is not and shall not be obligated to, and does not, accept or adopt any wage rates, employee benefits, employee policies, or any other terms and conditions of employment provided by Sellers prior to the Closing to any Buyer Employee other than as expressly set forth under a Buyer Existing/Modified CBA. Notwithstanding anything to the contrary herein, Buyer shall assume any vacation, sick leave, and/or personal time accrued but unused by the Buyer Employees as of the Closing Date to the extent any associated Liabilities are included as Assumed Funded Liabilities; provided, that any such assumed vacation, sick leave or personal time is taken pursuant to the applicable Buyer policies that cover the Buyer Employee after the Closing Date.

(b)     Access to Information. After the Execution Date, the Sellers shall provide Buyer and its Affiliates with reasonable access to the Employees and with information, including employee records and Benefit Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by Legal Requirement.

(c)     No Third Party Beneficiaries; Employment Status. All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective Parties. Nothing contained herein (i) shall confer upon any former, current or future employee of the Sellers or Buyer or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future Employee to be other than terminable at will or (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

(d)     WARN Act. With respect to Buyer Employees, Buyer will have full responsibility under the WARN Act relating to any act or omission of Buyer after the Closing Date. With respect to the Employees, the Sellers will have full responsibility under the WARN Act relating to any act or omission on or prior to the Closing Date, including responsibility for any WARN Act Liabilities that result from Employees' separation of employment from the Sellers and/or Employees not becoming Buyer Employees pursuant to this Section 8.6. Unless otherwise agreed to by the Sellers and Buyer, the Sellers agree to issue all WARN Act notices, in a form acceptable to Buyer, no later than sixty (60) days prior to the Closing Date, to the Employees and

all other parties required to receive notice under the WARN Act. Buyer shall not unreasonably withhold its consent to such form of WARN Act notices. To the extent practicable, Buyer shall provide the Sellers with sufficient advance notice to allow the Sellers to comply with their WARN Act notice obligations hereunder in the event that Buyer, to its knowledge, fails to offer employment to a sufficient number of Employees or offer terms of employment to a sufficient number of Employees that, in either event would reasonably be expected to constitute a constructive discharge under the WARN Act.

(e)    Collective Bargaining Agreements. The Sellers shall obtain the consent of Buyer before amending, modifying, waiving any provision of, assuming, renewing, extending the term of (other than short-term extensions of no more than thirty (30) days each, and no more than ninety (90) days in the aggregate, in each case, that do not affect any terms of the Collective Bargaining Agreement other than the term) or terminating any Collective Bargaining Agreement. For the avoidance of doubt, as of the Closing, Buyer will not accept or assume or otherwise be bound by or subject to any Collective Bargaining Agreements other than any Buyer Approved CBA as and to the extent set forth in this Agreement.

8.7    Post-Closing Books and Records and Personnel. From and after the Closing Date for a period of three (3) years, each Party shall provide the other Parties (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the assets, books, records, systems and other property and any employees of the other Parties so as to enable Buyer and the Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and to enable the Sellers to wind down their bankruptcy estates and Buyer to own and operate the Business and the Acquired Assets. During such three (3) year period, each Party (and their respective Representatives) shall be permitted to make copies of any books and records described in this Section 8.7, subject to the confidentiality requirements set forth in Sections 7.1 and 13.2. If any Party desires to dispose of any such books and records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove or copy such records to be disposed of at the removing Party's expense. Buyer and the Sellers shall retain such books and records for a period of six (6) years following the Closing.

8.8    Casualty Loss. Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is condemned or taken by eminent domain, or is damaged or destroyed by act of God, fire, explosion, collision, earthquake, windstorm, flood, terrorism or other casualty, the Sellers shall notify Buyer promptly in writing of such fact, and (a) in the case of condemnation or taking, the Sellers shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (b) in the case of acts of God, explosion, collision, earthquakes, windstorm, flood, terrorism or other casualty, the Sellers shall assign the insurance claims and proceeds therefrom to Buyer at the Closing; provided, that for the avoidance of doubt, Buyer shall not be entitled to both take assignment and payment of the proceeds resulting from the conditions described in the foregoing clauses (a) and (b) and remove any of the Acquired Assets that were the subject thereof from the Acquired Assets (or adjust the Purchase Price therefor) pursuant to Section 2.1. Notwithstanding the foregoing, the provisions of this Section 8.8 shall not in any way modify Buyer's other rights under this Agreement,

including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.9    Change of Name. Promptly following the Closing (and in any event no later than ten (10) days after the Closing Date), (a) each Seller shall, and shall cause its direct and indirect Subsidiaries to, discontinue the use of its current name and change its name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) to a name that does not include the word "Murray" or any other name or mark included in the Intellectual Property included in the Acquired Assets or any name or mark confusingly similar thereto (collectively, the "Restricted Names"), (b) the Sellers shall cause the names of the Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller as provided in the last sentence of this Section 8.9 and (c) the Sellers shall promptly notify Buyer of such name changes by the Sellers and all direct and indirect Subsidiaries of the Sellers; provided, however, that each Seller and each of its direct and indirect Subsidiaries may use any Restricted Names included on any business cards, stationery and other similar materials following the Closing for a period of up to sixty (60) days solely for purposes of winding down the affairs of each Seller, provided, that when utilizing such materials, other than in incidental respects, each Seller and each of its direct and indirect Subsidiaries shall use commercially reasonable efforts to indicate its new name and reference its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) as "formerly known as" or similar designation. From and after the Closing, except as otherwise expressly set forth in this Agreement (including this Section 8.9), each Seller covenants and agrees not, and to cause its direct and indirect Subsidiaries not, to use or otherwise employ any of the Restricted Names (other than as may be necessary for tax or regulatory filings or otherwise in connection with internal historical, archival, or record-keeping purposes). From and after the Closing, neither the Sellers nor any of their respective direct or indirect Subsidiaries shall challenge the ownership, validity or enforceability of any Restricted Names. Immediately following the Closing, the Sellers shall file, and shall cause their respective direct and indirect Subsidiaries to file, all necessary organizational amendments with the applicable Secretary of State of each such entity's jurisdiction of formation and in each State in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

