**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) | Case No. 19-56885 (JEH) |
| | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MOTION FOR INTERIM RELIEF**
**UNDER SECTIONS 1113 AND 1114 OF THE BANKRUPTCY CODE**

---

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy. The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

## **RELIEF REQUESTED**

1.      Because of the unprecedented market downturn, which has necessitated an urgent need for cost savings, and the recent legislation that protects the Debtors' retirees, the Debtors seek entry of an order, substantially in the form attached as **Exhibit A**, modifying the National Bituminous Coal Wage Agreement of 2016 ("2016 CBA") on an interim basis to suspend the Debtors' obligations to pay for certain retiree healthcare under the Murray Energy Corporation Individual Employer Plan ("Murray IEP").[1]   The suspension will not impact any retiree, as the Debtors' obligations are back-stopped by the U.S. Treasury.   As detailed in the proposed order, the Debtors are taking all reasonable steps, including coordinating with the 1993 Plan (as defined below), to facilitate the transition of the Union Retirees (as defined below) from the Murray IEP to the 1993 Plan to ensure there is no gap in benefit coverage and a smooth transition process.

2.      In support of this Motion, the Debtors submit (a) the *Declaration of Robert D. Moore in Support of the Debtors' Motion for Interim Relief Under Sections 1113 and 1114 of the Bankruptcy Code*, attached as **Exhibit B** ("Moore Declaration"); (b) the *Declaration of Robert Campagna in Support of the Debtors' Motion for Interim Relief Under Sections 1113 and 1114 of the Bankruptcy Code*, attached as **Exhibit C** ("Campagna Declaration"); and (c) the *Declaration of Gregory Berube in Support of the Debtors' Motion for Interim Relief Under Sections 1113 and 1114 of the Bankruptcy Code*, attached as **Exhibit D** ("Berube Declaration"). The Debtors anticipate presenting additional evidence at the hearing on this Motion, unless these matters are resolved.

---

[1]   Furthermore, with all rights reserved, the Debtors are not presently (a) seeking interim relief to withdraw from the 1974 Pension Plan (as defined below) prior to the sale closing, or (b) asking the UMWA to waive the Debtors' accrued but unpaid obligations, if any, to contribute to the 1974 Pension Plan for hours that UMWA members have worked under the 1974 Pension Plan.

## PRELIMINARY STATEMENT

3.     In sections 1113(e) and 1114(h) of the Bankruptcy Code, Congress recognized that a debtor's situation can be so challenged that mid-case modifications are necessary to save the enterprise. While Congress sets a high standard for those interim modifications, these Debtors meet it.

4.     The deteriorating coal markets, global economic crisis, and costly chapter 11 proceedings have wreaked havoc on the Debtors' finances. Forecasts once thought conservative were re-written and, then weeks later, re-written again. The Debtors have just $6 million of cash on hand. While the Debtors also have untapped liquidity under their DIP facility, the Debtors' access to those funds is presently in jeopardy. That is because the unused DIP Funds are in escrow; to access that liquidity, the Debtors must meet a condition that there is no default or event of default. An event of default will occur if certain covenants, including financial covenants, are breached. In light of recent, negative financial performance, the Debtors are concerned they may default under one or more of those financial covenants.

5.     Even if the Debtors continue to maintain access to the unused DIP Funds, the Debtors project just $30 million at emergence, which is insufficient to responsibly manage the business in this (or any) environment. That is the best case scenario, yet the Debtors are just beginning to feel the impacts of the global crisis. Every dollar spent in chapter 11—this motion would save the Debtors about $200,000 *per day*—puts a successful emergence in increasing jeopardy.

6.     Meanwhile, the Debtors have exhausted or will exhaust all other viable options to preserve liquidity. Many vendors were stretched into the chapter 11 filing and will only recover a fraction of what they are owed. Mines have been idled. Employees have foregone bonus and retention payments while continuing to work as hard as ever. More than 540 employees have

been laid off or terminated since December 2019. The Debtors' chief executive officer is personally approving all expenditures above $25,000, a modest sum in a capital-intensive business like coal mining.

7.      The difficult reality is that—despite the Debtors' various cost-cutting measures— it is not enough. The Debtors desperately need interim relief to get to the finish line. Importantly, it would in no way prejudice current UMWA employees or Union Retirees because federally funded programs are in place to assume the Debtors' liabilities once this Court authorizes the Debtors to cease payments.

8.      The bottom line is that if the Debtors do not cut off these obligations in the near term, they will likely exhaust liquidity during these cases—leaving no business to restructure and no go-forward employment opportunities for thousands. The Debtors and the UMWA would be left with no proposal to implement, the Debtors risk defaulting under their DIP Facility, and they may be faced with no choice but to begin a value-destructive enterprise-wide liquidation.

## JURISDICTION AND VENUE

9.      The United States Bankruptcy Court for the Southern District of Ohio ("Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order 30-3* from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4, 2019 ("General Order"). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The bases for the relief requested herein are sections 363, 1113, and 1114 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 ("Bankruptcy Code"), Bankruptcy Rule 6004, and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of Ohio ("Local Rules"), and the General Order.

## BACKGROUND

### A.     Overview and Recent, Sector-Wide Challenges.

12.     The Debtors are the largest privately-owned coal company in the United States. Headquartered in St. Clairsville, Ohio, the Debtors—together with their non-Debtor affiliates and Murray Metallurgical Coal Holdings, LLC and its subsidiaries ("Murray Met")—own and operate 12 active mines across the Northern, Central, and Southern Appalachia Basins (in Ohio, West Virginia, eastern Kentucky, and Alabama), the Illinois Basin (in Illinois and western Kentucky), the Uintah Basin (in Utah), and Colombia, South America.[2] Moore Decl. ¶ 6.

