**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**



John E. Hoffman, Jr.
United States Bankruptcy Judge

**Dated: August 31, 2020**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |
|---|---|
| In re: | ) )  Chapter 11 |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | )  Case No. 19-56885 (JEH) |
|  | ) )  Judge John E. Hoffman, Jr. |
| Debtors. | ) )  (Jointly Administered) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING DEBTORS' SECOND AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE [RELATED TO DOCKET NOS. 2091, 2108, 2118 & 2127]**

---

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

having:

a.  commenced, on October 29, 2019 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of Ohio (the "Court") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code");

b.  continued to operate and manage their businesses and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.  filed, on December 3, 2019, the *Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 322] and the *Disclosure Statement for the Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 323];[2]

d.  filed, on December 4, 2019, the *Debtors' Motion for Entry of an Order (I) Approving (A) the Adequacy of Information in the Disclosure Statement, (B) Solicitation and Voting Procedures, and (C) Certain Dates with Respect to Plan Confirmation, and (II) Granting Related Relief* [Docket No. 324] (the "Disclosure Statement Motion");

e.  obtained, on January 9, 2020, the *Order (I) Approving the Bidding Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets, (II) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief [Related to Docket No. 326]* [Docket No. 742] (the "Bidding Procedures Order") and the bidding procedures attached thereto as Exhibit 1 (the "Bidding Procedures");

f.  served, on January 14, 2020, the Bidding Procedures and otherwise complied with the notice requirements and procedures set forth in the Bidding Procedures Order, as set forth in the *Certificate of Service* [Docket No. 757] (the "Bidding Procedures Mailing Affidavit");

g.  caused to be published, on January 14–17, 2020, notice of the Bidding Procedures in *The Wall Street Journal* (national edition), in *The New York Times* (national edition), in *The Salt Lake City Tribune*, in *The Courier-Journal*, in the *Lexington Herald Leader*, in *The Herald-Dispatch*, in *The Columbus Dispatch*, and in *The Birmingham News*, as set forth in the *Notice of Filing of Affidavits of Publication*

---

2  All capitalized terms used but otherwise not defined in these findings of fact, conclusions of law, and order (the "Confirmation Order") have the meanings given to them in the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A** (as supplemented from time to time, the "Plan"). The rules of interpretation set forth in Article I of the Plan shall apply to this Confirmation Order.

KE 69035745

[Docket No. 785] (with the Bidding Procedures Mailing Affidavit, the "<u>Bidding Procedures Affidavits</u>");

h.    filed, on March 16, 2020, the *Notice of Filing of Executed Stalking Horse Purchase Agreement* [Docket No. 1064];

i.    filed, on March 20, 2020, a *Notice of Cancellation of Auction and Designation of Successful Bidder*, deeming the Stalking Horse Bidder as the Successful Bidder (as defined in the Bidding Procedures) and the only bidder to submit a Qualified Bid (as defined in the Bidding Procedures) and cancelling the auction [Docket No. 1076] ("<u>Notice of Successful Bidder</u>");

j.    caused, on March 20, 2020, the Notice of the Successful Bidder to be served, as set forth in the *Certificate of Service* [Docket No. 1089] (the "<u>Successful Bidder Affidavit</u>");

k.    filed, on April 3, 2020, the *Notice of Filing of Schedules to Stalking Horse Purchase Agreement* [Docket No. 1146] and the *Amended Notice of Filing of Schedules to the Stalking Horse Purchase Agreement* [Docket No. 1147];

l.    filed, on April 6, 2020, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1154] and the revised *Disclosure Statement for the Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1155];

m.    filed, on April 22, 2020, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1315];

n.    filed, on April 22, 2020, the revised *Disclosure Statement for the Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1316];

o.    filed, on April 23, 2020, the revised *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1342], and the revised *Disclosure Statement for the Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1344];

p.    obtained, on April 24, 2020, the *Order (I) Approving (A) the Adequacy of the Disclosure Statement, (B) Solicitation and Voting Procedures, and (C) Certain Dates with Respect to Plan Confirmation, and (II) Granting Related Relief* [Docket No. 1356] (the "<u>Solicitation Order</u>"), which approved, among other things, solicitation procedures (the "<u>Solicitation Procedures</u>"), related notices, and form ballots (collectively the "<u>Solicitation Packages</u>");

q.    obtained, on April 24, 2020, an *Order Approving Certain Dates and Protocols in Connection with Plan Confirmation* [Docket No. 1357] (the "<u>Confirmation Scheduling Order</u>");

3

r.   filed, on April 25, 2020, the solicitation version of the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1359] (the "Original Plan") and the *Disclosure Statement for the Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1360] (the "Disclosure Statement");

s.   caused, on April 27, 2020, the Solicitation Packages and notice of the original confirmation hearing (the "Original Confirmation Hearing") to be distributed in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and the Solicitation Order, as evidenced by, among other things, the *Affidavit of Service of Solicitation Materials* [Docket No. 1487] (the "Solicitation Affidavit");

t.   caused to be published, on May 4, 2020, notice of the Original Confirmation Hearing (the "Confirmation Hearing Notice") in *The Wall Street Journal*, *The Salt Lake City Tribune*, *The Courier-Journal*, the *Lexington Herald Leader*, *The Herald-Dispatch*, *The Columbus Dispatch*, and *The Birmingham News,* as evidenced by the *Notice of Filing of Affidavits of Publication* [Docket No. 1446] (the "Publication Affidavit"), consistent with the Solicitation Order;

u.   filed, on May 15, 2020, the *Notice of Proposed Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 1529] and *Notice Regarding Executory Contract and Unexpired Leases to be Rejected Pursuant to the Plan* [Docket No. 1530] (the "Executory Contract Schedules");

v.   filed, on May 29, 2020, July 24, 2020, August 6, 2020, August 25, 2020, and August 28, 2020, the supplements to the Plan [Docket Nos. 1610, 1873, 1933, 2104, and 2125] (collectively, with the Executory Contract Schedules, and as modified, supplemented, or otherwise amended from time to time, the "Plan Supplement");

w.   caused, on May 15, 2020, and May 29, 2020, notices of the Initial Plan Supplements and the Plan Supplement to be served as set forth in the respective affidavits of service [Docket Nos. 1581, 1610] (collectively, the "Plan Supplement Affidavits");

x.   filed, on June 4, 2020, the *Notice of Adjournment of (A) the Confirmation and Sale Hearing and (B) Related Dates and Deadlines* [Docket No. 1639];

y.   filed, on July 24, 2020, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1872];

z.   obtained, on July 27, 2020, an *Order Approving Certain Dates and Protocols in Connection with Plan Confirmation* [Docket No. 1184] (the "Continued Confirmation Scheduling Order");

aa.   filed, on July 29, 2020, the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Continued Solicitation of the Amended Plan and the Adequacy of the Supplemental Disclosure in Connection Therewith, and (II) Granting Related Relief* and the *Supplemental Disclosure Statement for the Debtors' Second*

*Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1886];

bb.     obtained, on August 6, 2020, an *Order (I) Authorizing the Debtors to Enter into Exit Financing Commitment and Fee Letters and (II) Granting Related Relief* [Docket No. 1924] (the "Exit Financing Order");

cc.     filed, on August 6, 2020, the *Notice of Filing Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1932];

dd.     filed, on August 6, 2020, the *Notice of Filing Supplemental Disclosure Statement for the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1934];

ee.     obtained, on August 7, 2020, an *Order (I) Approving the Debtors' Continued Solicitation of the Amended Plan and the Adequacy of the Supplemental Disclosure in Connection Therewith, and (II) Granting Related Relief* [Docket No. 1939] (the "Continued Solicitation Order," and together with the Solicitation Order, the "Disclosure Statement Orders"), which order, among other things, approved a supplement to the Disclosure Statement (the "Disclosure Statement Supplement"), modified ballots in connection with the continued solicitation of the Plan, and new dates in connection with confirmation;

ff.     caused, on August 7, 2020, the Disclosure Statement Supplement and related ballots to be served in accordance with the Continued Solicitation Order [Docket Nos. 1951] (the  "Solicitation Affidavit");

gg.     filed, on August 24, 2020, the *Declaration of James Daloia Regarding Analysis of Ballots for Accepting or Rejecting the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2081] (the "Voting Report"), which detailed the results of the Plan voting process;

hh.     filed, on August 24, 2020, the *Notice of Filing Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2082]; and

ii.     filed, on August 24, 2020, (i) the *Memorandum of Law in Support of Confirmation of the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2078] (the "Confirmation Brief"), (ii) the *Declaration of Robert D. Moore in Support of Confirmation of the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2087] (the "Moore Declaration"), (iii) the *Declaration of Mark Cox in Support of Confirmation of the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2088] (the "Cox Declaration"), (iv) the *Declaration of Gregory Berube in Support of Confirmation of the Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2089] (the "Berube Declaration"), and (v)  the *Declaration of Robert A. Campagna in Support of Confirmation of the Debtors' Second Amended Joint Plan*

*Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2090] (the "Campagna Declaration").

The Court having:

a.   entered, on January 9, 2020, the Bidding Procedures Order and approved the Bidding Procedures;

b.   entered, on April 24, 2020, (a) the Solicitation Order and approved the Solicitation Procedures and Solicitation Packages, and (b) the Confirmation Scheduling Order;

c.   entered, on July 27, 2020, the Continued Confirmation Scheduling Order;

d.   entered, on August 6, 2020, the Exit Financing Order;

e.   entered, on August 7, 2020, the Continued Solicitation Order;

f.   set August 26, 2020, at 10:00 a.m., prevailing Eastern Time, as the date and time for the commencement of the confirmation hearing (the "Confirmation Hearing"), pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code, as set forth in the Continued Confirmation Scheduling Order and the Continued Solicitation Order;

g.   reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Moore Declaration, the Cox Declaration, the Berube Declaration, the Campagna Declaration, the Voting Report, the Affidavits, the Ballots, and all filed pleadings, exhibits, statements, and comments regarding Confirmation of the Plan, including all objections, statements, and reservations of rights;

h.   held, on August 26, 2020, through August 31, 2020, the Confirmation Hearing;

i.   heard the statements and arguments made by counsel in respect of Confirmation of the Plan and the objections thereto; and

j.   considered all oral representations, affidavits, testimony, documents, filings, and other evidence regarding Confirmation of the Plan and the objections thereto.

NOW, THEREFORE, it appearing to the Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation of the Plan has been adequate and appropriate, and the legal and factual bases set forth in the documents filed in support of Confirmation of the Plan and other evidence presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing

therefor, the Court hereby makes and issues the following findings of fact and conclusions of law, and orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

     **A.**     **Findings and Conclusions.**

     1.     The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

     **B.**     **Jurisdiction, Venue, and Core Proceeding.**

     2.     The United States Bankruptcy Court for the Southern District of Ohio (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order 30-3* from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4, 2019 (the "General Order"). Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court has jurisdiction to enter a Final Order determining that the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

     **C.**     **Eligibility for Relief.**

     3.     The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

     **D.**     **Judicial Notice.**

     4.     This Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of this Court.

### E. Objections.

5.     Any resolution of objections to Confirmation explained on the record at the Confirmation Hearing is hereby incorporated by reference.  All unresolved objections, statements, informal objections, and reservations of rights (except with respect to unresolved cure amounts), if any, related to the Confirmation of the Plan are overruled on the merits.

### F. Burden of Proof—Confirmation of the Plan.

6.     The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation of the Plan.

### G. Notice; Joinder/Intervention.

7.     As evidenced by the Affidavits, the Debtors have provided due, adequate, and sufficient notice of the Plan, the Sale Transaction, the Plan Supplement, and the Confirmation Hearing, to known and unknown Holders of Claims and Interests and other Entities with an interest in the Debtors' property and otherwise complied with the notice requirements of the Bankruptcy Code, the Bankruptcy Rules, and the procedures set forth in the Disclosure Statement Orders.  Such notice was adequate and sufficient pursuant to section 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3017, and 3020, and other applicable law and rules, and no other or further notice is or shall be required.

### H. Voting Report.

8.     Prior to the Confirmation Hearing, the Debtors filed the Voting Report.  As evidenced by the Voting Report and based on the record before the Court, the procedures used to tabulate Ballots were fair and conducted in accordance with the Disclosure Statement Orders, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations. Holders of Claims or Interests in Class 4 (Superpriority Claims), Class 5 (Term Loan Claims),

8

Class 6 (1.5L Notes Claims), Class 7 (Stub 2L Notes Claims), Class 8 (2L Notes Claims), Class 9

(General Unsecured Claims), and Class 14 (1974 Plan Claims) were eligible to vote on the Plan

(the "Voting Classes").  The Ballots the Debtors used to solicit votes to accept or reject the Plan

from Holders in the Voting Classes adequately addressed the particular needs of the Chapter 11

Cases and were appropriate for Holders in the Voting Classes to vote to accept or reject the Plan.

The form of the Ballots were approved by the Court as part of the Disclosure Statement Orders.

Holders of Claims or Interests in Classes 1, 2, 3, 10, 11, 12, and 13 were either Unimpaired or

Impaired under the Plan and were not entitled to vote to accept or reject the Plan (collectively,

the "Non-Voting Classes").  Thus, Holders of Claims or Interests in the Non-Voting Classes were

conclusively presumed to have accepted, or deemed to have rejected, the Plan, as applicable.

Based on the foregoing, and as evidenced by the Voting Report, Class 4 (Superpriority Claims),

Class 6 (1.5L Notes Claims), and Class 8 (2L Notes Claims) voted to accept the Plan at each Debtor

at which they were entitled to vote, Class 9 (General Unsecured Claims) voted to accept the Plan

at Debtors Murray Energy Holdings Company and Utah American Energy, Inc., and Class 14

(1974 Plan Claims) voted to accept the Plan at each Debtor in accordance with the requirements

of sections 1124, 1126, and 1129 of the Bankruptcy Code.  Class 5 (Term Loan Claims) voted to

reject the Plan at each Debtor at which that Class was entitled to vote and Class 9 (General

Unsecured Claims) voted to reject the Plan at all Debtors other than those referenced above.  The

Debtors did not receive votes for Class 7 (Stub 2L Notes Claims), and it is deemed to consent to

the Plan pursuant to Article III.F of the Plan.

**I.      Solicitation.**

9.      As described in the Voting Report, the solicitation of votes on the Plan complied

with the Solicitation Procedures, was appropriate and in good faith and satisfactory based upon

the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the

Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of Ohio (the "Local Rules"), and any other applicable rules, laws, and regulations.

10.     As described in the Voting Report and the Affidavits, as applicable, the Solicitation Packages were transmitted and served, including to all Holders in the Voting Classes, in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the Disclosure Statement Orders, and any applicable nonbankruptcy law.  Transmission and service of the Solicitation Packages was timely, adequate, and sufficient.  No further notice is required.

11.     As set forth in the Voting Report, the Solicitation Package initially was distributed to Holders in the Voting Classes that held a Claim against or Interest in the Debtors, as of April 24, 2020 (the "Voting Record Date").  The establishment and notice of the Voting Record Date were approved by the Solicitation Order.  New ballots were distributed to Holders in the Voting Classes that held a Claim against or Interest in the Debtors and the Debtors continued soliciting votes on the Plan in accordance with the Continued Solicitation Order.

12.     Under sections 1126(f) and 1126(g) of the Bankruptcy Code, the Debtors were not required to solicit votes from the Holders of Claims or Interests, as applicable, in the Non-Voting Classes, each of which is conclusively presumed to have accepted, or deemed to have rejected, the Plan.

   **J.   Plan Supplement.**

13.     The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan, and the filing and notice of such documents are good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable nonbankruptcy law and no other or further notice is required.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan (including

Article X of the Plan), the Debtors' right to alter, amend, update, or modify the Plan Supplement before the Effective Date is reserved.

### K. Compliance with Bankruptcy Code Requirements—Section 1129(a)(1).

14. The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code. In addition, the Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

### (i) Proper Classification—Sections 1122 and 1123.

15. The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into fourteen Classes, based on differences in the legal nature or priority of such Claims and Interests (other than DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, which are addressed in Article II of the Plan and which are not required to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code). Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not promulgated for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests. In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. The Plan, therefore, satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

### (ii) Specified Unimpaired Classes—Section 1123(a)(2).

16. Article III of the Plan specifies that Claims in Classes 1, 2, and 3 are Unimpaired under the Plan. The Plan, therefore, satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### (iii) Specified Treatment of Impaired Classes—Section 1123(a)(3).

17. Article III of the Plan specifies the treatment of each Impaired Class of Claims or Interests under the Plan, including Classes 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14. The Plan, therefore, satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### (iv) No Discrimination—Section 1123(a)(4).

18. Article III of the Plan provides the same treatment for each Claim or Interest within a particular class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest. The Plan, therefore, satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### (v) Adequate Means for Plan Implementation—Section 1123(a)(5).

19. The Plan and the various documents and agreements set forth in the Plan Supplement provide adequate means for the Plan's implementation, including (a) the consummation of the Sale Transaction in accordance with the Stalking Horse APA, the Plan, and this Confirmation Order, (b) the distribution of the Sale Proceeds and any cash on hand in accordance with the Plan, and (c) the appointment of the Plan Administrator to take any action necessary to wind down and dissolve the Estates, among others. The Plan, therefore, satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### (vi) Non-Voting Equity Securities—Section 1123(a)(6).

20. The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code prohibiting the issuance of nonvoting equity securities. On the Effective Date, (a) all Property of

the Estates (other than the Retained Assets) not distributed to Holders of Claims or Interests on the Effective Date, or transferred pursuant to the Stalking Horse APA or the Plan, shall be transferred in accordance with the Restructuring Steps Memorandum to the Wind-Down Trust and (b) all the fiduciary duties, authority, power, and incumbency of any and all persons acting as officers, directors, managers, and shareholders of the Debtors shall be deemed to have been terminated and vest in the Plan Administrator.  The Plan Administrator shall be responsible for:  (a) winding down the Debtors' businesses; (b) resolving Disputed Claims; (c) making all distributions to Holders of Allowed Claims; (d) filing tax returns; (e) taking necessary actions with respect to the Retained Assets; and (f) administering the Plan.  Accordingly, the requirements of section 1123(a)(6) of the Bankruptcy Code are inapplicable to confirmation of the Plan.

### (vii)   Directors and Officers—Section 1123(a)(7).

21.     The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. The Plan provides that, on the Effective Date, the term of the current members of the board of managers or directors and officers of the Debtors and non-Debtor subsidiaries shall expire and the Plan Administrator will be appointed.   Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### (viii)   Claims and Executory Contracts—Section 1123(b)(1)–(2).

22.     Article III of the Plan leaves Impaired or Unimpaired, as the case may be, each Class of Claims and Interests, and Article V of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) have been previously assumed or rejected by the Debtors pursuant to a

13

Bankruptcy Court order; (c) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date; or (d) are a contract, release, or other agreement or document entered into in connection with the Plan.  The Debtors provided sufficient notice to each non-Debtor counterparty to an Executory Contract or Unexpired Lease assumed, assumed and assigned, or rejected by the Debtors pursuant to the Plan, the Plan Supplement, or otherwise during the Chapter 11 Cases.

> **(ix)** **Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3).**

23.     The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code. Article VIII.C of the Plan describes certain releases granted by the Debtors (the "Debtor Release"), Article VIII.D of the Plan provides for the release of the Released Parties by the Releasing Parties (the "Third-Party Release"), Article VIII.E of the Plan provides for exculpation for the Exculpated Parties (the "Exculpation"), and Article VIII.F of the Plan provides for an injunction (the "Injunction").  The Bankruptcy Court has jurisdiction under sections 1334(a) and 1334(b) of the Judicial Code and authority under section 105 of the Bankruptcy Code to approve each of the Debtor Release, the Third-Party Release, the Exculpation, and the Injunction.  As has been established based upon the evidence presented at the Confirmation Hearing, such provisions (a) were given in exchange for good, valuable, and adequate consideration after due notice and opportunity for hearing, (b) are appropriately tailored under the facts and circumstances of the Chapter 11 Cases, (c) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code, (d) confer substantial benefits on the Estates, (e) are fair, equitable, and reasonable, (f) were negotiated in good faith and at arm's length, and (g) are in the best interests

14

of the Debtors, the Estates, Holders of Claims and Interests, and all other parties in interest. Further, the failure to implement the Debtor Release, Third-Party Release, Exculpation, and Injunction would impair the Debtors' ability to confirm and implement the Plan.

24.    Good and valid justifications have been demonstrated in support of the Debtor Release, and the Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Release.  The Debtor Release represents a valid exercise of the Debtors' business judgment.  Each of the Released Parties provided good and valuable consideration in exchange for the releases—including services, substantial DIP funding, an agreement to exchange DIP funding for new debt issued by the Stalking Horse Bidder, and the consensual waiver of claims, as the case may be—and otherwise facilitated the Chapter 11 Cases and the implementation of the Sale Transaction contemplated by the Plan.  The pursuit by the Debtors of any claims against the Released Parties is not in the best interests of the Estates. The Debtor Release is furthermore: (a) an essential means of implementing the Plan; (b) an integral and non-severable element of the Plan and the transactions incorporated therein; (c) conferring a material benefit on, and in the best interests of, the Debtors, their Estates and their creditors; (d) important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; (e) fair, equitable, and reasonable and in exchange for good and valuable consideration; (f) a good-faith settlement and compromise of the Claims released by the Debtor Release; (g) given, and made, after due notice and opportunity for hearing; and (h) consistent with sections 105, 1123, 1129, 1141, and other applicable provisions of the Bankruptcy Code.

25.    The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.  In light of, among other things, the value provided by the

15

Released Parties to the Debtors' Estates and the critical nature of the Debtor Release to the Plan, the Debtor Release is approved and authorized in its entirety.

26.     The Third-Party Release is an essential provision of the Plan.  Accordingly, for the reasons set forth herein and in the Confirmation Brief, the Third-Party Release (a) is an essential means of implementing the Plan, (b) is fair, equitable, and reasonable and in exchange for the good and valuable consideration provided by the Released Parties, (c) is a good-faith settlement and compromise of the claims and Causes of Action released thereby, (d) is materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, (e) is fair, equitable, and reasonable, (f) is given and made after due notice and opportunity for hearing, (g) is consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code, (h) is an integral and non-severable element of the Plan and the transactions incorporated therein, (i) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and all Holders of Claims and Interests, (j) is specific in language and scope, and (k) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors.

27.     Like the Debtor Release, the Third-Party Release facilitated participation in the Plan and the Chapter 11 Cases, and is an integral element of the Plan.  The scope of the Third-Party Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.  The Third-Party Release is consensual because all parties to be bound by the Third-Party Release either (i) voted to accept the Plan or (ii) affirmatively agreed to be a Releasing Party.  All Holders of Claims were given due and adequate notice of the Third-Party Release and sufficient opportunity and instruction to vote to accept or reject the Plan; the Third-Party Release is therefore fair to the Releasing Parties, and is appropriate.  Additionally, the release provisions of the Plan

16

were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, and the Non-Voting Status Notice (as defined in the Disclosure Statement Motion). Further, the Confirmation Hearing Notice sent to all Notice Parties (including those not entitled to vote on the Plan) and published in *The Wall Street Journal*, *The Columbus Dispatch*, the *Lexington Herald Leader*, and *The Courier-Journal* on April 29, 2020, *The Salt Lake City Tribune* and *The Herald-Dispatch* on April 30, 2020, and *The Birmingham News* on May 1, 2020, and the Ballots sent to all Holders of Impaired Claims in the Voting Classes, in each case, unambiguously stated that the Plan contains the Third-Party Release and a vote in favor of the Plan was consent to such Third-Party Release. Accordingly, in light of all of the circumstances, the Third-Party Release is consensual, fair to the Releasing Parties, and otherwise appropriate.

28. The Exculpation is an essential provision of the Plan. The Exculpation is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with the Debtors and the Exculpated Parties, and was agreed upon in return for the Exculpated Parties providing benefits to the Debtors. The Exculpation appropriately affords protection to those parties who constructively participated in and contributed to the Debtors' chapter 11 process and it is appropriately tailored to protect the Exculpated Parties from inappropriate litigation. The Exculpation granted under the Plan is reasonable in scope as it does not relieve any party of liability for an act or omission to the extent such act or omission is determined by final order to constitute actual fraud, willful misconduct, or gross negligence.

29. The Injunction is essential to the Plan and is necessary to implement the Plan and to preserve and enforce the Debtor Release, the Third-Party Release, the Exculpation, and release

17

provisions in Article VIII of the Plan. The Injunction is appropriately tailored to achieve those purposes.

30.     The release of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article VIII.B of the Plan (the "Lien Release") is necessary to implement the Plan. The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, Holders of Claims and Interests, and other Entities with an interest in the Debtors' property.

31.     The record of the Confirmation Hearing is sufficient to support the Debtor Release, Third-Party Release, Exculpation, and Injunction. Accordingly, based upon the representations of the parties and the evidence proffered, adduced, or presented at the Confirmation Hearing, the Debtor Release, Third-Party Release, Exculpation, and Injunction are consistent with the Bankruptcy Code and applicable law.

32.     The provisions regarding the preservation of Causes of Action in the Plan (including Article IV.Q), including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

### (x)     Additional Plan Provisions—Section 1123(b)(4)

33.     As set forth in section EE below, the Plan provides for the sale of substantially all of the Debtors' assets in accordance with section 1123(b)(4) of the Bankruptcy Code and constitutes an appropriate wind-down and liquidation of the Estates.

### (xi)     Additional Plan Provisions—Section 1123(b)(6).

34.     The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

18

**L.      Debtor Compliance with the Bankruptcy Code—Section 1129(a)(2).**

35.      The Debtors have complied with the applicable provisions of the Bankruptcy Code

and, thus, satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically,

each Debtor:

> a.  is an eligible debtor under section 109 of the Bankruptcy Code and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code;
>
> b.  has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court; and
>
> c.  complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable nonbankruptcy law, rule, and regulation, the Disclosure Statement Orders, and all other applicable law, in transmitting the Solicitation Package and related documents and notices, and in soliciting and tabulating the votes on the Plan.

**M.      Plan Proposed in Good Faith—Section 1129(a)(3).**

36.      The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

The Debtors proposed the Plan in good faith and not by any means forbidden by law.  In so

determining, the Court has examined the totality of the circumstances surrounding the filing of the

Chapter 11 Cases, the Plan itself, the process leading to Confirmation of the Plan, including the

support of Holders of Claims or Interests entitled to vote on the Plan, and the transactions to be

implemented pursuant thereto. The Plan is the product of good faith, arm's-length negotiations

among the Debtors and their stakeholders.  The Chapter 11 Cases were filed, and the Plan was

proposed, with the legitimate purpose of allowing the Debtors to consummate a sale pursuant to

the Stalking Horse APA or other successful bid and satisfy their obligations with sufficient

liquidity and capital resources.

**N.      Payment for Services or Costs and Expenses—Section 1129(a)(4).**

37.      The procedures set forth in the Plan for the Court's review and ultimate

determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11

KE 69035745

Cases, or in connection with the Plan and incidental to the Chapter 11 Cases, satisfy the objectives

of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

### O.    Directors, Officers, and Insiders—Section 1129(a)(5).

38.    The Plan provides for the liquidation of the Estates after the consummation of the

Sale Transaction in accordance with the Stalking Horse APA and the Plan.    Article IV.D of the

Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code, to the extent

applicable, by providing for the appointment of the Plan Administrator, and the Plan Supplement

discloses the identity of, and compensation for the Plan Administrator.  The Debtors, therefore,

have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

### P.    No Rate Changes—Section 1129(a)(6).

39.    Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Chapter 11

Cases.  The Plan proposes no rate change subject to the jurisdiction of any governmental regulatory

commission.