8.10    No Successor Liability. The Parties intend that, upon the Closing, Buyer shall not be deemed to: (a) be the successor of, or related person, successor in interest or successor employer (as described under any applicable Legal Requirement) to, any of the Sellers, including, with respect to any Collective Bargaining Agreements (other than as expressly agreed to in writing by Buyer with respect to any Buyer Existing/Modified CBA) and any Benefit Plans, under the Coal Act, and any common law successor liability in relation to the UMWA Health and Retirement Funds, including the UMWA 1974 Pension Plan, including with respect to withdrawal liability; (b) have, de facto or otherwise, merged with or into the Sellers; (c) be a mere continuation or substantial continuation of the Sellers or the enterprise(s) of the Sellers; or (d) other than as expressly set forth in this Agreement, be liable for any acts or omissions of the Sellers in the current or former conduct of the Business or arising under or related to the Acquired Assets or any other assets or the Business. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Buyer shall not be liable for any Encumbrances (other than that certain of the Acquired Assets may be subject to certain of the Permitted Encumbrances) against any Seller or any of its

predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, or whether fixed or contingent, whether now existing or hereafter arising, with respect to the Business, the Acquired Assets or any Liabilities of the Sellers arising prior to or after the Closing Date. The Parties agree that the provisions substantially in the form of this Section 8.10 shall be reflected in the Confirmation Order.

8.11   Notification of Certain Events. Each Party shall promptly notify the other Parties of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a material violation or breach of this Agreement by such Party (or a breach of any representation or warranty of such Party contained in this Agreement) that would reasonably be expected to prevent any condition in Article 10 (in the case of notice by Sellers) or Article 11 (in the case of notice by Buyer) from being satisfied by the Outside Date; provided, that a breach of this sentence will not cause any condition in Section 10.2 or Section 11.2, as applicable, to Closing to fail to be satisfied unless such breach was willful and knowing. During the period prior to the Closing Date, each Party will promptly advise the other Parties in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement and the Transaction Documents. A Party's receipt of information pursuant to this Section 8.11 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by the other Parties in this Agreement and shall not be deemed to amend or supplement the Schedules.

8.12   Sellers' Obligations. The Company shall cause each other Seller to comply with such Seller's obligations under this Agreement, including with respect to the transfer and assignment of the Acquired Assets and Assumed Liabilities and the obligations in Section 7.2. Any failure by any Seller to comply with the terms hereof will be treated as a breach of this Agreement by the Company.

8.13   Murray Met Restructuring Support Agreement. That certain Restructuring Support Agreement dated as of February 11, 2020, by and among Murray Met and each of its Subsidiaries, Murray Energy Corporation, the equity partners set forth therein, the consenting term lenders set forth therein and Javelin Global Commodities (UK) LTD (the "Murray Met RSA") shall be deemed to be an Assumed Contract and an Acquired Asset pursuant to Section 2.1(c) hereunder, unless the Murray Met RSA has been terminated in accordance with its terms by or with respect to any Seller party thereto prior to the Closing. Notwithstanding anything to the contrary in Section 2.5 or any other provision of this Agreement or any Schedule hereto (including any right Buyer has under this Agreement to treat certain Acquired Equity Interests as Excluded Assets), or any provision of the Bidding Procedures Order, Buyer shall not be permitted to remove the Murray Met RSA from the Assumed Contracts Schedule or deem the Murray Met RSA to be an Excluded Contract.

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER AND THE SELLERS TO CLOSE

The obligations of Buyer (and any Buyer Designee) and the Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions:

9.1     No Order. No Governmental Authority shall have enacted, issued, promulgated, decreed, enforced or entered any Order which is in effect and has the effect of making any of the transactions contemplated by this Agreement illegal, or otherwise enjoining, restraining, prohibiting or staying (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated hereby.

9.2     Confirmation Order. The Bankruptcy Court shall have entered an order (the "Confirmation Order") in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Company and Buyer, and, without limitation to the generality of the foregoing, such Confirmation Order shall provide that the transfer of the Acquired Assets to Buyer and/or one or more Buyer Designees, as applicable, shall be, pursuant to, inter alia, Sections 105, 363(f), 365, 1123, 1129(b)(2)(A) and 1146(a) of the Bankruptcy Code, free and clear of all obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all obligations, Liabilities and Encumbrances arising from any coal severance or ad valorem real property taxes, and all successor liability, including any successorship obligations under any Collective Bargaining Agreement (other than as expressly agreed to in writing by Buyer with respect to any Buyer Existing/Modified CBA), and/or with respect to any Benefit Plan or the Coal Act), other than the Permitted Encumbrances, and the Confirmation Order shall be a Final Order.

9.3     Plan. Each of the conditions to the effective date of the Plan shall have been satisfied (or shall become effective concurrent with the Closing Date hereunder) or waived in accordance therewith.

9.4     Termination of Waiting Period. (i) Any applicable waiting period (and any extension thereof) under the HSR Act applicable to the purchase of the Acquired Assets or the Business contemplated hereby, and any time period specified in an agreement between Buyer and the Company, on the one hand, and the United States Federal Trade Commission or United States Department of Justice Antitrust Division, on the other hand, shall have expired or been terminated and (ii) any applicable waiting period (and any extension thereof) with respect to any Foreign Antitrust Approvals shall have expired or been terminated and any approval or consent with respect to any Foreign Antitrust Approvals shall have been obtained.