13.     The Debtors mainly mine thermal coal, which is principally used by the electric utility industry to produce steam to drive turbines to generate electricity.  In April 2019, the Debtors began mining metallurgical coal after acquiring Murray Met.  Metallurgical coal is a globally scarce resource that is critical to the production of coke, an integral component for steel production. *Id.* ¶ 7.

14.     The thermal coal markets that the Debtors traditionally serve have been meaningfully challenged in recent years.  This sector-wide decline was driven largely by (a) the closure of significant U.S. coal-fired electric generating capacity, (b) a record production of inexpensive natural gas, and (c) the growth of wind and solar energy (and gas and renewables) displacing coal used by U.S. power plants.  During its peak in 2007, coal was the power source

---

[2]     The Debtors also manage and operate five mines in the Illinois Basin through their partnership with Foresight Energy LP.

for half of electricity generation in the U.S.; by early 2019, coal-fired electricity generation fell to less than 30 percent. *Id.* ¶ 8.

15.     These challenges intensified in the lead-up to the Petition Date as (a) certain electric utility companies filed for bankruptcy protection and others sought, and received, subsidies for their nuclear generation capacity to avoid bankruptcy, at the expense of coal-fired facilities, (b) domestic natural gas prices have continued to drop significantly, and (c) overall demand for electricity in the U.S. has continued to decline, further depleting demand for coal at domestic utilities.  At the same time, demand for U.S. coal from international utilities was also subject to negative pressures. *Id.* ¶ 9.

16.     The impact of depressed demand and pricing in both domestic and international markets hit the Debtors hard, as customers with pre-existing commitments have been unable or unwilling to accept deliveries.  Because of limited alternative markets to place product, the Debtors had to idle mining operations.  At the same time, the Debtors had to rebate cash to certain customers under price sharing arrangements, negatively impacting the Debtors' realization per ton. *Id.* ¶ 10.

17.     The Debtors withstood these challenges for many years, even as they watched more than 40 coal companies file for bankruptcy since 2008.  These bankruptcies left their mark on the Debtors.  Competitors have used bankruptcy to reduce debt and lower their cost structures by eliminating cash interest obligations and pension and benefit obligations, leaving them better positioned to compete for volume and pricing in the current market.  Meanwhile, the Debtors continued to satisfy their significant financial obligations required by the weight of their own capital structure and legacy liability expenses.  As a result, the Debtors generated little cash flow

after satisfying debt service obligations, paying employee health and pension benefits, and maintaining operations.  *Id.* ¶ 11.

18.    The Debtors' debt service obligations were significant.  As of October 2019, the Debtors had approximately $2.7 billion of outstanding funded debt.  The associated annual interest expense was approximately $278 million.  *Id.* ¶ 12.

19.    In addition, the Debtors have more than $8 billion in actual or potential legacy liabilities stemming from various retiree and employee benefit plans pursuant to both statutory obligations and certain collective bargaining agreements, including workers compensation, the Black Lung Act, and reclamation and environmental obligations.  For 2019 alone, the Debtors' cash outlay for such obligations was approximately $145 million.  Of these amounts approximately $93 million and $16 million relate to post-retirement health benefits and pension contributions, respectively.  The Debtors' competitors are not similarly subject to these liabilities; most of their competitors have filed for bankruptcy and shed their legacy liability obligations, leaving the Debtors as the single largest remaining contributor to retiree benefits for coal miners.  *Id.* ¶ 13.

**B.    The Debtors Enter Chapter 11 With a Plan for a Value-Maximizing Exit.**

20.    By September 2019, the Debtors did not have sufficient liquidity to make the principal and interest payments under their Superpriority Term Loan, Term Loan, and Notes, while also making other payments necessary to operate the business.  Failure to make these debt service payments would have triggered defaults under the Debtors' credit agreements and cross-defaults across the capital structure.  Berube Decl. ¶ 9.

21.    With shrinking liquidity, significant payment obligations, extremely challenging industry conditions and unreceptive capital markets, the Debtors and their advisors commenced discussions with an ad hoc group of Superpriority Term Loan lenders, holders of 1.5 Lien and

Second Lien Notes, and their respective advisors regarding potential transactions that would enable the Debtors to deleverage their balance sheet. To facilitate these discussions, on October 2, 2019, the Debtors and the requisite majorities of lenders under the Prepetition ABL Facility and Superpriority Term Loan entered into forbearance agreements. The Debtors preserved liquidity by, among other things, not making amortization and interest payments due under the Term Loans and Notes. *Id.* ¶ 10.

22.     Following significant back and forth, on October 28, 2019, the Debtors, their principal equityholders, lenders holding more than 60% of claims under the Superpriority Term Loan Facility, and certain of the Debtors' other creditors entered into the RSA. The RSA provided a framework for the Debtors' sale process and the commitment of the Superpriority Term Loan Lenders, as the Credit Bid Lenders, to form a stalking horse bidder in that process, along with their commitment to fund chapter 11 administrative costs as well as ongoing operating expenses of the business. *Id.* ¶ 11.

23.     As part of the RSA, the Superpriority Term Loan lenders agreed to make a $350 million new money commitment to fund the DIP Term Loan, which together with the $90 million DIP FILO, comprised the DIP Facility. A portion of the loans was used to refinance the pre-petition ABL facility. As described in the *Declaration of Gregory Berube in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief*, dated October 29, 2019 [Docket No. 28-3, at ¶¶ 16-21], Evercore ran a DIP marketing process that yielded the DIP Facility, and confirmed that facility was the Debtors' only viable source of

7

postpetition funding and that no other, better alternative was reasonably attainable under the circumstances. *Id.* ¶ 12.