### Q.    Best Interest of Creditors—Section 1129(a)(7).

40.    The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

The liquidation analysis attached to the Disclosure Statement as Exhibit E and the other evidence

related thereto in support of the Plan that was proffered or adduced at the Confirmation Hearing:

(a) is reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was

prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and

assumptions; (c) has not been controverted by other evidence; and (d) establishes that each Holder

of an Allowed Claim or Interest in each Class will recover at least as much under the Plan on

account of such Claim or Interest, as of the Effective Date, as such Holder would receive if the

Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

20

### R. Acceptance by Certain Classes—Section 1129(a)(8).

41.     The Plan does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code.  Classes 1, 2, and 3 constitute Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.  Class 4 voted to accept the Plan at each Debtor at which it was entitled to vote (all Debtors other than Murray Columbian Resources, LLC), Classes 6 and 8 voted to accept the Plan at all Debtors at which they were entitled to vote, Class 9 voted to accept the Plan at Debtors Murray Energy Holdings Co. and Utah American Energy, Inc., and Class 14 voted to accept the Plan at all Debtors. No Holders of Claims in Class 7 submitted a vote, and Class 7 is deemed to consent to the Plan pursuant to Article III.F of the Plan at all Debtors at which they were entitled to vote.  Class 5 voted to reject the Plan at each Debtor at which that Class was entitled to vote, and Class 9 voted against the Plan.  Holders of Claims or Interests in Classes 10, 11, 12, and 13 receive no recovery pursuant to the Plan and are deemed to have rejected the Plan.  Notwithstanding the foregoing, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

### S. Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9).

42.     The treatment of Administrative Claims, Professional Fee Claims, and Priority Tax Claims, under Article II of the Plan, and of Other Priority Claims, Other Secured Claims, and Secured Tax Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

### T. Acceptance By At Least One Impaired Class—Section 1129(a)(10).

43.     The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, among other Classes, Class 4 voted to accept the Plan by the requisite number and amount of Claims at each Debtor at which it was entitled to vote (all Debtors

21

other than Murray Columbian Resources, LLC) and Class 14 (1974 Plan Claims) voted to accept the Plan by the requisite number and amount of Claims at each Debtor, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

### U.   Feasibility—Section 1129(a)(11).

44.     The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The evidence supporting Confirmation of the Plan proffered or adduced by the Debtors at, or prior to, or in the Campagna Declaration filed in connection with, the Confirmation Hearing:  (a) are reasonable, persuasive, and credible as of the dates such analysis or evidence was prepared, presented, or proffered; (b) have not been controverted by other evidence; and (c) establish that the Plan is feasible and that the Wind-Down Trust or the Stalking Horse Bidder, as applicable, will have sufficient funds available to meet their obligations under the Plan.

### V.   Payment of Fees—Section 1129(a)(12).

45.     The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article XII.D of the Plan provides for the payment of all fees payable by the Debtors under section 1930(a) of the Judicial Code.

### W.   Continuation of Employee Benefits—Section 1129(a)(13).

46.     The Debtors have satisfied section 1129(a)(13) of the Bankruptcy Code.  Certain of the Debtors and the United Mine Workers of America (the "UMWA") were party to the National Bituminous Coal Wage Agreement of 2016 (the "2016 CBA"), and were contributing employers to The United Mine Workers of America 1974 Pension Plan and Trust (the "1974 Pension Plan"), and The United Mine Workers of America 1993 Benefit Plan and Trust (the "1993 Benefit Plan"). In accordance with, and subject to, the *Order Granting the Debtors' Motion for Interim Relief Under Sections 1113 and 1114 of the Bankruptcy Code* [Docket No. 1260] and the *Order*

22

*(I) Authorizing, but not Directing, the Debtors to (A) Reject Certain Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement the Terms of the Contingent Arrangement Between the Debtors, The United Mine Workers of America, and the Stalking Horse Bidder and (II) Granting Related Relief* [Docket No. 1455] (the "Final 1113/1114 Order," and collectively, the "1113/1114 Orders"), the Debtors have been authorized to reject the 2016 CBA and to modify all retiree benefits (as defined in section 1114 of the Bankruptcy Code) as provided in the 1113/1114 Orders, and accordingly, on the Effective Date, the Debtors shall be deemed to have rejected the 2016 CBA and to have modified all retiree benefits (as defined in section 1114 of the Bankruptcy Code) as provided in the 1113/1114 Orders and the *Order Granting the Debtors' Motion for Entry of an Order (I) Approving the Settlement Between the Debtors, the Retiree Committee, and the United Mine Workers of America 1992 Benefit Plan and (II) Granting Related Relief* [Docket No. 1417], effectuating a complete withdrawal from the 1974 Pension Plan and terminating all obligations to provide retiree benefits to certain retirees pursuant to 26 U.S.C. § 9711, and have no further contribution obligations to any pension plans or retiree benefits under the 2016 CBA.  Subject to section T of the Conclusions of Law of this Confirmation Order, any sale of assets shall be free and clear of any encumbrances, liabilities, including any successor liability or obligations under or related to the 2016 CBA, pension plans, or retiree benefits.

### X.  Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16).

47.  Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.  The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

### Y.  "Cram Down" Requirements—Section 1129(b).

48.  The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code because (a) at least one Voting Class of Claims at each Debtor voted to accept the Plan and (b) the

Plan does not discriminate unfairly and is fair and equitable with respect to the Claims and Interests in the Classes that are deemed to reject the Plan.  The Plan may therefore be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

### Z.    Only One Plan—Section 1129(c).

49.    The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.  The Plan is the only chapter 11 plan filed in each of the Chapter 11 Cases.

### AA.    Principal Purpose of the Plan—Section 1129(d).

50.    The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

### BB.    Good Faith Solicitation—Section 1125(e).

51.    The Debtors, the Released Parties, and the Exculpated Parties have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to support of the Plan and this Confirmation Order, including the solicitation of acceptances of the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

### CC.    Satisfaction of Confirmation Requirements.

52.    Based on the foregoing, the Plan satisfies the requirements for Confirmation thereof set forth in section 1129 of the Bankruptcy Code.

### DD.    Likelihood of Satisfaction of Conditions Precedent to the Effective Date.

53.    Each of the conditions precedent to the Effective Date, as set forth in Article IX.A of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Article IX.B of the Plan.

**EE.   Implementation.**

54.   All documents necessary to implement the Plan and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements.

**FF.   Sale Transaction.**

55.   The Stalking Horse APA was negotiated, proposed, and entered into by the Debtors and the Stalking Horse Bidder without collusion, in good faith, and from arm's-length bargaining positions.   Neither the Debtors nor the Stalking Horse Bidder have engaged in any conduct that would cause or permit the Stalking Horse APA to be avoided under section 363(n) of the Bankruptcy Code, and the Exit Facility Lenders and Exit Facility Agent have acted in good faith in providing the Exit Facility in support of the Sale Transaction.   The Stalking Horse Bidder is consummating the Sale Transaction in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code.   The Stalking Horse Bidder has proceeded in good faith in all respects in connection with the Sale Transaction.   The Stalking Horse Bidder is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

56.   The Debtors' marketing process with respect to the Sale Transaction afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer. No other person or entity or group of entities has offered to purchase the assets for greater overall value to the Debtors' Estates than the Stalking Horse Bidder.   The Stalking Horse APA constitutes the highest and best offer, and will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative.   The Debtors' determination that the Stalking Horse APA constitutes the highest and best offer constitutes a valid and sound exercise of the Debtors' business judgment.   Approval of the Stalking Horse APA and the consummation of the Sale

Transaction is in the best interests of the Debtors' Estates, their creditors, and other parties in interest.

57.     The consideration provided by the Stalking Horse Bidder pursuant to the Stalking Horse APA (a) is fair and reasonable, (b) is the highest or best offer for the purchased assets, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

58.     The Stalking Horse Bidder is not a mere continuation or substantial continuation of the Debtors or their Estates and there is no continuity of enterprise or common identity between the Stalking Horse Bidder and any of the Debtors.  The Stalking Horse Bidder is not holding itself out to the public as a continuation of any of the Debtors.  The Stalking Horse Bidder is not a successor to the Debtors or their Estates by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of the Stalking Horse Bidder with or into any of the Debtors.  The Stalking Horse Bidder has entered into the Stalking Horse APA in material reliance on and with fair consideration provided for the Sale Transaction being free and clear of all claims and interests relating to the Debtors arising prior to the closing of the Sale Transaction, except as expressly provided under the Stalking Horse APA, the Plan, or this Confirmation Order, including any successor or vicarious liabilities of any kind or nature, as set forth herein and in the Stalking Horse APA, and would not have entered into the Stalking Horse APA or the Sale Transaction without such terms and the findings herein.

59.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell assets and property pursuant to the Stalking Horse APA free and

26

clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever other than as expressly provided under the Stalking Horse APA, the Plan, or this Confirmation Order. In addition to and without limiting the foregoing, the proposed Sale Transaction is to be consummated under the Plan, and the assets and property to be sold pursuant to the Sale Transaction are dealt with by the Plan and this Confirmation Order; therefore, except as expressly provided under the Stalking Horse APA or this Confirmation Order, the Debtors may sell assets and property pursuant to the Stalking Horse APA free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever pursuant to section 1141(c) of the Bankruptcy Code.

60. The Debtors may sell such assets free and clear of all claims, liens, encumbrances, and other interests of any kind or nature whatsoever (other than as expressly permitted under the Stalking Horse APA, the Plan, or this Confirmation Order) because, in each case, one or more of the standards set forth in sections 363(f)(l)–(5), 1129(b)(2)(A)(ii), 1141(a), or 1141(c) of the Bankruptcy Code has been satisfied. All holders of such claims, liens, encumbrances, or other interests against the Debtors, their Estates, or any of the assets subject to the Sale Transaction (a) who did not object, or who withdrew their objections, to the Sale Transaction are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code and (b) are bound by this Confirmation Order or the Plan pursuant to section 1141(a) of the Bankruptcy Code. All holders of such claims, liens, encumbrances, or other interests are adequately protected by having their claims, liens, encumbrances, or other interests, if any, in each instance against the Debtors, their Estates, or any of the assets subject to the Sale Transaction, attach to the net cash proceeds of the Sale Transaction ultimately attributable to the assets in which such creditor alleges a claim, lien, encumbrance, or other interest, in the same order of priority, with the same validity, force, and

27

effect that such claim, lien, encumbrance, or other interest had prior to consummation of the Sale Transaction, subject to any claims and defenses the Debtors and their Estates may possess with respect thereto, and with such claims, liens, encumbrances, or other interests being treated in accordance with the Plan.

61. Prior to the Effective Date, the Debtors may amend the Stalking Horse APA (including any schedules thereto) in accordance with its terms without notice to or approval by this Bankruptcy Court so long as any such amendment does not (a) modify the distributions contemplated by the Plan, other than to include consideration to be distributed pursuant to the Plan, or (b) modify any of the resolutions of any formal or informal Plan objections set forth in the Plan and this Confirmation Order (collectively, an "APA Amendment"); *provided* that the Debtors must provide prior written notice of any APA Amendment to: (i) the U.S. Trustee; (ii) counsel to the UCC; (iii) counsel to the Stalking Horse Bidder; (iv) counsel to the Ad Hoc Group of Superpriority Lenders; and (v) the Department of Justice (collectively, the "APA Amendment Notice Parties"). The APA Amendment Notice Parties shall have 2 business days, unless otherwise agreed, after receipt of written notice of an APA Amendment to object to the APA Amendment by delivering such written objection to the Debtors and the other APA Amendment Notice Parties.

## GG. Disclosure of Facts.

62. The Debtors have disclosed all material facts regarding the Plan, the Plan Supplement, and the adoption, execution, and implementation of the other matters provided for under the Plan involving corporate action to be taken by or required of the Debtors.

## HH. Good Faith.

63. The Debtors, the Released Parties, and the Releasing Parties have acted in good faith in negotiating and proposing the Plan. The Debtors, the Released Parties, and the Releasing Parties will continue to be acting in good faith if they proceed to consummate the Plan and the

agreements, transactions, and transfers contemplated thereby and take the actions authorized and directed by this Confirmation Order.

## ORDER

IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

### A.    Findings of Facts and Conclusions of Law.

64.    The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact is determined to be a conclusion of law, it is deemed so, and vice versa.

### B.    Objections.

65.    Any and all objections to the Plan that have not been withdrawn or resolved prior to or during the Confirmation Hearing are hereby overruled.

### C.    Confirmation of the Plan.

66.    The Plan, including (a) all of the modifications to the Plan filed with the Court prior to or during the Confirmation Hearing and (b) all documents incorporated into the Plan through the Plan Supplement (including the final forms thereof), is confirmed pursuant to section 1129 of the Bankruptcy Code.

67.    The documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements introduced into evidence by the Debtors at the Confirmation Hearing (including all exhibits and attachments thereto), and the execution, delivery, and performance thereof by the Debtors, the Plan Administrator, and the other parties thereto, are authorized and approved, and are an integral part of, and incorporated by reference into, the Plan, and the Debtors and the Plan Administrator, as

applicable, are authorized to take all actions required under the Plan and the Plan Supplement documents to effectuate the Plan.  Without further notice to, or action, order, or approval of the Court, the documents included in the Plan Supplement may be amended and supplemented, whether prior to or after execution, so long as such amendment or supplement does not change the treatment of Holders of Claims or Interests under the Plan, and is not inconsistent with the Plan or this Confirmation Order.  The documents comprising the Plan Supplement shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms. All of the financing instruments and other agreements to be executed, delivered, or issued by Murray NewCo and its subsidiaries pursuant to the Plan, including instruments and agreements executed, delivered, or issued pursuant to the Exit Facility and New Takeback Debt, are valid, binding, and enforceable pursuant to their terms, and the obligations, guarantees, mortgages, pledges, liens, other security interests, and claims granted pursuant to or in connection with such financing are (a) valid, binding, perfected, and enforceable on the collateral as set forth in the documents governing such financing, with the priority set forth in such documents and the lenders under such financing are hereby authorized to make any and all filings and recordings necessary or desirable in connection with such liens and security interests, (b) granted in good faith, for good and valuable consideration, and for legitimate business purposes, and (c) shall not be deemed to constitute a fraudulent conveyance, and may not be avoided under the Bankruptcy Code, the Uniform Voidable Transfer Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other applicable laws.

68.     The terms of the Plan, the Plan Supplement, and the final forms of the exhibits thereto are incorporated herein by reference, and are an integral part of this Confirmation Order. The terms of the Plan, the Plan Supplement, and the exhibits thereto, and all other relevant and

necessary documents shall be effective and binding as of the Effective Date.  The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision, it being the intent of the Court that the Plan, the Plan Supplement, and the exhibits thereto be confirmed in their entirety.

69.     The failure specifically to include or to refer to any particular article, section, or provision of the Plan or the Plan Supplement in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provisions, it being the intent of the Bankruptcy Court that the Plan and any related documents be confirmed and approved in their entirety.

### D.     Release, Exculpation, Discharge, and Injunction Provisions.

70.     Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and will be immediately effective on the Effective Date without further order or action by the Court, any of the parties to such releases, or any other Entity: (a) Lien Release (Article VIII.B), (b) Debtor Release (Article VIII.C), (c) Third-Party Release (Article VIII.D), (d) Exculpation (Article VIII.E), and (e) Injunction (Article VIII.F).

### E.     Approval of the Sale Transaction.

71.     The Stalking Horse APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.  Pursuant to sections 105(a), 363(b), and 1123(b)(4) of the Bankruptcy Code, on the Effective Date, the Debtors and the Stalking Horse Bidder are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Stalking Horse APA, the Plan, and this Confirmation Order, (b) close the Sale Transaction as contemplated in the Stalking Horse APA, the Plan, and this Confirmation Order, and (c) execute and deliver, perform under, consummate, implement, and fully close the Stalking Horse APA, together with

31

all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse APA and the Sale Transaction.

72.     Pursuant to sections 105(a), 363(f), 365(f), 1129(b)(2)(A)(ii), 1141(a), and 1141(c) of the Bankruptcy Code, on the Effective Date, subject to the closing of the Sale Transaction, and except as expressly provided for in the Stalking Horse APA, the Plan, or this Confirmation Order, all Acquired Assets, including all Acquired Mines and Wells, shall be sold and transferred to and vested in the Stalking Horse Bidder or any of its designated direct or indirect subsidiaries free and clear of any and all liens, claims, encumbrances, and other interests to the fullest extent permitted by section 363(f) and section 1141(c) of the Bankruptcy Code, and all such liens, claims, encumbrances, or other interests shall attach to the net cash proceeds of the Sale Transaction ultimately attributable to the property against or in which such liens, claims, encumbrances, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such liens, claims, encumbrances, or other interests now have, subject to any rights, claims, and defenses the Debtors or their Estates, as applicable, may possess with respect thereto, and with such claims, liens, encumbrances, or other interests being treated in accordance with the Plan.

73.     The transfer of assets to the Stalking Horse Bidder and consummation of the Sale Transaction pursuant to the Stalking Horse APA, the Plan, and this Confirmation Order do not require any consents other than as expressly provided for in the Stalking Horse APA or this Confirmation Order.  Each and every federal, state, province, county, and local governmental agency or department, whether foreign or domestic, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse APA, the Plan, and this Confirmation Order.

32

74. After the Effective Date, a certified copy of this Confirmation Order may be filed with the appropriate clerk or recorded with the recorder of any federal, state, province, county, or local authority, whether foreign or domestic, to act to cancel any of the Claims, Liens, and other encumbrances of record except as expressly provided under the Stalking Horse APA or this Confirmation Order.

75. Except as expressly provided for in the Stalking Horse APA, the Plan, or this Confirmation Order, the Stalking Horse Bidder shall not assume or have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets. Without limiting the generality of the foregoing, except as set forth in this Confirmation Order, the Sale Transaction shall be free and clear of successor, vicarious, or transferee liabilities to the Stalking Horse Bidder to the fullest extent permitted by section 363(f) or section 1141(c) of the Bankruptcy Code.

76. As of the Effective Date, and subject to the provisions of the Plan and this Confirmation Order, all persons and entities are hereby forever prohibited and permanently enjoined from taking any action that would adversely affect or interfere with the consummation of the Sale Transaction. Without limiting the generality of the foregoing or the Injunction, (a) except as expressly provided for in the Stalking Horse APA, the Plan, or this Confirmation Order, all persons or entities are hereby forever prohibited and permanently enjoined from asserting against the Stalking Horse Bidder, its successor and assigns, or the Acquired Assets, any liabilities, liens, claims, encumbrances, or other interests, or successor or transferee liabilities, and (b) each non-Debtor party to an Executory Contract or Unexpired Lease being assumed and assigned to the Stalking Horse Bidder pursuant to the Stalking Horse APA, the Plan, and this Confirmation Order is hereby forever prohibited and permanently enjoined from imposing or charging against the Stalking Horse Bidder any rent accelerations, assignment fees, increases, or any other fees in

33

connection with the specific assumed and assigned Executory Contract or Unexpired Lease by reason of the Debtors' assumption and assignment of such Executory Contract and Unexpired Lease, and the validity of such assumption and assignment, which shall in all events be effective as of the Effective Date, shall not be affected by the pendency or resolution of any dispute between the Debtors and any non-Debtor party to any such assigned Executory Contract or Unexpired Lease.

77.     Pursuant to section 363(m) of the Bankruptcy Code, the reversal or modification on appeal of the authorization provided herein to effectuate the Sale Transaction and consummate the transactions contemplated by the Stalking Horse APA shall not affect the validity of such transactions (including the assumption, assignment, and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such transactions are duly stayed pending such appeal.

**F.     New Interests and New Preferred Interests.**

78.     On the Effective Date, Murray NewCo and all holders of the New Interests or New Preferred Interests then outstanding shall be deemed to be parties to the New Organizational Documents, substantially in the form, or consistent with the term sheets, contained in the Plan Supplement, without the need for execution by any such holder.  The New Organizational Documents shall be binding on Murray NewCo and its subsidiaries and all parties receiving, and all holders of, New Interests or New Preferred Interests.

**G.     Treatment of Executory Contracts and Unexpired Leases.**

79.     The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article V of the Plan (including the procedures regarding any disputes concerning the assumption, assumption and assignment, or rejection, as applicable, of such Executory Contracts and Unexpired Leases) are hereby approved in their entirety.

80.     With respect to each Executory Contract or Unexpired Lease to be assumed and assigned under the Plan:  (a) the applicable assignee of such Executory Contract or Unexpired Lease has provided adequate assurance of future performance under the relevant Executory Contract or Unexpired Lease within the meaning of section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code and (b) the applicable assignee of such Executory Contract or Unexpired Lease shall be deemed to be substituted for the Debtors as a party to the applicable Executory Contract or Unexpired Lease and the Debtors, the Estates, the Plan Administrator, and the Wind-Down Trust shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under such Executory Contract or Unexpired Lease.

81.     Notwithstanding the rejection of any unexpired lease of nonresidential real property (the "Rejected Leases," and each a "Rejected Lease") pursuant to the Plan, this Confirmation Order, or otherwise, counterparties to the Rejected Leases (and their successors and assigns) shall not deny Murray NewCo or its direct or indirect subsidiaries (or their employees, agents, or contractors) reasonable access to the premises related to any Rejected Lease for purposes of undertaking any reclamation and other environmental compliance activities as Murray NewCo or its direct or indirect subsidiaries are, or may in the future be, required to perform under applicable law.

### H.     The Wind-Down Trust.

82.     On the Effective Date, immediately after consummation of the Sale Transaction, the Wind-Down Trust will be formed in accordance with the terms of the Restructuring Steps Memorandum and pursuant to the Wind-Down Trust Agreement.  The Wind-Down Trust will be established for the primary purpose of liquidating the Wind-Down Trust Assets and winding down the Debtors' Estates, subject to and in accordance with the Plan.  The Plan Administrator shall serve as trustee and administer of the Wind-Down Trust in accordance with the Wind-Down Trust

Agreement.  The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that are necessary to assist the Plan Administrator in the performance of his or her duties in accordance with the Plan and the Wind-Down Trust Agreement. The Plan Administrator may elect to treat all or certain of such reserves as "disputed ownership funds" governed pursuant to Treasury Regulation section 1.468B-9, which treatment also may be applied to the extent possible for state and local tax purposes.

83.    The Debtors and the Plan Administrator are authorized to take all actions, necessary, appropriate, or desirable to enter into, implement, and consummate the contracts, instruments, releases, agreements, or other documents created or executed in connection with the Plan.  In accordance with section 1142 of the Bankruptcy Code and applicable nonbankruptcy law, such actions may be taken without further action by stockholders, managers, or directors.

### I.    Securities Matters.

84.    The offering, issuance, exchange, or distribution of any securities pursuant to the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and any state or local law requiring registration prior to such activities, in each case to the fullest extent available under section 1145 of the Bankruptcy Code.

### J.    Tax Matters.

85.    This Confirmation Order is and shall be binding upon and shall govern the acts of all persons or entities including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, provincial, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Stalking Horse APA, the Plan, and this Confirmation Order shall not be subject to any stamp or similar tax.  Pursuant to sections 105(a), 1141(a), and 1142(b) of the Bankruptcy Code, each and every federal, state, provincial, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order without payment of any stamp tax or similar tax, recordation fee, or governmental assessment imposed by law.

### K.    Plan Payments and Injunction.

86.    The assets of the Debtors and of the Wind-Down Trust shall be used for the satisfaction of expense obligations and the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Trust, or the Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or this Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

87.    As of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or this Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan, or any Claim that is subject to the releases and exculpations set forth in Article VIII.D and Article VIII.E of the Plan, shall be precluded and permanently enjoined on and after the Effective Date

37

from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims, except for the receipt of the payments or distributions that are contemplated by the Plan.

## L.    Post-Confirmation Transactions.

88.    Prior to the Effective Date, the Debtors and any applicable third parties, with the prior written consent of the Stalking Horse Bidder, and subject to the terms of the Stalking Horse APA and DIP Credit Agreement, are authorized to take any action to consummate any transaction outside the ordinary course of business for the sale of any of the Debtors' assets (except for the Acquired Mines and Wells) to one or more third parties that the Debtors determine in their business judgment is in the best interest of their Estates, without further notice or order of the Bankruptcy Court.  To the extent any such sale transaction requires the Debtors to alter the treatment of any Executory Contract or Unexpired Lease, including the rejection of, or assumption and assignment of, any Executory Contract or Unexpired Lease, the Debtors shall file a revised Schedule of Assumed Executory Contracts and Unexpired Leases or Schedule of Rejected Executory Contracts with the Bankruptcy Court.  Subject to customary confidentiality protections and without limiting the applicable consent rights in the preceding sentences, the Debtors shall provide no less than 2 business days written notice prior to the closing on any such sale transaction to: (i) the U.S. Trustee; (ii) counsel to the Stalking Horse Bidder; (iii) counsel to the Ad Hoc Group of Superpriority Lender; (iv) counsel to the DIP Agents; (v) counsel to the UCC; and (vi) any known affected creditors that may be affected by such sale transaction.

## M.    Certain Governmental Matters.

89.    Notwithstanding anything contained in the Plan, the Plan Supplement, the Stalking Horse APA, or this Confirmation Order to the contrary, with respect to any Entity other than the Stalking Horse Bidder or any of its affiliates, nothing in the Plan, the Plan Supplement, the Stalking Horse APA, or this Confirmation Order shall discharge, release, impair, enjoin, exculpate, or

38

otherwise preclude or diminish (a) any liability to any Governmental Unit under any police power or regulatory statute, regulation, rule, or ordinance, including Environmental Law (collectively, "Police or Regulatory Law") that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code, regardless of whether such liability arose on, after, or before the Confirmation Date, (b) any liability or obligation to, or any Claim or Cause of Action by, a Governmental Unit under any Police or Regulatory Law to which any such Entity is subject as the owner, lessor, lessee, permittee, controller, or operator of real property, or a mine or oil and gas complex, or other facility after the Effective Date (whether or not such liability, obligation, Claim or Cause of Action is based in whole or in part on acts or omissions prior to the Effective Date), or (c) any liability to any Governmental Unit of any non-debtor. Subject to the limitations provided in section 553 of the Bankruptcy Code, nothing in the Plan, the Plan Supplement, or this Confirmation Order shall affect any setoff or recoupment rights of any Governmental Unit. All rights and defenses of the Debtors and the Stalking Horse Bidder and its affiliates under applicable non-bankruptcy laws, regulations, and rules concerning any Governmental Unit's setoff or recoupment rights are expressly reserved.

90. Notwithstanding anything contained in the Plan, the Plan Supplement, the Stalking Horse APA, or this Confirmation Order to the contrary, with respect to the Stalking Horse Bidder or any of its affiliates, nothing in the Plan, the Plan Supplement, the Stalking Horse APA, or this Confirmation Order shall discharge, release, impair, enjoin, exculpate, transfer free and clear of or otherwise preclude the enforcement of any liability or obligation to, or any Claim or Cause of Action by, a Governmental Unit under Police or Regulatory Law to which the Stalking Horse Bidder or any of its affiliates is subject as the owner, lessor, lessee, permittee, controller, or operator of real property, or a mine or oil and gas complex or other facility after the Effective Date

39

(whether or not such liability, obligation, Claim, or Cause of Action is based in whole or in part on acts or omissions prior to the Effective Date); *provided*, *however*, that neither the Stalking Horse Bidder nor any of its affiliates shall assume any liability to a Governmental Unit for penalties for days of violation prior to the closing of the Sale Transaction, response costs incurred by a Governmental Unit or any other third party prior to the Effective Date, or any liability relating to offsite disposal that occurred prior to the Effective Date (except with respect to compliance obligations relating to mine spoil disposal pursuant to any Transferred Permits or as required by any underground injection control permits identified as Transferred Permits).