## ARTICLE 10
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following

conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

10.1    Accuracy of Representations.

(a)    Each of the (i) Fundamental Representations of the Company contained in this Agreement shall be true and correct in all respects (other than (A) *de minimis* inaccuracies in respect of Section 5.2(b) and (B) immaterial inaccuracies in respect of the last sentence of Section 5.1), on and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects) and (ii) representations and warranties of the Company set forth in Section 5.7 (Title to Acquired Assets) and Section 5.8 (Sufficiency of Assets) shall be true and correct in all material respects (or, in the case of any such representation or warranty that is qualified by materiality, Material Adverse Effect or any similar qualification, in all respects), on and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)    Each of the representations and warranties of the Company contained in this Agreement (without giving effect to any qualification as to materiality, Material Adverse Effect or words of similar import included therein), other than Fundamental Representations and the representations and warranties set forth in Section 5.7 (Title to Acquired Assets) and Section 5.8 (Sufficiency of Assets), shall be true and correct in all respects on and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure to be so true and correct (without giving effect to any qualifications as to materiality, Material Adverse Effect or words of similar import included therein) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    Buyer shall have received a certificate of the Sellers certifying the satisfaction of the conditions set forth in Sections 10.1(a) and 10.1(b), signed by a duly authorized officer of each Seller.

10.2    Sellers' Performance. The covenants and agreements that the Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects and Buyer shall have received a certificate of the Sellers to such effect signed by a duly authorized officer of each Seller.

10.3    Permits.

(i)    In the event that, as of the Closing, (i) not all the Transferred Permits have been transferred to, or obtained by, Buyer and/or the applicable Buyer Designee(s), or (ii) not all approvals of all applicable Governmental Authorities of the change of ownership and control of the Specified Entities Group Members with respect to the Specified Entities Permits have been obtained, the applicable Sellers and Buyer and/or any applicable Buyer Designee(s) shall have entered into the Permit Transfer Agreements with respect to such Transferred Permits and

84

Specified Entities Permits and Buyer and/or the applicable Buyer Designee(s) shall have the right to conduct, pursuant to <u>Section 7.6</u> and the Permit Transfer Agreements, Mining operations following the Closing on the applicable Real Property, including, where applicable, being approved as the designated operator under such Transferred Permits until such transfer is complete.

(ii)      No facts or circumstances exist that have caused or would be reasonably expected to cause (a) any Seller, any Seller's officers or directors, any Person with authority (directly or indirectly) to determine the manner in which a Seller conducts mining operations, or any other Person listed on a Transferred Permit to be "permit blocked" on the Applicant Violator System, or (b) any "permit block" that would otherwise reasonably be expected to adversely affect the operation of any of the Acquired Assets excluding any permit block that adversely affects only the operations of one or more Specified Entities Group Members.

(iii)      Buyer and/or its applicable Buyer Designee(s) shall have not received or otherwise become aware of any written notice from any Governmental Authority indicating (i) the transfer of the Transferred Permits to Buyer and/or its applicable Buyer Designees, (ii) the approval of the change of ownership and control of the Specified Entities Group Members occurring as a result of the transactions contemplated by this Agreement, (iii) the approval of Buyer and/or its applicable Buyer Designee(s) as a designated operator under any Transferred Permit, or (iv) the conduct of operations and activities under the Transferred Permits following the Closing will, in each case, be materially and adversely impacted by any "permit block" on the Applicant Violator System.

(iv)      Arrangements satisfactory to Buyer in its sole discretion shall be in place regarding the regulatory bonding and security arrangements required in connection with the transfer of the Acquired Assets, including with respect to the Transferred Permits as contemplated herein; <u>provided</u>, that Buyer agrees that Sellers' existing regulatory bonding and security arrangements program is satisfactory to Buyer.

10.4      <u>Restructuring Support Agreement</u>. The RSA shall not have been terminated with respect to any party thereto.

10.5      <u>Plan</u>. The Plan confirmed by the Confirmation Order, including the treatment of the Superpriority Lenders' claims thereunder, shall be in substantially the same form and substance as the plan filed by the Debtors on December 3, 2019, at Docket No. 322 in the Bankruptcy Court, as may be amended, modified or supplemented from time to time in accordance with the RSA; <u>provided</u>, that the Confirmation Order, upon having become a Final Order, shall not be amended, modified or supplemented.

10.6      <u>Assumed Contracts</u>. At least five (5) Business Days prior to the Closing Date, the Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assumed Contract pursuant to Section 365 of the Bankruptcy Code through entry of an order that shall have become a Final Order, and all such Assumed Contracts shall have been duly assigned to Buyer at or prior to the Closing. All Assumed Contracts that require novation will have been novated to Buyer. Without limiting the generality of the foregoing, at least five (5) Business Days prior to the Closing Date, (i) the objection deadline shall have passed for all

counterparties to the Assumed Contracts to object to assumption and assignment of the Assumed Contracts, including as to the Cure Costs contained in their respective Cure Notices, provided, that unless it affirmatively elects to do so in writing, Buyer, in its sole and absolute discretion, shall not be obligated to assume any given Assumed Contract if the Cure Costs associated therewith are above the amounts agreed between Buyer and Seller pursuant to Section 2.5(d) and, unless Buyer elects otherwise in writing, such Contract will become an Excluded Contract under the Plan and (ii) any objections to such assumption and assignment shall have been resolved by the above-referenced Final Order.

10.7    Sellers' Deliveries. Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

10.8    Material Adverse Effect. Since the Execution Date, no Material Adverse Effect shall have occurred and be continuing.