24.     Without the DIP Term Loan, the Debtors would have been unable to meet their pressing and immediate liquidity concerns, including employee wages and critical vendor payments, resulting in irreparable value-destruction to the estate and probable liquidation of assets.  There was a high likelihood that a number of mines would have been closed, which would have eliminated thousands of jobs and brought forward significant environmental remediation issues and costs.  The Debtors specifically sized the DIP Facility, based on the Debtors' projections at the time, to provide the Debtors with sufficient cash to run their operations in chapter 11 for approximately nine months—the amount of time required to run a thorough, competitive marketing process for their assets and to conduct good-faith negotiations with various stakeholders, but without an extended (and expensive) stay in chapter 11. *Id.* ¶ 13.

25.     In return for much-needed liquidity, the DIP Lenders required customary protections for their commitment, including superpriority liens on substantially all of the Debtors' assets.  On December 12, 2019, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 425], which approved the DIP Facility.  The DIP Facility set forth a series of case milestones (which were extended by the DIP Lenders at the request of the UMWA and the Creditors' Committee) regarding the Debtors' efforts to sell all or substantially all of their assets and negotiations around the Debtors' labor obligations, including, if needed, the filing of a motion to seek relief pursuant to sections 1113 and 1114 of the Bankruptcy Code.  A failure to

reach these milestones would constitute an Event of Default, as defined in the DIP credit agreement, which could lead to an acceleration of the DIP Term Loan and/or DIP FILO Facility. *Id.* ¶ 14.

26.     On December 4, 2019, the Debtors filed their Bidding Procedures Motion, pursuant to which the Ad Hoc Group agreed to direct the Superpriority Term Loan agent to form an entity ("<u>Stalking Horse Bidder</u>") to provide an offer for the Debtors' assets in the form of a credit bid ("<u>Stalking Horse Bid</u>").  *Id.* ¶ 15.

27.     The Bidding Procedures Motion also sets forth a proposed overbid process ("<u>Bidding Procedures</u>"), intended to permit a fair, robust, and competitive sale process—either to confirm that the Stalking Horse Bid is the best offer or to identify an alternative bid that is higher or otherwise better.   On January 9, 2020, the Court approved the Bidding Procedures as reasonable and customary, and set a final bid deadline of March 16, 2020, and, if necessary, an auction for March 26, 2020 [Docket No. 742].  *Id.* ¶ 16.

28.     Section D of the Bidding Procedures contained a number of customary requirements for a bid to be considered a "Qualified Bid," including a good-faith deposit equal to ten percent of the purchase price and the absence of financing and diligence contingencies. Potential purchasers were encouraged to engage directly with the UMWA and the UMWA Funds to discuss treatment of applicable collective bargaining agreements and legacy liabilities.  The Bidding Procedures make clear (i) in Section D(xix), that each bid should indicate the proposed treatment of the Debtors' union and retiree obligations, and (ii) in Section H, that the Debtors would consider a bid's treatment of the Debtors' union and retiree obligations in selecting a winning bidder.  *Id.* ¶ 17.

29.     In connection with the bidding process, Evercore contacted 88 potential purchasers.  Twelve signed non-disclosure agreements, and nine received access to an electronic data room containing diligence related to the Debtors' assets.  Prior to the Preliminary Bid Deadline, the Debtors received four non-binding indications of interest.  By the Bid Deadline, the Debtors received three bids in addition to the Stalking Horse Bid; those bids are discussed briefly below.  In short, the Debtors did not receive any topping bid for substantially all of the Debtors' assets, and no qualified bidder indicated that it would assume the Debtors' obligations to pay for retiree healthcare under the Murray IEP.  *Id.* ¶ 18.

30.     Two parties made bids for a small portion of the Debtors' assets:  (i) a bid of $12.5 million for the Debtors' assets located in Utah; and (ii) a bid for $350,000 for certain surface right interests in West Virginia.  Neither price presented a compelling opportunity for the Debtors in the context of these chapter 11 cases.  *Id.* ¶ 19.

31.     A third party submitted a bid in the nominal amount of $325 million ($75 million in cash and a $250 million take-back term loan to the DIP Lenders) for certain of the Debtors' mining assets in West Virginia and certain of the Debtors' river assets.  That bidder was willing to assume certain of the obligations that are the subject of this Motion.  The bid, however, suffered from a number of infirmities and was not deemed by the Debtors, after consultation with Evercore and their other advisors, to be a Qualified Bid.  Among other unacceptable divergences from the Bidding Procedures, the bidder refused to make the necessary good-faith deposit (offering only a $1 million deposit if its bid were accepted, instead of the $32.5 million called for under the Bidding Procedures), and the bid included a "diligence out" that would have provided the bidder with a unilateral termination right and introduced execution risk.  *Id.* ¶ 20.

10

32.     Further, even it were deemed to be a Qualified Bid, the bid presented a number of other problems rendering it a lower and otherwise worse bid than the Stalking Horse Bid.  For example, selling the West Virginia and river assets on their own almost certainly would render the remainder of the Debtors' assets materially less valuable and make it more challenging, if not impossible, to reorganize via a feasible chapter 11 plan.  Indeed, the Debtors do not believe the assets left behind after such a sale could sustain a go-forward reorganization plan.  Of significant importance, the DIP Lenders agree with this assessment, and their advisors have indicated that the DIP Lenders will not consensually release their liens on the assets at issue given the offered purchase price.  *Id.* ¶ 21.