91.    Nor shall anything in this Confirmation Order, the Plan, the Stalking Horse APA, or the Plan Supplement (a) enjoin or otherwise bar any Governmental Unit or other Entity with standing to do so under an enabling statute, regulation, rule, ordinance, certification, or permit from asserting or enforcing, outside the Bankruptcy Court, any liability or obligation described in paragraphs 89 through 90 of this Confirmation Order, (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in section M under Police or Regulatory Law, (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not otherwise have jurisdiction, (d) authorize the transfer or assignment of any governmental or tribal (i) license, (ii) permit, (iii) registration, (iv) authorization, (v) certification, or (vi) approval (collectively, the "Governmental Authorizations"), or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy laws, regulations, and rules (including Police or Regulatory Law or otherwise), or (e) authorize the transfer or assignment of any interests in contracts, leases, rights-of-use and easements, and rights-of-way, or other interests or agreements with any Governmental Units (collectively, the "Governmental Leases"), Governmental Authorizations,

40

covenants, operating rights agreements, or agreements involving governmental land or minerals, without compliance with all applicable legal requirements under non-bankruptcy laws, regulations, and rules.  Prior to the Effective Date, the Debtors will, in compliance with applicable non-bankruptcy laws, regulations, and rules, seek authorization for the Stalking Horse Bidder or any of its affiliates to operate pursuant to any of the Debtors' Governmental Authorizations as of the Effective Date, as applicable to prevent interruption of the conduct of the mining operations with respect to the Acquired Mines and Wells by the Stalking Horse Bidder or any of its affiliates.  The Stalking Horse Bidder or any of its affiliates shall make all necessary filings to obtain, in compliance with applicable non-bankruptcy laws, regulations, and rules, any Governmental Authorizations necessary for the operation on or after the Effective Date of the Acquired Mines and Wells.  Notwithstanding anything to the contrary in the Plan, Plan Supplement, Stalking Horse APA or this Confirmation Order, the Debtors shall cause all performance security or bonds, as applicable, to remain valid and in place until such time as the Stalking Horse Bidder or any of its affiliates obtain replacement performance security or bonds which are approved by the appropriate Governmental Unit and comply with non-bankruptcy laws, regulations, and rules.

92.    Without limitation to the foregoing, the Department of the Interior Office of Natural Resources Revenue ("ONRR") expressly reserves its rights to (i) condition the sale or transfer of any and all interests in the Governmental Leases on the payment to ONRR of all amounts determined by ONRR consistent with applicable legal requirements to be owed by the Debtors for pre-petition and post-petition royalties (other than such amounts settled under the Utah Settlement Agreement, as that term is defined below) known to date including interest accrual through the date of receipt by ONRR of such cure amount(s), unless otherwise agreed to by ONRR and the Debtors in writing, and (ii) audit and/or perform any compliance review and, if appropriate, collect

41

from the Debtors and/or the Stalking Horse Bidder, as applicable, any additional monies owed by the Debtors prior to the transfer or assignment of the Governmental Leases without those rights being adversely affected by these bankruptcy proceedings.  The Debtors and the Stalking Horse Bidder shall retain all defenses and/or rights, other than defenses and/or rights under bankruptcy law, to challenge any determinations relating to the Governmental Leases.  The Debtors, the Stalking Horse Bidder, and ONRR each reserve their rights regarding whether such challenge should be heard by the Court or in another forum, *provided*, *however*, that the initial determination of which forum or forums have jurisdiction over any such challenge and the proper venue for any such challenge (subject to all parties' appellate rights) shall be made by the Court; *provided*, *however*, that the Stalking Horse Bidder shall file a motion seeking such determination by the Court no less than thirty days after the receipt of an order (an "Audit Order") by ONRR, or its designee, finding, pursuant to an audit, that additional amounts are due and owing as a result of mining activities prior to the transfer or assignment of the Governmental Leases.  In the event that the Stalking Horse Bidder seeks such determination from the Court, ONRR and the Stalking Horse Bidder agree that (a) the Stalking Horse Bidder will file an administrative appeal, pursuant to ONRR's regulations, within thirty days of receipt of the Audit Order, and (b) the Stalking Horse Bidder and ONRR agree to jointly move to stay such administrative appeal until the Stalking Horse Bidder withdraws its motion or the Court (i) decides whether it has or does not have jurisdiction, (ii) declines to exercise any such jurisdiction over the matter, (iii) makes a determination of concurrent jurisdiction but requires the exhaustion of administrative remedies through ONRR's administrative appeal process before exercising its jurisdiction, or (iv) denies the Stalking Horse Bidder's motion.  The United States reserves its right to move the Court for an order modifying or vacating any such stay of the administrative proceeding.  The audit and/or compliance review

42

period shall remain open for the full statute of limitations period established by federal or state law.

93. Notwithstanding any other provision of this Confirmation Order or any other order of this Court, no sale, transfer, or assignment of any rights and interests of the Debtors in any federal license or authorization issued by the Federal Communications Commission ("FCC") shall take place prior to the issuance of FCC regulatory approval for such sale, transfer, or assignment pursuant to the Communications Act of 1934, as amended, and the rules and regulations promulgated thereunder. The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such sales, transfers, or assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

94. The subsidiary of the Stalking Horse Bidder that will acquire the assets of The Marshall County Coal Company ("MCCC") pursuant to the Stalking Horse APA as of the Effective Date shall assume all of the obligations of MCCC set forth in the Settlement Agreement dated February 24, 2020, resolving litigation brought by MCCC against the United States (in a case captioned *The Marshall County Coal Company v. Brigadier General Mark Toy, et.al*., No. 5:17-cv-91 (N.D. W. Va.)), filed in the United States District Court for the Northern District of West Virginia relating to the Conner Run Impoundment, a coal refuse and fly ash impoundment located in West Virginia.

95. The Stalking Horse Bidder or its designated direct or indirect subsidiary shall assume all of Debtors' obligations in the following consent orders and agreements ("COA") between Debtors and the Commonwealth of Pennsylvania, Department of Environmental

43

Protection ("PA DEP"): (1) the COA executed on November 23, 2010, between PA DEP and Debtor Canterbury Coal Company ("CCC") requiring CCC to establish a post-mining water treatment trust to secure CCC's obligations to treat water discharges from multiple mining sites; (2) the COA executed on November 23, 2010, between PA DEP and Debtor Maple Creek Mining, Inc. ("MCMI") requiring MCMI to establish a trust to secure certain of its reclamation obligations at the Ginger Hill II Coal Refuse Disposal Area and its obligations to pump and treat water from the Maple Creek Mine; (3) the COA executed on March 22, 2013, between PA DEP, Debtor Consolidation Coal Company ("Consolidation"), and other parties requiring Consolidation to bring certain oil and gas wells into compliance with all applicable Pennsylvania statutes and regulations; and (4) the COA executed on October 24, 2018, between PA DEP and MCMI requiring MCMI to develop and implement a compliance plan to meet effluent limitations for Osmotic Pressure in MCMI's National Pollutant Discharge Elimination System Permit authorizing discharges from the Ginger Hill II Coal Refuse Disposal Area.

96.     The Debtors are authorized to enter into a settlement agreement (the "Utah Settlement Agreement"), by and between the U.S. Department of the Interior (including the Bureau of Land Management), the Office of Natural Resources Revenue, UtahAmerican Energy, Inc., West Ridge Resources, Inc., Genwal Resources, Inc., Andalex Resources, Inc., and AMCA Coal Leasing, Inc., resolving certain disputes related to advance royalties on certain Utah federal coal leases as set forth in the Utah Settlement Agreement, and the Utah Settlement Agreement shall be assumed by the Debtors and assigned to Murray NewCo (or its direct or indirect subsidiary designee) upon the closing of the Sale Transaction.  The Debtors shall assume the Federal Leases, as defined in the Utah Settlement Agreement, and the Debtors shall assign the Federal Leases to Utah Land Resources, Inc.; *provided*, *however*, the assignment of the Federal Leases to Utah Land

44

Resources, Inc. is expressly conditioned on Utah Land Resources, Inc.'s full performance of its obligations under the Utah Settlement Agreement and compliance with all applicable legal requirements under non-bankruptcy laws, regulations, and rules with respect to the transfer of the Federal Leases, including, but not limited to, requirements under 43 C.F.R. Subpart 3453.

97.     That certain Settlement Agreement executed on August 24, 2020, between the Illinois Department of Natural Resources, Office of Mines and Minerals, Division of Land Reclamation, and The American Coal Company shall be assumed by the Debtors and assigned to Murray NewCo (or its direct or indirect subsidiary designee) upon the Effective Date.

## N.     Provisions Regarding Indemnity National Insurance Company.

98.     Indemnity National Insurance Company ("Surety") has (a) issued certain commercial surety bonds on behalf of and/or for the benefit of the Debtors in connection with, without limitation, certain of the Debtors' statutory reclamation and Pennsylvania and West Virginia workers' compensation obligations (collectively, the "Existing Surety Bonds" and each an "Existing Surety Bond") and (b) entered into certain indemnity and related agreements with the Debtors regarding the Existing Surety Bonds (the "Existing Bond Agreements"). Nothing in this Confirmation Order, the Plan, or the Stalking Horse APA or any documents related thereto shall be construed to authorize or permit the assumption and assignment of the Existing Surety Bonds or the Existing Bond Agreements. Notwithstanding anything to the contrary in this Confirmation Order, the Debtors, the Plan Administrator, the Wind-Down Trust, the Existing Surety Bond obligees, and the Stalking Horse Bidder and any of its subsidiaries reserve all rights and defenses with respect to the Existing Surety Bonds and Existing Bond Agreements.

99.     The Debtors have posted, and Surety has a valid, perfected, and unavoidable first priority lien and security interest in the following collateral: (a) an irrevocable standby letter of credit issued by Goldman Sachs Bank USA in the amount of $25,000,000 (the "LC"), (b) one

hundred and fifty (150) Series 2 Preferred Shares of KEWA US, Inc. (the "Preferred Shares"); and (c) funds on deposit with Surety in the amount of $26,500,000 (the "Funds" and collectively with the LC and the Preferred Shares, the "Existing Surety Collateral").

100.   Nothing in the Plan, the Stalking Horse APA, or this Confirmation Order shall (a) release, discharge, preclude, or enjoin any obligation of the Debtors to Surety under the Existing Surety Bonds, the Existing Bond Agreements, or obligations under the common law of suretyship, (b) bar, impair, prevent, or otherwise enjoin Surety from exercising any valid rights in the Existing Surety Collateral, (c) alter, diminish, or enlarge the rights or obligations of Surety or any obligee under the Existing Surety Bonds, or (d) enjoin the Surety from asserting any rights, claims, or defenses, in regards to and against any obligee under any Existing Surety Bond.

101.   Consistent with the prior orders of the Bankruptcy Court, the Debtors will pay premiums to Surety and inspection fees to Newbridge Services, Inc. on the Existing Surety Bonds until the Effective Date.  For the avoidance of doubt, any and all obligations of the Debtors to pay premiums or inspection fees that arise on or after the Petition Date and before the Effective Date shall be entitled to administrative expense treatment under section 503(b) of the Bankruptcy Code in the Chapter 11 Cases.

102.   Surety has agreed, subject to the execution by the Stalking Horse Bidder or any of its subsidiaries and Surety of all required indemnity and related agreements (the "Replacement Bond Agreements"), and the occurrence of the Effective Date, to issue surety bonds on behalf of and/or for the benefit of the Stalking Horse Bidder or any of its subsidiaries to replace in full the Existing Surety Bonds that relate to (a) the assets, obligations, or liabilities acquired by the Stalking Horse Bidder, which include, without limitation, the Transferred Permits, the Acquired Mines and Wells, the Assumed Police or Regulatory Liabilities, and the Pennsylvania and West Virginia

46

workers' compensation liabilities, and (b) those statutory reclamation obligations of Murray Alabama Minerals, LLC assumed by the Stalking Horse Bidder, or its designee, in connection with the Met Plan (collectively, the "Replacement Surety Bonds," and each, a "Replacement Surety Bond").

103.    Notwithstanding anything in this Confirmation Order, the Plan, the Stalking Horse APA, or any documents related thereto to the contrary, Surety shall retain its valid, perfected and unavoidable first priority security interest in the Existing Surety Collateral, which Existing Surety Collateral shall continue to secure the Debtors' obligations to Surety under the Existing Surety Bonds and the Existing Bond Agreements until such time as the Existing Surety Bonds are released.  Upon execution of the Replacement Bond Agreements and the occurrence of the Effective Date, Surety and, as applicable, KEWA US Inc., shall consent to the transfer of the Preferred Shares and all of the Debtors' rights with respect to the Funds to the Stalking Horse Bidder (the "Transferred Collateral"), *provided* that, notwithstanding such assignment, the Transferred Collateral shall continue to secure the Debtors' obligations under the Existing Surety Bonds and the Existing Bond Agreement until such time as the Existing Surety Bonds are released. Notwithstanding anything to the contrary in this Confirmation Order, the Plan, the Stalking Horse APA, or any documents related thereto to the contrary, the Stalking Horse Bidder and its subsidiaries shall not be liable for any Existing Surety Bonds and/or related obligations arising under the Existing Bond Agreements to the extent they relate to assets that are not transferred to the Stalking Horse Bidder or any of its subsidiaries, nor shall the Stalking Horse Bidder or any of its subsidiaries be deemed a substitute principal under any Existing Surety Bond or an indemnitor under any Existing Bond Agreement.  Upon approval by an applicable regulatory authority of the transfer of any mining permit (including approval of a Replacement Surety Bond) from the Debtors

47

to the Stalking Horse Bidder or any of its subsidiaries, the Plan Administrator shall promptly request release of all Existing Surety Bonds issued pursuant to such transferred mining permit.

### O.   Provision Regarding Gavin Power, LLC.

104.   The Debtors are authorized to amend their coal supply agreements with Gavin Power, LLC (as amended from time to time, the "Gavin Coal Supply Agreements"), as provided in that Amendment, Assumption and Assignment Agreement dated June 12, 2020 (the "Gavin Amendment Agreement"), and the Gavin Coal Supply Agreements and the Gavin Amendment Agreement shall be assumed by the Debtors and assigned to Murray NewCo (or its direct or indirect subsidiary designee) upon the closing of the Sale Transaction.

### P.   Provision Regarding Encina Equipment Finance SPV, LLC.

105.   The Debtors are authorized to amend that certain Master Lease Agreement with Encina Equipment Finance SPV, LLC  (as amended from time to time, the "Encina Master Lease Agreement"), as provided in that certain Amendment to Schedule No. 001-001007-001 to the Master Lease Agreement dated July 31, 2020 (the "Encina Lease Amendment"), and the Encina Master Lease Agreement and the Encina Lease Amendment shall be assumed by the Debtors and assigned to Murray NewCo (or its designated direct or indirect subsidiary) upon the Effective Date.

### Q.   Provision Regarding Huntington National Bank.

106.   Notwithstanding anything to the contrary contained herein, the lien and security interest in favor of the Huntington National Bank ("Huntington") in that certain Account Number:  XXXXXX6899 with a balance of approximately $400,000 pledged by the Company in favor of Huntington (the "Pledged Account") shall not be divested or impaired by the Sale Transaction, Plan, or this Confirmation Order and shall continue to serve as collateral for all obligations owing to Huntington under and in accordance with that certain Commercial Card Account Agreement dated November 30, 2018, together with all renewals, extensions, and

48

amendments thereto, until all such obligations shall have been paid in full and the Commercial Card Account Agreement has been terminated or expires by its terms.

### R.    Provision Regarding Rockwood Casualty Insurance Company.

107.    Article V of the Plan controls over any restrictions imposed by Article VIII.F of the Plan as it pertains to Rockwood Casualty Insurance Company ("Rockwood"), as a provider of workers compensation and related coverage, including for the payment of claims, rights to access collateral, and/or payment or reimbursement of Rockwood.

108.    The Debtors' agreements with Rockwood, set forth on Exhibit C to the first amended plan supplement [Docket No. 1873] (collectively, the "Rockwood Agreements"), shall be transferred to Murray NewCo (or its designated direct or indirect subsidiary), and without limiting any authority provided to  Murray NewCo's boards of directors, Murray NewCo (or its designated direct or indirect subsidiary) shall amend, adopt, assume, and/or honor in the ordinary course of business any Rockwood contracts, agreements, policies, programs, and plans that are integrated into the Rockwood Agreements, in accordance with their respective terms.  The Rockwood Agreements shall be amended solely to change the name of the insured and reflect Murray NewCo's (or its designated direct or indirect subsidiary's) Federal Employer Identification Number, or in such other manner as is mutually agreed to by Rockwood and Murray NewCo.

### S.    Provision Regarding the United Mine Workers of America 1993 Benefit Plan and Trust.

109.    On the Effective Date, the Stalking Horse Bidder or its designated direct or indirect subsidiary will enter into that Amended and Restated Participation Agreement (the "Participation Agreement"), by and between such entity and the United Mine Workers of America 1993 Benefit Plan and Trust, and such entity will assume the obligations set forth in the Participation Agreement.

49

**T.    Provision Regarding the United Mine Workers of America.**

110.    Notwithstanding anything to the contrary in this Confirmation Order and the Plan, on the Effective Date, the Stalking Horse Bidder or its designated direct or indirect subsidiary will enter into the 2020 CBA (as defined in the Final 1113/1114 Order), by and between such entity and the United Mine Workers of America, and such entity will assume the obligations set forth in the 2020 CBA, all on the terms and conditions set forth in the Final 1113/1114 Order and related motion [Docket No. 1231].

**U.    Provision Regarding the United Mine Workers of America 1974 Pension Plan and Trust.**

111.    Notwithstanding any release, settlement, satisfaction, compromise, discharge, exculpation, enjoining, injunction, or similar provision provided in the Plan (including those in Article VIII), this Confirmation Order (including in connection with the UCC Settlement), or any ballot submitted, any such injunction, release, settlement, satisfaction, compromise, discharge, exculpation, enjoining, or similar provision will not enjoin, preclude, or limit the 1974 Plan from pursuing any or all Claims or Causes of Action the 1974 Plan may have against Released Parties other than the Debtors, the Estates, Murray NewCo and all of Murray NewCo's subsidiaries (including the Stalking Horse Bidder), or the Wind-Down Trust arising from or related to the Debtors' withdrawal from the 1974 Plan.  Notwithstanding the foregoing, the 1974 Plan shall also retain its right to pursue Claims and Causes of Action against the Wind-Down Trust solely with respect to payments or distributions that are contemplated by the Plan from the Wind-Down Trust. The 1974 Plan shall be deemed to opt out of the Third-Party Release in the Plan.  For the avoidance of doubt, any and all claims (including claims based on any theory of successorship) that the 1974 Plan has against the Debtors, Murray NewCo, and all of Murray NewCo's subsidiaries (including the Stalking Horse Bidder), are fully released and satisfied; claims that the 1974 Plan has against

50

any party other than the Debtors, Murray NewCo, and all of Murray NewCo's subsidiaries (including the Stalking Horse Bidder), are preserved and shall be preserved in this Confirmation Order and this paragraph shall preempt any above-referenced release, injunction, settlement, satisfaction, compromise, discharge, exculpation, enjoining, or other similar provision in the Plan or this Confirmation Order.

## V. Provisions Regarding CONSOL Energy, Inc and NRP (Operating) LLC.

112. The Debtors are authorized to execute the CONSOL Term Sheets (as defined herein), resolving certain disputes as set forth in the CONSOL Term Sheets.

113. Notwithstanding anything to the contrary in this Confirmation Order, the Plan, the Plan Supplement, the Stalking Horse APA, or any financing instruments and other agreements to be executed, delivered, or issued pursuant to the Exit Facility and New Takeback Debt, those certain term sheets dated on or about August 28, 2020, and executed by the Debtors, CONSOL Energy, Inc. (together with its direct and indirect subsidiaries, "CONSOL"), Murray NewCo, and NRP (Operating) LLC (together with its direct and indirect subsidiaries, "NRP") (collectively, the "CONSOL Term Sheets") shall govern the rights and obligations of the Debtors and Murray NewCo (or its designated direct or indirect subsidiaries) to CONSOL with respect to the subject matter addressed therein, which CONSOL Term Sheets and any related definitive documentation shall become binding upon Murray NewCo (or its designated direct or indirect subsidiaries), CONSOL and NRP upon the occurrence of the Effective Date.

114. The terms and conditions set forth in the CONSOL Term Sheets[3] are hereby approved, which terms and conditions include, but are not limited to: (a) the Debtors' rejection of

---

[3] Capitalized terms used and not defined in this paragraph 114 shall have the meanings ascribed to them in the CONSOL Term Sheets. In the event of any conflict between this paragraph 114 and the CONSOL

the 2013 SPA and CONSOL's waiver of any objection thereto; (b) the Debtors' assumption and assignment to Murray NewCo (or its designated direct or indirect subsidiaries) and payment of certain cure and other amounts relating to the First Overriding Royalty Agreement, as amended, the Second Overriding Royalty Agreement, as amended, the Water Treatment Cost Sharing Agreement, as amended, and the Master Entry Driver Lease Agreement; (c) the Debtors' assumption and assignment to Murray NewCo (or its designated direct or indirect subsidiaries) of the Cooperation and Safety Agreement, the Surface Use Agreement, the Substation and Power Line Agreement, the Substation and Power Line Rights-of-Way, the McMillian Assignment, the Partial Powerline Assignment, the 2013 Well Plugging Consent Order and Agreement, and the 2020 Well Plugging Agreement; (d) the Debtors' and CONSOL's continued cooperation about certain matters consistent with historical practice, including (i) with respect to each parties' payment obligations related to certain claims relating to certain worker's compensation, Black Lung, and long term disability and (ii) with respect to easements and boundaries as set forth in the 2013 SPA and the Closing Land Letter Agreement; (e) the Debtors' assumption of, and CONSOL's payment of certain amounts relating to, the Split Leases; (f) CONSOL's transfer to Murray NewCo (or its designated direct or indirect subsidiaries), and Murray NewCo's (or its designated direct or indirect subsidiaries') payment for, certain coalbed methane wells, gas wells, and land; (g) the usage by CONSOL of the power structure of Murray NewCo (or its designated direct or indirect subsidiaries) on agreed upon terms and the Debtors' and Murray NewCo's release of the alleged claim for CONSOL's prior usage; (h) CONSOL's dismissal of *CONSOL Energy Inc. v Murray Energy Holdings Co., et al.*, Adversary Case 2:20-ap-02036, with prejudice, which

---

Term Sheets or the definitive documentation thereof, the terms of the CONSOL Term Sheets (or, if the CONSOL Term Sheets have been committed to definitive documentation, the definitive documentation) shall control.

dismissal will be contingent upon (i) the Debtors' assumption and assignment to Murray NewCo (or its designated direct or indirect subsidiaries) of the Assumed CONSOL Agreements and (ii) the Debtors' compliance with the terms of the CONSOL Term Sheets and other agreements consistent with these transactions; and (i) certain other terms and conditions consistent with the foregoing.  The foregoing agreements and compromises, which will be memorialized in definitive documentation, shall be treated as a single, integrated transaction.

115.    The Debtors waive and release all Avoidance Actions against CONSOL upon the Effective Date of the Plan.

### W.    Provision Regarding CNX Resources Corporation.

116.    The Debtors are authorized to (i) enter into  and perform under a term sheet, dated as of August 28, 2020 (the "CNX Term Sheet"), by and among the Debtors, CNX Resources Corporation (together with its direct and indirect subsidiaries and affiliates, "CNX"), and Murray NewCo (as that term is defined in the CNX Term Sheet), resolving certain disputes as set forth in the CNX Term Sheet and (ii) enter into and perform under any further documentation that the Debtors, CNX, and Murray NewCo (as that term is defined in the CNX Term Sheet) deem reasonable or necessary to effectuate the CNX Term Sheet, which, once executed by all parties, will control in the event of a discrepancy between such documentation and the CNX Term Sheet. The terms and conditions of the CNX Term Sheet are hereby approved.  The CNX Term Sheet or any further or related documentation, as applicable, shall become binding upon Murray NewCo (as that term is defined in the CNX Term Sheet) and CNX upon the occurrence of the Effective Date.

### X.    Provisions Resolving Certain Objections.

117.     Notwithstanding anything in the Plan or the Confirmation Order to the contrary, (a) Black Diamond Commercial Finance, L.L.C. shall not be deemed a Releasing Party and the

Third-Party Release shall not apply to any claims asserted by it as Term Loan Agent, (b) nothing in the Plan or Confirmation Order (including, for the avoidance of doubt, the cancelation of any agreement or cure of any default) shall be deemed to release, enjoin, or prejudice any (i) claims brought in, or the final adjudication of the claims asserted in, the Adv. Pro. No. 19-02143 (*Black Diamond Commercial Finance, L.L.C., as Administrative Agent v. Murray Energy Corporation, Murray Energy Holdings Co., GLAS Trust Company LLC, and U.S. Bank, N.A.*) (the "Adversary Proceeding"), or (ii) claims that the Term Loan Agent may have, and defenses that any other party may have, based upon the Term Loan Documents or otherwise (for the avoidance of doubt and as stated by the Court in its order granting the temporary stay, Adversary Proceeding Docket No. 103, the Debtors, the Defendants, the Superpriority Lenders, and any of their affiliates, successors, and assigns irrevocably waive any claims against the Term Loan Agent and Term Loan Lenders based on the Term Loan Agent's initiation of the Adversary Proceeding or in connection with the Chapter 11 Cases), against any parties other than the Debtors, although the Debtors may be made or required to remain as nominal parties to such claims or actions for the purpose of setting up and adjudicating such claims, and (c) nothing in the Plan or the Confirmation Order shall be deemed to moot any of the claims or defenses asserted in the Adversary Proceeding, or otherwise affect this Court's jurisdiction to adjudicate the claims asserted in the Adversary Proceeding on the merits.  Notwithstanding anything in the Plan, the Plan Supplement, or the Confirmation Order to the contrary, the Debtors, the Defendants in the Black Diamond Adversary, the Superpriority Lenders, and any of their affiliates, successors, and assigns waive any claims against the Term Loan Agent for breach of contract or on any other basis based on the filing of the Adversary Proceeding or in connection with the Chapter 11 Cases.

54

118.    Notwithstanding anything to the contrary in this Confirmation Order, the Plan, or the Stalking Horse APA, until a Disputed Other Secured Claim is Allowed or disallowed by Final Order or an agreement of the claimant with the Debtors (prior to the Effective Date) or the Stalking Horse Bidder (after the Effective Date), the lien or liens on property securing such Disputed Other Secured Claim shall remain on such property in the same priority that such lien or liens held prior to entry of the Confirmation Order. Notwithstanding the foregoing, the holder of a Disputed Other Secured Claim may not seek, and shall not have any rights, to enforce such lien or liens unless and until the corresponding Disputed Other Secured Claim is Allowed in an amount greater than zero. To the extent that an Other Secured Claim is Allowed and the Debtors (with the consent of the Stalking Horse Bidder) or the Plan Administrator, as applicable, elect for the holder of such Allowed Other Secured Claim to receive the treatment set forth in section III.B.2(b)(ii) of the Plan, (a) the lien or liens on property securing such Allowed Other Secured Claim shall remain on such property in the same priority that such lien or liens held prior to entry of the Confirmation Order, as established by order of the Bankruptcy Court (including an agreed order by and among the Debtors (with the consent of the Stalking Horse Bidder) or the Plan Administrator, as applicable, and the holder of such Allowed Other Secured Claim), and, to the extent the property subject to such liens constitutes an Acquired Asset, such liens shall constitute Permitted Encumbrances under the Stalking Horse APA and (b) notwithstanding anything to the contrary in this Confirmation Order or the Plan, any *in personam* rights that such Allowed Other Secured Claim may entitle such holder to have against any applicable Debtors shall be preserved and not released, discharged, or extinguished, and the holder of any such Claim shall not be enjoined from exercising any such rights against any applicable Debtors or the Wind-Down Trust.  If a Disputed Other Secured Claim is either disallowed, Allowed in an amount of zero, or reclassified as a General Unsecured Claim

55

by a Final Order or an agreement of the claimant with the Debtors (with the consent of the Stalking Horse Bidder), the lien or liens on property securing such claim shall be deemed released and extinguished.  Nothing herein shall prejudice any party's rights with respect to the *Debtors' First Omnibus Objection to Certain Mechanic's Lien Claims* [Docket No. 1749] or any of the responses, replies, objections, or oppositions filed or other litigation related thereto.