10.9    Agreement of Certain Amounts. Each of (a) the amount of the Funded Liabilities (including the breakdown of each of the Liabilities constituting part thereof), the Wind-Down Amount and the Final Wind-Down Amount and (b) the amount of the adjustment to the Purchase Price pursuant to the proviso in Section 3.1 (if applicable), shall, in each case, have been agreed in amounts acceptable to Buyer in its sole discretion.

10.10   Collective Bargaining Agreements.

(a)    All Collective Bargaining Agreements (other than any Buyer Existing/Modified CBAs) to which Sellers and their Affiliates that are Debtors are parties shall have been rejected and all obligations of Sellers and their Affiliates that are Debtors with respect to retiree or pension benefits or plans, including, without limitation, retiree benefits as defined in Section 1114 of the Bankruptcy Code and any other obligations to contribute to any health, retirement or pension plan, shall have been terminated or modified, in each case in a manner acceptable to Buyer (including pursuant to acceptable Final Order or Final Orders of the Bankruptcy Court) pursuant to Sections 1113(c) and 1114(g) of the Bankruptcy Code, as applicable.

(b)    The Confirmation Order shall provide that Buyer does not assume and shall not be liable for any obligations of any Seller, any Affiliate of a Seller or any of their respective predecessors in respect of any retiree or pension benefits or plans, including, without limitation, retiree benefits as defined in Section 1114 of the Bankruptcy Code and any other obligations to contribute to any health, retirement or pension plan, whether arising under a Collective Bargaining Agreement or otherwise.

10.11   Seller Cure Costs. The Seller Cure Costs shall have been paid by the Sellers in accordance with an order of the Bankruptcy Court or shall have been reserved in a sufficient amount to be paid by the Plan Administrator (as defined in the Plan) from the Wind Down Amount (as defined in the Plan) upon agreement on the Seller Cure Costs or an order from the Bankruptcy Court or another court of competent jurisdiction determining the applicable Seller Cure Cost.

10.12   Certain Approvals.  The approvals and consents set forth in item 2 of Schedule 5.4 of the Company Schedules shall have been obtained in form and substance satisfactory to

Buyer and such approvals and consents shall be in full force and effect.The foregoing conditions of this Article 10 are for the sole benefit of Buyer and may be waived by Buyer, in whole or in part, at any time and from time to time in the sole discretion of Buyer. The failure by Buyer at any time to exercise any of its rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time. Buyer may not assert the failure of a condition set forth in this Article 10 or Article 9 as a reason for refusal by Buyer to consummate the transactions contemplated by this Agreement if such failure was due to Buyer's breach or violation any of its representations, warranties, covenants or agreements contained herein.

## ARTICLE 11
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE SELLERS TO CLOSE

The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by the Sellers, in their sole and absolute discretion:

11.1     Accuracy of Representations. The representations and warranties of Buyer set forth in Sections 6.1, 6.2 and 6.4 of this Agreement shall be true and correct in all respects on and as of the Closing Date as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). All other representations and warranties of Buyer shall be true and correct in all respects (without giving any effect to any qualification as to materiality or words of similar impact), on and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a material and adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement. The Company shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

11.2     Buyer's Performance. The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and the Company shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

11.3     Buyer's Deliveries. Each of the deliveries required to be made to the Sellers pursuant to Section 4.2 shall have been so delivered.

11.4     Buyer Cure Costs. The Buyer Cure Costs shall have been paid (or otherwise reserved for as set forth in this Agreement) in accordance with an order of the Bankruptcy Court or shall have been reserved in a sufficient amount to be paid by the Plan Administrator (as defined in the Plan) from the Wind Down Amount (as defined in the Plan) upon agreement on the Buyer Cure Costs or an order from the Bankruptcy Court or another court of competent jurisdiction determining the applicable Buyer Cure Cost.

11.5   Buyer's Financial Ability. Buyer shall have the financial ability to comply with Sections 365 and 1123 of the Bankruptcy Code, including providing adequate assurance of (x) future performance under all Assumed Contracts and (y) satisfaction of all Assumed Liabilities.

11.6   Satisfaction of the Final Wind-Down Amount. Upon consummation of the transactions contemplated hereby, the Sellers shall have unrestricted cash in an amount sufficient to satisfy the Final Wind-Down Amount.

The foregoing conditions of this Article 11 are for the sole benefit of the Sellers and may be waived by the Sellers, in whole or in part, at any time and from time to time in the sole discretion of the Sellers. The failure by the Sellers at any time to exercise any of their rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time. The Sellers may not assert the failure of a condition set forth in this Article 11 or Article 9 as a reason for refusal by the Sellers to consummate the transactions contemplated by this Agreement if such failure was due to any Seller's breach or violation any of its representations, warranties, covenants or agreements contained herein.

## ARTICLE 12
## TERMINATION

12.1   Termination Events. Notwithstanding anything to the contrary, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)   by mutual written consent of the Company and Buyer;

(b)   by written notice from either the Company or Buyer:

(i)   if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby; provided, that the right to terminate this Agreement under this Section 12.1(b)(i) shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii)   if the Closing shall not have occurred on or prior to June 23, 2020 (the "Outside Date"); provided, that the terminating party under this Section 12.1(b)(ii) is not (at such time of termination) in breach of any representation, warranty, covenant or other agreement in this Agreement so as to cause any conditions to the Closing not to be satisfied and shall not have been the proximate cause of the failure of the Closing to occur on or prior to the Outside Date;

(iii)   if at the end of the auction contemplated by the Bidding Procedures, Buyer is not determined by the Sellers in accordance with the Bidding Procedures Order to be either the (A) Successful Bidder or (B) Back-Up Bidder;