33.     As a result, the Stalking Horse Bid presents the only viable path forward for a sale of substantially all of the Debtors' assets as a going concern and maximizes value for the estates. Accordingly, the Debtors filed a notice cancelling the auction and announcing their intent to enter into the Stalking Horse Purchase Agreement.  *Id.* ¶ 22; Docket No. 1076.

**C.     Continued Industry Headwinds and Unanticipated Costs.**

34.     Since the Petition Date, the negative market conditions that plagued the Debtors pre-petition have worsened.  Demand for coal is experiencing further downward pressure from a variety of factors, including:

- ***Excess Supply*** – Coal producers responded to the 2019 decline in export prices by introducing greater coal in the domestic market.[3]

- ***Continued Transition to Renewable Energy Sources*** – Renewable energy sources are expected to surpass coal in market share for electricity generation by 2021.[4]

---

[3]   Olivia Kalb, *US Thermal, Met Coal Outlook Negative on Weak Pricing and Dropping Demand: Moody's*, S&P Glob. Platts (Jan. 22, 2020, 9:11 PM), https://www.spglobal.com/platts/en/market-insights/latest-news/coal/012220-us-thermal-met-coal-outlook-negative-on-weak-pricing-and-dropping-demand-moodys.

[4]   Dylan Brown, *Renewables Primed to Pass Coal Power*, E&E News (Jan. 15, 2020), https://www.eenews.net/stories/1062089099 ("By 2021, renewables will surpass coal and produce 24% of U.S.

- ***Cheap Natural Gas Prices*** – Low natural gas prices are expected to hasten transitions away from coal.[5]

- ***Warmer Than Expected Winter*** – Total demand for electricity has been hampered by an unusually warm winter, which in turn has dampened demand for coal.[6]

- ***Coronavirus*** – In the last month, the pandemic has caused the Debtors' business to deteriorate unexpectedly and rapidly from both a supply and demand perspective. On the demand side, many Asian countries have not transitioned to using renewable energy sources as rapidly as the United States and European countries and therefore are an important source of demand for the Debtors. The dramatic spread of the coronavirus had drastic negative effects on that demand from Asian coal markets, which has become yet another headwind for the Debtors' business. *See* Moore Decl. ¶ 14.[7]

35.    Unfortunately, the Debtors and the coal industry generally expect these trends to continue for the foreseeable future.[8]  The negative market trends have been compounded by power price sharing adjustments with certain customers and customer stockpiles that are already at full or near full levels.  At this time, the Debtors are employing alternate work schedules to

---

electricity.").

[5]    Anna Duquiatan, *et al.*, *US Power Generators Set for Another Big Year in Coal Plant Closures in 2020*, S&P Glob. Mkt. Intelligence (Jan. 13, 2020), https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/56496107 ("Pressured by various stakeholders, many with environmental concerns associated with burning coal, power generators continue to instead turn to natural gas and renewable energy. Meanwhile, a glut of cheap natural gas and falling renewable energy prices are quickening the transition to lower-emission fuels. Power generators with plans to retire coal capacity say they are sticking to those plans despite more favorable policies coming out of the Trump administration.").

[6]    John Kemp, *Plunging U.S. Gas Prices Intensify Squeeze on Coal*, Reuters (Jan. 21, 2020), https://www.reuters.com/article/us-usa-gas-kemp/plunging-u-s-gas-prices-intensify-squeeze-on-coal-kemp-idU SKBN1ZK1J2 ("Warm weather is sapping total demand for electricity, while ultra-low gas prices mean more of the demand that remains will be satisfied by gas-fired units rather than coal plants.").

[7]    Olivia Kalb, *Coronavirus Spreads to Hurt Global Coal Market in H1 2020: Platts Analytics, S&P Glob. Platts* (Mar. 2, 2020, 9:52 PM), https://www.spglobal.com/platts/en/market-insights/latest-news/coal/030220-coronavirus-spreads-to-hurt-global-coal-market-in-h1-2020-platts-analytics ("[C]oal demand at costal Chinese power plants is down 30% year on year, while coal burn has declined 15.2% in January and February compared with the 2018 level.").

[8]    *Short-Term Energy Outlook*, U.S. Energy Information Administration (Feb. 11, 2020), https://www.eia.gov/outlooks/steo/report/coal.php ("Electricity generation from renewable energy sources will rise from a share of 17% last year to 20% in 2020 and 21% in 2021. The increase in the renewables share is the result of expected use of additions to wind and solar generating capacity. Coal's forecast share of electricity generation will fall from 24% in 2019 to 21% in both 2020 and 2021.").

12

preserve liquidity, with certain operations being idled for as many as five days per week.  *Id.* ¶ 15.

36.    The Debtors' operating expenses have also been elevated as a result of the complexity of these chapter 11 cases and those of Murray Met.  Every day the Debtors spend in chapter 11, they incur substantial professional fees and fees owed to the U.S. Trustee.  Moreover, the Debtors incur unquantifiable costs on account of diverted employee time and attention to complying with statutory reporting obligations; responding to information requests from various creditor constituencies; traveling to, preparing for, and attending hearings and creditor meetings; and participating in negotiations related to Murray Met and Foresight Energy LP.  There has been a significant drain on human capital associated with managing multiple, capital-intensive businesses with limited cash.  Campagna Decl. ¶ 9.

37.    Murray Met's own restructuring, in particular, has been a major diversion of financial and human resources.  Arriving at a comprehensive resolution to Murray Met's liquidity issues took far longer than anticipated, and the Debtors incurred significant carrying costs to "hot idle" the Maple Eagle and Oak Grove mines in the process.  In addition, to reach a resolution that avoided spillover consequences to these cases, the Debtors had no option but to commit significant capital to Murray Met, including approximately $10.5 million of intercompany funding prior to Murray Met's bankruptcy filing in February 2020, and a commitment to fund $18.2 million of DIP financing.  *Id.* ¶ 10.