119.     Notwithstanding anything in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, (i) that certain term sheet dated on or about August 17, 2020, and executed by the Thoroughbred Parties, Murray Energy Holdings Co. and Western Kentucky Consolidated Resources, Inc. (the "Thoroughbred Term Sheet") shall govern the rights and obligations of the Debtors and Murray NewCo (or its designated direct or indirect subsidiary) to Thoroughbred Resources, L.P., Ceralvo Holdings, LLC, and Western Mineral Development, LLC (collectively, the "Thoroughbred Parties") with respect to the subject matter addressed therein, which Thoroughbred Term Sheet shall become binding upon Murray NewCo (or its designated direct or indirect subsidiary) and the Thoroughbred Parties upon the occurrence of the Effective Date, (ii) subject to the terms of the Thoroughbred Term Sheet, the Pride, Lucia, Genesis and KRI leases as identified in the Thoroughbred Term Sheet (the "Thoroughbred Leases") shall be assumed upon the Effective Date, and, on the Effective Date, Debtors or Murray NewCo (or its designated direct or indirect subsidiary) shall pay all amounts required to bring the Leases current as of the Effective Date, as those amounts continue to accrue, (iii) the Debtors acknowledge and agree that the amounts required to cure the monetary defaults under the Thoroughbred Leases as of July 31, 2020, are, cumulatively, $630,259.50, and (iv) the releases set forth in the Plan do not release any party, including Murray NewCo, from any pre-Effective Date obligations under the Thoroughbred Leases, as modified by the Thoroughbred Term Sheet, all of which obligations

56

(including the Thoroughbred Indemnification Obligations, as that term is defined below) are "Assumed Liabilities" as that term is defined in the Stalking Horse APA. Subject to the terms of the Thoroughbred Term Sheet, and for the avoidance of doubt, upon the Effective Date, (i) all pre-existing, ongoing, and future indemnity obligations (irrespective of the time that events or conduct gave rise to any underlying actual or contingent liability and whether during the periods of tenancy by Murray or any predecessor operator) ("Thoroughbred Indemnification Obligations") shall remain unaffected by any modification to the Thoroughbred Leases, this Confirmation Order, the Plan, the Stalking Horse APA, or other orders entered in this Bankruptcy Case, and (ii) Murray NewCo (or its designated direct or indirect subsidiary) shall comply with all Thoroughbred Indemnification Obligations and shall hold the Thoroughbred Parties harmless and indemnify and defend the Thoroughbred Parties, including, but not limited to, with regard to (x) *Western Leasing, Inc. et al. v. Western Mineral Development, LLC, et al.*, United States District Court for the Western District of Kentucky Case No. 4:18-cv-0038. including all appeals, (y) the dispute between Thoroughbred and Murray arising in *In re Armstrong Energy, Inc., et al.*, United States Bankruptcy Court for the Eastern District of Missouri, Case No. 4:17-bk-47541, including all appeals, and (z) all other Indemnification Obligations under the Thoroughbred Leases.

120. Nothing in the Plan shall limit or affect the ability of the Ohio Bureau of Workers' Compensation (the "OBWC") to draw on any collateral or security it holds or exercise any rights it has in any excess insurance policies in the event of a default by the Debtors on their Ohio Workers Compensation self-insurance obligations under self-insured risk no. 20003015; *provided*, *however*, the Debtors reserve all rights provided under Ohio law to contest that an event of default has occurred.

121.    Notwithstanding anything to the contrary in the Plan, the Stalking Horse APA, this Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, the Stalking Horse APA, or this Confirmation Order, the adequate assurance deposit held by the Debtors in the amount of $86,965.48 for the benefit of Kentucky Utilities Company including its Old Dominion Power Company unit (together, "KU") and the pre-petition cash deposits held by KU as post-petition adequate assurance (if any) shall continue to be held by or for the benefit of KU following the Effective Date and the Closing Date to permit KU to invoice the Debtors and to be paid by them for electricity provided to the Debtors after the Petition Date and up to the Effective Date; *provided* that, following the payment of invoices for electricity that was provided to the Debtors after the Petition Date and prior to the Effective Date, the amounts held by KU as post-petition adequate assurance (if any) after payment of such invoices shall be paid to the Stalking Horse Bidder or its designated direct or indirect subsidiary.  In the event that the Debtors fail to pay any invoice for electricity that was provided to them after the Petition Date and prior to the Effective Date, KU shall first apply any pre-petition cash deposits held by it to any such invoice and remit any excess funds to the Debtors.  Further, KU shall have and is not waiving its right to assert a post-petition administrative expense claim for any unpaid amounts owing to it for electricity provided to the Debtors after the Petition Date and up to the Effective Date; *provided* that, the Debtors or Plan Administrator reserve all rights to contest such a claim.  For the avoidance of doubt, all of the Debtors' utility accounts with KU shall be deemed terminated upon the Effective Date, unless otherwise agreed by KU and the Stalking Horse Bidder or its designated direct or indirect subsidiary.

122.    The various real property interests set forth on Exhibit A to the objection [Docket No. 1993] (collectively, the "Equitrans Interests") filed by Equitrans, L.P., Equitrans Midstream

58

Corporation, EQM Olympus Midstream, LLC, EQM Poseidon Midstream, LLC, and Mountain Valley Pipeline, LLC (the "Equitrans Entities") shall each be considered a "Permitted Encumbrance" as defined in the Stalking Horse APA; *provided*, *however*, that nothing in this Confirmation Order is a finding or conclusion that any of the Equitrans Interests are or are not subject to section 365 of the Bankruptcy Code, or that Debtors have ownership rights in the Equitrans Interests, and the rights of the Equitrans Entities and the Debtors are reserved with respect to classification and determination of the real or personal property nature of the Equitrans Interests.

123.    Article V.H of the Plan is amended to provide that in addition to the Bankruptcy Court and the Plan Administrator, the Debtors may also authorize the filing or amendment of a Claim after the Claims Bar Date or the Administrative Bar Date, as appropriate.

124.    Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or the Stalking Horse APA, the Debtors and the Objectors (as defined in the objection filed at Docket No. 2024) acknowledge and agree that (a) prior to or after the Effective Date, as applicable, the automatic stay imposed by section 362 of the Bankruptcy Code is modified to allow the United States District Court for the Northern District of West Virginia (the "District Court") to render a decision and enter and enforce a final judgment solely on count II of the complaint (the "Count II Decision") filed in Case No. 1:17-cv-00205 (the "District Court Litigation"), and (b) following such Count II Decision, the Debtors and Objectors further agree that a final unappealable judgment entitling the Objectors to specific performance, if any, shall not be a "Claim" against the Debtors as defined by section 101(5) of the Bankruptcy Code, but shall be enforceable as an interest of the Objectors against the Debtors, the Stalking Horse Bidder, or any subsequent transferee to the extent permitted by applicable non-bankruptcy law.  Following entry of this Confirmation Order,

the Objectors and the Debtors will file a notice with the District Court informing it of this Confirmation Order and request that the District Court issue the Count II Decision, and the Objectors will promptly dismiss with prejudice all counts of the complaint, other than count II.  For the avoidance of doubt, any money damages or costs imposed by the District Court against the Debtors, if any, shall be a "Claim" against the Debtors as defined by section 101(5) of the Bankruptcy Code.

125.    The Debtors and CSX Transportation, Inc. ("CSX") have agreed to adjourn the hearing regarding the Debtors' proposed assumption and assignment of its agreements with CSX to the next available omnibus hearing date in the Chapter 11 Cases subject to the Debtors' agreement that CSX's Harris County purported derailment claims under the Minetrack Agreement dated September 28, 1993, constitute direct action claims under Article V.E.5 of the Plan in the event that the Minetrack Agreement is rejected.  The Debtors and CSX reserve all rights and this statement is not a waiver of any of the Debtors or any insurers rights to contest any such direct action.

## Y.    Utility Order.

126.    On or as reasonably practicable after the Effective Date, the Stalking Horse Bidder or its designated direct or indirect subsidiaries are authorized to withdraw the funds held in the segregated escrow account established pursuant to the *Final Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "Utility Order"), and neither the Wind-Down Trust nor Murray NewCo or its direct or indirect subsidiaries shall have any obligations to comply with the Utility Order.

60

### Z.      Notice of Confirmation and Effective Date.

127.    The Debtors must file with the Court and serve a notice of the entry of this Confirmation Order and occurrence of the Effective Date, substantially in the form attached hereto as **Exhibit B**, upon (a) all parties listed in the creditor matrix maintained by Prime Clerk LLC and (b) such additional persons and entities as deemed appropriate by the Debtors, no later than five business days after the Effective Date, and will cause Prime Clerk LLC to file an affidavit of service with the Court.  The Debtors will publish the notice of the occurrence of the Effective Date in *The Wall Street Journal*, *The Salt Lake City Tribune*, *The Courier-Journal*, the *Lexington Herald Leader*, *The Herald-Dispatch*, *The Columbus Dispatch*, and *The Birmingham News* within seven business days after the Effective Date, and will cause an affidavit of service to be filed with the Court.

128.    The Confirmation Notice shall constitute sufficient notice of the entry of this Confirmation Order to such filing and recording officers, and shall be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law.

### AA.     Retention of Jurisdiction.

129.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Confirmation Order.

### BB.     Immediate Binding Effect.

130.    Subject to Article IX of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the Plan and the Plan Supplement shall be immediately effective and enforceable to the fullest extent permitted under the Bankruptcy Code and applicable nonbankruptcy law.

131.    Notwithstanding anything to the contrary in the Plan, the Bankruptcy Rules, including Bankruptcy Rule 3020(e), or otherwise, the terms and conditions of this Confirmation Order will be immediately effective and enforceable upon its entry.

### CC.    Effectiveness of All Actions.

132.    The Debtors and the Plan Administrator are authorized to take all actions necessary to effectuate the relief granted in this Confirmation Order in accordance with the Plan.  Except as specifically set forth herein, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations, of all states and any other governmental authority with respect to the implementation of consummation of the Plan and Sale Transaction and any documents, instruments, agreements, any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Stalking Horse APA, and any documents, instruments, securities, agreements, and any amendments or modifications thereto.

### DD.    Applicable Nonbankruptcy Law.

133.    The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law, except as provided herein.

### EE.    Governing Terms.

134.    This Confirmation Order supersedes any previous order of this Court in these Chapter 11 Cases issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan (including the Plan Supplement) and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.

## FF.    Final Order.

135.    This Confirmation Order is a final order, and the period in which an appeal must be filed shall commence immediately upon the entry hereof.

SO ORDERED.


Copies to Default List

**Exhibit A**

**The Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) | Case No. 19-56885 (JEH) |
|  | ) |  |
|  | ) | Judge John E. Hoffman, Jr. |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' SECOND AMENDED JOINT PLAN
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Kim Martin Lewis (0043533)
Alexandra S. Horwitz (0096799)
**DINSMORE & SHOHL LLP**
255 East Fifth Street
Suite 1900
Cincinnati, Ohio 45202
Telephone:       (513) 977-8200
Facsimile:       (513) 977-8141

*Counsel to the Debtors and Debtors in Possession*

Dated:  August 24, 2020

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Mark McKane, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

- and -

Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions.  This Plan is not an offer with respect to any securities.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
GOVERNING LAW ................................................................................................................................. 1

    A.      Defined Terms ........................................................................................................................ 1
    B.      Rules of Interpretation ......................................................................................................... 18
    C.      Computation of Time ........................................................................................................... 19
    D.      Governing Law ..................................................................................................................... 19
    E.      Reference to Monetary Figures............................................................................................. 19
    F.      Non-Consolidated Plan ........................................................................................................ 20

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS .............................. 20

    A.      Administrative Claims .......................................................................................................... 20
    B.      Payment of Fees and Expenses under DIP Order.................................................................. 21
    C.      Professional Fee Claims........................................................................................................ 21
    D.      DIP Claims............................................................................................................................ 22
    E.      Priority Tax Claims............................................................................................................... 23

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.................................... 23

    A.      Classification of Claims and Interests.................................................................................. 23
    B.      Treatment of Claims and Interests ....................................................................................... 24
    C.      Special Provision Governing Unimpaired Claims ............................................................... 30
    D.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 30
    E.      Subordinated Claims ............................................................................................................ 30
    F.      Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ............................ 30
    G.      Controversy Concerning Impairment................................................................................... 30

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN........................................................... 31

    A.      General Settlement of Claims and Interests ......................................................................... 31
    B.      Restructuring Transactions.................................................................................................... 31
    C.      Sources of Consideration for Plan Distributions ................................................................. 31
    D.      Plan Administrator and the Wind-Down Trust ................................................................... 34
    E.      New Organizational Documents ........................................................................................... 37
    F.      Debtors' Boards or Governance Bodies............................................................................... 37
    G.      New Employment Contracts ................................................................................................. 37
    H.      Acquired Mines and Wells................................................................................................... 37
    I.      Murray Alabama Minerals, LLC.......................................................................................... 37
    J.      Avoidance Action Waiver..................................................................................................... 37
    K.      Waiver of Distributions by Consenting Superpriority Lenders............................................ 38
    L.      Cancellation of Existing Securities and Agreements .......................................................... 38
    M.      Corporate Action.................................................................................................................. 39
    N.      Effectuating Documents; Further Transactions.................................................................... 39
    O.      Exemption from Securities Act Registration........................................................................ 39
    P.      Exemption from Certain Taxes and Fees ............................................................................. 40
    Q.      Preservation of Causes of Action ......................................................................................... 40
    R.      Payments under Critical Vendor Agreements ...................................................................... 41

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................ 41

    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ................................ 41
    B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases......................................... 42
    C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..................................... 42
    D.      Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases............ 43
    E.      Insurance Policies ................................................................................................................. 43

F.  Director, Officer, Manager, and Employee Liability Insurance ..................................................44
G.  Modifications, Amendments, Supplements, Restatements, or Other Agreements ........................44
H.  Reservation of Rights ...................................................................................................................44
I.  Nonoccurrence of Effective Date .................................................................................................45

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................................45

A.  Timing and Calculation of Amounts to Be Distributed ...............................................................45
B.  Distributions on Account of Obligations of Multiple Debtors ....................................................45
C.  Distributions Generally ................................................................................................................45
D.  Rights and Powers of Disbursing Agent ......................................................................................46
E.  Delivery of Distributions and Undeliverable or Unclaimed Distributions ..................................46
F.  Distributions on Account of Claims or Interests Allowed After the Effective Date ....................47
G.  Compliance with Tax Requirements .............................................................................................48
H.  Allocations Between Principal and Accrued Interest ...................................................................48
I.  No Postpetition Interest on Claims ..............................................................................................48
J.  Foreign Currency Exchange Rate ................................................................................................48
K.  Setoffs and Recoupment ..............................................................................................................48
L.  Claims Paid or Payable by Third Parties .....................................................................................49

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ................................................................................................................................49

A.  Allowance of Claims ....................................................................................................................49
B.  IBNR Claims ................................................................................................................................50
C.  Claims Administration Responsibilities .......................................................................................50
D.  Estimation of Claims ....................................................................................................................50
E.  Adjustment to Claims Without Objection ....................................................................................50
F.  Time to File Objections to Claims ...............................................................................................51
G.  Disallowance of Claims ...............................................................................................................51
H.  Amendments to Claims .................................................................................................................51
I.  No Distributions Pending Allowance ...........................................................................................51
J.  Distributions After Allowance .....................................................................................................51

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...............51

A.  Settlement, Compromise, and Release of Claims and Interests ...................................................51
B.  **Release of Liens** .........................................................................................................................52
C.  **Debtor Release** ..........................................................................................................................52
D.  **Third-Party Release** .................................................................................................................53
E.  **Exculpation** ...............................................................................................................................54
F.  **Injunction** ..................................................................................................................................55
G.  Treatment of 1974 Plan ................................................................................................................56
H.  Protections Against Discriminatory Treatment ............................................................................56
I.  Document Retention .....................................................................................................................56
J.  Reimbursement or Contribution ...................................................................................................56
K.  Term of Injunctions or Stays ........................................................................................................57
L.  Subordination Rights ....................................................................................................................57

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ...........................57

A.  Conditions Precedent to the Effective Date .................................................................................57
B.  Waiver of Conditions ...................................................................................................................58
C.  Substantial Consummation ...........................................................................................................58
D.  Effect of Failure of Conditions ....................................................................................................58

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...................................... 59

    A.       Modification and Amendments ................................................................................................. 59
    B.       Effect of Confirmation on Modifications ................................................................................. 59
    C.       Revocation or Withdrawal of Plan .......................................................................................... 59

ARTICLE XI. RETENTION OF JURISDICTION ............................................................................................. 59

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................................................................... 61

    A.       Immediate Binding Effect ......................................................................................................... 61
    B.       Payment of Certain Fees ........................................................................................................... 61
    C.       Additional Documents ............................................................................................................... 61
    D.       Payment of Statutory Fees ........................................................................................................ 62
    E.       Payment of Indenture Trustees Fees ........................................................................................ 62
    F.       UCC and Cessation of Fee and Expense Payment ................................................................... 62
    G.       Reservation of Rights ................................................................................................................ 62
    H.       Successors and Assigns .............................................................................................................. 62
    I.       Notices ........................................................................................................................................ 62
    J.       Entire Agreement ...................................................................................................................... 64
    K.       Exhibits ...................................................................................................................................... 64
    L.       Non-Severability of Plan Provisions ........................................................................................ 64
    M.       Votes Solicited in Good Faith ................................................................................................... 64
    N.       Closing of Chapter 11 Cases ..................................................................................................... 65
    O.       Conflicts ..................................................................................................................................... 65

## INTRODUCTION

Murray Energy Holdings Co. and its Debtor affiliates in the above-captioned Chapter 11 Cases propose this joint plan pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A. This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor. Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, projections, and future operations, as well as a summary and description of this Plan and certain related matters.

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.    "*1.5L Indenture*" means that certain Indenture, dated as of June 29, 2018, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among, Murray Energy Corporation, as issuer, each of the guarantors party thereto, U.S. Bank National Association, as collateral trustee, and The Bank of New York Mellon Trust Company, N.A., as trustee, pursuant to which Murray Energy Corporation issued its 12.00% Senior Secured Notes due 2024.

2.    "*1.5L Notes Claims*" means Claims outstanding under the 1.5L Notes Documents.

3.    "*1.5L Notes Documents*" means, collectively, the 1.5L Indenture and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

4.    "*1974 Plan*" means the United Mine Workers of America 1974 Pension Plan and the United Mine Workers of America 1974 Pension Trust.

5.    "*1974 Plan Carve-Out*" means the carve-out in favor of the 1974 Plan from the Debtor Release, Third-Party Release, and Plan injunction and exculpation provisions set forth in Article VIII.G.

6.    "*1974 Plan Claims*" means all Claims held by the 1974 Plan against the Debtors.

7.    "*2L Indenture*" means that certain Indenture, dated as of April 16, 2015, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among, Murray Energy Corporation, as issuer, each of the guarantors party thereto, U.S. Bank National Association, as collateral trustee, and Wilmington Savings Fund Society, FSB, as successor trustee to The Bank of New York Mellon Trust Company, N.A., pursuant to which Murray Energy Corporation issued its 11.25% Senior Secured Notes due 2021.

8.    "*2L Notes Claims*" means Claims outstanding under the 2L Notes Documents.

9.    "*2L Notes Documents*" means, collectively, the 2L Indenture and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

10.    "*401 Water Quality Certification*" means those Transferred Permits that constitute certifications issued by any state under the Clean Water Act, 33 U.S.C. § 1341.

11. "*ABL Credit Agreement*" means that certain Amended and Restated Revolving Credit Agreement, dated as of June 29, 2018, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among Murray Energy Corporation, as borrower, each of the guarantors from time to time party thereto, Goldman Sachs Bank USA, as administrative agent, and the lenders party thereto from time to time.

12. "*ABL FILO Claims*" means Claims arising under the ABL Loan Documents related to the ABL FILO Loans borrowed pursuant to the terms of the ABL Credit Agreement, which Claims were refinanced (or "rolled up") by the DIP FILO Facility pursuant to the authority granted in the DIP Order, subject to the challenge rights set forth in the DIP Order.

13. "*ABL FILO Lender*" means GACP Finance Co., LLC, solely in its capacity as first in, last out lender under the ABL Credit Agreement.

14. "*ABL FILO Loans*" means the first in, last out loans under the ABL Credit Agreement that, upon entry of the DIP Order, were converted into the DIP FILO Loans.

15. "*ABL Loan Documents*" means, collectively, the ABL Credit Agreement and any related letter of credit documentation, security agreement, intercreditor agreement, and any other collateral and ancillary documents, including any forbearance agreements, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

16. "*ABL Revolver Claims*" means Claims arising under the ABL Loan Documents other than the ABL FILO Claims, which Claims were repaid in full in Cash pursuant to the authority granted in the DIP Order, subject to the challenge rights set forth in the DIP Order.

17. "*Acquired Assets*" has the meaning set forth in the Stalking Horse APA; *provided* that Acquired Assets shall not include any Avoidance Actions to the extent waived under the Plan (including pursuant to Article IV.J).

18. "*Acquired Mines and Wells*" means all mine and oil and gas complexes (including all idled, closed, and inactive mines and wells, associated impoundments, disposal areas and wells, treatment plants, gas storage wells, and underground injection wells) owned and/or operated by the Debtors; *provided*, *however*, that the mine complexes owned and/or operated by Murray Metallurgical Coal Holdings, LLC, Foresight Energy LP, and each of their direct and indirect subsidiaries shall not constitute Acquired Mines and Wells.

19. "*Ad Hoc Group of Superpriority Lenders*" has the meaning set forth in the RSA.

20. "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date through and including the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) amounts owing pursuant to the DIP Order.

21. "*Administrative Claim Bar Date*" means the deadline for filing requests for payment of Administrative Claims (other than (a) (x) Professional Fee Claims, (y) Administrative Claims arising in the ordinary course of business, or (z) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code, which are required to be filed in accordance with the Bar Date Order, and (b) DIP Claims), which shall be 30 days after the Effective Date.

22. "*Administrative Claim Objection Bar Date*" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the later of (a) 60 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of the Administrative Claims; *provided* that the Administrative Claim Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

23.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

24.    "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be filed), is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt:  (x) a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

25.    "*Army Corps Permits*" means those Transferred Permits issued by the Secretary of the Army under the Clean Water Act, 33 U.S.C. § 1344, and Section 10 of the River and Harbors Act, 33 U.S.C. § 403, acting through and as delegated by the Chief of Engineers.

26.    "*Assumed Police or Regulatory Liabilities*" means all police or regulatory and compliance obligations arising under any Environmental Law, whether arising under any statute, regulation, rule, ordinance, certification, or permit associated with or applicable to the Acquired Mines and Wells including or relating to: (a) reclamation; (b) restoration; (c) well plugging and restoration; (d) dam safety; (e) water treatment; (f) stream and wetland mitigation; (g) underground injection control; (h) contamination; (i) pollution; (j) hazardous or toxic substances; (k) mine drainage; (l) water supply protection; (m) mine subsidence remediation; (n) protection of the environment; and (o) environmental impacts on human health, safety, and welfare; *provided*, *however*, that the Stalking Horse Bidder or any of its subsidiaries shall not assume, and the Assumed Police or Regulatory Liabilities shall not include, any liability to a Governmental Unit for penalties for days of violation prior to the closing of the Sale Transaction, response costs incurred by a Governmental Unit or any other third party prior to closing, or any liability relating to offsite disposal that occurred prior to closing (except with respect to compliance obligations relating to mine spoil disposal pursuant to any Transferred Permits or as required by any underground injection control permits identified as Transferred Permits).

27.    "*Auction*" means the auction, if any, for some or all of the Debtors' assets, conducted in accordance with the Bidding Procedures.

28.    "*Avoidance Actions*" mean any and all avoidance, recovery, or subordination actions or remedies that may be brought by or on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 542, 544, 545, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code.

29.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 100–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

3

30.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Ohio, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of reference under section 157 of the Judicial Code and/or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of Ohio.

31.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

32.     "*Bar Date Order*" means the *Order (A) Setting Bar Dates for Filing Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. 740], entered by the Bankruptcy Court on January 9, 2020.

33.     "*Bidding Procedures*" means the procedures governing the Auction and sale of all, substantially all, or certain of the Debtors' assets, as approved by the Bankruptcy Court on January 9, 2020, and as may be amended from time to time in accordance with their terms [Docket No. 741].

34.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

35.     "*Case Management Order*" means the *Second Amended Order Implementing Certain Notice and Case Management Procedures* [Docket No. 1103], entered by the Bankruptcy Court on March 30, 2020, which, among other things, established the procedures for interim compensation and reimbursement of expenses for retain professionals.

36.     "*Cash*" or "*$*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

37.     "*Causes of Action*" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

38.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

39.     "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code against a Debtor or an Estate.

40.     "*Claims Bar Date*" means the dates established by the Bankruptcy Court by which Proofs of Claim must have been Filed with respect to such Claims (other than Claims required to be Filed by the Administrative Claims Bar Date), pursuant to (a) the Bar Date Order, (b) a Final Order of the Bankruptcy Court, or (c) the Plan.

41.     "*Claims Objection Bar Date*" means the later of:  (a) the first Business Day following 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing upon a motion either Filed on or before the day that is 180 days after the Effective Date or filed thereafter, for cause.

4

42.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

43.     "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

44.     "*Collective Bargaining Agreements*" means the Collective Bargaining Agreements by and between certain Debtors, on the one hand, and, as applicable, the United Mine Workers of America and The Seafarers International Union, on the other hand, as the same may have been amended from time to time.

45.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

46.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

47.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code, including any adjournments thereof.

48.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order must be acceptable to the Debtors, the Required Consenting Superpriority Lenders, and the Stalking Horse Bidder.

49.     "*Consenting Equityholders*" means the holders of Class A and Class B Common Shares in Holdings that are party to the RSA, solely in their capacities as such.

50.     "*Consenting Superpriority Lenders*" means the Superpriority Lenders that are party to the RSA, together with their respective successors and permitted assigns and any subsequent Superpriority Lenders that become party to the RSA in accordance with the terms of the RSA.

51.     "*Contingent DIP Obligations*" means all of the Debtors' obligations under the DIP Documents and the DIP Order that are contingent and/or unliquidated, other than contingent indemnification obligations as to which a Claim has been asserted on or prior to the Effective Date.

52.     "*Consummation*" means the occurrence of the Effective Date.

53.     "*Critical Vendor Agreement*" means an agreement executed (or in agreed form by and between a Trade Claimant and a Debtor but pending execution) on or before the UCC Trigger Date pursuant to the Critical Vendor Order.

54.     "*Critical Vendor Order*" means the *Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Lien Claimants, (C) Shippers, (D) 503(b)(9) Claimants, and (E) Royalty and Leasehold Claimants, (II) Confirming Administrative Expense Priority Status of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 358].

55.     "*Cure Amounts*" means (a) the applicable cure amount identified on the Schedule of Assumed Executory Contracts or Unexpired Leases or other applicable Filed motion (subject to the rights of a party to such Executory Contract or Unexpired Lease to object to such amount, and to establish a different cure amount, in accordance with and as set forth in the order approving the Bidding Procedures [Docket No. 742]), plus (b) the amount necessary to cure defaults under such Executory Contracts or Unexpired Leases (if any) that arose after the date that the applicable Schedule of Assumed Executory Contracts or Unexpired Leases or other applicable Filed motion was first Filed on the docket in the Chapter 11 Cases and existing as of the Effective Date.

56.     "*D&O Liability Insurance Policies*" means all applicable insurance policies (including any "tail policy") of any of the Debtors that cover current or former directors', managers', officers', or employees' liability.

57.     "*Debtor*" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

58.     "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.C of the Plan.