(iv)     if at the end of the auction contemplated by the Bidding Procedures, Buyer is determined by the Sellers in accordance with the Bidding Procedures Order to be the Back-Up Bidder and the Sellers close a sale transaction with the Successful Bidder; or

(v)     upon final, non-appealable denial of one or more of the Governmental Authorizations the absence of which, individually or in the aggregate, would cause any of the conditions described in Sections 9.4 or 10.3 not to be satisfied;

(c)     by written notice from Buyer:

(i)     upon a termination of the RSA;

(ii)     if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases;

(iii)     if any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee in the Bankruptcy Cases or a responsible officer or an examiner with enlarged powers is appointed (other than a fee examiner) relating to the operation of the Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered;

(iv)     in the event of any breach of, or failure to perform, by any Seller of any of their agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in the Sellers being unable to satisfy a condition set forth in Article 10 by the then-applicable Outside Date and (B) cannot be cured within fifteen (15) Business Days after Buyer notifies the Company of such breach in writing; provided, that Buyer shall not have a right of termination pursuant to this Section 12.1(c)(iv) if it is then in material breach of any of its material agreements, covenants, representations or warranties contained herein or any of the obligations imposed on Buyer under the Confirmation Order;

(v)     upon the exercise of any rights or remedies of any Lender (as defined in the DIP Credit Agreement), or any party acting at the direction of any of the Lenders, in accordance with the DIP Credit Agreement as a result of any Event of Default (as defined in the Final Order) under the DIP Credit Agreement that is not waived or cured in accordance with the terms of the DIP Credit Agreement;

(vi)     upon any Seller entering into a definitive agreement with respect to the sale of a non de minimis portion of the Acquired Assets (other than Inventory in the Ordinary Course of Business);

(vii)     if, for any reason, Buyer (other than as a result of its own breach of this Agreement) is unable, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid in payment of any portion of the Purchase Price as set forth in Section 3.1 (other than the Assumed Liabilities);

(viii)   if the Bidding Procedures Order shall have been stayed, vacated, reversed or materially modified or amended by the Bankruptcy Court or another court of competent jurisdiction at any time without the prior written consent of Buyer, not to be unreasonably withheld;

(ix)   if a Potential Bidder (as defined in the Bidding Procedures Order) submits a bid for all or substantially all of the Acquired Assets that contemplates a Purchase Price (as defined in the Bidding Procedures Order) in an amount less than the Purchase Price set forth herein and is acceptable to the Ad Hoc Group of Superpriority Lenders (as defined in the RSA) or Buyer; provided, that such bid is reasonably acceptable to the Company; or

(x)   if the Company Schedules in a form mutually agreed by the Company and Buyer have not been delivered by the Company to the Buyer by the Schedules Deadline.

(d)   by written notice from the Company (i) upon a determination of the board of directors of Murray Energy Corporation that termination of the Agreement is in the best interest of the Sellers' estates and is necessary for the board of directors to fulfill its fiduciary duties or (ii) in the event of any breach of, or failure to perform, by Buyer of any of its agreements, covenants, representations or warranties contained herein, which breach or failure to perform (a) would result in Buyer being unable to satisfy a condition set forth in Section 11.1 by the then-applicable Outside Date and (b) cannot be cured within fifteen (15) Business Days after the Sellers notify Buyer of such breach in writing; provided, that the Sellers shall not have a right of termination pursuant to this Section 12.1(d)(ii) if any Seller is then in material breach of any of such Seller's agreements, covenants, representations or warranties contained herein or any of the obligations imposed on such Seller under the Confirmation Order.

Each termination trigger set forth in this Section 12.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such termination trigger. If more than one of the termination triggers set forth in this Section 12.1 are applicable, the applicable party shall have the right to choose the termination trigger pursuant to which this Agreement is to be terminated.

12.2   Effect of Termination. In the event of termination of this Agreement by Buyer or the Company or the Sellers pursuant to this Article 12, this Agreement shall become null and void and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any willful and knowing breach of this Agreement occurring prior to such termination and (ii) the provisions of Section 7.1(c) (Access and Reports; Confidentiality), Section 13.9 (Expenses), Section 13.12 (Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver) and this Section 12.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Articles 1 and 13) shall expressly survive the termination of this Agreement.

# ARTICLE 13
## GENERAL PROVISIONS

13.1 <u>Survival</u>. Except in the case of Fraud, the covenants and agreements contained in <u>Section 7.2</u>, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing. All other covenants and agreements contained herein shall survive the Closing in accordance with their terms until fully performed or satisfied.

13.2 <u>Confidentiality</u>. Following the Closing, the Sellers agree not to, and to cause their Representatives not to, use or disclose any confidential or non-public information concerning the Acquired Assets or the Business, or the business affairs of Buyer and its Subsidiaries or the Assumed Liabilities ("<u>Confidential Information</u>") except disclosure of Confidential Information that (a) is lawfully obtained after Closing from a source that, to the Knowledge of such Seller, was not under an obligation of confidentiality to Buyer with respect to such information, (b) is disclosed or becomes available to the public without any breach by the Sellers of the terms of this Agreement, (c) is or may be necessary to wind down any of the Sellers' bankruptcy estates, or in connection with the enforcement of the rights of, or the defense of any Action against or involving, any Seller <u>provided</u>, that in each case, the Confidential Information is afforded confidential treatment, (d) to the extent it relates to any Excluded Assets and/or Excluded Liabilities, (e) is or may be disclosed in connection with the Bankruptcy Cases <u>provided</u>, that the Confidential Information is afforded confidential treatment in connection with such disclosure or (f) is required to be disclosed pursuant to the Bidding Procedures Order. Notwithstanding the foregoing, a Seller may disclose Confidential Information if such Seller believes (after consultation with counsel) it is legally required to make such disclosure in order to comply with Legal Requirements, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (i) any self-regulatory organization of which such Seller is a member or (ii) in connection with the Bankruptcy Cases). If a Seller or any of its Representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Bankruptcy Cases to disclose any of the Confidential Information on a non-confidential basis, such Seller or Representative shall use reasonable efforts to provide Buyer with prompt notice, to the extent allowed by law, rule and regulation, of such requirement, and, to the extent reasonably practicable, cooperate with Buyer, at Buyer's expense, to obtain a protective order or similar remedy to cause such information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege; <u>provided</u>, that in the event that such protective order or other similar remedy is not obtained, such Seller shall, or shall cause such Representative to, furnish only that portion of such information that it reasonably believes it is required to disclose, and shall, or shall cause its Representative (as applicable) to, exercise its commercially reasonable efforts, at Buyer's expense, to obtain assurance that confidential treatment will be accorded such disclosed information.