38.    In response to the headwinds and high costs, the Debtors re-evaluated what were once thought to be conservative estimates at the outset of these chapter 11 cases.  When the Debtors sized their DIP financing needs immediately prior to the filing in October 2019, they forecasted a new money need of approximately $250 million (exclusive of approximately $190

13

million of funding required to replace their prepetition ABL / FILO facility, for a total DIP facility of $440 million).  The DIP was sized to fund the Debtors' operations and restructuring costs over the course of a potential nine-month case, through July 2020.  The DIP forecast reflected projected cumulative EBITDA for November 2019 through January 2020 of $109.2 million.  Actual results for this same time period, however, were $69.4 million, a shortfall of $39.8 million.  And while results for February 2020 have not yet been fully closed, the negative trends have continued (indeed, accelerated), with preliminary results indicating a shortfall of approximately $40 million as compared to the EBITDA projected for February 2020 in the DIP forecast.  *Id.* ¶ 11.

39.    The Debtors' recent results have put increased pressure on their liquidity position. As of March 14, 2020, the Debtors had approximately $118 million of remaining liquidity, consisting of approximately $6 million of cash on hand[9] and $112 million of funds from the DIP Facility remaining in a segregated escrow account, available for use in accordance with the terms of the DIP credit agreement.  The Debtors' access to those escrowed DIP funds, however, is presently in jeopardy because the Debtors are concerned they may default under one or more financial covenants that they must satisfy to access that liquidity.  *Id.* ¶ 12; *see also* Docket No. 28 at Ex. B. (DIP Credit Agreement) at § 6.18.

40.    Further, for context, the Debtors had $300 million of liquidity at the end of December 2019, meaning the Debtors' liquidity has been ***reduced by approximately $180 million in only two months***.  Looking forward, the Debtors' most recent 13-week cash flow forecast reflects estimated remaining liquidity of $85 million as of the end of March 2020, $47 million as of the end of April 2020, $42 million as of the end of May 2020, and $30 million as of

---

[9]    This amount excludes amounts held in adequate assurance accounts on behalf of the Debtors' utility providers. *See* Docket No. 387.

the end June 2020.  Based upon recent shortfalls in tons sold and overall market uncertainty, there are further downside risks associated with these most recent estimates.  If these negative trends continue and further exacerbate, the Debtors may fully expend their remaining liquidity over the next three months or be left with insufficient liquidity to emerge from Chapter 11.  *Id.* ¶ 13.

> **D.      The Debtors Have Taken Steps to Preserve Cash.**

41.      In response to the Debtors' declining financial performance, the Debtors have initiated another round of cost cutting and liquidity preserving initiatives.  Among other things, the Debtors abandoned incentive and retention bonus plans to their employees that were included in their initial DIP sizing and DIP forecast.  The Debtors also limited the amounts paid to critical vendors.   The Debtors received Court approval to pay $162.5 million, but are no longer expecting to utilize the full amount.  *Id.* ¶ 14.

42.      Further, the Debtors minimized the funding needs at Murray Met to only what is absolutely necessary to prevent potential significant harm to the Debtors' estates, including the risk of being "permit blocked" or otherwise falling out of compliance with applicable non-bankruptcy law (which could result in reclamation and environmental liabilities in excess of $60 million).  Indeed, in early discussions regarding the funding need at Murray Met, the Debtors contemplated a potential funding of $35 million to $50 million.  Ultimately, the Debtors funded approximately $28.7 million, consisting of $10.5 million funded as emergency financing prior to the Murray Met chapter 11 filing and $18.2 million in new money, debtor-in-possession financing.  *Id.* ¶ 15.

43.      The Debtors also implemented additional cost-cutting measures to minimize cash depletion, including idling the Genesis Mine in March 2020, reducing corporate-level headcount by approximately 95 employees, and deferring certain corporate salaries.  These measures are

15

expected to yield more than $15 million of annual cost savings.  Meanwhile, the Debtors' CEO is personally approving all expenditures over $25,000, a reflection of how important each dollar is to the enterprise.  *Id.* ¶ 16.

44.    While the Debtors' cost-cutting and other cash preservation efforts will help extend the liquidity runway, the Debtors cannot be confident that it will be enough to consummate a going-concern sale and exit chapter 11 before the Debtors exhaust their remaining liquidity.  Accordingly, it is critical that the Debtors obtain interim modifications and cease paying more than $6 million per month in post-retirement medical obligations, to preserve their liquidity so that they can responsibly operate the business, particularly given the unprecedented headwinds the Debtors continue to face.  *Id.* ¶ 17.

### E.    The Debtors' Union and Retiree Obligations.

45.    The Debtors employ approximately 1,850 members of the UMWA at six mines in West Virginia and Ohio.[10]    Certain of the Debtors and UMWA are party to the 2016 CBA, which expires at the end of 2021.

46.    Pursuant to the 2016 CBA, the Debtors contribute to a pension plan and a deferred savings plan on behalf of their UMWA employees:  (a) the 1974 Pension Plan and (b) the United Mine Workers of America Cash Deferred Savings Plan of 1988 ("CDSP").  The Debtors also contribute to a health care plan for "orphaned" retired miners:  the UMWA 1993 Benefit Plan and Trust ("1993 Plan").

47.    The Debtors also provide their UMWA employees and retired employees ("Union Retirees") with certain health care and other post-employment benefits ("Contractual OPEB

---

10    Members of the UMWA work at the following mines:  Franklin County; Harrison County; Marion County; Monongalia County; Marshall County; and Ohio County.  Ohio Valley Transloading also employs four UMWA Employees.