59.     "*Debtors*" means, collectively: (a) Holdings; (b) AMCA Coal Leasing, Inc.; (c) AmCoal Holdings, Inc.; (d) American Compliance Coal, Inc.; (e) American Energy Corporation; (f) American Equipment & Machine, Inc.; (g) American Mine Services, Inc.; (h) American Natural Gas, Inc.; (i) AmericanHocking Energy, Inc.; (j) AmericanMountaineer Energy, Inc.; (k) AmericanMountaineer Properties, Inc.; (l) Anchor Longwall and Rebuild, Inc.; (m) Andalex Resources, Inc.; (n) Andalex Resources Management, Inc.; (o) Avonmore Rail Loading, Inc.; (p) Belmont Coal, Inc.; (q) Belmont County Broadcast Studio, Inc.; (r) Canterbury Coal Company; (s) CCC Land Resources LLC); (t) CCC RCPC LLC; (u) Central Ohio Coal Company; (v) Coal Resources Holdings Co.; (w) Coal Resources, Inc.; (x) Consolidated Land Company; (y) Consolidation Coal Company; (z) Corporate Aviation Services; (aa) Eighty-Four Mining Company; (bb) Empire Dock, Inc.; (cc) Energy Resources, Inc.; (dd) Energy Transportation, Inc.; (ee) Genwal Resources, Inc.; (ff) Kanawha Transportation Center, Inc.; (gg) KenAmerican Resources, Inc.; (hh) Keystone Coal Mining Corporation; (ii) Maple Creek Mining, Inc.; (jj) Maple Creek Processing, Inc.; (kk) McElroy Coal Company; (ll) Mill Creek Mining Company; (mm) Mon River Towing, Inc.; (nn) MonValley Transportation Center, Inc.; (oo) Murray American Coal, Inc.; (pp) Murray American Energy, Inc.; (qq) Murray American Kentucky Towing, Inc.; (rr) Murray American Minerals, Inc.; (ss) Murray American Resources, Inc.; (tt) Murray American River Towing, Inc.; (uu) Murray American Transportation, Inc.; (vv) Murray Colombian Resources, LLC; (ww) Murray Equipment & Machine, Inc.; (xx) Murray Global Commodities, Inc.; (yy) Murray Kentucky Energy Services, Inc.; (zz) Murray Kentucky Energy, Inc.; Murray Keystone Processing, Inc.(aaa) Murray South America, Inc.; (bbb) Murray Utah Energy Services, Inc.; (ccc) OhioAmerican Energy, Incorporated; (ddd) Ohio Energy Transportation, Inc.; (eee) Ohio Valley Resources, Inc.; (fff) Oneida Coal Company, Inc.; (ggg) PennAmerican Coal L.P.; (hhh) PennAmerican Coal, Inc.; (iii) Pennsylvania Transloading, Inc; (jjj) Pinski Corp.; (kkk) Pleasant Farms, Inc.; (lll) Premium Coal, Inc.; (mmm) Southern Ohio Coal Company; (nnn) Spring Church Coal Company; (ooo) Sunburst Resources, Inc.; (ppp) T D K Coal Sales, Incorporated; (qqq) The American Coal Company; (rrr) The American Coal Sales Company; (sss) The Franklin County Coal Company; (ttt) The Harrison County Coal Company; (uuu) The Marion County Coal Company; (vvv) The Marshall County Coal Company; (www) The McLean County Coal Company; (xxx) The Meigs County Coal Company; (yyy) The Monongalia County Coal Company; (zzz) The Muhlenberg County Coal Company; (aaaa) The Muskingum Coal Company; (bbbb) The Ohio County Coal Company; (cccc) The Ohio Valley Transloading Company; (dddd) The Oklahoma Coal Company; (eeee) The Washington County Coal Company; (ffff) The Western Kentucky Coal Company; (gggg) Twin Rivers Towing Company; (hhhh) UMCO Energy, Inc.; (iiii) UtahAmerican Energy, Inc.; (jjjj) West Ridge Resources, Inc.; (kkkk) West Virginia Resources, Inc.; (llll) Western Kentucky Coal Resources; (mmmm) Western Kentucky Consolidated Resources, LLC; (nnnn) Western Kentucky Land Holding, LLC; (oooo) Western Kentucky Rail Loadout, LLC; (pppp) Western Kentucky Resources Financing, LLC; (qqqq) Western Kentucky Resources, LLC; (rrrr) Western Kentucky River Loadout, LLC; (ssss) Murray Energy Corporation; and (tttt) The Ohio Valley Coal Company.

60.     "*DIP Agents*" means, collectively, (a) the DIP Term Loan Agent and (b) GLAS Americas LLC, as collateral agent under the DIP Credit Agreement, each solely in its capacity as such.

61.     "*DIP Claims*" means, collectively, the DIP FILO Claims and the DIP Term Loan Claims.

62.     "*DIP Credit Agreement*" means that certain Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of October 31, 2019, by and among the Debtors, the DIP Agents, the DIP Term Loan Lenders, and the DIP FILO Lender, as may be amended, modified, restated, or supplemented from time to time.

63.     "*DIP Documents*" means, collectively, the DIP Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, as may be amended, modified, restated, or supplemented from time to time.

64.     "*DIP Facility*" means the DIP Term Loan Facility and the DIP FILO Facility.

65.     "*DIP FILO Claims*" means all Claims of the DIP FILO Lender arising under, derived from, secured by, or based on the DIP Credit Agreement, the DIP Documents, or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP FILO Facility.

66.     "*DIP FILO Facility*" means the debtor-in-possession first in, last out facility provided for under the DIP Credit Agreement.

67.     "*DIP FILO Lender*" means GACP Finance Co., LLC, solely in its capacity as a lender under the DIP Credit Agreement, and any Person to whom GACP Finance Co., LLC assigned a DIP FILO Loan.

68.     "*DIP FILO Loans*" means those ABL FILO Loans that, upon entry of the interim DIP Order, were converted into first in, last out loans under the DIP Facility.

69.     "*DIP Lenders*" means, collectively, the DIP Term Loan Lenders and the DIP FILO Lender.

70.     "*DIP Order*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and incur postpetition obligations thereunder, as such orders may be amended, supplemented, or modified from time to time [Docket Nos. 93 and 431].

71.     "*DIP Term Loan Agent*" means GLAS USA LLC, as administrative agent under the DIP Credit Agreement, solely in its capacity as such.

72.     "*DIP Term Loan Claims*" means all Claims of the DIP Term Loan Agent and the DIP Term Loan Lenders arising under, derived from, secured by, or based on the DIP Credit Agreement, the DIP Documents, or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP Term Loan Facility.

73.     "*DIP Term Loan Facility*" means the new money term loan credit facility provided for under the DIP Credit Agreement.

74.     "*DIP Term Loan Lenders*" means the banks, financial institutions, and other various lenders party to the DIP Credit Agreement from time to time (other than the DIP FILO Lender), each solely in their capacity as such.

75.     "*Disbursing Agent*" means, as applicable, the Debtors or the Plan Administrator (as applicable) or any Entity or Entities selected by the Debtors or the Plan Administrator to make or facilitate distributions contemplated under the Plan.

76.     "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1360], dated as of April 25, 2020, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, which must be reasonably acceptable to the Debtors and the Required Consenting Superpriority Lenders.

77.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

78.     "*Disputed Claims Reserve*" means amounts in a bank account or accounts reserved for Disputed Claims, which shall be administered by the Plan Administrator pursuant to the terms of the Wind-Down Trust Agreement and the Plan.

79.     "*Distribution Record Date*" means, other than with respect to Holders of public Securities, the record date for determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions

7

under the Plan, which date shall be the Effective Date or such other date prior to the Effective Date as is designated by the Debtors with the consent of the Required Consenting Superpriority Lenders, not to be unreasonably withheld, conditioned, or delayed.

80.     "*DTC*" means The Depository Trust Company.

81.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B of the Plan and (b) no stay of the Confirmation Order is in effect, which shall be the day Consummation occurs.

82.     "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

83.     "*Environmental Law*" means all federal, state, and local statutes, regulations, rules, ordinances, certifications, permits, or similar provisions having the force or effect of law, all judicial and administrative orders, agreements, and determinations and all common law concerning reclamation, restoration, well plugging and restoration, dam safety, water treatment, stream and wetland mitigation, underground injection control, contamination, pollution, hazardous or toxic substances, mine drainage, water supply protection, mine subsidence remediation, protection of the environment, and environmental impacts on human health, safety, and welfare, including: (a) the Comprehensive Environmental Response, Compensation, and Liability Act; (b) the Clean Water Act; (c) the Clean Air Act; (d) the Emergency Planning and Community Right-to-Know Act; (e) the Federal Insecticide, Fungicide, and Rodenticide Act; (f) the Oil Pollution Act; (g) the Atomic Energy Act; (h) the Resource Conservation and Recovery Act; (i) the Safe Drinking Water Act; (j) the Surface Mining Control and Reclamation Act; (k) the Toxic Substances Control Act; and (l) any state or local laws, statutes, regulations, rules, ordinances, or certifications, including coal mining, underground injection control, and water pollution primacy laws, statutes, regulations, rules, ordinances, or certifications, that regulate media or activities that are the subject of these laws.

84.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

85.     "*Exculpated Party*" means collectively, and in each case solely in its capacity as such: (a) the Debtors; (b) the UCC and each of its respective members; (c) the DIP Agents; (d) the DIP Term Loan Lenders; (e) the DIP FILO Lender; (f) the Superpriority Agent; (g) the Consenting Superpriority Lenders; (h) the ABL FILO Lender; (i) the Indenture Trustees; (j) U.S. Bank National Association, as collateral agent; (k) the Plan Administrator; (l) DTC; (m) Murray NewCo and all of its subsidiaries (including the Stalking Horse Bidder); (n) the Exit Facility Agent; (o) the Exit Facility Lenders; (p) the New Takeback Debt Agent; (q) the New Takeback Debt Lenders; (r) the Retiree Committee and its members; and (s) with respect to each of the foregoing entities, such Entity and its current and former Affiliates, and such Entities' and their current Affiliates' directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided*, *further*, that notwithstanding anything to the contrary herein, no Non-Released Party shall be an Exculpated Party.

86.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

87.     "*Exit Facility*" means the new money term loan facility in an original principal amount of $45,000,000 provided for under the Exit Financing Documents.

88.     "*Exit Facility Agent*" means Silver Point Finance, LLC, as administrative and collateral agent under the Exit Facility Agreement, solely in its capacity as such.

89.     "*Exit Facility Agreement*" means that certain credit, loan, or other agreement, dated as of the Effective Date, by and among the Stalking Horse Bidder and certain of its affiliated entities, the Exit Facility Agent, and the Exit Facility Lenders, the terms of which shall be included in the Plan Supplement.

90.     "*Exit Facility Documents*" means, collectively, the Exit Facility Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which documents shall be acceptable to the Debtors and the Required Consenting Superpriority Lenders.

91.     "*Exit Facility Lenders*" means the lenders party to the Exit Facility Agreement.

92.     "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

93.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

94.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be Filed relating to such order shall not cause such order to not be a Final Order.

95.     "*General Unsecured Claim*" means any Claim that is not Secured and is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) an unsecured deficiency claim arising from any Secured Claim (which include, for the avoidance of doubt, Superpriority Claims, Term Loan Claims, 1.5L Notes Claims, Stub 2L Notes Claims, 2L Notes Claims), or (e) the 1974 Plan Claims.

96.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

97.     "*Holder*" means an Entity holding a Claim or an Interest in any Debtor.

98.     "*Holdings*" means Murray Energy Holdings Co.

99.     "*IBNR Claims*" means all incurred but not reported Claims relating to the Debtors' Self-Funded Health Plan, to the extent (a) the services giving rise to such IBNR Claims were performed (i) on or after the Petition Date or as otherwise required under the terms of the applicable UMWA Participation Agreement and (ii) before the Effective Date, and (b) such IBNR Claims were timely filed under the terms of the applicable Self-Funded Health Plan.

100.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

101.     "*Indenture Trustees*" means, collectively, the trustees under the 1.5L Indenture, Stub 2L Indenture, and 2L Indenture.

102.    "***Initial Distribution Date***" means the date on which the Disbursing Agent shall make initial distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date.

103.    "***Intercompany Claim***" means any Claim held by a Debtor against another Debtor arising before the Petition Date.

104.    "***Intercompany Interest***" means an Interest in any Debtor, or a direct subsidiary of any Debtor, other than an Interest in Holdings.

105.    "***Interest***" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

106.    "***Isolated Wetland Permit***" means any Transferred Permit issued pursuant to Ohio Revised Code 6111.02-6111.028.

107.    "***Javelin***" means Javelin Global Commodities Holdings LLP and its direct and indirect subsidiaries.

108.    "***Judicial Code***" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

109.    "***Lien***" means any lien, as such term is defined in section 101(37) of the Bankruptcy Code.

110.    "***Management Incentive Plan***" means the post-Effective Date management incentive plan of Murray NewCo, which shall provide for New Interests or other equity or similar interests in Murray NewCo to be reserved for directors, officers, and employees of Murray NewCo or a subsidiary of Murray NewCo to be distributed on terms to be determined by the New Board; *provided* that the percent of the New Interests reserved for issuance under the Management Incentive Plan and the terms and conditions for the initial issuance of New Interests to Robert D. Moore under the Management Incentive Plan shall be set forth in the Plan Supplement if determined as of such time.

111.    "***Met Plan***" means the joint chapter 11 plan of Murray Metallurgical Coal Holdings, LLC and its direct and indirect debtor subsidiaries in the jointly administered chapter 11 cases captioned *In re Murray Metallurgical Coal Holdings, LLC, et al.*, Case No. 20-10390 (JEH).

112.    "***Murray Alabama Minerals Reclamation Obligations***" mean all obligations under applicable mining laws or mining permits (including Permits P-3199, P-3222, and P-3257) to conduct or fund reclamation, revegetation, recontouring, abatement, control, remediation, clean-up, or prevention of adverse effects of mining activities, or any other activity required to restore mined land to an approved postmining land use as required under applicable law, including, for the avoidance of doubt, reclamation of land, treatment of water (including perpetual water treatment), or other natural resources relating to Murray Alabama Minerals, LLC, the North River Mine, the Kellerman Prep Plant, and Mine #3.

113.    "***Murray Family Entities***" means Robert E. Murray, his sons Ryan Murray, Robert Edward Murray, and Jonathan Murray, his wife Brenda Murray, and any of their affiliated trusts.

114.    "***Murray Family Settlement***" means the settlement, effective as of the Effective Date, between the Debtors and the Murray Family Entities, and pursuant to which, among other things, and in exchange for, among other

things, the Murray Family Settlement Proceeds, the Murray Family Entities shall be included as Releasing Parties and Released Parties under the Plan.

115.     "***Murray Family Settlement Proceeds***" means at least $15,700,756.25 paid by or on behalf of any of the Murray Family Entities to the Debtors pursuant to the Murray Family Settlement.

116.     "***Murray NewCo***" means ACNR Holdings, Inc., as the indirect owner of 100 percent of the equity interests of the Stalking Horse Bidder.

117.     "***Murray Settlement Distributable Consideration***" means 18.5 percent of the Murray Family Settlement Proceeds.

118.     "***New Board***" means the initial board of directors, members, or managers, as applicable, of Murray NewCo.

119.     "***New Employment Contracts***" means those certain new employment contracts between Murray NewCo or its subsidiaries and certain executive employees (including Robert D. Moore, as President and Chief Executive Officer), which shall be on terms acceptable to such executive and the Required Consenting Superpriority Lenders, in consultation with the Consenting Equityholders and the Debtors.

120.     "***New Interests***" means the common equity interests in Murray NewCo.

121.     "***New Organizational Documents***" means the form of certificates or articles of incorporation, bylaws, trust agreements, or such other applicable formation documents of Murray NewCo and any of its subsidiaries, including any shareholders' or stockholders' agreement, if any, the terms of which shall be consistent with the RSA and otherwise acceptable to the Required Consenting Superpriority Lenders.

122.     "***New Preferred Interests***" means the preferred equity interests in Murray NewCo with a liquidation preference of $125,000,000 upon issuance, which preferred interests will be distributed to holders of DIP Term Loan Claims and the material terms and conditions of which shall be consistent with those set forth in the term sheet included in the Plan Supplement.

123.     "***New Takeback Debt***" means the term loan facility under the New Takeback Debt Documents, which shall have an aggregate principal amount equal to (a) $350,000,000 (plus all accrued and unpaid interest and fees on the DIP Term Loan Facility) and (b) the capitalized commitment, financing, and other fees set forth in the New Takeback Debt Documents, the material terms and conditions of which shall be consistent with those set forth in the term sheet included in the Plan Supplement.

124.     "***New Takeback Debt Agent***" means GLAS USA LLC, as administrative agent under the New Takeback Debt Agreement, solely in its capacity as such.

125.     "***New Takeback Debt Agreement***" means that certain agreement or agreements, dated as of the Effective Date, by and among the Stalking Horse Bidder and certain of its affiliated entities, the New Takeback Debt Agent, and the New Takeback Debt Lenders, in form and substance acceptable to the Required Consenting Superpriority Lenders (and with respect to any provision that affects the rights or duties of the New Takeback Debt Agent, the New Takeback Debt Agent), which will set forth the terms of the New Takeback Debt.

126.     "***New Takeback Debt Documents***" means, collectively, the New Takeback Debt Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

127.     "***New Takeback Debt Lenders***" means the banks, financial institutions, and other various lenders party to the New Takeback Debt Agreement, each solely in their capacity as such.

11

128.    "*Non-Released Party*" means each party set forth on the Non-Released Party Schedule.

129.    "*Non-Released Party Schedule*" means a schedule that sets forth the identities of each Non-Released Party and is Filed with the Bankruptcy Court as part of the Plan Supplement.

130.    "*Notice and Claims Agent*" means Prime Clerk LLC in its capacity as notice and claims agent for the Debtors and any successor thereto.

131.    "*Other Priority Claim*" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

132.    "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim, a Superpriority Claim, a Secured Tax Claim, a Term Loan Claim, a 1.5L Notes Claim, a Stub 2L Notes Claim, or a 2L Notes Claim.

133.    "*Ownership Cap*" means 19.99% of the total New Interests outstanding on the Effective Date.

134.    "*Person*" means a person as such term as defined in section 101(41) of the Bankruptcy Code.

135.    "*Petition Date*" means October 29, 2019, the date on which each of the Debtors commenced the Chapter 11 Cases.

136.    "*Plan*" means this *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, as may be altered, amended, modified, or supplemented from time to time in accordance with Article X hereof, including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

137.    "*Plan Administrator*" means Drivetrain, LLC, who will serve as the trustee and administrator for the Wind-Down Trust and will administer the wind down of the Retained Assets, and will have all power and authorities as set forth in Article IV.D of the Plan.

138.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, all subject to the consent rights set forth in the RSA, the initial draft of certain of such documents shall be Filed by the Debtors seven calendar days before the Voting Deadline, and additional documents Filed with the Bankruptcy Court prior to the Effective Date, as may be amended, supplemented, altered, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) a term sheet reflecting the material terms of the New Takeback Debt Agreement, which term sheet shall also reflect the material terms of the New Preferred Interests; (b) a term sheet reflecting the material terms of the Exit Facility Agreement; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) the Schedule of Rejected Executory Contracts and Unexpired Leases; (e) the Schedule of Retained Causes of Action; (f) the Non-Released Party Schedule; (g) the form or a term sheet reflecting the material terms of the New Organizational Documents; (h) the terms and conditions for the initial issuance of New Interests to Robert D. Moore under the Management Incentive Plan, if determined; (i) the identity and terms of compensation of the Plan Administrator; (j) the Wind-Down Trust Agreement; (k) the Wind-Down Budget; (l) the Restructuring Steps Memorandum; and (m) the Warrant, each of which shall be in form and substance consistent with the RSA.

139.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

140.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

141.    "*Professional*" means an Entity retained in the Chapter 11 Cases pursuant to and in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

12

142. "***Professional Fee Claims***" mean all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court and regardless of whether a monthly fee statement or interim fee application has been Filed for such fees and expenses, other than Claims for fees and expenses incurred by the advisors to the UCC that are subject to the UCC Advisor Fee Cap that are in excess of the UCC Advisor Fee Cap. To the extent a Bankruptcy Court or higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

143. "***Professional Fee Escrow Account***" means an interest-bearing escrow account to be funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount, *provided* that the Professional Fee Escrow Account shall be increased with Cash from Murray NewCo (or its subsidiaries) to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

144. "***Professional Fee Escrow Amount***" means the total amount of Professional Fee Claims estimated in consultation with the Required Consenting Superpriority Lenders pursuant to Article II.C.3 of the Plan.

145. "***Proof of Claim***" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

146. "***Proof of Interest***" means a written proof of Interest Filed against any of the Debtor in the Chapter 11 Cases.

147. "***Quarterly Distribution Date***" means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30, and December 31 of each calendar year) occurring after the Effective Date, or as soon thereafter as is reasonably practicable.

148. "***Reinstate***," "***Reinstated***," or "***Reinstatement***" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest not Impaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

149. "***Released Party***" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Superpriority Agent; (c) the Consenting Superpriority Lenders; (d) the DIP Term Loan Lenders; (e) the ABL FILO Lender; (f) the DIP FILO Lender; (g) the DIP Agents; (h) the Indenture Trustees; (i) U.S. Bank National Association, as collateral agent; (j) the Plan Administrator; (k) Murray NewCo and all of its subsidiaries (including the Stalking Horse Bidder); (l) the UCC and its members; (m) DTC; (n) the Exit Facility Agent; (o) the Exit Facility Lenders; (p) the New Takeback Debt Agent; (q) the New Takeback Debt Lenders; (r) GLAS Trust Company LLC, in its capacity as predecessor administrative agent under the Term Loan Credit Agreement; (s) each Murray Family Entity; (t) the Retiree Committee and its members; and (u) with respect to each of the foregoing in clauses (a) through (t), such Entity and its current and former Affiliates, and such Entities' and their current Affiliates' directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment

bankers, consultants, representatives, and other professionals; *provided* that notwithstanding anything to the contrary herein, no Non-Released Party shall be a Released Party; *provided*, *further*, that the 1974 Plan will be a Released Party solely to the extent set forth in the 1974 Plan Carve-Out.

150.     "*Releasing Parties*" means, collectively, each of the following: (a) the Debtors; (b) the Superpriority Agent; (c) the Consenting Superpriority Lenders; (d) the DIP Term Loan Lenders; (e) the ABL FILO Lender; (f) the DIP FILO Lender (g) the DIP Agents; (h) the Indenture Trustees; (i) U.S. Bank National Association, as collateral agent; (j) Murray NewCo and all of its subsidiaries (including the Stalking Horse Bidder); (k) all Holders of Claims or Interests that vote to accept the Plan (*provided* that such Holders of Claims and Interests will not be deemed to release the Retiree Committee and its members, or any of their related parties set forth in "(u)" of Article I.A149); (l) GLAS Trust Company LLC, in its capacity as predecessor administrative agent under the Term Loan Credit Agreement; (m) each Murray Family Entity; and (n) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed accounts or funds, participants, and each of their respective current and former equity holders, officers, directors, managers, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively; *provided* that the 1974 Plan, the UCC, the members of the UCC, and their respective professionals and affiliates, solely in their capacity as such, shall be Released Parties regardless of whether they vote to approve the Plan, and shall not be Releasing Parties or required to or be deemed to grant any release of Claims.

151.     "*Required Consenting Superpriority Lenders*" has the meaning set forth in the RSA.

152.     "*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the restructuring contemplated by the Plan, which shall be in the Plan Supplement.

153.     "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

154.     "*Retained Assets*" means (a) the equity interests (if any) of Murray Metallurgical Coal Holdings, LLC owned by Murray Metallurgical Coal Properties, LLC on the Effective Date immediately before the closing of the Sale Transaction, (b) the equity interests of Murray Metallurgical Coal Properties, LLC owned by Murray Energy Corporation on the Effective Date immediately before the closing of the Sale Transaction, (c) the equity interests of Murray Metallurgical Coal Properties II, LLC owned by Murray Energy Corporation on the Effective Date immediately before the closing of the Sale Transaction, (d) the equity interests of Javelin Investment Holdings, LLC owned by Murray Metallurgical Coal Properties II, LLC on the Effective Date immediately before the closing of the Sale Transaction, and (e) the Retained Assets Expense Fund, including any accounts to hold such funds.

155.     "*Retained Assets Expense Fund*" means Cash in an amount, as determined by the Plan Administrator, with the consent of the Required Consenting Superpriority Lenders, sufficient to cover any and all reasonably expected costs and expenses to be incurred directly or indirectly by any Debtor and/or the Plan Administrator after the Effective Date with respect to the Retained Assets.

156.     "*Retained Assets Termination Time*" means the time at which with respect to the equity interests (if any) of Murray Metallurgical Coal Properties, LLC and Murray Metallurgical Coal Properties II, LLC, both (i) the equity interests held directly or indirectly by such entities in Murray Metallurgical Coal Holdings, LLC have been extinguished pursuant to any chapter 11 plan in the jointly administered chapter 11 cases captioned *In re Murray Metallurgical Coal Holdings, LLC*, No. 20-10390 (JEH) (Bankr. S.D. Ohio) (which plan may include the Met Plan) and (ii) all other assets held by Murray Metallurgical Coal Properties, LLC and Murray Metallurgical Coal Properties II, LLC have been disposed of or otherwise transferred.

157.     "*RSA*" means that certain Restructuring Support Agreement, dated as of October 28, 2019, by and among the Debtors, the Consenting Superpriority Lenders, and the Consenting Equityholders, as amended on December 12, 2019, and January 2, 2020, and amended and restated on July [23], 2020, and as may be further amended, restated, supplemented, or modified from time to time in accordance with the terms thereof.

14

158.    "*Sale Transaction*" means the sale of certain of the Debtors' assets to the Stalking Horse Bidder to be consummated in accordance with the Plan and Stalking Horse APA.

159.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means that certain schedule filed with the Plan Supplement of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, or assumed by the Debtors and assigned to the Stalking Horse Bidder or any subsidiary of the Stalking Horse Bidder pursuant to the Plan and in accordance with the Stalking Horse APA, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, which shall be acceptable to the Debtors and the Stalking Horse Bidder.

160.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means that certain schedule filed with the Plan Supplement of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan and in accordance with the Stalking Horse APA, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, which shall be acceptable to the Debtors and the Stalking Horse Bidder.

161.    "*Schedule of Retained Causes of Action*" means that certain schedule filed with the Plan Supplement of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or the Stalking Horse APA, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, which shall be acceptable to the Debtors and the Stalking Horse Bidder.

162.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified, or supplemented from time to time.

163.    "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; *provided* that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

164.    "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, which value shall be determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

165.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

166.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

167.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

168.    "*Self-Funded Health Plan*" means, collectively, the Debtors' self-funded medical plan, vision plan, dental plan, and prescription drug plan.

169.    "*SMCRA*" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

170.    "*Stalking Horse APA*" means that certain Asset Purchase Agreement, dated as of March 16, 2020, executed by the Stalking Horse Bidder, as buyer, for the sale of certain of the Debtors' assets to the Stalking Horse Bidder, a copy of which has been filed [Docket No. 1064], together with all exhibits, appendices, supplements,

15

documents, and agreements ancillary thereto (certain schedules of which have been filed [Docket Nos. 1146, 1147]), in each case as amended, modified, or supplemented from time to time.

171.   "***Stalking Horse Bidder***" means American Consolidated Natural Resources, Inc. and its designees, as purchaser of certain of the Debtors' assets pursuant to and in accordance with the Stalking Horse APA.

172.   "***Stub 2L Indenture***" means that certain Indenture, dated as of May 8, 2014, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among, Murray Energy Corporation, as issuer, each of the guarantors party thereto, U.S. Bank National Association, as collateral trustee, and Delaware Trust Company, as successor trustee to The Bank of New York Mellon Trust Company, N.A., pursuant to which Murray Energy Corporation issued its 9.5% Senior Secured Notes due 2020.

173.   "***Stub 2L Notes Claims***" means Claims outstanding under the Stub 2L Notes Documents.

174.   "***Stub 2L Notes Documents***", means, collectively, the Stub 2L Indenture and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

175.   "***Superpriority Agent***" means GLAS Trust Company LLC, solely in its capacity as administrative agent under the Superpriority Credit Agreement.

176.   "***Superpriority Claims***" means Claims outstanding under the Superpriority Loan Documents.

177.   "***Superpriority Credit Agreement***" means that certain Superpriority Credit and Guaranty Agreement, dated as of June 29, 2018, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among Murray Energy Corporation, as borrower, Holdings, as holdings, each of the guarantors party thereto, the Superpriority Agent, and the Superpriority Lenders.