13.3 <u>Public Announcements</u>. Except as required in the Bankruptcy Cases, unless otherwise required by applicable Legal Requirement or by obligations of Buyer or the Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and the Company, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to

this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement prior to such consultation.

13.4    <u>Notices</u>. All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or electronic mail, or facsimile transmission:

(i)    If to the Company, the Sellers or to Sellers' Representative, then to:

Murray Energy Corporation
46226 National Road
St. Clairsville, Ohio 43950
Attn:   Mike McKown
         Robert Moore
Email: mmckown@coalsource.com
         rmoore@coalsource.com
         legal@coalsource.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Nicole Greenblatt, P.C.
         David M. Klein, P.C.
Email: ngreenblatt@kirkland.com
         dklein@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:   Ross M. Kwasteniet, P.C.
         Joseph M. Graham
Email: ross.kwasteniet@kirkland.com
         joe.graham@kirkland.com

(ii)    If to Buyer:

Mining Purchaser, Inc.
Second Street, Suite 206
Jersey City, New Jersey 07311
Attn:   Martin Reed
Email: andrew.goldman@wilmerhale.com

with a copy (which shall not constitute notice) to:

> Davis Polk & Wardwell LLP
> 450 Lexington Ave.
> New York, New York 10017
> Attn:  William L. Taylor
>           Damian S. Schaible
> Email: william.taylor@davispolk.com
>           damian.schaible@davispolk.com

or to such other person or address as any party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally delivered or faxed or delivered by overnight courier.

13.5    <u>Waiver</u>. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

13.6    <u>Entire Agreement; Amendment</u>. This Agreement (including the Schedules), the RSA, the Confirmation Order and the Exhibits, the Bidding Procedures Order and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and the Sellers, on the other hand, with respect to their subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and the Sellers, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties.

13.7    <u>Assignment</u>. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of all of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party) and any assignment in contravention of this <u>Section 13.7</u> shall be null and void *ab initio*; <u>provided</u>, <u>however</u>, that, subject to compliance with <u>Section 4.4</u>, Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of the Company; <u>provided</u>, that no such assignment shall relieve Buyer from its liabilities or obligations hereunder; <u>provided</u>, <u>further</u>, that the Sellers shall be permitted to assign their rights hereunder in part to the acquirer of any Excluded Assets or Excluded Liabilities with the prior written consent of Buyer; <u>provided</u>, that no such assignment shall relieve the Sellers from their liabilities or obligations hereunder, other than with respect to such Excluded Assets or Excluded Liabilities.

13.8    <u>Severability</u>. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

13.9    <u>Expenses</u>. Except as otherwise expressly provided in this Agreement or any order of the Bankruptcy Court, whether or not the transactions contemplated hereby are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Except as otherwise expressly provided in this Agreement or any order of the Bankruptcy Court, any and all fees required by any Governmental Authority to obtain or for the transfer of a Permit shall be the sole responsibility of Buyer.

13.10    <u>Company Schedules</u>. The Sellers have set forth information on the Company Schedules in a section thereof that corresponds to the section of this Agreement to which it relates. A matter set forth in one section of a Company Schedule need not be set forth in any other section so long as its relevance to such other section of the Company Schedule or section of the Agreement would be reasonably apparent on the face of the information disclosed therein to a Person with no independent knowledge of the relevant subject matter. The Parties acknowledge and agree that (i) the Company Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Buyer, and (ii) the disclosure by the Sellers of any matter in the Schedules shall not be deemed to constitute an acknowledgment by the Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

13.11    <u>Buyer Schedules</u>. Buyer has set forth information on the Buyer Schedules in a section thereof that corresponds to the section of this Agreement to which it relates. A matter set forth in one section of a Buyer Schedule need not be set forth in any other section so long as its relevance to such other section of the Buyer Schedule or section of the Agreement would be reasonably apparent on the face of the information disclosed therein to a Person with no independent knowledge of the relevant subject matter. The Parties acknowledge and agree that (i) the Buyer Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of the Sellers, and (ii) the disclosure by Buyer of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Buyer that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

13.12    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to

principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action; provided, however, that, if the Bankruptcy Cases have been closed pursuant to Section 350(a) of the Bankruptcy Code, all Actions arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the Borough of Manhattan, New York, New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action. The Parties consent to service of process by mail (in accordance with Section 13.4) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

13.13   Counterparts. This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 13.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

13.14   Parties in Interest; No Third Party Beneficiaries. No provision of this Agreement is intended to confer any rights hereunder upon any Person other than the Parties, the Buyer Designees and their respective successors and permitted assigns.