Obligations"). The Contractual OPEB Obligations are provided through the Murray IEP and administered by the 1993 Plan, to which the Debtors pay an administration fee. The Debtors provide Contractual OPEB Obligations to approximately 11,661 of the Union Retirees (including spouses and dependents) pursuant to the 2016 CBA.

48.     Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), the Debtors provide approximately 2,279 retirees (including spouses and dependents) with healthcare and retiree benefits under the Murray IEP ("Statutory Retirees" and "Statutory Obligations"). The Coal Act covers eligible coal miners who retired before October 1, 1994, and their spouses and eligible dependents. *See* 26 U.S.C. §§ 9711(b)(1), 9712(b)(2). The Coal Act provides retiree medical care coverage through individual employer plans that are funded and administered directly by current or former coal operators, *see id.* § 9711, or through one of two UMWA-administered retiree benefit funds ("Coal Act Funds") for which current and former coal operators pay annual and/or monthly premiums:   (a) the Combined Benefit Fund, *see id.* § 9704, and (b) the UMWA 1992 Benefit Plan ("1992 Plan"), *see id.* § 9712(d)(1). The Debtors owe Statutory Obligations under section 9711 of the Coal Act and to the 1992 Plan, which they satisfy in part through the Murray IEP.[11]

49.     In 2019, the Debtors (a) contributed approximately $16.2 million to the 1974 Pension Plan, 1993 Plan, and CDSP, and (b) approximately $93.3 million in Contractual OPEB Obligations and Statutory Obligations under the Murray IEP. Using 2019 figures, the Debtors accrue approximately $256,000 per day in pension and Contractual OPEB Obligations. Historically, contributions to the Statutory Retirees have been approximately 20% to 25% of the

---

[11]   For the avoidance of doubt, the relief requested herein does not apply to any Statutory Retirees (including spouses and dependents) currently receiving certain health care and other post-employment benefits under the Murray IEP as required by the Coal Act.

total contributions (approximately $51,000 to $64,000 per day); the Debtors anticipate filing a separate motion relating to those amounts and the Retiree Committee.  This Motion addresses contributions to the Union Retirees, which have been approximately 75% to 80% of the total contributions (approximately $192,000 to $205,000 per day).  During the first few months of 2020, monthly contributions have been higher as compared to 2019, so the amounts reported in this paragraph are likely understated.

50.    The following chart summarizes the average annual cost of the Debtors' Statutory and Contractual OPEB Obligations.

| Plan | Number of Participants[12] | Annual Cost[13] |
|---|---|---|
| **Statutory Obligations** | | |
| Murray IEP (Statutory Retirees) | 2,279 | • Approximately $23 million |
| 1992 Plan | N/A | • No annual premiums<br>• Approximately $22.5 million of security posted |
| Combined Benefit Fund | N/A | • No annual premiums |
| **Contractual OPEB Obligations and Pension Obligations** | | |
| 1993 Plan | N/A | • Approximately $2.1 million |
| Murray IEP (Union Retirees) | 11,661 | • Approximately $74 million |
| 1974 Pension Plan | 1,207 | • Approximately $18 million contributed |
| CDSP | N/A | • Approximately $8 million contributed |

---

[12]  As of December 31, 2019.

[13]  With respect to the Murray IEP annual costs, this amount will vary annually depending on the number and dollar amount of liability claims submitted by eligible retirees.  The approximations are based on the most recent yearly data.

### F.   The 2019 Miners Act.

51.   Last year, the Debtors worked with the UMWA to advocate for legislation that backstops the 1974 Pension Plan, 1993 Plan, and 1992 Plan, among other things.  In December 2019, Congress passed a federal funding appropriations bill that included the Bipartisan American Miners Act of 2019 ("2019 Miners Act").  President Trump signed the 2019 Miners Act into law on December 20, 2019.  The 2019 Miners Act was enacted to prevent the insolvency of the 1974 Pension Plan and secure the pensions and healthcare of over 100,000 beneficiaries by amending the Surface Mining Control and Reclamation Act of 1977 ("SMCRA").

52.   The SMCRA requires coal mining operators to pay a reclamation fee into the Abandoned Mine Land Fund ("AML Fund") maintained by the Secretary of the Interior. 30 U.S.C. § 1232(a).  Money from the AML Fund is given to states and Indian tribes as part of reclamation programs to clean up and restore lands surrounding abandoned mines.  *See id.* § 1232(g).  Interest amounts accrued on the money in the AML Fund is also transferred to the Combined Benefit Fund and then, if any amount remain, to the 1992 Plan and the 1993 Plan health plans to offset any deficit in the net assets of those plans.  *See id.* § 1232(h)(2).

53.   The 2019 Miners Act amended the SMCRA in several relevant ways.  ***First***, the 2019 Miners Act increased the cap on the amount that may be transferred to the UMWA Funds' health plans each year from $490 million to $750 million.  *See* 2019 Miners Act, Pub. L. 116-94, § 102(a)(1), 133 Stat. 2534, 3091.  ***Second***, after funds have been transferred to the UMWA Finds' health plans and certified states and Indian tribes for reclamation, any amount remaining within the new annual cap will be transferred to the 1974 Pension Plan.  *See* 2019 Miners Act § 102(a)(4)(A).  These transfers will continue so long as the funded percentage of the 1974 Pension Plan is less than 100 percent.  *Id.* § 102(a)(4)(B).  And third, the 2019 Miners Act

19

expands the field of retiree beneficiaries under the 1993 Plan to include retirees whose health

benefits "would be denied or reduced, as a result of a bankruptcy proceeding commenced in

2012, 2015, 2018 or 2019." *Id.* at § 103(2).[14]

54.     The 2019 Miners Act is designed to prevent certain retired miners from losing

their retiree health benefits as a result of bankruptcy proceedings like these.  As such, the 1974

Pension Plan, 1993 Plan, and 1992 Plan—as well as the Debtors' UMWA employee and retiree

beneficiaries thereunder—are now effectively backstopped by the U.S. Treasury in the event that

the Debtors obtain the relief sought in this Motion.