178.   "***Superpriority Lenders***" means the various lenders party to the Superpriority Credit Agreement.

179.   "***Superpriority Loan Documents***" means, collectively, the Superpriority Credit Agreement and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, including any forbearance agreements, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

180.   "***Term Loan Agent***" means Black Diamond Commercial Finance, L.L.C., solely in its capacity as administrative agent under the Term Loan Credit Agreement.

181.   "***Term Loan Claims***" means any and all Claims relating to, arising out of, arising under, or arising in connection with the Term Loan Facility and the Term Loan Documents.

182.   "***Term Loan Credit Agreement***" means that certain Credit and Guaranty Agreement, dated as of April 16, 2015, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among Murray Energy Corporation, as borrower, Holdings, as holdings, each of the guarantors party thereto, Black Diamond Commercial Finance, L.L.C., as successor administrative agent to GLAS Trust Company LLC, and the lenders party to the Term Loan Credit Agreement.

183.   "***Term Loan Documents***" means, collectively, the Term Loan Credit Agreement and any related security agreement, collateral trust agreement, intercreditor agreement, and any other collateral and ancillary documents, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

184.   "***Term Loan Facility***" means the term loan facility provided for under the Term Loan Credit Agreement.

185. "***Third-Party Release***" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.D of the Plan.

186. "***Trade Claimant***" has the meaning ascribed to such term in the Critical Vendor Order.

187. "***Transferred Permits***" means all police or regulatory and environmental permits, licenses, authorizations, and certifications (including those listed on Schedule 2.1(y) of the Stalking Horse APA) relating to the Acquired Mines and Wells and the Assumed Police or Regulatory Liabilities subject to the "designated operator" provisions of subsection (a)(i) in the first sentence of Section 7.6, and the last two sentences in Section 7.6(a) of the Stalking Horse APA and further subject to applicable legal requirements under non-bankruptcy laws, regulations, and rules governing such transfers.

188. "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of Ohio.

189. "***UCC***" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on November 7, 2019, pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 168].

190. "***UCC Advisor Fee Cap***" means the following caps on fees and expenses incurred by the following advisors to the UCC after the UCC Trigger Date, that are payable by the Estates, which shall be (a) with respect to fees and expenses incurred by Morrison & Foerster LLP, $300,000, (b) with respect to fees and expenses incurred by AlixPartners LLP, $150,000, and (c) with respect to (x) the restructuring fee of Moelis and Company LLC, $2,000,000 and (y) any monthly fees of Moelis and Company LLC incurred after May 31, 2020, $0; *provided* that (a) the UCC Advisor Fee Cap may be increased as agreed in writing among the Ad Hoc Group of Superpriority Lenders and the applicable UCC advisor and (b) the Ad Hoc Group of Superpriority Lenders and the UCC agree to negotiate in good faith regarding a reasonable increase in the UCC Advisor Fee Cap if either Confirmation does not occur prior to September 1, 2020, or the Effective Date does not occur on or prior to September 15, 2020.

191. "***UCC Settlement***" means that certain settlement-in-principle between the UCC and the Ad Hoc Group of Superpriority Lenders reached on or about the UCC Trigger Date.

192. "***UCC Trigger Date***" means May 24, 2020.

193. "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

194. "***UMWA Participation Agreement***" means the agreement between certain of the Debtors and the United Mine Workers of America 1993 Benefit Plan, as currently in effect up to and until the Effective Date, at which time such agreement shall be rejected, *provided* that certain of Murray NewCo's direct or indirect subsidiaries and the United Mine Workers of America 1993 Benefit Plan will enter into a new amended and restated participation agreement, which will become effective as of the Effective Date and shall replace such rejected agreement.

195. "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

196. "***Voting Deadline***" means 4:00 p.m., prevailing Eastern Time, on August [ ], 2020, which date may be extended by the Debtors with the consent of the Required Consenting Superpriority Lenders (which consent may not be unreasonably withheld, conditioned, or delayed).

197. "***Warrant***" means a warrant, issued by Murray NewCo, to purchase New Interests, the terms of which will provide that, among other things, the holder may exercise its rights to purchase New Interests at nominal or no cost, which shall be in form and substance acceptable to the Debtors and the Required Consenting Superpriority Lenders.

198.    "***Western Kentucky Debtors***" means, collectively, (a) Murray Kentucky Energy, Inc., (b) Western Kentucky Coal Resources, LLC, (c) Western Kentucky Resources Financing, LLC, (d) Western Kentucky Consolidated Resources, Inc., (e) Western Kentucky Consolidated Resources, Inc., (f) Western Kentucky Rail Loadout LLC, (g) Western Kentucky Resources, LLC, (h) Western Kentucky River Loadout LLC, (i) The Western Kentucky Coal Company, LLC, (j) The Muhlenberg Country Coal Company, LLC, and (k) Western Kentucky Land Holding, LLC.

199.    "***Wind-Down***" means the wind down, dissolution, and liquidation of the Debtors' Estates after the Effective Date (including the Plan Administrator's taking or causing the applicable Debtor to take any actions necessary to satisfy obligations arising from and otherwise maintain ownership directly or indirectly by Murray Energy Corporation of the Retained Assets until the Retained Assets Termination Time).

200.    "***Wind-Down Amount***" means Cash in an amount determined by the Debtors and acceptable to the Required Consenting Superpriority Lenders, which amount shall be retained by the Debtors and used by the Plan Administrator to fund the Wind-Down in accordance with the Wind-Down Budget; *provided* that fees and expenses incurred by the Plan Administrator to reconcile, object to, and settle General Unsecured Claims against the Estates shall not exceed $250,000.

201.    "***Wind-Down Budget***" means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases, which budget, activities, and reasonable expenses shall be agreed to by the Required Consenting Superpriority Lenders.  The Wind-Down Budget shall include line item estimates for, among other things, post-Effective Date Professional fees.  The fees and expenses incurred by the Plan Administrator to reconcile, object to, and settle General Unsecured Claims against the Estates under the Wind-Down Budget shall not exceed $250,000.

202.    "***Wind-Down Distributable Consideration***" means the excess, if any, of (i) any Cash proceeds of the Wind-Down Trust Assets (other than Murray Family Settlement Distributable Consideration), over (ii) amounts necessary to (a) satisfy the Administrative Claims, Priority Tax Claims, Other Priority Claims, Secured Tax Claims, and Other Secured Claims in full in Cash (unless such Claims receive such other treatment that leaves such Claims Unimpaired) and (b) fund the Wind-Down Amount.

203.    "***Wind-Down Trust***" means that certain trust to be created on the Effective Date, as described in Article IV.D of the Plan.

204.    "***Wind-Down Trust Account***" means the bank account or accounts used to fund all expenses and payments required to be made by the Plan Administrator, which shall be established by the Plan Administrator on or after the Effective Date.

205.    "***Wind-Down Trust Agreement***" means that certain agreement establishing the Wind-Down Trust, which shall be acceptable to the Debtors and the Required Consenting Superpriority Lenders, and the form of which shall be included in the Plan Supplement.

206.    "***Wind-Down Trust Assets***" means all of the assets of the Debtors' Estates remaining after the closing of the Sale Transaction (other than the Retained Assets), which assets shall be treated as transferred (in accordance with the Restructuring Steps Memorandum) to and beneficially owned by the Wind-Down Trust as of the Effective Date.

B.    *Rules of Interpretation*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to

18

be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (9) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any effectuating provisions may be interpreted by the Debtors or Plan Administrator, in consultation with counsel to the Required Consenting Superpriority Lenders, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (15) except with respect to Article II and Article III.B.4 hereof, any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (18) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (19) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Trust shall mean the Debtors and the Wind-Down Trust, as applicable, to the extent the context requires.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtors not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.     *Non-Consolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan that addresses the reorganization of each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors and the Plan is a separate Plan for each Debtor.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.     *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, and with respect to any non-ordinary course Allowed Administrative Claims, with the consent of the Required Consenting Superpriority Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed), or the Plan Administrator, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 45 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that any Allowed Administrative Claim that has been expressly assumed by the Stalking Horse Bidder or any of its subsidiaries as an Assumed Funded Liability (as defined in the Stalking Horse APA) under the Stalking Horse APA or other documentation related to the Sale Transaction shall not be an obligation of the Debtors or the Wind-Down Trust.

Except for Professional Fee Claims and DIP Claims (which are addressed in Article II.B and Article II.C, respectively), and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Plan Administrator no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Objections to such requests must be Filed and served on the Plan Administrator (if the Plan Administrator is not the objecting party) and the requesting party on or before the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims and DIP Claims, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Trust, the Plan Administrator, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors or the Plan Administrator or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

B.     *Payment of Fees and Expenses under DIP Order*

On the later of (1) the Effective Date and (2) the date on which such fees, expenses, disbursements, contribution, or indemnification obligations would be required to be paid under the terms of the DIP Order, the Debtors or the Wind-Down Trust, as applicable, shall pay (x) all fees, expenses, and disbursements of the DIP Agents and DIP Lenders, in each case that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the applicable DIP Order and (y) any Claim related to the reasonable and documented fees and expenses, contribution or indemnification obligations (including, for the avoidance of doubt, those that may accrue before or after the Effective Date (including in any appellate proceedings related to the Chapter 11 Cases)) of the Superpriority Agent, the Superpriority Lenders, and their respective professionals payable pursuant to the DIP Order.  Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims. Nothing herein shall require the DIP Agents, DIP Lenders, Superpriority Agent, Superpriority Lenders, or their respective professionals, to file applications, a Proof of Claim, or otherwise seek approval of the Court as a condition to the payment of such Allowed Administrative Claims.

C.     *Professional Fee Claims*

1.     Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders; *provided* that the Professional fees and expenses incurred by the UCC's Professionals that are subject to the UCC Advisor Fee Cap that are in excess of the UCC Advisor Fee Cap shall not be paid by the Debtors or any of their successors; *provided*, *further*, that the Professional fees and expenses incurred by the UCC's Professionals shall not be subject to the Investigation Budget (as defined in the DIP Order).  The Plan Administrator (or the authorized signatories to the Professional Fee Escrow Account, after consultation with the Plan Administrator) shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

2.     Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, the Plan Administrator, or the Wind-Down Trust.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Plan Administrator, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Plan Administrator's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind-Down Trust Assets; *provided* that, in the event that funds held in the Professional Fee Escrow Account are insufficient to pay for the Allowed Professional Fee Claims, the underfunded amount shall be payable from Murray NewCo (or its subsidiaries).  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to Murray NewCo or any of its designees without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.    Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors and/or the UCC before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine, in consultation with the Required Consenting Superpriority Lenders, the amount to be funded to the Professional Fee Escrow Account, *provided* that Murray NewCo (or its subsidiaries) shall pay Cash from its Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.    Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, on or after the Confirmation Date, the Debtors shall, without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by (a) the Debtors after the Confirmation Date, and (b) the UCC after the Confirmation Date through and including the date that the Committee's rights, duties, responsibilities, and liabilities cease in accordance with Article XII.F of the Plan, but subject to the UCC Advisor Fee Cap.  The Debtors and the Plan Administrator, as applicable, shall pay within ten business days after submission of a detailed invoice to the Debtors or the Plan Administrator, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors, as applicable.  If the Debtors or the Plan Administrator dispute the reasonableness of any such invoice, the Debtors or the Plan Administrator, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Case Management Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.    *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses.  Upon the indefeasible payment or satisfaction in full in Cash of the Allowed DIP Claims in accordance with the terms of this Plan, or other such treatment as contemplated by this Article II.C of the Plan, and except with respect to the Contingent DIP Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Documents), on the Effective Date all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Notwithstanding the foregoing, the Contingent DIP Obligations shall survive the Effective Date and shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash on the Effective Date, or to the extent accrued after the Effective Date, on a current basis in full in Cash as invoiced and shall not be released pursuant to the Plan or Confirmation Order, and shall be paid by the Plan Administrator from the Wind-Down Trust Assets as and when due under the DIP Documents.  After the Effective Date, the Plan Administrator shall continue to reimburse the DIP Agents and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agents and the DIP Lenders after the Effective Date that survive termination or maturity of the DIP Facility in accordance with the terms thereof and/or the DIP Order.  The Plan Administrator shall pay all of the amounts that may become payable to the DIP Agents or any of the DIP Lenders under any of the foregoing provisions in accordance with the terms of the DIP Documents and the DIP Order.

22

### 1. DIP Term Loan Claims

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed DIP Term Loan Claim, on the Effective Date each such Holder of an Allowed DIP Term Loan Claim shall receive its Pro Rata share of the New Takeback Debt, plus all additional consideration set forth in the Plan Supplement (including its Pro Rata share of the New Preferred Interests). The DIP Term Loan Claims shall be Allowed in the aggregate amount outstanding under the DIP Term Loan Facility as of the Effective Date.

Pursuant to the DIP Credit Agreement, all distributions pursuant to this Article II.D.1 shall be made to the DIP Term Loan Agent for distributions to the DIP Term Loan Lenders in accordance with the DIP Credit Agreement and DIP Documents. The DIP Term Loan Agent shall hold or direct distributions for the benefit of the Holders of DIP Term Loan Claims. The DIP Term Loan Agent shall retain all rights as DIP Term Loan Agent under the DIP Documents in connection with the delivery of the distributions to the DIP Term Loan Lenders. The DIP Term Loan Agent shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Term Loan Agent, except for liability arising from gross negligence, willful misconduct, or actual fraud of the DIP Term Loan Agent.

### 2. DIP FILO Claims

Except to the extent that a Holder of an Allowed DIP FILO Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for, each Allowed DIP FILO Claim, each Holder of an Allowed DIP FILO Claim shall receive on the Effective Date either (i) payment in full in Cash of such Holder's Allowed DIP FILO Claim or (ii) such other treatment as acceptable to the DIP FILO Lender. The DIP FILO Claims shall be Allowed in the aggregate amount outstanding under the DIP FILO Facility as of the Effective Date.

E.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F hereof. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (other than Murray Colombian Resources, LLC, which will only exist for Class 9 and Class 14 to the extent of any Claims in such Class), except that (i) Class 5, Class 7, and Class 8 each will be vacant at Debtor

KE 65249798

Murray South America, Inc. and the Western Kentucky Debtors and (ii) Class 12 will be vacant at each Debtor other than Holdings.  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Superpriority Claims | Impaired | Entitled to Vote |
| Class 5 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 6 | 1.5L Notes Claims | Impaired | Entitled to Vote |
| Class 7 | Stub 2L Notes Claims | Impaired | Entitled to Vote |
| Class 8 | 2L Notes Claims | Impaired | Entitled to Vote |
| Class 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 10 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Interests in Holdings | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 14 | 1974 Plan Claims | Impaired | Entitled to Vote |

B.      *Treatment of Claims and Interests*

        Subject to Article IV hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

        1.   Class 1 – Other Priority Claims

                (a)     *Classification*:  Class 1 consists of all Other Priority Claims.

                (b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor (with the consent of the Stalking Horse Bidder) or the Plan Administrator, as applicable:

(i)      payment in full in Cash of the unpaid portion of its Other Priority Claim on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim; or

(ii)      such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of an Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

(a)      *Classification*:  Class 2 consists of all Other Secured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (with the consent of the Stalking Horse Bidder) or the Plan Administrator, as applicable:

(i)      payment in full in Cash of such Holder's Allowed Other Secured Claim; or

(ii)      such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of an Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 – Secured Tax Claims

(a)      *Classification*:  Class 3 consists of all Secured Tax Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim and the applicable Debtor (with the consent of the Stalking Horse Bidder) or the Plan Administrator agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, each such Holder shall receive, at the option of the applicable Debtor (with the consent of the Stalking Horse Bidder) or the Plan Administrator, as applicable:

(i)      payment in full in Cash of the unpaid portion of such Holder's Allowed Secured Tax Claim on the later of the Effective Date and such date such Secured Tax Claim becomes an Allowed Secured Tax Claim; or

(ii)      such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)      *Voting*:  Class 3 is Unimpaired under the Plan.  Each Holder of a Secured Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a Secured Tax Claim is not entitled to vote to accept or reject the Plan.

4. <u>Class 4 – Superpriority Claims</u>

   (a)   *Classification*:  Class 4 consists of Superpriority Claims.

   (b)   *Allowance*:  The Superpriority Claims shall be deemed allowed in the amount of $1,753,616,131.58 (consisting of $1,593,188,196.27 in B-2 Superpriority Claims and $160,427,935.31 in B-3 Superpriority Claims) as of the Petition Date, plus interest, fees, and other expenses and amounts provided for in the Superpriority Credit Agreement, incurred after such date, through the Effective Date, solely to the extent Allowed by the Bankruptcy Code.

   (c)   *Treatment*:  Except to the extent that a Holder of an Allowed Superpriority Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement and release of and in exchange for such Allowed Superpriority Claims, each Holder of an Allowed Superpriority Claim shall receive, up to the full amount of such Holder's Allowed Superpriority Claim:

      (i)    its Pro Rata share (along with Class 5) of 100 percent of the New Interests, subject to dilution for the Management Incentive Plan; *provided* that in the event that such Holder's Pro Rata share of the New Interests would result in such Holder receiving an amount of New Interests in excess of the Ownership Cap, such Holder shall receive (A) the maximum amount of New Interests permitted to be issued pursuant to the Organizational Documents that would result in such Holder receiving New Interests in an amount up to the Ownership Cap and (B) a Warrant exercisable into the amount of New Interests in excess of the Ownership Cap that such Holder would otherwise be entitled to receive;

      (ii)   its Pro Rata share (along with Class 5) of Cash proceeds of any of the Debtors' assets that are not Acquired Assets and that constitute collateral of the Superpriority Claims pursuant to the Superpriority Loan Documents; and

      (iii)  its Pro Rata share (along with Class 5, Class 6, Class 7, Class 8, and Class 9) of Wind-Down Distributable Consideration, if any.

   (d)   *Voting*:  Class 4 is Impaired under the Plan.  Holders of Superpriority Claims are entitled to vote to accept or reject the Plan.

5. <u>Class 5 –Term Loan Claims</u>

   (a)   *Classification*:  Class 5 consists of all Term Loan Claims.

   (b)   *Allowance*:  The Term Loan Claims shall be deemed Allowed in the amount of $51,983,914.14 (consisting of $38,941,849.11 in B-2 Term Loan Claims and $13,042,065.03 in B-3 Term Loan Claims) as of the Petition Date, plus (a) interest, fees, and other expenses and amounts provided for in the Term Loan Credit Agreement (not including fees and expenses included in the following proviso (b)), incurred after such date, through the Effective Date, solely to the extent Allowed by the Bankruptcy Code and (b) the fees and documented expenses of the Term Loan Agent, including attorney's fees and expenses, through and until the Effective Date.

   (c)   *Treatment*:  Except to the extent that a Holder of an Allowed Term Loan Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement and release of and in exchange for such Allowed Term Loan Claims, each Holder of an Allowed Term Loan Claim shall receive, up to the full amount of such Holder's Allowed Term Loan Claim:

(i)        its Pro Rata share (along with Class 4) of 100 percent of the New Interests, subject to dilution for the Management Incentive Plan; *provided* that in the event that such Holder's Pro Rata share of the New Interests would result in such Holder receiving an amount of New Interests in excess of the Ownership Cap, such Holder shall receive (A) the maximum amount of New Interests permitted to be issued pursuant to the Organizational Documents that would result in such Holder receiving New Interests in an amount up to the Ownership Cap and (B) a Warrant exercisable into the amount of New Interests in excess of the Ownership Cap that such Holder would otherwise be entitled to receive;

(ii)      its Pro Rata share (along with Class 4) of Cash proceeds of any of the Debtors' assets that are not Acquired Assets and that constitute collateral of the Superpriority Claims pursuant to the Superpriority Loan Documents; and

(iii)     its Pro Rata share (along with Class 4, Class 6, Class 7, Class 8, and Class 9) of Wind-Down Distributable Consideration, if any.

(d)     *Voting*: Class 5 is Impaired under the Plan. Holders of Term Loan Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 6 – 1.5L Notes Claims</u>

(a)     *Classification*: Class 6 consists of 1.5L Notes Claims.

(b)     *Allowance*: The 1.5L Notes Claims shall be deemed Allowed in the amount of $522,835,228.95.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed 1.5L Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed 1.5L Notes Claim, each Holder of an Allowed 1.5L Notes Claim shall receive, up to the full amount of such Holder's Allowed 1.5L Notes Claim, (i) its Pro Rata Share (along with Class 7, Class 8, and Class 9) of 7.5 percent of the Murray Settlement Distributable Consideration and (ii) its Pro Rata share (along with Class 4, Class 5, Class 7, Class 8, and Class 9) of Wind-Down Distributable Consideration, if any.

(d)     *Voting*: Class 6 is Impaired under the Plan. Holders of 1.5L Notes Claims are entitled to vote to accept or reject the Plan.

7.     <u>Class 7 – Stub 2L Notes Claims</u>

(a)     *Classification*: Class 7 consists of Stub 2L Notes Claims.

(b)     *Allowance*: The Stub 2L Notes Claims shall be deemed Allowed in the amount of $1,983,751.89.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Stub 2L Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Stub 2L Notes Claim, each Holder of an Allowed Stub 2L Notes Claim shall receive, up to the full amount of such Holder's Allowed Stub 2L Notes Claim, (i) its Pro Rata Share (along with Class 6, Class 8, and Class 9) of 7.5 percent of the Murray Settlement Distributable Consideration and (ii) its Pro Rata share (along with Class 4, Class 5, Class 6, Class 8, and Class 9) of Wind-Down Distributable Consideration, if any.

27

(d)     *Voting*:  Class 7 is Impaired under the Plan.  Holders of Stub 2L Notes Claims are entitled to vote to accept or reject the Plan.

8.     Class 8 – 2L Notes Claims

(a)     *Classification*:  Class 8 consists of 2L Notes Claims.

(b)     *Allowance*:   The 2L Notes Claims shall be deemed Allowed in the amount of $312,634,748.43.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed 2L Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed 2L Notes Claim, each Holder of an Allowed 2L Notes Claim shall receive, up to the full amount of such Holder's Allowed 2L Notes Claim, (i) its Pro Rata Share (along with Class 6, Class 7, and Class 9) of 7.5 percent of the Murray Settlement Distributable Consideration and (ii) its Pro Rata share (along with Class 4, Class 5, Class 6, Class 7, and Class 9) of Wind-Down Distributable Consideration, if any.

(d)     *Voting*:  Class 8 is Impaired under the Plan.  Holders of 2L Notes Claims are entitled to vote to accept or reject the Plan.

9.     Class 9 – General Unsecured Claims

(a)     *Classification*:  Class 9 consists of all General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such Holder's Allowed General Unsecured Claim, (i) its Pro Rata Share (along with Class 6, Class 7, and Class 8) of 7.5 percent of the Murray Settlement Distributable Consideration and (ii) its Pro Rata share (along with Class 4, Class 5, Class 6, Class 7, and Class 8) of Wind-Down Distributable Consideration, if any.

(c)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

10.     Class 10 – Intercompany Claims

(a)     *Classification*:  Class 10 consists of all Intercompany Claims.

(b)     *Treatment*:  Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claims.  On or after the Effective Date, the Plan Administrator may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present, or future tax or similar liabilities by the Debtors, including as provided in the Restructuring Steps Memorandum.

(c)     *Voting*:   Class 10 is Impaired under the Plan.   Holders of Intercompany Claims are  conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

KE 65249798

11.    Class 11 – Intercompany Interests

  (a)    *Classification*: Class 11 consists of all Intercompany Interests.

  (b)    *Treatment*: Intercompany Interests shall be cancelled and released without any distribution on account of such Interests.

  (c)    Voting: Class 11 is Impaired under the Plan. Holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

12.    Class 12 – Interests in Holdings

  (a)    *Classification*: Class 12 consists of all Interests in Holdings.

  (b)    *Treatment*: The later of the Effective Date or the Retained Assets Termination Time, all Interests in Holdings will be cancelled, released, and extinguished, and will be of no further force or effect.

  (c)    *Voting*: Class 12 is Impaired under the Plan. Holders of Interests in Holdings are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Interests in Holdings are not entitled to vote to accept or reject the Plan.

13.    Class 13 – Section 510(b) Claims

  (a)    *Classification*: Class 13 consists of all Section 510(b) Claims.

  (b)    *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

  (c)    *Treatment*: Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

  (d)    *Voting*: Class 13 is Impaired under the Plan. Holders (if any) of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of 510(b) Claims are not entitled to vote to accept or reject the Plan.

14.    Class 14 – 1974 Plan Claims

  (a)    *Classification*: Class 14 consists of all 1974 Plan Claims.

  (b)    *Allowance*: The 1974 Plan Claims shall be deemed Allowed in the unsecured, non-priority amount of $5,684,964,892.00, which Allowed amount may be adjusted by agreement of the 1974 Plan and the Plan Administrator following final actuarial calculation after withdrawal occurs.

  (c)    *Treatment*: Subject to the 1974 Plan Carve-Out, except to the extent that the Holder of an Allowed 1974 Plan Claim agrees to less favorable treatment, on the Effective Date, in full

and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed 1974 Plan Claim, the Holder of the Allowed 1974 Plan Claim shall receive, up to the full amount of the Holder's Allowed 1974 Plan Claim, 92.5 percent of the Murray Settlement Distributable Consideration.

(d)     *Voting*:  Class 14 is Impaired under the Plan.  The Holder of an Allowed 1974 Plan Claim is entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired; *provided*, *however*, that the Reinstatement or other treatment of such Claims shall not be inconsistent with the Stalking Horse APA.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.     *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Plan Administrator reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.     *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

G.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests*

As discussed in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including the Murray Family Settlement and the UCC Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

B.      *Restructuring Transactions*

On the Effective Date, the Debtors shall take all actions set forth in the Restructuring Steps Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the transactions described herein, subject in all respects to the terms set forth herein, including, as applicable: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the Debtors and Murray NewCo and any of its subsidiaries (including the Stalking Horse Bidder) determine to be necessary or appropriate in connection with the consummation of the Sale Transaction, including making filings or recordings that may be required by applicable law in connection with the Plan.

C.      *Sources of Consideration for Plan Distributions*

On and after the Effective Date, the Debtors or the Plan Administrator, as applicable, will fund the Debtors' distributions and obligations under the Plan with (i) the New Takeback Debt, (ii) the Exit Facility, (iii) the distribution of New Interests, (iv) the distribution of any Warrants, (v) the Murray Family Settlement Proceeds, (vi) Cash proceeds from the sale of any of the Debtors' assets that are not acquired by Murray NewCo, (vii) the Wind-Down Amount, and (viii) Cash on hand. After the Effective Date, to the extent not held in the Professional Fee Escrow Account, the amounts held by the Wind-Down Trust shall be held in the Wind-Down Trust Account.

1.      Sale Transaction

On the Effective Date, the Debtors shall consummate the Sale Transaction and, among other things, the Acquired Assets shall be transferred to and vest in the Stalking Horse Bidder free and clear of all Liens, Claims, charges, interests or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Stalking Horse APA, each as applicable. On and after the Effective Date, except as otherwise provided in the Plan, the Stalking Horse Bidder may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

2.   The New Interests

On the Effective Date, Murray NewCo is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Steps Memorandum, issue the New Interests for eventual distribution to the Holders of Superpriority Claims and Holders of Term Loan Claims in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Interests shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Interests issued pursuant to the Plan, as contemplated by the Sale Transaction, shall be duly authorized and validly issued.

On the Effective Date, Murray NewCo and all holders of the New Interests then outstanding shall be deemed to be parties to the New Organizational Documents, substantially in the form, or consistent with the term sheets, contained in the Plan Supplement, without the need for execution by any such holder. The New Organizational Documents shall be binding on Murray NewCo and its subsidiaries and all parties receiving, and all holders of, New Interests.

3.   The New Preferred Interests

On the Effective Date, Murray NewCo is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Steps Memorandum, issue the New Preferred Interests for eventual distribution to the Holders of DIP Term Loan Claims in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Preferred Interests shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Preferred Interests issued pursuant to the Plan, as contemplated by the Sale Transaction, shall be duly authorized and validly issued.