13.15   Acknowledgements.

(a)     This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as Parties and then only in their capacities as such. Except to the extent named as a Party, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present, or future direct or indirect stockholder, member, other direct or indirect equityholder, partner, manager, director, officer, employee, Affiliate, agent or Representative of any Party to this Agreement, will have any Liability (whether in contract, tort,

equity, or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or liabilities of any of the Parties under this Agreement or for any claim based upon, arising out of or related to this Agreement. Without limiting the foregoing, no claim arising under or relating to this Agreement will be brought or maintained by any Party or any of its successors or permitted assigns against any present or future stockholder, member, other equityholder, partner, manager, director, officer, employee, Affiliate, agent or Representative of any other Party to this Agreement that is not otherwise expressly identified as a Party to this Agreement, and no recourse will be brought or granted against any of them, by virtue of or based upon any alleged misrepresentations or inaccuracy in or breach or nonperformance of any of the representations, warranties, covenants, or agreements of any Party hereto set forth or contained in this Agreement or any exhibit, schedule, the Schedules or other document delivered hereunder or any certificate delivered hereunder. Nothing in the foregoing is however intended to restrict or limit recourse in the event of Fraud by a Party in connection with the transactions contemplated hereby.

(b)     This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

13.16   Remedies. Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit the Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

13.17   Specific Performance. Each Party recognizes that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached, and that monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries. Accordingly, a non-breaching Party shall be entitled, in addition to any other remedies that may be available, to injunctive relief to specifically enforce the terms and provisions of this Agreement. If any Action is brought by the non-breaching Party or Parties to enforce any of the terms or provisions of this Agreement pursuant to this Section 13.17, the Party in breach, or threatening to be in breach, shall waive the defense that there is an adequate remedy at law. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action seeking specific performance of such terms or provisions and that the only permitted objection that it may raise in response to any action for specific performance of such terms or provisions is that it contests the existence of a breach or threatened breach of such provisions. The rights set forth in this Section 13.17 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

13.18   Certain Waivers. Buyer and each of its Subsidiaries agree that, following the Closing, Kirkland & Ellis LLP may serve as counsel to the Sellers and their Affiliates in connection with any matters related to this Agreement and the transactions contemplated hereby,

including any dispute arising out of or relating to this Agreement and the transactions contemplated hereby, notwithstanding any representation by Kirkland & Ellis LLP of the Specified Entities and their Subsidiaries prior to the Closing Date. Buyer hereby (a) consents to Kirkland & Ellis LLP's representation of the Sellers and their Affiliates in connection with any matters related to this Agreement and the transactions contemplated hereby, and (b) waives any claim it has or may have that Kirkland & Ellis LLP has a conflict of interest or is otherwise prohibited from engaging in such representation of the Sellers based on its representation of the Specified Entities and their Subsidiaries prior to the Closing.

13.19   <u>Fiduciary Obligations</u>. Notwithstanding anything else herein to the contrary, nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective directors, officers, shareholders or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, in violation of their fiduciary obligations; <u>provided</u>, that any failure to comply with other terms of this Agreement as a result of <u>Section 13.19</u> shall not limit any of Buyer's rights hereunder except (i) its right to require such compliance under <u>Section 13.17</u> or (ii) its right to damages for the failure to so comply.

13.20   <u>Sellers' Representative</u>.

(a)   Each Seller designates the Company as its representative ("<u>Sellers' Representative</u>") and attorney-in-fact of such Seller with full power and authority, including power of substitution, acting in the name of and on behalf of such Seller, for all purposes under this Agreement, including receipt of disclosures, granting and/or executing consents or waivers, receiving notices, settling disputes with respect to indemnification claims and the calculation of the Purchase Price and other amounts hereunder and agreeing to and executing amendments and/or modifications to this Agreement. Any notice given to Sellers' Representative shall be deemed to be a notice given to all of the Sellers.

(b)   By executing this Agreement under the heading of "Sellers' Representative," the Company hereby (i) accepts its appointment and authorization to act as Sellers' Representative as attorney-in-fact and agent on behalf of the Sellers in accordance with the terms of this Agreement and (ii) agrees to perform its obligations under, and otherwise comply with, this <u>Section 13.20</u>.

(c)   In the performance of its duties hereunder, Sellers' Representative shall be entitled to rely upon any document or instrument reasonably believed by it to be genuine and accurate. Sellers' Representative may assume that any Person purporting to give any notice in accordance with the provisions hereof has been duly authorized to do so. In the absence of proven willful misconduct, (i) Sellers' Representative shall not be liable to the Sellers with respect to its performance of the functions specified in this Agreement, and (ii) no Seller shall commence, prosecute or maintain any actions or proceedings against Sellers' Representative with respect to its performance of the functions specified in this Agreement. In determining the occurrence of any fact, event or contingency, Sellers' Representative may request from any of the Sellers such reasonable additional evidence as Sellers' Representative in its sole discretion may deem necessary, and may at any time inquire of and consult with others, including any of

the Sellers, and shall not be liable to any Seller for any damages resulting from any delay in acting hereunder pending receipt and examination of additional evidence requested.

[*Signature pages follow.*]

**In Witness Whereof,** the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

<u>**SELLERS**</u>:

MURRAY ENERGY CORPORATION

By: _____
Name: Robert D. Moore
Title:   President and Chief Executive Officer


MURRAY ENERGY HOLDINGS CO.