## BASIS FOR RELIEF

55.     Until the anticipated closing, the Debtors expect to spend approximately $256,000

per day in retiree medical contributions that they cannot afford.  If the Debtors do not transition a

significant amount of those obligations as soon as possible, the Debtors may liquidate—leaving

no business to restructure and no go-forward employment opportunities for

thousands.  Therefore, the Debtors seek authorization to modify the 2016 CBA and terminate

their Contractual OPEB Obligations, on an interim basis, by transferring the Union Retirees from

the Murray IEP to the 1993 Plan.  Given the Debtors' projected performance and liquidity, these

interim modifications are necessary.

### A.     Congress Recognized That Interim Relief May Be Appropriate.

56.     In sections 1113(e) and 1114(h) of the Bankruptcy Code, Congress recognized

that, in rare instances, a debtor's situation can be so dire that mid-case modifications are

necessary to save the enterprise.  These provisions are designed to allow a struggling debtor to

carry on its business for the benefit of all, while the parties renegotiate a CBA or modify retiree

---

14  The 2019 Miners Act also extends and increases the Black Lung Disability Trust Fund excise tax.

obligations. *See In re Russell Transfer, Inc.*, 48 B.R. 241, 243 (Bankr. W.D. Va. 1985) ("Section

1113(e) was enacted as an emergency stopgap measure pending proceedings in the rejection

process."); *In re United Press Int'l, Inc.*, 134 B.R. 507, 513 (Bankr. S.D.N.Y. 1991) (recognizing

that the "purpose of [section 1113](e) is to allow the Court sufficient flexibility to provide the

debtor in possession temporary economic relief in order to . . . preserve the business, if possible,

for the benefit of all").

57.   Section 1113(e) provides:

> If during a period when the collective bargaining agreement
> continues in effect, and if essential to the continuation of the
> debtor's business, or in order to avoid irreparable damage to the
> estate, the court, after notice and a hearing, may authorize the
> trustee to implement interim changes in the terms, conditions,
> wages, benefits or work rules provided by a collective bargaining
> agreement. Any hearing under this paragraph shall be scheduled in
> accordance with the needs of the trustee. The implementation of
> such interim changes shall not render the application for rejection
> moot.

11 U.S.C. § 1113(e).  Section 1114(h)(1) similarly provides:

> Prior to a court issuing a final order under subsection (g) of this
> section, if essential to the continuation of the debtor's business, or
> in order to avoid irreparable damage to the estate, the court, after
> notice and a hearing, may authorize the trustee to implement
> interim modifications in retiree benefits.

*Id.* at § 1114(h)(1).

58.   To grant interim relief, a court must determine that the proposed changes either

(a) will "avoid irreparable damage to the estate," or (b) are "essential to the continuation of the

Debtors' business." *See* §§ 1113(e), 1114(h)(1).  Although the standards are disjunctive, courts

may require a debtor to show that both criteria are met to satisfy sections 1113(e) and

1114(h)(1).  *See In re Wright Air Lines Inc.*, 44 B.R. 744, 745 (Bankr. N.D. Ohio 1984)

(reviewing both prongs); *In re United Press Int'l*, 134 B.R. at 514 (holding that, under section

21

1113(e), "a debtor need only meet one of the statutory standards without having met the other");

*In re Garfinckels Inc.*, 124 B.R. 3, 4–5 (Bankr. D.D.C. 1991) (reviewing both the essential and

harm prongs of section 1114(h)).

59.    To satisfy the "irreparable harm" standard, a debtor should provide financial

evidence that it will suffer near-term harm without interim relief. *See In re Salt Creek*

*Freightways*, 46 B.R. 347, 350 (Bankr. D. Wyo. 1985) ("The debtor submitted schedules

showing the comparison effects of labor costs with and without the proposed interim changes . . .

[and] testified that, without the requested interim changes, the company will not be able to stay

in business longer than one (1) week.").

60.    A showing of "essential to the continuation of the Debtors' business" requires a

debtor to show a "more immediate level of economic emergency than it would need to show as

support for an application for rejection." *Id.*   Interim relief is limited to the "bare minimum,

short-term requirements for the debtor's immediate survival." *In re United Press Int'l*, 134 B.R.

at 514.   Essential is determined on a case-by-case basis and is "measured against whether a

debtor will collapse without change." *Id.*   For example, if interim relief would prevent a debtor

from converting to chapter 7, then it may be necessary to the continuation of the chapter 11

proceedings. *See In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 525 (Bankr. S.D.N.Y. 1991)

(holding that under section 1114(h) "'necessary to permit the reorganization' must be interpreted

to mean 'necessary to accommodate confirmation of a Chapter 11 plan'").

61.    As explained below, the Debtors' requested interim modifications are both

necessary to avoid irreparable damage to the Debtors' estates and essential to the continuation of

the Debtors' business.   The Debtors request that such interim modifications of the 2016 CBA

remain in place until the earlier of (a) a consensual agreement with the UMWA is reached and implemented, or (b) further order of the Court.[15]

**B.    The Requested Interim Modifications Satisfy Sections 1113(e) and 1114(h).**

62.    Without these interim modifications, the Debtors will likely run out of liquidity necessary to run the businesses amid this global crisis and historically bad coal markets before they are scheduled to emerge from chapter 11.