On the Effective Date, Murray NewCo and all holders of the New Preferred Interests then outstanding shall be deemed to be parties to the New Organizational Documents, substantially in the form, or consistent with the term sheets, contained in the Plan Supplement, without the need for execution by any such holder. The New Organizational Documents shall be binding on all parties receiving, and all holders of, New Preferred Interests.

4.   The Warrants

On the Effective Date, Murray NewCo is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Steps Memorandum, issue the Warrants for eventual distribution to certain of the Holders of Superpriority Claims and Holders of Term Loan Claims in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The Warrants shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the Warrants issued pursuant to the Plan, as contemplated by the Sale Transaction, shall be duly authorized and validly issued.

5.   Murray Family Settlement and Murray Family Settlement Proceeds

On or before the Effective Date, one or more of the Murray Family Entities shall pay to the Debtors the Murray Family Settlement Proceeds, which shall consist of payment to the Debtors of (a) a Cash contribution of $5,617,641, (b) Cash in the amount of $117,537 to purchase certain vehicles owned by the Debtors, (c) Cash in the amount of $4,310,334 to purchase certain assets owned by and used in connection with the operation of Debtor Pleasant Farms, Inc., and (d) Cash in the amount of $5,655,244 in full satisfaction of the Chagrin Loan (as defined in the Disclosure Statement), all on the terms set forth in the RSA. The Debtors will use 81.5 percent of the Murray Family Settlement Proceeds to fund Plan emergence costs and the Debtors' and/or Murray NewCo's operations, with the remaining 18.5 percent used to fund the Murray Settlement Distributable Consideration. In connection with the sale of certain of the assets owned by and used in connection with the operation of Debtor Pleasant Farms, Inc., to the extent new surveys are required by the county engineer to verify the relevant legal descriptions, any such associated costs will be borne by the Murray Family Entities.

In addition, the Murray Family Entities shall cooperate with the Debtors or Murray NewCo or any of its subsidiaries (including the Stalking Horse Bidder), as the case may be, in the event that the Debtors or Murray NewCo or any of its subsidiaries (including the Stalking Horse Bidder) elects to surrender or otherwise monetize any of their life insurance policies, including by providing medical records to the Debtors or Murray NewCo or any of its subsidiaries (including the Stalking Horse Bidder) upon request.

6.    The New Takeback Debt

On the Effective Date, the Stalking Horse Bidder and certain of its subsidiaries and parent entities shall execute and deliver the New Takeback Debt Documents and such documents shall become effective in accordance with their terms, and the Stalking Horse Bidder shall be authorized to distribute the New Takeback Debt for eventual distribution to the Holders of DIP Term Loan Claims in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person, all in accordance with the Restructuring Steps Memorandum. On and after the Effective Date, the New Takeback Debt Documents shall constitute legal, valid, and binding obligations of the Stalking Horse Bidder and certain of its subsidiaries and parent entities and be enforceable in accordance with their respective terms. The terms and conditions of the New Takeback Debt Documents shall bind the Stalking Horse Bidder and each other Entity that enters into such New Takeback Debt Documents as a guarantor. Any Entity's entry into the New Takeback Debt Agreement shall be deemed as its agreement to the terms of such New Takeback Debt Documents, as amended or modified from time to time following the Effective Date in accordance with its terms.

Confirmation shall be deemed approval of the New Takeback Debt Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees and expenses paid in connection therewith) and, to the extent not approved by the Bankruptcy Court previously, the Stalking Horse Bidder and certain of its subsidiaries and parent entities will be authorized to execute and deliver those documents necessary or appropriate to obtain the New Takeback Debt, including the New Takeback Debt Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Stalking Horse Bidder and certain of its subsidiaries and parent entities may deem to be necessary to enter into the New Takeback Debt Documents.

On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the New Takeback Debt Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Takeback Debt Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such other liens and security interests as may be permitted under the New Takeback Debt Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or applicable non-bankruptcy law.

On the Effective Date, all Holders of DIP Term Loan Claims then outstanding shall be deemed to be parties to the New Takeback Debt Agreement, in a form substantially consistent with the term sheet reflecting the material terms of the New Takeback Debt Agreement set forth in the Plan Supplement, without the need for execution by any such Holder. The New Takeback Debt Agreement shall be binding on all parties receiving, and all Holders of, the New Takeback Debt; *provided* that regardless of whether such parties execute the New Takeback Debt Agreement, such parties will be deemed to have signed the New Takeback Debt Agreement and are deemed to be party to any instruments of assignment or transfer as necessary to effectuate the consummation of the transactions set forth in the Restructuring Steps Memorandum, which shall be binding on such parties as if they had actually signed it.

7.    The Exit Facility

On the Effective Date, the Stalking Horse Bidder and certain of its subsidiaries and parent entities shall execute and deliver the Exit Facility Documents and such documents shall become effective in accordance with their terms. On and after the Effective Date, the Exit Facility Documents shall constitute legal, valid, and binding obligations of the Stalking Horse Bidder and certain of its subsidiaries and parent entities and be enforceable in accordance with their respective terms. The terms and conditions of the Exit Facility Agreement shall bind the

Stalking Horse Bidder and certain of its subsidiaries and parent entities and each other Entity that enters into such Exit Facility Agreement as a guarantor. Any Entity's entry into the Exit Facility Agreement shall be deemed as its agreement to the terms of such Exit Facility Agreement, as amended or modified from time to time following the Effective Date in accordance with its terms.

Confirmation shall be deemed approval of the Exit Facility Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Stalking Horse Bidder and certain of its subsidiaries and parent entities will be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, including the Exit Facility Documents, each as applicable, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Stalking Horse Bidder and certain of its subsidiaries and parent entities may deem to be necessary to enter into the Exit Facility Documents.

On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or applicable non-bankruptcy law.

D.      *Plan Administrator and the Wind-Down Trust*

      1.      Plan Administrator

On the Effective Date, the Plan Administrator shall be appointed for the purpose of conducting the Wind-Down and shall succeed to such powers as would have been applicable to the Debtors' officers, directors, and shareholders, and the Debtors shall be authorized to be (and, upon the conclusion of the Wind-Down (subject to Article IV.D.4), shall be) dissolved by the Plan Administrator. The Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, articles of incorporation or amendment by-laws, and related documents, as applicable, are deemed amended pursuant to the Plan to permit and authorize the same). From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for the post-Effective Date Debtors and their Estates.

Among other things, the Plan Administrator shall be responsible for: (1) implementing the Wind-Down as expeditiously as reasonably possible and administering the liquidation of the post-Effective Date Debtors and their Estates and any assets held by the Wind-Down Trust after the Effective Date and after consummation of the Sale Transaction, (2) resolving any Disputed Claims and undertaking a good faith effort to reconcile and settle General Unsecured Claims against the Estates (provided that the fees and expenses incurred by the Plan Administrator in connection with such resolution or undertaking shall be capped at $250,000), (3) paying Allowed Claims, (4) filing appropriate tax returns, (5) taking or causing the applicable Debtor to take any actions necessary to satisfy obligations arising from and otherwise maintaining ownership directly or indirectly by Murray Energy Corporation of the Retained Assets until the Retained Assets Termination Time, and (6) administering the Plan.

All property of the Estates (other than the Retained Assets) not distributed to the Holders of Claims or Interests on the Effective Date, or transferred pursuant to the Stalking Horse APA, shall be transferred in accordance with the Restructuring Steps Memorandum to the Wind-Down Trust and managed and distributed by the Plan Administrator pursuant to the terms of the Wind-Down Trust Agreement and shall be held in the name of the Wind-Down Trust free and clear of all Claims and Interests except for rights to such distributions provided to Holders of Allowed Claims and Allowed Interests as provided in the Plan. The Plan Administrator shall represent the Wind-Down Trust and shall have the right to retain the services of attorneys, accountants, and other professionals that the Plan Administrator determines, in its sole discretion, are necessary to assist the Plan Administrator in performing

34

his or her duties. The Plan Administrator shall pay the reasonable fees and expenses of such professionals upon the monthly submission of statements to the Plan Administrator without further order of the Bankruptcy Court. Any and all reasonable and documented costs and expenses incurred by the Plan Administrator in connection with the Retained Assets shall be paid by Murray Energy Corporation from the Retained Assets Expense Fund. Any and all reasonable and documented costs and expenses incurred by the Plan Administrator in connection with the Wind-Down (other than such costs and expenses incurred by the Plan Administrator in connection with the Retained Assets) shall be paid from the funds of the Wind-Down Trust, subject to the terms and conditions of the Wind-Down Trust Agreement. The Plan Administrator shall be compensated and reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Wind-Down Trust Agreement. The Plan Administrator shall provide the Stalking Horse Bidder with all non-privileged budgets, records, projections, financial information, reports, and other information that the Stalking Horse Bidder (or its consultants and advisors) may reasonably request. In the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Plan Administrator, the Wind-Down Trust Agreement shall set forth the process for appointing a new Plan Administrator.

2.   The Wind-Down

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan, and the Plan Administrator shall have the power and authority to take any reasonable action necessary to implement the Wind-Down. On and after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Sale Transaction and the Stalking Horse APA, and take such other reasonable actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind-Down, from and after the Effective Date, the Debtors (1) for all purposes, shall be deemed to have withdrawn their business operations from any state or province in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. The filing of the final monthly operating or disbursement report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

On the Effective Date, the Wind-Down Trust will be formed pursuant to the Wind-Down Trust Agreement and immediately after the consummation of the Sale Transaction to receive, in accordance with the Restructuring Steps Memorandum, all of the remaining assets (other than the Retained Assets) of the Debtors and the right to receive any portion of the Retained Assets Expense Fund held by Murray Energy Corporation reasonably promptly after the Retained Assets Termination Time has occurred. For the avoidance of doubt, and notwithstanding anything herein to the contrary, the Retained Assets will not be transferred to the Wind-Down Trust. The Wind-Down Trust will be established for the primary purpose of liquidating the Wind-Down Trust Assets and winding down the Estates, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Wind-Down Trust. The Debtors will have no reversionary or further interest in or with respect to the Wind-Down Trust Assets upon the transfer of the Wind-Down Trust Assets as more fully set forth in the Wind-Down Trust Agreement. The Debtors have agreed to take the position that grantor trust treatment applies to the extent reasonably practicable, in which case, for all U.S. federal income tax purposes, the beneficiaries of the Wind-Down Trust would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that the Wind-Down Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately foregoing sentence, it is intended for U.S. federal income tax purposes that the beneficiaries of the Wind-Down Trust be treated as if they had received an interest in the Wind-Down Trust's assets and then contributed such interests (in accordance with the Restructuring Steps Memorandum) to the Wind-Down Trust. As soon as possible after the transfer of the Wind-Down Trust Assets to the Wind-Down Trust, the Plan Administrator, in consultation with any financial advisors it deems appropriate, shall make a good faith valuation of the Wind-Down Trust Assets. This valuation will be made available from time to time as may be relevant for tax reporting purposes. Each of the Debtors, the Plan Administrator, and the Holders of Claims receiving distributions from the Wind-Down Trust shall take consistent positions with respect to the valuation of the Wind-Down Trust Assets, and such valuation shall be utilized for all U.S. federal income tax purposes. The Wind-Down Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Trusts Assets, make timely distributions to the beneficiaries of the Wind-Down Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration.

The Debtors expect that the Disputed Claims Reserve will be treated as a "disputed ownership fund" governed pursuant to section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate U.S. federal income tax return shall be filed with the U.S. Internal Revenue Service for the Disputed Claims Reserve, and the Disputed Claims Reserve will be subject to tax annually on a separate entity basis.  Any taxes (including with respect to interest, if any, earned in the account, or any recovery on the portion of assets allocable to such account in excess of the Disputed Claims Reserve's basis in such assets) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

On the Effective Date, any Estate non-Cash assets remaining after the Sale Transaction is consummated (other than the Retained Assets) shall vest in the Wind-Down Trust for the purpose of facilitating the above tasks. Such assets shall be held free and clear of all Liens, Claims, and Interests, except as otherwise provided in the Plan. The Debtors, the Plan Administrator, and the Wind-Down Trust shall be deemed to be fully bound to the terms of the Plan, the Confirmation Order, and the Wind-Down Trust Agreement.

On the Effective Date or as soon as reasonably practicable thereafter, the Wind-Down Trust shall be funded with the Wind-Down Amount pursuant to the Wind-Down Trust Agreement for the purpose of (a) satisfying all fees, expenses, and disbursements that the Plan Administrator may incur in connection with the Wind-Down, (b) paying fees and expenses that any attorney, accountant, or other professional that the Plan Administrator has retained to facilitate its duties, (c) paying the fees and expenses of attorneys, accountants, and other professionals that, in the discretion of the Ad Hoc Group of Superpriority Lenders, are necessary or desirable to assist the Ad Hoc Group of Superpriority Lenders, from the Wind-Down Trust within 5 business days of submission of statements to the Plan Administrator, which shall not be subject to the approval of the Bankruptcy Court, and (d) compensating the Plan Administrator, each in accordance with this Article IV.D and the Wind-Down Trust Agreement.  For the avoidance of doubt, all such fees, expenses, and disbursements that the Plan Administrator may incur in connection with the Retained Assets or otherwise pay to any attorney, accountant, or other professional that the Plan Administrator has retained in connection with the Retained Assets shall be paid by Murray Energy Corporation from the Retained Assets Expense Fund.

3.   Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, provincial, and local tax returns for each of the Debtors and the Wind-Down Trust.

4.   Dissolution of the Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Trust shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction.  Notwithstanding the foregoing, the Plan Administrator shall retain the authority to take all necessary actions to dissolve the Debtors in, and withdraw the Debtors from, applicable states and provinces to the extent required by applicable law.  Notwithstanding the foregoing or anything herein to the contrary, none of the Wind-Down Trust, Murray Energy Holdings Co., or Murray Energy Corporation shall be dissolved before the Retained Assets Termination Time has occurred, except, with respect to the Wind-Down Trust, if such earlier dissolution is reasonably necessary, as determined by the Plan Administrator, and as applicable to preserve the intended U.S. federal income tax treatment of the Wind-Down Trust as a liquidating trust under section 301.7701-4 of the Treasury Regulations.

5.   The Retained Assets

After the closing of the Sale Transaction, Murray Energy Corporation shall continue to directly or indirectly own the Retained Assets until the Retained Assets Termination Time has occurred.  Subject to Article IV.D.4, the Plan Administrator shall direct Murray Energy Corporation to transfer to the Wind-Down Trust any portion of the Retained Assets Expense Fund that it holds reasonably promptly after the Retained Assets Termination Time has

occurred. After the closing of the Sale Transaction, neither the Holders nor the Wind-Down Trust shall have any interest in or with respect to the Retained Assets, other than the Wind-Down Trust's right to any remaining portion of the Retained Assets Expense Fund, as described in the immediately preceding sentence.

E.      *New Organizational Documents*

The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the New Organizational Documents may be amended or restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

F.      *Debtors' Boards or Governance Bodies*

As of the Effective Date, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time.

G.      *New Employment Contracts*

On the Effective Date, Murray NewCo or its subsidiaries shall enter into New Employment Contracts, if any, with the employees covered by such New Employment Contracts, and such New Employment Contracts shall become effective in accordance with their terms.

H.      *Acquired Mines and Wells*

Under the Sale Transaction, the Stalking Horse Bidder or any of its subsidiaries will acquire all the Acquired Mines and Wells and assume all the Assumed Police or Regulatory Liabilities. The Stalking Horse Bidder or any of its subsidiaries will seek the transfer of Transferred Permits. The Stalking Horse Bidder has agreed that it does not have any right to exclude or otherwise change the scope of the Acquired Mines and Wells, Assumed Police or Regulatory Liabilities, or the Transferred Permits from the scope of assets purchased or liabilities assumed by the Stalking Horse Bidder or any of its subsidiaries at closing pursuant to the Stalking Horse APA and has waived and declined any right to do so, including but not limited to under the Stalking Horse APA. The only items that the Stalking Horse Bidder has the option to exclude from, or otherwise change, the scope of assets or liabilities assumed by the Stalking Horse Bidder or any of its subsidiaries pursuant to the Stalking Horse APA are certain Acquired Equity Interests and/or Assumed Executory Contracts and Unexpired Leases (which shall not include Transferred Permits).

I.      *Murray Alabama Minerals, LLC*

As set forth in the Met Plan, upon the effective date of the Met Plan, the Stalking Horse Bidder or a subsidiary of the Stalking Horse Bidder will assume the Murray Alabama Minerals Reclamation Obligations.

The Army Corps Permits and state 401 Water Quality Certifications and Isolated Wetland Permits shall be enforceable and effective after the Effective Date and the Stalking Horse Bidder or any of its subsidiaries shall be bound by the terms and conditions of the Army Corps Permits and the state 401 Water Quality Certifications and Isolated Wetland Permits, as and to the extent provided under applicable non-bankruptcy law. The Stalking Horse Bidder shall notify the Army Corps and the states of the Army Corps Permit and the state 401 Water Quality Certification and Isolated Wetland Permit transfers in accordance with the Army Corps Permits and state 401 Water Quality Certifications and Isolated Wetland Permits.

J.      *Avoidance Action Waiver*

Notwithstanding anything to the contrary contained in the Plan, the Debtors waive and release all Avoidance Actions, other than (i) Avoidance Actions against CONSOL Energy Inc., (ii) Avoidance Actions against other parties included in the Non-Released Party Schedule with the consent of the UCC (not to be unreasonably withheld, conditioned, or delayed), and (iii) for the sole purpose of asserting defenses to affirmative prepetition Claims asserted against the Debtors' Estates; *provided* that no Avoidance Actions shall be asserted as a defense to payment of

(a) amounts due under Critical Vendor Agreements, (b) the reasonable fees and expenses of the Indenture Trustees, (c) any Administrative Claim (including Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code), or (d) any other amount due under the UCC Settlement; *provided*, *further*, that no party shall seek an affirmative recovery for any claims arising from such waived Avoidance Actions. All Avoidance Actions not waived or released by the Debtors shall be transferred to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse APA.

K.      *Waiver of Distributions by Consenting Superpriority Lenders*

To the extent that a Consenting Superpriority Lender is a Holder of 1.5L Notes Claims, 2L Notes Claims, or Stub 2L Notes Claims, such Consenting Superpriority Lender waives, and shall not receive, any distribution on account of its 1.5L Notes Claims, 2L Notes Claims, or Stub 2L Notes Claims.

L.      *Cancellation of Existing Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations under the Superpriority Credit Agreement, the Term Loan Credit Agreement, the 1.5L Indenture, the 2L Indenture, Stub 2L Indenture, and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled, except as set forth herein, and the Wind-Down Trust shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released. Notwithstanding the foregoing, (a) no executory contract or unexpired lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, (b) the Superpriority Credit Agreement, Term Loan Credit Agreement, 1.5L Indenture, Stub 2L Indenture, and 2L Indenture shall continue in effect solely for the purpose of (I) allowing Holders of the Superpriority Claims, Term Loan Claims, 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims, as applicable, to receive the distributions provided for under the Plan, (II) allowing the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees to receive or direct distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan, (III) preserving all rights, including rights of enforcement, of the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees to indemnification or contribution pursuant and subject to the terms of the Superpriority Credit Agreement, Term Loan Credit Agreement, 1.5L Indenture, Stub 2L Indenture, and 2L Indenture in respect of any Claim or Cause of Action asserted against the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees, as applicable, (IV) permitting each of the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, (V) preserving the Indenture Trustees' charging liens under the 1.5L Indenture, 2L Indenture, and Stub 2L Indenture, and (VI) permitting the Indenture Trustees to perform any functions that are necessary to effectuate the provisions of the Plan, *provided* that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Plan Administrator, as applicable, except as expressly provided for in the Plan and (2) except as otherwise provided herein, the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan, and (c) the foregoing shall not affect the cancellation of shares issued pursuant to the Plan nor Intercompany Interests, which shall be treated as set forth in Article III.B.11.

Each of the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees shall be released and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Superpriority Agent, the Term Loan Agent, and the Indenture Trustees and their respective representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, each of the Superpriority Agent the Term Loan Agent, and the Indenture Trustees shall be relieved of and released from any obligations and duties arising thereunder.

Except as provided in this Plan, on the Effective Date, the DIP Agents and their respective agents, successors, and assigns shall be automatically and fully released of all of their duties and obligations associated with the DIP Documents. The commitments and obligations, if any, of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date. To the extent that any provision of the DIP Documents or DIP Order are of a type that survives repayment of the subject indebtedness, such provisions shall remain in effect notwithstanding satisfaction of the DIP Claims.

If the record Holder of either of the 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims is DTC or its nominee or another securities depository or custodian thereof, and Holders of such 1.5L Notes Claims, Stub 2L Notes Claims, or 2L Notes Claims are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of such 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims shall be deemed to have surrendered such Holder's note, debenture, or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

Prior to the Effective Date, the Debtors and their agents shall coordinate with the DTC, with the reasonable cooperation of the Indenture Trustees and the Consenting Superpriority Lenders (and their successors and assigns, if any), and such parties shall provide such information and take such action as may be necessary to effectuate the waiver of distributions as set forth in Article IV.K.

M.      *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (1) selection of the Plan Administrator; (2) implementation of the Restructuring Transactions; (3) consummation of the Sale Transaction; (4) performance under the Stalking Horse APA; (5) execution of the Stalking Horse APA; and (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors, with the consent of the Required Consenting Superpriority Lenders, not to be unreasonably withheld, conditioned, or delayed, before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Trust, and any corporate action required by the Debtors or the Wind-Down Trust in connection with the Plan or corporate structure of the Debtors or the Wind-Down Trust shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Plan Administrator. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Plan Administrator, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors or the Wind-Down Trust, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.M shall be effective notwithstanding any requirements under non-bankruptcy law.

N.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Sale Transaction, and the instruments issued pursuant to the Plan in the name of and on behalf of the Wind-Down Trust, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

O.      *Exemption from Securities Act Registration*

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder, the offering, issuance, exchange, or distribution of any securities pursuant to the Plan is or shall be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other

applicable United States, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.

The New Interests (to the extent they are deemed to be securities) to be issued under the Plan (or upon the exercise of any Warrant) (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. Should Murray NewCo elect on or after the Effective Date to reflect any ownership of the New Interests (to the extent they are deemed to be securities) to be issued under the Plan through the facilities of DTC, Murray NewCo need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Interests (to the extent they are deemed to be securities) to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Interests (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Interests (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

To the extent the New Interests are deemed to be "securities," the issuance of such units under the Plan is exempt, pursuant to (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder (including with respect to an entity that is an "underwriter").

P.      *Exemption from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers of property under the Plan (including pursuant to the Stalking Horse APA) or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Trust, including in accordance with the Stalking Horse APA, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Sale Transaction), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Q.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IV.J and Article VIII hereof and the Stalking Horse APA, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) acquired by Murray NewCo or its subsidiaries in accordance with the Sale Transaction, (b) released by the Debtors pursuant to the releases and exculpations contained in the Plan,

including in Article VIII, or (c) waived in accordance with Article IV.J. which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Wind-Down Trust as of the Effective Date.

The Plan Administrator may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Trust.  The Plan Administrator shall retain and may exclusively enforce any and all such Causes of Action.  The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Administrator will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Stalking Horse Bidder in accordance with the Stalking Horse APA or otherwise expressly provided in the Plan, including this Article IV and Article VIII of the Plan.**  Unless any such Causes of Action against an Entity are expressly waived (including pursuant to Article IV.J of the Plan), relinquished, exculpated, released, compromised, assigned, or transferred to the Stalking Horse Bidder in accordance with the Stalking Horse APA, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

R.      *Payments under Critical Vendor Agreements*

The Debtors shall pay the amounts that are due and unpaid under Critical Vendor Agreements in accordance with the terms of such agreements, as may be amended by the applicable Trade Claimant and the Debtors, on the later of the Effective Date or the date that such amounts are due under the applicable Critical Vendor Agreement, and each Critical Vendor Agreement (to the extent any obligations thereunder remain outstanding as of the Effective Date) is hereby assigned to Murray NewCo or its designee as of the Effective Date, *provided* that after such assignment all post-petition amounts that have accrued or otherwise arisen as of the Effective Date (excluding amounts due and unpaid under Critical Vendor Agreements on account of pre-petition debts, which the Debtors shall pay) with respect to any Critical Vendor Agreement that have not been satisfied by the Debtors or the Estates shall be satisfied by Murray NewCo or its designee in accordance with the terms of such Critical Vendor Agreement, *provided*, *further*, that Critical Vendor Agreements assigned to Murray NewCo or its designee shall not be treated as Executory Contracts under the Plan and all amounts due under such Critical Vendor Agreements shall be satisfied in accordance with this Paragraph (and not in accordance with the cure procedures set forth in Article V.C of the Plan).

### ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) have been previously assumed or rejected by the Debtors pursuant to a Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date; or (4) are a contract, release, or other agreement or document entered into in connection with the Plan.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases assumed, assumed and assigned, or rejected pursuant to the Plan or the Stalking Horse APA.  Any Filed motions to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases (or Filed objection with respect to the proposed assumption and assignment of such contract) that

41

is pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Plan Administrator, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party on or prior to the Effective Date, shall revest in the Debtors and be fully enforceable by the Plan Administrator in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Wind-Down Trust, the Plan Administrator, or the Stalking Horse Bidder, or the property of any of the foregoing Entities without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Unless the parties to such Executory Contracts or Unexpired Leases may otherwise agree, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, of the Cure Amounts. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Debtors, the Stalking Horse Bidder, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, any such dispute shall be resolved as set forth in Article V.A above or as set forth in the order approving the Bidding Procedures [Docket No. 742] with any related cure payments required by section 365(b)(1) of the Bankruptcy Code to be made following the entry of a Final Order resolving the dispute and approving the assumption or as otherwise resolved in accordance with the order approving the Bidding Procedures.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, the Stalking Horse APA, or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption; *provided*, *however*, that notwithstanding anything in the Plan, the Stalking Horse APA, the Plan Supplement, or otherwise to the contrary, any non-Debtor party to any such Executory Contract or

Unexpired Lease shall be entitled to receive, and nothing herein shall release or result in the satisfaction of such party's right to receive, payment in full of all Cure Amounts and all amounts that have accrued or otherwise arisen as of the Effective Date (but are not in default as of the Effective Date) with respect to any Executory Contract or Unexpired Lease; *provided*, *further*, that all amounts that have accrued or otherwise arisen as of the Effective Date (but are not in default as of the Effective Date) with respect to any Executory Contract or Unexpired Lease that is assumed and assigned to the Stalking Horse Bidder (or an affiliate thereof) shall be satisfied by the Stalking Horse Bidder or such affiliate in accordance with the terms of such Executory Contract or Unexpired Lease.  For the avoidance of doubt, nothing in the Plan, the Stalking Horse APA, the Plan Supplement, or the Confirmation Order shall preclude counterparties to Executory Contracts or Unexpired Leases from asserting claims with respect to indemnification obligations that arise under such Executory Contracts or Unexpired Leases, regardless of whether the events or omissions giving rise to such obligations occurred before or after the Effective Date but so long as the payment of such amounts on account of such indemnification obligations were not in default as of the date that the applicable Schedule of Assumed Executory Contracts or Unexpired Leases or other applicable Filed motion was first Filed on the docket in the Chapter 11 Cases.