By: _____
Name: Robert D. Moore
Title:   Chief Financial Officer

AMCA COAL LEASING, INC.
AMCOAL HOLDINGS, INC.
AMERICAN COMPLIANCE COAL, INC.
AMERICAN ENERGY CORPORATION
AMERICAN EQUIPMENT & MACHINE, INC.
AMERICAN NATURAL GAS, INC.
ANCHOR LONGWALL AND REBUILD, INC.
ANDALEX RESOURCES MANAGEMENT, INC.
ANDALEX RESOURCES, INC.
AVONMORE RAIL LOADING, INC.
CANTERBURY COAL COMPANY
COAL RESOURCES HOLDINGS CO.
COAL RESOURCES, INC.
CONSOLIDATED LAND COMPANY
CORPORATE AVIATION SERVICES, INC.
EMPIRE DOCK, INC.
ENERGY RESOURCES, INC.
ENERGY TRANSPORTATION, INC.
GENWALL RESOURCES, INC.
KENAMERICAN RESOURCES, INC.
MILL CREEK MINING COMPANY
MURRAY AMERICAN COAL, INC.
MURRAY GLOBAL COMMODITIES, INC.
MURRAY KENTUCKY ENERGY, INC.
MURRAY KENTUCKY ENERGY SERVICES,
INC.
MURRAY UTAH ENERGY SERVICES, INC.
OHIOAMERICAN ENERGY, INCORPORATED
ONEIDA COAL COMPANY, INC.
PENNSYLVANIA TRANSLOADING, INC.
PLEASANT FARMS, INC.
PREMIUM COAL, INC.
SPRING CHURCH COAL COMPANY
T D K COAL SALES, INCORPORATED
THE AMERICAN COAL COMPANY
THE AMERICAN COAL SALES COMPANY
THE OKLAHOMA COAL COMPANY
UTAHAMERICAN ENERGY, INC.
WEST RIDGE RESOURCES, INC.
WESTERN KENTUCKY COAL RESOURCES,
LLC

By: _____

Name:  Michael O. McKown

Title:  Secretary

[Signature Page to Asset Purchase Agreement]

AMERICAN MINE SERVICES, INC.
AMERICANMOUNTAINEER PROPERTIES, INC.
CCC LAND RESOURCES LLC
CCC RCPC LLC
CENTRAL OHIO COAL COMPANY
CONSOLIDATION COAL COMPANY
EIGHTY-FOUR MINING COMPANY
KEYSTONE COAL MINING CORPORATION
MCELROY COAL COMPANY
MON RIVER TOWING, INC.
MURRAY AMERICAN RIVER TOWING, INC.
MURRAY AMERICAN TRANSPORTATION, INC.
MURRAY KEYSTONE PROCESSING, INC.
MURRAY METALLURGICAL COAL PROPERTIES II, LLC
MURRAY METALLURGICAL COAL PROPERTIES, LLC
OHIO VALLEY RESOURCES, INC.
SOUTHERN OHIO COAL COMPANY
THE FRANKLIN COUNTY COAL COMPANY
THE HARRISON COUNTY COAL COMPANY
THE MARION COUNTY COAL COMPANY
THE MARSHALL COUNTY COAL COMPANY
THE MCLEAN COUNTY COAL COMPANY
THE MEIGS COUNTY COAL COMPANY
THE MONONGALIA COUNTY COAL COMPANY
THE MUSKINGUM COUNTY COAL COMPANY
THE OHIO COUNTY COAL COMPANY
THE WASHINGTON COUNTY COAL COMPANY
TWIN RIVERS TOWING COMPANY

By: _____
Name:  Robert D. Moore
Title:   Vice President

BELMONT COAL, INC.
KANAWHA TRANSPORTATION CENTER, INC.
MURRAY AMERICAN ENERGY, INC.
MURRAY AMERICAN RESOURCES, INC.
MURRAY EQUIPMENT & MACHINE, INC.
OHIO ENERGY TRANSPORTATION, INC.
PENNAMERICAN COAL, INC.

By: _____
Name: Robert D. Moore
Title:   President


AMERICANHOCKING ENERGY, INC.
MAPLE CREEK MINING, INC.
MAPLE CREEK PROCESSING, INC.
SUNBURST RESOURCES, INC.
THE OHIO VALLEY COAL COMPANY
THE OHIO VALLEY TRANSLOADING COMPANY
UMCO ENERGY, INC.

By: _____
Name: Ronnie D. Dietz
Title:   Treasurer

AMERICANMOUNTAINEER ENERGY, INC.
BELMONT COUNTY BROADCAST STUDIO, INC.
MONVALLEY TRANSPORTATION CENTER, INC.
MURRAY AMERICAN KENTUCKY TOWING, INC.
MURRAY AMERICAN MINERALS, INC.
THE MUHLENBERG COUNTY COAL COMPANY, LLC
THE WESTERN KENTUCKY COAL COMPANY, LLC
WESTERN KENTUCKY CONSOLIDATED RESOURCES, LLC
WESTERN KENTUCKY LAND HOLDING, LLC
WESTERN KENTUCKY RAIL LOADOUT, LLC
WESTERN KENTUCKY RESOURCES FINANCING, LLC
WESTERN KENTUCKY RESOURCES, LLC
WESTERN KENTUCKY RIVER LOADOUT, LLC

By: _____
Name: Anthony C. Vcelka, II
Title: Treasurer


PENNAMERICAN COAL, L.P.

By:     PINSKI Corp.
Its:     General Partner

By: _____
Name: Robert D. Moore
Title: Secretary and Treasurer


PINSKI CORP.

By: _____
Name: Robert D. Moore
Title: Secretary and Treasurer


[Signature Page to Asset Purchase Agreement]

WEST VIRGINIA RESOURCES, INC.

By: _____
Name:  Robert L. Putsock
Title:  Secretary and Treasurer

[Signature Page to Asset Purchase Agreement]

**BUYER**:

MINING PURCHASER, INC.

By: _____
Name: Martin Reed
Title: Chief Executive Officer and Secretary

[Signature Page to Asset Purchase Agreement]