63.    The Debtors have lost $180 million of liquidity in the last two months.  As of March 14, 2020, the Debtors had approximately $118 million of remaining liquidity, consisting of approximately $6 million of cash on hand[16] and—although continued access is presently in jeopardy—$112 million of funds from the DIP Facility.  If these negative trends continue, which the Debtors expect, the Debtors may fully expend their remaining liquidity over the next two months or be left with insufficient liquidity to emerge from Chapter 11.

64.    If the Debtors liquidate, approximately 4,900 employees, including approximately 1,850 union employees, will lose their jobs.  As one of the largest remaining coal companies in operation, that would also have negative consequences for hundreds of the Debtors' vendors and suppliers (not to mention the ongoing Murray Met chapter 11 proceeding).[17]

65.    The Debtors' proposed interim modifications are a last resort.  *See supra* Background Section D.  Few, if any, stakeholders remain unscathed in these chapter 11

---

[15] Although interim relief is usually granted for no longer than two months, courts may grant extensions. *See* 7 Collier on Bankruptcy ¶ 1113.07 (16th ed. 2019) (explaining that courts limit interim relief to two months but may grant additional extensions); *see also In re Nw. Airlines Corp.*, 346 B.R. 307, 331–32 (Bankr. S.D.N.Y. 2006) (granting interim relief for three months, which was later extended by the court to more than eight months); *In re Almacs, Inc.*, 169 B.R. 279, 280 (Bankr. D.R.I. 1994) (extending and modifying an original, section 1113(e) order over a period of a year); *Landmark Hotel & Casino, Inc.*, 78 B.R. 575, 576 (B.A.P. 9th Cir. 1987) (ordering interim relief for six months and later extending it four more months).

[16] *See supra*, note 9.

[17] The Debtors are party to hundreds of vendor contracts and make significant contributions to the SMCRA.

23

proceedings.   Moreover, the rapidly changing market conditions as a result of the current coronavirus pandemic severely impair the Debtors' ability to predict and mitigate their losses. The only remaining way to decrease expenses—and continue to responsibly operate through confirmation—is to immediately cease providing Contractual OPEB Obligations until a final resolution with the UMWA can be reached and the effective date occurs.   And because of the backstops provided by the 2019 Miners Act, the Union Retirees will not experience any day-to-day consequences from the interim relief.   As a result, the balance of hardships favors the Debtors, and the proposed interim modifications are less consequential than other relief that courts have granted in similar circumstances.   *See, e.g.*, *In re US Airways, Inc.*, No. 04-13819 (SSM) (Bankr. E.D. Va. Oct. 15, 2004) (approving 21% reduction in salaries, modification to employer pension contributions, and suspension of other provisions in CBAs); *In re Russell Transfer, Inc.*, 48 B.R. at 244 (approving 20% reduction in salaries and benefits of Union employees and 10% reduction in salaries of administrative employees); *In re Hoffman Bros. Packing Co., Inc.*, 173 B.R. 177, 183 (B.A.P. 9th Cir. 1994) (affirming interim reduction of debtor's health and pension contribution costs by more than two thirds); *In re Nat'l Forge Co.*, 289 B.R. at 803 (noting approval of a 6% wage rollback, cancellation of scheduled 5% wage increase, and reduction in health and welfare benefits); *In re United Press Int'l*, 134 B.R. at 515 (reducing wages to 80% level and suspending severance pay).

66.   The proposed interim modifications are truly "stop-gap" relief that will only partially address the Debtors' immediate cash crisis.   The Debtors are requesting only that which is necessary for their survival—to allow them the time and resources necessary to continue their efforts to implement a long-term plan for success.   *See In re Ionosphere* 139 B.R. 772, 782 (S.D.N.Y. 1992) ("[T]he Court holds that the standard for interim relief under § 1113(e) requires

a showing that the short term survival of the debtor is threatened unless immediate changes to the collective bargaining agreement are authorized.").

67.     The Debtors have done their best to mitigate and spread financial pain across their enterprise to avoid a chapter 7 liquidation.  Without these stop-gap measures, the Debtors' efforts to consummate a successful chapter 11 emergence are jeopardized.  *See In re United Press Int'l, Inc.*, 134 B.R. at 514 (noting that essential is determined on a case-by-case basis and is "measured against whether a debtor will collapse without change").

## Notice

68.     The Debtors have provided notice of this motion to the entities on the Master Service List (as defined in the Case Management Order).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

69.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached as **Exhibit A**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  March 30, 2020
Cincinnati, Ohio

/s/ Kim Lewis

| | |
|---|---|
| Kim Martin Lewis (0043533) | Nicole L. Greenblatt, P.C. (admitted *pro hac vice*) |
| Alexandra S. Horwitz (0096799) | Mark McKane, P.C. (admitted *pro hac vice*) |
| **DINSMORE & SHOHL LLP** | **KIRKLAND & ELLIS LLP** |
| 255 East Fifth Street | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Suite 1900 | 601 Lexington Avenue |
| Cincinnati, Ohio 45202 | New York, New York 10022 |
| Telephone:     (513) 977-8200 | Telephone:     (212) 446-4800 |
| Facsimile:     (513) 977-8141 | Facsimile:     (212) 446-4900 |
| Email:     kim.lewis@dinsmore.com | Email:     nicole.greenblatt@kirkland.com |
|              allie.horwitz@dinsmore.com |              mark.mckane@kirkland.com |

*Counsel to the Debtors and Debtors in Possession*

- and -

Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     ross.kwasteniet@kirkland.com
              joe.graham@kirkland.com

*Counsel to the Debtors and Debtors in Possession*