**Except as otherwise agreed by any of the Debtors and any non-Debtor counterparty to any Executory Contract or Unexpired Lease (including pursuant to any Critical Vendor Agreement allowing for such non-Debtor party to retain any General Unsecured Claims following the receipt of any payments under any Critical Vendor Agreement), following the assumption of any such Executory Contract or Unexpired Lease, any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan, the Stalking Horse APA, or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies*

Notwithstanding anything to the contrary in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, any bar date notice or claim objection, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening, grants an injunction, discharge, or release, or requires a party to opt out of any releases): (1) on the Effective Date, the Debtors shall assume and assign to the Stalking Horse Bidder or any of its subsidiaries, solely to the extent set forth in the Stalking Horse APA and other documentation in connection with the Sale Transaction, and explicitly provided in the Schedule of Assumed Executory Contracts and Unexpired Leases, and subject to the terms of the applicable insurance policies, any agreement, documents, or instruments relating thereto, or applicable non-bankruptcy law (which may require the express written consent of the applicable insurer), all of the Debtors' insurance policies issued at any time and any agreements, documents, and instruments relating thereto in their entirety, including all of the Debtors' obligations thereunder regardless of when such obligations arise, pursuant to sections 105 and 365 of the Bankruptcy Code; *provided* that any of the Debtors' insurance policies issued at any time and any agreements, documents, and instruments relating thereto that are not assumed and assigned to the Stalking Horse Bidder or any of its subsidiaries shall be assumed by the Debtors in their entirety, including all of the Debtors' obligations thereunder regardless of when such obligations arise, pursuant to sections 105 and 365 of the Bankruptcy Code, and further, thereafter the Plan Administrator may, subject to the terms of such insurance policies and applicable non-bankruptcy law, resolve any Claims covered by such insurance policies, resolve any Causes of Action retained in connection with such insurance policies, and collect any and all outstanding deposits, restricted cash, and letters of credit related thereto; (2) nothing alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by or obligations of the Debtors or the Plan Administrator, as applicable, under) such insurance policies or the duty, if any, that the insurers have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Plan Administrator (or

the Stalking Horse Bidder or any of its subsidiaries, solely to the extent assumed and assigned to the Stalking Horse Bidder or any of its subsidiaries under the Stalking Horse APA and in accordance with Article V.E) or draw on any collateral or security therefor; (3) nothing shall alter, modify, amend, affect, impair, or prejudice the legal, equitable, or contractual rights, obligations, and defenses of the insurers, the Debtors, or any other individual or entity, as applicable, under any of such insurance policies and related agreements, including, but not limited to, any agreement to arbitrate disputes; (4) the insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims; and (5) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with direct action claims against the insurers under applicable non-bankruptcy law to proceed with their claims; (b) the insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) claims where a claimant asserts a direct claim against the insurers under applicable non-bankruptcy law, (II) claims where an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its Claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel the insurance policies, and take other actions relating to such insurance policies (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of such insurance policies.

F.      *Director, Officer, Manager, and Employee Liability Insurance*

After the Effective Date, nothing herein shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including, if applicable, any "tail policy") with respect to conduct occurring on or prior to the Effective Date, and nothing herein shall prejudice any officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date from being entitled to the full benefits of any such policy for the full term of such policy (including with respect to the purchase of a "tail policy," the full six-year term or other applicable term of such policy) in accordance with the terms thereof, following the purchase of such policy, regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Initial Distribution Date, on the next Quarterly Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Distributions on Account of Obligations of Multiple Debtors*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan, *provided* that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor.  Any such Claims shall be released pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

C.      *Distributions Generally*

Except as otherwise provided herein, distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Trust.

Notwithstanding any provision of the Plan to the contrary, distributions to Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims shall be made to or at the direction of each of the Indenture Trustees, as applicable, each of which shall act as Disbursing Agent for distributions to the respective Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims under the 1.5L Indenture, Stub 2L Indenture, and 2L Indenture, as applicable.  The Indenture Trustees shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.  The Indenture Trustees may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims.  For the avoidance of doubt, such distributions shall be subject

to any charging lien rights of the Indenture Trustees under the 1.5L Indenture, Stub 2L Indenture, and 2L Indenture, as applicable.  All distributions to be made to Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the 1.5L Indenture, Stub 2L Indenture, or 2L Indenture, as applicable.

D.      *Rights and Powers of Disbursing Agent*

        1.      Powers of the Disbursing Agent

        The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

        2.      Expenses Incurred On or After the Effective Date

        Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash from the Wind-Down Trust; *provided* that the amounts to be paid to the Indenture Trustees under this paragraph, if any, shall not count towards (or affect) the calculation of the cap set forth in Article XII.E.

E.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

        1.      Record Date for Distribution.

        On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, with respect to Holders of Superpriority Claims and Term Loan Claims, distributions shall be made to such Holders that are listed on the register or related document maintained by the Superpriority Agent and Term Loan Agent.  Notwithstanding the foregoing, the Distribution Record Date shall not apply to the Indenture Trustees with respect to Holders of 1.5L Notes Claims, Stub 2L Notes Claims, and 2L Notes Claims.

        2.      Delivery of Distributions

                (a)     Initial Distribution Date

        Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records or the register or related document maintained by, as applicable, the DIP Term Loan Agent or the Superpriority Agent as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the reasonable discretion of the Disbursing Agent; *provided*, *further*, that the address for each Holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such Holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

                (b)     Quarterly Distribution Date

        Except as otherwise determined by the Plan Administrator in its reasonable discretion, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions

required to be made on account of Allowed Claims and Interests under the Plan on such date. Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim or Interest on such date, shall be distributed on the first Quarterly Distribution Date after such Claim or Interest is Allowed. No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.I of the Plan.

(c)      Distributions to Holders of Superpriority Claims

Except as set forth in this Article VI.E.2(c), the Superpriority Agent shall be deemed to be the Holder of all Superpriority Claims for purposes of distributions to be made hereunder, and all distributions on account of such Superpriority Claims shall be made to or on behalf of the Superpriority Agent. The Superpriority Agent shall act as Disbursing Agent for, and shall hold or direct such distributions for the benefit of the Holders of Superpriority Claims. As soon as practicable following compliance with the requirements set forth in this Article VI, the Superpriority Agent shall arrange to deliver or direct the delivery of such distributions for which it is the deemed Holder to or on behalf of such Holders of Allowed Superpriority Claims.

Notwithstanding anything to the contrary herein, the Superpriority Agent shall be entitled to maintain a record of Holders of Superpriority Claims in the ordinary course of business and shall be entitled without regard to the general occurrence of the Distribution Record Date, to make distributions that it receives under the Plan to Holders of Superpriority Claims based upon its books and records. The Superpriority Agent shall not be held liable to any person with respect to distributions made or directed to be made by the Superpriority Agent except for liability arising from gross negligence, willful misconduct, or actual fraud of the Superpriority Agent.

3.    Minimum Distributions

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $30 in value (whether cash or otherwise), and each such Claim to which this limitation applies shall be released pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting such Claim against the Debtors, the Wind-Down Trust, the Plan Administrator, or their property; *provided* that any Cash that would be distributed to a Holder of a Claim in Class 6, Class 7, Class 8, or Class 9, but for this paragraph, shall be distributed to the other Holders of Allowed Claims in Class 6, Class 7, Class 8, or Class 9 on a Pro Rata basis in accordance with the Plan.

4.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Trust automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be released and forever barred.

A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Plan Administrator of an intent to accept a particular distribution; (c) responded to the Debtors' or Plan Administrator's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

F.    *Distributions on Account of Claims or Interests Allowed After the Effective Date*

1.    Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Effective Date, but which later become Allowed Claims or Interests, as applicable, shall

be paid out of the Disputed Claims Reserve and shall be deemed to have been made on the applicable Quarterly Distribution Date after they have actually been made, unless the Plan Administrator and the applicable Holder of such Claim or Interest agree otherwise.  No interest shall accrue or be paid on a Disputed Claim before it becomes an Allowed Claim in accordance with Article VI.I of the Plan.

>     2.     Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Plan Administrator, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until the Disputed Claim or Interest has become an Allowed Claim or Interest, as applicable, or has otherwise been resolved by settlement or Final Order; *provided* that if the Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated Holders of Allowed Claims pursuant to the Plan.

G.     *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Plan Administrator, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.     *Allocations Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.     *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan, the DIP Order, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

J.     *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.     *Setoffs and Recoupment*

Except as expressly provided in this Plan, the Plan Administrator may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Debtor(s) and Holder of

48

Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any and all claims, rights, and Causes of Action that such Debtor or its successor may possess against the applicable Holder.

Notwithstanding anything to the contrary in this Plan, the Stalking Horse APA, or the Confirmation Order, all rights of third parties to setoff, recoupment, and subrogation are preserved and shall continue unaffected by Confirmation or the occurrence of the Effective Date.

L.      *Claims Paid or Payable by Third Parties*

    1.    Claims Paid by Third Parties

The Debtors or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Plan Administrator.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  If the Debtors or the Plan Administrator, as applicable, become aware of any payment of a Claim by a third party, the Debtors or Plan Administrator, as applicable, will send a notice of wrongful payment to the Holder of such Claim requesting the return of any excess payments and advising the recipient of the provisions of the Plan requesting turnover of excess estate funds.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Plan Administrator annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

    2.    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, payments to Holders of Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by any insurers of any rights or defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.
PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims*

After the Effective Date, subject to Article IV.J, the Plan Administrator shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date except for such rights and defenses assigned or transferred to the Stalking Horse Bidder in accordance with the Stalking Horse

APA (which, for the avoidance of doubt, shall include all rights and defenses of the Debtors with respect to any Claims that constitute Assumed Liabilities (as defined in the Stalking Horse APA), which the Stalking Horse Bidder or any of its subsidiaries shall have and retain).

B.      *IBNR Claims*

Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Stalking Horse APA, or the Confirmation Order, the Stalking Horse Bidder shall either assume or fund all IBNR Claims to the extent (i) such claims are due and payable pursuant to the terms of the applicable Self-Funded Health Plan and (ii) the proper documentation is provided.  For the avoidance of doubt, the payment of such IBNR Claims as described herein shall take place notwithstanding the any limits imposed by the Plan, the Stalking Horse APA, or otherwise.

C.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, the Plan Administrator shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

D.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

E.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Plan Administrator without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim against or Interest in the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Plan Administrator without the Plan Administrator having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

G.      *Disallowance of Claims*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Trust.  All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

H.      *Amendments to Claims*

Except as otherwise expressly provided for in the Plan or the Confirmation Order, on or after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, a Claim may not be Filed or amended without the authorization of the Bankruptcy Court or the Plan Administrator.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

I.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.C, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

J.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Settlement, Compromise, and Release of Claims and Interests*

The assets of the Debtors and the Wind-Down Trust Assets are being and shall be used for the satisfaction of expense obligations and/or the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose.  Except as otherwise specifically provided in the Plan (including Article IV.I) or in any contract,

instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, compromise, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Trust, or the Chapter 11 Cases, that occurred prior to the Effective Date, other than as expressly provided in the Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan. The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.

## B.    *Release of Liens*

**On the Effective Date, concurrently with the consummation of the Sale Transaction and except as otherwise set forth in the Stalking Horse APA, the Acquired Assets shall be transferred to and vest in the Stalking Horse Bidder free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Stalking Horse APA, each as applicable.  Without limiting the foregoing, except as otherwise provided in the Plan, the Plan Supplement, the Exit Facility Documents, the New Takeback Debt Documents, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim or Secured Tax Claim, satisfaction in full of the portion of the Other Secured Claim or Secured Tax Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.2 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Plan Administrator to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

## C.    *Debtor Release*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy**

52

of which is hereby confirmed, on and after the Effective Date each Released Party is deemed released and discharged by each and all of the Debtors, their Estates, and the Wind-Down Trust, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Wind-Down Trust, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, their Estates, or the Wind-Down Trust, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Superpriority Loan Documents, the ABL Loan Documents, the Term Loan Documents, the 1.5L Notes Documents, the 2L Notes Documents, the Stub 2L Notes Documents, the Restructuring Transactions, the Sale Transaction, entry into the Stalking Horse APA, the Exit Facility, the New Takeback Debt, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Disclosure Statement, the DIP Term Loan Facility, the Sale Transaction, the Stalking Horse APA, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Term Loan Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of the Stalking Horse Bidder to the Debtors relating to the Stalking Horse APA, (2) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including the Stalking Horse APA and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan, (3) any Causes of Action listed on the Schedule of Retained Causes of Action, or (4) any claims by any of the Debtors or Javelin arising out of any ordinary course dealings between such parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their respective Estates, or the Wind-Down Trust asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

D.      *Third-Party Release*

Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, on and after the Effective Date each of the Releasing Parties shall be deemed to have

conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Superpriority Loan Documents, the ABL Loan Documents, the Term Loan Documents, the 1.5L Notes Documents, the 2L Notes Documents, the Stub 2L Notes Documents, the Restructuring Transactions, the Sale Transaction, entry into the Stalking Horse APA, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Disclosure Statement, the DIP Term Loan Facility, the Sale Transaction, the Stalking Horse APA, the Plan, the Plan Supplement, the Exit Facility, the New Takeback Debt, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Term Loan Facility, the Exit Facility, the New Takeback Debt, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of any Entity to the Stalking Horse Bidder relating to the Stalking Horse APA, (2) any post-Effective Date obligations of any party or Entity under the Plan (or preserved by the Plan), any Restructuring Transaction, or any document, instrument, or agreement (including the Stalking Horse APA and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan, or (3) any claims by any of the Debtors or Javelin arising out of any ordinary course dealings between such parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each Third-Party Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their respective Estates, or the Wind-Down Trust asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

E.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Cause of Action for any claim related to any act or omission based on the negotiation, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases, including the RSA, the Stalking Horse APA, the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order, or created or entered into in connection with the RSA, the Stalking Horse APA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit

54

of the Sale Transaction, the administration and implementation of the Plan, including the issuance of any securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement, and the implementation of the Sale Transaction and the Restructuring Transactions contemplated by the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, except for claims related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release (1) any obligation or liability of any Entity relating to the Stalking Horse APA, (2) for any post-Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (3) any claims by any of the Debtors or Javelin arising out of any ordinary course dealings between such parties.

## F.    *Injunction*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.A of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of liens pursuant to Article VIII.B of the Plan), or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Trust, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan; *provided* that the foregoing shall not enjoin any Consenting Superpriority Lender from exercising any of its rights under the RSA in accordance with the terms thereof.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.

For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as otherwise specifically provided in the Plan, all Persons or Entities who have held, hold,

**or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors, the Estates, Murray NewCo and all of its subsidiaries (including the Stalking Horse Bidder), or the Wind-Down Trust, except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Trust.  Such injunction will not enjoin Persons or Entities that do not consent to the Third-Party Release from pursuing any direct (but not derivative) claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, Murray NewCo and all of its subsidiaries (including the Stalking Horse Bidder), or the Wind-Down Trust.**

G.      *Treatment of 1974 Plan*

Notwithstanding any release, settlement, satisfaction, compromise, discharge, exculpation, enjoining, injunction, or similar provision provided in the Plan (including those in Article VIII), the Confirmation Order (including in connection with the UCC Settlement), or any ballot submitted, any such injunction, release, settlement, satisfaction, compromise, discharge, exculpation, enjoining, or similar provision will not enjoin, preclude, or limit the 1974 Plan from pursuing any or all claims or Causes of Action the 1974 Plan may have against Released Parties other than the Debtors, the Estates, Murray NewCo and all of Murray NewCo's subsidiaries (including the Stalking Horse Bidder), or the Wind-Down Trust arising from or related to the Debtors' withdrawal from the 1974 Plan. Notwithstanding the foregoing, the 1974 Plan shall also retain its right to pursue claims and Causes of Action against the Wind-Down Trust solely with respect to payments or distributions that are contemplated by the Plan from the Wind-Down Trust.  The 1974 Plan shall be deemed to opt out of the Third-Party Release in the Plan.  For the avoidance of doubt, any and all claims (including claims based on any theory of successorship) that the 1974 Plan has against the Debtors, Murray NewCo, and all of Murray NewCo's subsidiaries (including the Stalking Horse Bidder) are fully released and satisfied; claims that the 1974 Plan has against any party other than the Debtors, Murray NewCo, and all of Murray NewCo's subsidiaries (including the Stalking Horse Bidder) are preserved and shall be preserved in the Confirmation Order and this paragraph shall preempt any above-referenced release, injunction, settlement, satisfaction, compromise, discharge, exculpation, enjoining, or other similar provision in the Plan or Confirmation Order.

H.      *Protections Against Discriminatory Treatment*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Document Retention*

On and after the Effective Date, the Plan Administrator may maintain documents in accordance with the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Plan Administrator.

J.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

K.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

L.    *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, their respective property, and Holders of Claims and Interests and is fair, equitable, and reasonable.

### ARTICLE IX.
### CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall not have been stayed, modified, or vacated on appeal;

2.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the Sale Transaction;

3.    the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility shall be deemed to occur concurrently with the occurrence of the Effective Date;

4.    the New Takeback Debt Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Takeback Debt shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New Takeback Debt shall be deemed to occur concurrently with the occurrence of the Effective Date;

5.    the Debtors shall have (a) reached an agreement with the applicable authorized representatives of the employees and retirees regarding modifications to the Debtors' Collective Bargaining Agreements and retiree benefits, respectively, in form and substance acceptable to the Required Consenting Superpriority Lenders, or (b) absent such

agreement, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Required Consenting Superpriority Lenders, authorizing the rejection of the Debtors' Collective Bargaining Agreements under section 1113 of the Bankruptcy Code and the modification of the Debtors' retiree benefits under section 1114 of the Bankruptcy Code and such order shall have become a Final Order;

6.    the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

7.    the RSA shall not have been terminated and shall remain in full force and effect, and the Required Consenting Superpriority Lenders shall not have provided notice to the Debtors that an event or occurrence that, with the passage of time, would give rise to a right of such Required Consenting Superpriority Lenders to terminate the RSA, which right such Required Consenting Superpriority Lenders have informed the Debtors they intend to exercise;

8.    all unpaid fees and expenses incurred on or before the Effective Date by the Superpriority Agent, the DIP Agent, and all attorneys, advisors, and other professionals payable under the RSA, the DIP Order, or the Plan shall have been paid in Cash;

9.    the date of substantial consummation shall have occurred (or shall occur contemporaneously in the order set forth in the Restructuring Steps Memorandum) with respect to the joint chapter 11 plan of Murray Metallurgical Coal Holdings, LLC and its direct and indirect debtor subsidiaries in the jointly administered chapter 11 cases captioned Murray Metallurgical Coal Holdings Co., No. 20-10390 (JEH) (Bankr. S.D. Ohio);

10.    the Murray Family Settlement Proceeds shall have been funded by one or more of the Murray Family Entities; and

11.    all conditions precedent to the consummation of the Sale Transaction shall have been satisfied in accordance with the terms thereof, and the closing of the Sale Transaction shall be deemed to occur concurrently with the occurrence of the Effective Date.

B.    *Waiver of Conditions*

Subject to and without limiting the rights of each party to the RSA, the conditions to Consummation set forth in Article IX may be waived by the Debtors with the consent of the Required Consenting Superpriority Lenders and the Stalking Horse Bidder (solely to the extent relating to or concerning the Sale Transaction), and the DIP Agents and Superpriority Agent (solely with respect to the condition set forth in Article IX.A.8), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; *provided* that the following conditions to Consummation shall not be waived without the consent of the UCC:  Article IX.A.1, Article IX.A.6 (solely with respect to amounts to be reserved for the UCC's advisors), Article IX.A.8 (solely with respect to amounts payable to the UCC's advisors or amounts implicated by the UCC Settlement), and Article IX.A.10 (solely with respect to the portion of the Murray Family Settlement Proceeds that must be used to fund the Murray Settlement Distributable Consideration in full (i.e., 18.5 percent of $15,700,756.25)).

C.    *Substantial Consummation*

The "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date.

D.    *Effect of Failure of Conditions*

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Required Consenting Superpriority Lenders and the Stalking Horse Bidder (solely to the extent relating to or concerning the Sale Transaction as contemplated in the Stalking Horse APA), reserve the right to modify the Plan, whether such modification is material or immaterial, seek Confirmation consistent with the Bankruptcy Code, and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, in each case subject to the consent rights set forth in the RSA.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans, in each case subject to any applicable consent rights as set forth in the RSA, the DIP Order, or the DIP Term Loan Facility.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Causes of Action, or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the extent legally permissible, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Professional Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Plan Administrator amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4. ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

8. enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, 1141, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12. resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid in accordance with the Plan;

13. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or, subject to any applicable forum selection clauses, any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15. enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to distributions under the Plan;

17. consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order or any Entity's obligations incurred in connection with the Plan, including, subject to any applicable forum selection clauses, disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

21.     adjudicate, decide, and resolve any cases, controversies, suits, or disputes related to (and/or arising under, as applicable) the Sale Transaction or the Stalking Horse APA; *provided*, *however*, that the Bankruptcy Court's jurisdiction shall not be exclusive;

22.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

24.     enforce all orders previously entered by the Bankruptcy Court; and

25.     hear any other matter not inconsistent with the Bankruptcy Code.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Trust, the Plan Administrator, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Payment of Certain Fees*

The Debtors and, after the Effective Date, the Plan Administrator shall continue to pay, reimburse, and honor the Contingent DIP Obligations.  Counsel to each of the DIP Agents, the DIP Term Loan Lenders, and the DIP FILO Lender shall be authorized to disburse any and all retainer monies in its possession to reimburse the reasonable fees and expenses of such counsel.

C.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Plan Administrator, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

KE 65249798

D.      *Payment of Statutory Fees*

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date, including fees and expenses payable to the U.S. Trustee, shall be paid by the Debtors on the Effective Date. After the Effective Date, the Disbursing Agent or the Plan Administrator, as applicable, shall pay any and all such fees for each quarter (including any fraction thereof), and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee and file quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

E.      *Payment of Indenture Trustees Fees*

On the Effective Date, the Debtors or the Wind-Down Trust, as applicable, shall pay all reasonable and documented fees, expenses, and disbursements of the Indenture Trustees that have accrued and are unpaid as of the Effective Date in an amount not to exceed $1,250,000 in the aggregate. To the extent that the Debtors or any successor in interest require further performance by the Indenture Trustees after the Effective Date, including with respect to any documentation requested to be prepared or executed to evidence the release of any liens, any further activities required for distributions, or any action required to be taken in furtherance of the Plan, the reasonable fees and expenses of the Indenture Trustees and their professionals in taking such action shall be paid by the Debtors or such successor in interest in the ordinary course.

F.      *UCC and Cessation of Fee and Expense Payment*

On the Effective Date, the UCC shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that (a) the UCC will remain in place after the Effective Date solely for the purpose of addressing (i) all final fee applications for all Committee Professionals and (ii) the resolution of any appeals of the Confirmation Order, and (b) the members of the UCC are discharged from all of their duties as of the date that the UCC is dissolved with respect thereto.

G.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

H.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

I.      *Notices*

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by courier or registered or certified mail (return receipt requested) or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

        1.  If to the Debtors, to:

                Murray Energy Holdings Co.

46226 National Road,
St. Clairsville, Ohio 43950
Attention:  Mike McKown
    Robert Moore
E-mail: mmckown@coalsource.com
    rmoore@coalsource.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Nicole L. Greenblatt, P.C.
    Mark McKane, P.C.
E-mail: nicole.greenblatt@kirkland.com
    mark.mckane@kirkland.com

- and -

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  Ross M. Kwasteniet, P.C.
    Joseph M. Graham
    Tricia Schwallier
E-mail: ross.kwasteniet@kirkland.com
    joe.graham@kirkland.com
    tricia.schwallier@kirkland.com

2.  <u>If to the Consenting Superpriority Lenders or the DIP Term Loan Lenders, to:</u>

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention:  Damian S. Schaible
    Adam L. Shpeen
E-mail: damian.schaible@davispolk.com
    adam.shpeen@davispolk.com

3.  <u>If to the UCC, to:</u>

Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Attention:  Lorenzo Marinuzzi
    Jennifer Marines
    Todd Goren
E-mail: lmarinuzzi@mofo.com
    jmarines@mofo.com
    tgoren@mofo.com

    After the Effective Date, the Plan Administrator may notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

KE 65249798

J. *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan. If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses. This Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to Plan and the documents comprising the Plan Supplement is part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

K. *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice and Claims Agent at https://cases.primeclerk.com/MurrayEnergy  or (for a fee) the Bankruptcy Court's website at http://www.ecf.ohsb.uscourts.gov/.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control. The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order. Notwithstanding anything to the contrary in this Plan, in the event of any inconsistency between the Stalking Horse APA and this Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, the Stalking Horse APA shall control solely with respect to the assumption and assignment of Executory Contracts and Unexpired Leases, the Causes of Action listed on the Schedule of Retained Causes of Action, the Acquired Assets, the Assumed Liabilities (as defined in the Stalking Horse APA), and any other matter between or among the Stalking Horse Bidder and the Debtors or the Plan Administrator, their successors and permitted assigns, or any other Entity, relating to the Stalking Horse APA; *provided*, *however*, that the Plan shall control with respect to the terms of the UCC Settlement and the obligations set forth in Article IV.H, Article IV.I, and Article V.C of the Plan.

L. *Non-Severability of Plan Provisions*

The provisions of the Plan, including its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

M. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

KE 65249798

N.    *Closing of Chapter 11 Cases*

The Plan Administrator shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

O.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 65249798

Respectfully submitted, as of the date first set forth above,

Murray Energy Holdings Co.

By:    */s/ Robert D. Moore*

Name:  Robert D. Moore
Title:   President, Chief Executive Officer, and Chief Financial Officer

## **Exhibit B**

**Notice of Confirmation**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) | Case No. 19-56885 (JEH) |
|  | ) |  |
|  | ) | Judge John E. Hoffman, Jr. |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF (I) ENTRY OF CONFIRMATION ORDER,
## (II) OCCURRENCE OF EFFECTIVE DATE, AND (III) RELATED BAR DATES

**PLEASE TAKE NOTICE** that on August [●], 2020, the United States Bankruptcy Court for the Southern District of Ohio (the "Court") entered an order [Docket No. [●]] (the "Confirmation Order") confirming the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2082] (the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that the Effective Date, as defined in the Plan, occurred on [_____]**, 2020**.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Confirmation Order, the release, injunction, and exculpation provisions in Article VIII of the Plan are now in full force and effect.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Article V.B of the Plan, unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Wind-Down Trust, the Plan Administrator, or the Stalking Horse Bidder, or the property of**

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

**any of the foregoing Entities without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**PLEASE TAKE FURTHER NOTICE** that except as otherwise provided by the Confirmation Order, the Plan, or a Final Order of the Court, the deadline for filing requests for payment of Administrative Claims (other than (1) Professional Fee Claims, (2) Administrative Claims arising in the ordinary course of business, or (3) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code), which are required to be filed in accordance with the Plan) shall be [_____]**, 2020** (which is the first Business Day that is 30 days after the Effective Date). If a Holder of an Administrative Claim (other than DIP Claims, cure Claims, Professional Fee Claims, Administrative Claims arising in the ordinary course of business, and Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code) that is required to but does not file and serve a request for payment of such Administrative Claim by the Administrative Claims Bar Date, such Holder shall be forever barred from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, their Estates, the Plan Administrator, or the Wind-Down Trust.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Plan, the Deadline to file final requests for payment of Professional Fee Claims is [_____]**, 2020** (which is the first Business Day that is 45 days after the Effective Date, the "Professional Fee Application Deadline"). All Professionals must file final requests for payment of Professional Fee Claims by no later than the Professional Fee Application Deadline to receive final approval of the fees and expenses incurred in the Chapter 11 Cases.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Confirmation Order, and all other documents filed in these chapter 11 cases are available free of charge by visiting http://cases.primeclerk.com/MurrayEnergy. You may also obtain copies of any pleadings by visiting the Court's website at https://ecf.ohsb.uscourts.gov in accordance with the procedures and fees set forth therein.

KE 69035745

Dated:   [_____], 2020
Cincinnati, Ohio

| | |
|---|---|
| Kim Martin Lewis (0043533)<br>Alexandra S. Horwitz (0096799)<br>**DINSMORE & SHOHL LLP**<br>255 East Fifth Street<br>Suite 1900<br>Cincinnati, Ohio 45202<br>Telephone:   (513) 977-8200<br>Facsimile:   (513) 977-8141<br>Email:   kim.lewis@dinsmore.com<br>   allie.horwitz@dinsmore.com | Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)<br>Mark McKane, P.C. (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:   (212) 446-4900<br>Email:   nicole.greenblatt@kirkland.com<br>   mark.mckane@kirkland.com |

*Counsel to the Debtors and Debtors in Possession*

- and -

Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:   ross.kwasteniet@kirkland.com
   joe.graham@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

3